UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

Owen Rosenberg, individually and on behalf of
all others similarly situated,

        Plaintiff,

    v.                                          Case No. 2:20-cv-00869-NJ

S.C. Johnson & Son, Inc.,

        Defendant.

---

## APPENDIX OF UNREPORTED CASES CITED IN SC JOHNSON'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS

---

*Benson v. Fannie May Confections Brands, Inc.,*
    No. 17 C 3519, 2018 WL 1087639 (N.D. Ill. Feb. 28, 2018)

*Calnin v. Hilliard,*
    2008 WL 336892 (E.D. Wis. Feb. 5, 2008)

*Childers v. Menard, Inc.,*
    No. 20-cv-107-jdp, 2020 U.S. Dist. LEXIS 162283 (W.D. Wis. Sep. 3, 2020)

*Chin v. Gen. Mills, Inc.,*
    No. 12-2150, 2013 WL 2420455 (D. Minn. June 3, 2013)

*Coleman-Anacleto v. Samsung Elecs. Am., Inc.,*
    2016 WL 4729302 (N.D. Cal. Sept. 12, 2016)

*Gilson v. Rainin Instrument, LLC,*
    2005 WL 955251 (W.D. Wis. Apr. 25, 2005)

*Jou v. Kimberly-Clark Corp.,*
    No. C-13-03075 JSC, 2013 U.S. Dist. LEXIS 173216 (N.D. Cal. Dec. 10, 2013)

*Kisting v. Gregg Appliances, Inc.,*
    No. 16-CV-141, 2016 WL 5875007 (E.D. Wis. Oct. 7, 2016)

*Miller v. Vonage Am., Inc.,*
    No. 14-CV-379, 2015 WL 59361 (E.D. Wis. Jan. 5, 2015)

*Padilla v. Costco Wholesale Corp.*,
    No. 11 C 7686, 2012 U.S. Dist. LEXIS 87222 (N.D. Ill. June 21, 2012)

*Pearson v. Target Corp.*,
    No. 11 CV 7972, 2012 U.S. Dist. LEXIS 187208 (N.D. Ill. Nov. 9, 2012)

*Tarzian v. Kraft Heinz Foods Co.*,
    No. 18 C 7148, 2019 U.S. Dist. LEXIS 175670 (N.D. Ill. Oct. 10, 2019)

*Ulrich v. Probalance, Inc.*,
    No. 16 C 10488, 2017 WL 3581183 (N.D. Ill. Aug. 18, 2017)

2018 WL 1087639
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Clarisha BENSON and Lorenzo Smith,
individually and on behalf of all
others similarly situated, Plaintiffs,
v.
FANNIE MAY CONFECTIONS BRANDS,
INC., a Delaware Corporation, Defendant.

No. 17 C 3519
|
Signed 02/28/2018

**Attorneys and Law Firms**

James X. Bormes, Catherine P. Sons, Law Office of James
X. Bormes, P.C., Kasif Khowaja, The Khowaja Law, LLC,
Chicago, IL, for Plaintiffs.

David Joel Chizewer, Goldberg Kohn Ltd., Chicago, IL, for
Defendant.

## OPINION AND ORDER

SARA L. ELLIS, United States District Judge

**\*1** Plaintiffs Clarisha Benson and Lorenzo Smith purchased
some delightful treats at two stores owned by Defendant
Fannie May Confections Brands, Inc. ("Fannie May"), and
were saddened to discover upon opening their boxes of Mint
Meltaways and Pixies that the boxes were not brimming
with delectable goodies. Rather, the boxes were filled merely
two-thirds of the way to their brims, leaving Benson and
Smith twenty-four-cubic-inches or more short of satisfaction.
Plaintiffs now bring this putative class action alleging that
the candies in question did not simply melt or fly away as
their names imply, but that Fannie May never placed them
in the box in the first place and did so to trick potential
consumers into believing they were receiving more candy
than they really were. Plaintiffs' complaint alleges violations
of the Illinois Consumer Fraud and Deceptive Business
Practices Act ("ICFA"), 815 Ill. Comp. Stat. 505/1 et seq.,
and seeks injunctive relief (Count I) and damages (Count II).

Plaintiffs also have two Illinois common-law claims for unjust
enrichment (Count III) and breach of implied contract (Count
IV). Fannie May moves to dismiss [11] the complaint in its
entirety, arguing that Plaintiffs have not alleged a violation of the
Food Drug and Cosmetic Act ("FDCA"), 21 U.S.C. § 301
et seq., therefore all of their state-law claims are preempted
and must be dismissed. Alternatively, Fannie May argues
that Plaintiffs have not adequately pleaded the elements of
their ICFA claim, that they lack standing to bring claims on
behalf of purchasers of products Plaintiffs did not purchase,
and that they lack standing to seek injunctive relief. Because
the Plaintiffs have not adequately alleged a violation of the
FDCA, the Court grants the motion to dismiss the complaint
without prejudice. Additionally, the Court grants the motion
to dismiss the injunctive relief claim because Plaintiffs do
not adequately allege that they are likely to be injured in the
future and the Court grants the motion to dismiss with respect
to the products Plaintiffs did not purchase because they lack
standing to bring those claims.

## BACKGROUND[1]

Plaintiffs purchased two 7 ounce, opaque boxes of candy
from Fannie May for approximately $10 each. Upon opening
the boxes, Plaintiffs realized that the boxes were not filled
to the top, but contained between 33% and 40% of empty
space. This empty space is called "slack-fill." The candies
Plaintiffs purchased were Mint Meltaways and Pixies. In
addition to these candies, Fannie May also sells Hot Fudge
Truffles, Peanut Butter Buckeyes, Sea Salt Caramels (Dark),
Sea Salt Caramels (Milk), Pixies ("Bite Size"), Carmash
(Milk), Carmash (Dark), and Trinidads (collectively, the
"Non-purchased Products," and, with the Mint Meltaways
and Pixies, the "Products") in similar 7 ounce boxes. The
Non-purchased Products also include substantial amounts
of slack-fill, in all cases exceeding 33%. Plaintiffs, despite
having not purchased any of these other candies, bring this
putative class action on behalf of consumers who may have
purchased them.

**\*2** Plaintiffs state that the slack-fill in these boxes has no
functional purpose and therefore is misleading to consumers.
They allege that had they known the Products contained large
amounts of slack-fill, they would not have purchased them.

## LEGAL STANDARD

Case 2:20-cv-00869-JPS   Filed 09/28/20   Page 3 of 109   Document 7

1

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of a claim's basis but must also be facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L.Ed. 2d 868 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L.Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). This "ordinarily requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case." *AnchorBank*, 649 F.3d at 615 (citation omitted). Rule 9(b) applies to "all averments of fraud, not claims of fraud." *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007). "A claim that 'sounds in fraud'—in other words, one that is premised upon a course of fraudulent conduct—can implicate Rule 9(b)'s heightened pleading requirements." *Id.*

## ANALYSIS

### I. Jurisdiction

As a preliminary matter, the Court addresses its subject matter jurisdiction to hear this case. On December 19, 2017, the Court ordered the parties to submit briefs on the issue of subject matter jurisdiction, because upon review of the complaint, the Court noted that it was not clear from the face of the complaint that such jurisdiction existed. Plaintiffs asserted federal jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). Under CAFA, federal courts have jurisdiction over a class action in which the amount in controversy exceeds $5,000,000 and "[a]ny member of a class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. § 1332(d)(2)(A). However, the Court shall decline to exercise that jurisdiction if "greater than two-thirds of the members of all proposed plaintiff

classes in the aggregate are citizens of the State in which the action was originally filed," and at least one defendant is a citizen of that same state. *Id.* § 1332(d)(4).

The complaint sufficiently alleged that the amount in controversy exceeds $5,000,000, but did not adequately allege diversity. The complaint alleged that Fannie May is an Illinois corporation and that all of the named plaintiffs were Illinois citizens. The complaint did state that at least one unnamed member of the putative class would be a non-Illinois resident, but this is insufficient to satisfy § 1332(d). *See Toulon v. Cont'l Cas. Co.*, 877 F.3d 725, 733 (7th Cir. 2017) (simply stating that a member of a class of plaintiffs is from a different state than a defendant does not satisfy the requirement of minimal diversity). Furthermore, the complaint seeks damages arising only from sales at physical stores in Chicago, Illinois, and online, but makes no representation as to what percentage of those purchases were made by Illinois residents versus non-Illinois residents, making it impossible for the Court to determine whether § 1332(d)(4) required the Court to decline to exercise jurisdiction.

**\*3** The filing of Fannie May's response to the Court's December 19, 2017 Order rendered these issues moot. In that response, Fannie May stated that it is in fact not a citizen of Illinois, but is a Delaware corporation with its principal place of business in Ohio. *See Toulon*, 877 F.3d at 732 (allowing parties to provide additional facts by affidavit to establish subject matter jurisdiction). This fact changes the analysis above, as it is now clear that there is diversity sufficient to satisfy § 1332(d)(2) and § 1332(d)(4) is no longer implicated. Therefore, the Court finds that it has subject matter jurisdiction and now turns to the substance of Fannie May's motion to dismiss.

### II. Motion to Dismiss

Fannie May moves to dismiss Plaintiffs' complaint arguing that they have failed to adequately allege a violation of the FDCA, that they have failed to allege a deceptive act on the part of Fannie May, and that they have failed to plead causation and damages. To state an ICFA deceptive practices claim, Plaintiffs must allege (1) a deceptive or unfair act or practice by Fannie May, (2) Fannie May's intent that Plaintiffs rely on the deceptive or unfair practice, (3) the deceptive or unfair practice occurred in the course of conduct involving trade or commerce, and (4) Fannie May's deceptive or unfair practice caused Plaintiffs actual damage. *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 574 (7th Cir. 2012);

*Kim v. Carter's Inc.*, 598 F.3d 362, 365 (7th Cir. 2010). Because Plaintiffs proceed on a deceptive practices claim, they must meet Rule 9(b)'s heightened pleading standard. *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 737 (7th Cir. 2014).

### A. FDCA Preemption

The FDCA does not provide a private right of action; therefore, Plaintiffs are only able to seek relief pursuant to related state-law causes of action. *See Turek v. Gen. Mills, Inc.*, 662 F.3d 423, 426 (7th Cir. 2011). However, the FDCA expressly preempts state law claims that impose labeling requirements "not identical" to its own requirements. 21 U.S.C. § 343-1. For the purposes of preemption the FDA has said that:

> "Not identical to" ... means that the State requirement directly or indirectly imposes obligations or contains provisions concerning the composition or labeling of food, or concerning a food container, that: (i) Are not imposed by or contained in the applicable provision (including any implementing regulation) of section 401 or 403 of the act; or (ii) Differ from those specifically imposed by or contained in the applicable provision (including any implementing regulation) of section 401 or 403 of the act.

21 C.F.R. § 100.1(c)(4). Thus, a plaintiff bringing a misleading labeling claim under state law must allege a violation of the FDCA to avoid preemption. *Trazo v. Nestle USA, Inc.*, No. 5:12-CV-2272 PSG, 2013 WL 4083218, at \*5 (N.D. Cal. Aug. 9, 2013) ("To avoid preemption under Section 343-1(a), the plaintiff must be suing for conduct that violates the FDCA.").

Here, Plaintiffs argue that the Products violate the FDA's slack-fill regulations. Slack-fill is "the difference between the actual capacity of a container and the volume of product contained therein." 21 C.F.R. § 100.100(a). Slack-fill can be functional or nonfunctional; however, containers that do not allow consumers to fully view their content may not have nonfunctional slack-fill. *Id.* A package contains nonfunctional slack-fill if it is filled to less than capacity for any reason other than the following six:

(1) Protection of the contents of the package;

(2) The requirements of the machines used for enclosing the contents in such package;

(3) Unavoidable product settling during shipping and handling;

**\*4** (4) The need for the package to perform a specific function (e.g., where packaging plays a role in the preparation or consumption of a food), where such function is inherent to the nature of the food and is clearly communicated to consumers;

(5) The fact that the product consists of a food packaged in a reusable container where the container is part of the presentation of the food and has value which is both significant in proportion to the value of the product and independent of its function to hold the food, e.g., a gift product consisting of a food or foods combined with a container that is intended for further use after the food is consumed; or durable commemorative or promotional packages; or

(6) Inability to increase level of fill or to further reduce the size of the package (e.g., where some minimum package size is necessary to accommodate required food labeling (excluding any vignettes or other nonmandatory designs or label information), discourage pilfering, facilitate handling, or accommodate tamper-resistant devices).

*Id.* Furthermore, any slack-fill in excess of the amount "necessary to accomplish a particular function is nonfunctional slack-fill." *Misleading Containers; Nonfunctional Slack-Fill*, 58 Fed. Reg. 64123-01, 64126 (Dec. 6, 1993).

Plaintiffs allege that the Products' packaging is opaque, contains more than 33% slack-fill, and that the slack-fill is in excess of the amount necessary to achieve the purposes enumerated in § 100.100(a). There are not many previous cases dealing with the slack-fill regulations, but when faced with similar barebones allegations, courts across the country have found them insufficient to state a violation of the regulations. *See, e.g., Martinez-Leander v. Wellnx Life Scis., Inc.*, No. CV 16-08220 SJO (EX), 2017 WL 2616918, at \*7 (C.D. Cal. Mar. 6, 2017) (alleging defendants did not meet any of the exceptions and lacked any lawful justification for slack-fill is insufficient to state a claim); *Bautista v. CytoSport, Inc.*, 223 F. Supp. 3d 182, 190–91 (S.D.N.Y. 2016) (same); *Wurtzburger v. Kentucky Fried Chicken*, No. 16-CV-08186 (NSR), 2017 WL 6416296, at \*5 (S.D.N.Y. Dec. 13, 2017) (granting motion to dismiss where plaintiff alleged no facts plausibly showing that the slack-fill was not functional); *Bush v. Mondelez Int'l, Inc.*, No. 16-CV-02460-RS, 2016 WL 7324990, at \*4 (N.D. Cal. Dec. 16, 2016) (conclusory allegations regarding nonfunctional slack-fill insufficient to survive a motion to dismiss). Plaintiffs do not cite any

cases in their response in the section regarding the slack-fill regulations. However, in support of their argument that they have properly pleaded an ICFA claim they cite to *White v. Just Born, Inc.*, No. 2:17-CV-04025-C-NKL, 2017 WL 3130333 (W.D. Mo. July 21, 2017), in which the court denied a motion to dismiss a consumer fraud claim, finding that the plaintiffs had adequately alleged a violation of the federal slack-fill regulations. *White* is distinguishable from the present case, however, because in *White*, the plaintiffs included concrete allegations to support their claim that defendants' use of slack-fill did not fall into any of the six exceptions. The plaintiffs specifically alleged:

> [T]he boxes have "substantial, non-functional slack-fill" that "cannot be justified"; industry-standard machines are capable of filling and enclosing the boxes "with far less slack-fill"; similar candies are packaged and sold in similar boxes containing "substantially less slack-fill" than Just Born's Hot Tamales and Mike and Ike boxes; and "the level of fill ... can certainly be increased[,]" as demonstrated by promotional sales of the Hot Tamales and Mike and Ike candies in the same kinds of boxes "with increased fill levels[.]"

**\*5** *Id.* at \*7 (quoting complaint); *see also Escobar v. Just Born Inc.*, No. CV1701826BROPJWX, 2017 WL 5125740, at \*12 (C.D. Cal. June 12, 2017) (enumerating six factual allegations plaintiff made to plausibly allege the existence of nonfunctional slack-fill). Unlike in the present case, these allegations go well beyond the bare elements and plausibly state a claim that the slack-fill in the offending boxes was nonfunctional in violation of § 100.100(a). Plaintiffs' barebones allegations, on the other hand, are not sufficient to state a violation of § 100.100(a) under either Rule 8 or the heightened standard under Rule 9(b).

Thus, because Plaintiffs have not adequately alleged a violation of the federal regulations, they cannot state a non-preempted claim under Illinois law, and the Court accordingly grants the motion to dismiss.

### B. Injunctive Relief

Although the Court need not address the issue of injunctive relief because Plaintiffs have not alleged a violation of federal law, the Court will address the issue because it is fully briefed and will serve judicial efficiency to rule on the issue rather than delay.

Even if Plaintiffs had alleged a violation of federal law and a colorable ICFA claim, they still would have no right

to seek injunctive relief. ICFA does provide for injunctive relief "when appropriate," 815 Ill. Comp. Stat. § 505/10a(c); however, a party must still establish standing to seek that relief. *See Ulrich v. Probalance, Inc.*, No. 16 C 10488, 2017 WL 3581183, at \*7 (N.D. Ill. Aug. 18, 2017) (plaintiff seeking injunctive relief in mislabeling case lacked standing because the alleged harm had already occurred). To establish standing to seek injunctive relief, a plaintiff must allege a threat of future harm that is not conjectural or hypothetical. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L.Ed. 2d 351 (1992); *see also O'Shea v. Littleton*, 414 U.S. 488, 495–96, 94 S. Ct. 669, 38 L.Ed. 2d 674 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief, however, if unaccompanied by any continuing, present adverse effects.").

Plaintiffs allege that they will suffer harm again in the future if they decide to purchase Fannie May's products because they cannot rely upon the packaging. But, already aware of Fannie May's alleged deceptive practices, Plaintiffs cannot claim they will be deceived again in the future. Most courts to address similar circumstances have held that absent some concrete basis to conclude that the plaintiffs will or must purchase the product again in the future and be deceived, they cannot meet the standing requirements for injunctive relief claims. *See Ulrich*, 2017 WL 3581183 at \*7 (a plaintiff who is aware of the alleged deceptive practice faces no threat of being revictimized); *In re Herbal Supplements Mktg. & Sales Practices Litig.*, No. 15-CV-5070, 2017 WL 2215025, at \*7 (N.D. Ill. May 19, 2017) (same). And the Seventh Circuit stated in *Camasta v. Jos. A. Bank Clothiers, Inc.*, in dicta, that a plaintiff who is aware of a defendant's deceptive practices is not likely to be harmed by them in the future, and therefore lacks standing to pursue injunctive relief. 761 F.3d 732, 741 (7th Cir. 2014). Therefore, even if Plaintiffs adequately pleaded a violation of federal law, they lack standing to seek prospective injunctive relief against Fannie May.

### C. Standing for Non-Purchased Products

Plaintiffs allege only purchasing the Mint Meltaways and the Pixies, but seek to bring this action on behalf of a putative class of individuals who purchased eight other Fannie May products, namely, Hot Fudge Truffles, Peanut Butter Buckeyes, Sea Salt Caramels (Dark), Sea Salt Caramels (Milk), Pixies ("Bite Size"), Carmash (Milk), Carmash (Dark), and Trinidads. Plaintiffs allege that all of the Products are sold in 7.0 ounce packages, that the packages are non-transparent, and that the packages contain nonfunctional slack-fill. In Exhibits A and B to the complaint, Plaintiffs

attached photos of most of the Non-Purchased products and their boxes. In Exhibit B, Plaintiffs show that the various boxes have different levels of slack-fill ranging from 38% to 59%. What is also apparent from the photos is that the various items are all different sizes and shapes.

**\*6** Several courts have found that a plaintiff may pursue claims based on products he did not purchase that are similar to products he did purchase in a class action under limited circumstances. A "plaintiff may have standing to assert claims for unnamed class members based on products he or she did not purchase so long as the products and alleged misrepresentations are substantially similar." *Ulrich*, 2017 WL 3581183, at \*6 (quotation marks omitted) (citation omitted). However, other courts have declined to follow this line of argument, holding that named plaintiffs in a putative class action cannot overcome the requirements of Article III standing simply by arguing that products are substantially similar; they must still satisfy the injury in fact requirement. *Porter v. NBTY, Inc.*, No. 15 CV 11459, 2016 WL 6948379, at \*3 (N.D. Ill. Nov. 28, 2016).

Even if the Court were to side with the former line of cases, Plaintiffs have not shown that the Non-Purchased Products are substantially similar to the products they purchased so as to confer standing upon them. Plaintiffs assert that the Products here are substantially similar because they are all

"chocolate and confection products," and that the alleged misrepresentation is the same for all of them, *i.e.*, they contain nonfunctional slack-fill. Doc. 20 at 15. These two similarities could equally apply to not just other candies made by Fannie May, but to products made by almost any other chocolate or confection maker who sells their products in opaque containers. As Fannie May points out, and the exhibits to the complaint confirm, the Products are all substantially different in size, ingredients, and in many cases, their packaging. Beyond being candies sold by Fannie May, the Products are not similar enough to grant standing to Plaintiffs who did not purchase them and thus were not harmed by any alleged mislabeling of those products.

Therefore, the Court dismisses the claims with respect to the Non-purchased Products on this basis as well.

## CONCLUSION

For the foregoing reasons, the Court grants Fannie May's motion to dismiss [11] the complaint without prejudice.

## All Citations

Not Reported in Fed. Supp., 2018 WL 1087639

---

Footnotes

1     The facts in the background section are taken from the complaint and are presumed true for the purpose of resolving Fannie May's motion to dismiss. *See Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011); *Local 15, Int'l Bhd. of Elec. Workers, AFL-CIO v. Exelon Corp.*, 495 F.3d 779, 782 (7th Cir. 2007).

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:20-cv-00869-JPS   Filed 09/28/20   Page 7 of 109   Document 7

5

2008 WL 336892
United States District Court,
E.D. Wisconsin.

John J. CALNIN, et al., Plaintiffs,

v.

Wallace J. HILLIARD, Defendant.
John F. Butz, et al., Plaintiffs,

v.

Wallace J. Hilliard, Defendant.
Greg J. Decleene, et al., Plaintiffs,

v.

Wallace J. Hilliard, Defendant.
Revocable Living Trust of Roy E. Downham
of January 30, 1979, et al., Plaintiffs,

v.

Wallace J. Hilliard, Defendant.
Gregory J. Larsen, Plaintiff,

v.

Wallace J. Hilliard, Defendant.

Nos. 05–C–694, 05–C–1092, 05–
C–784, 05–C–1148, 05–C–958.
|
Feb. 5, 2008.

**Attorneys and Law Firms**

George Burnett, Joseph W. Laframboise, Liebmann Conway Olejniczak & Jerry SC, Green Bay, WI, for Plaintiffs.

Sean O. Bosack, Winston A. Ostrow, Sherry D. Coley, Godfrey & Kahn SC, Milwaukee, WI, for Defendant.

**ORDER**

J.P. STADTMUELLER, District Judge.

**\*1** The plaintiffs in this consolidated action sue defendant Wallace J. Hilliard ("Hilliard") for allegedly violating the Securities Exchange Act of 1934, 17 C.F.R. § 240.10b–5(b); 15 U.S.C. § 78j, by making material misrepresentations and omissions in connection with the sale of securities. The

plaintiffs also allege nine claims under Wisconsin and Florida state laws. The court has federal question jurisdiction over the first cause of action and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the nine state law claims. On May 4, 2007, Hilliard filed a motion for partial summary judgment and the plaintiffs also moved for summary judgment. On June 26, 2007, the plaintiffs withdrew their motion, noting that Hilliard's affidavit submitted in response to their motion created genuine issues of material fact. Accordingly, the court will deny the plaintiffs' motion as moot. Hilliard's motion for partial summary judgment will be granted in part and denied in part for the reasons stated below.

**BACKGROUND**

The plaintiffs in *Calnin, et al. v. Hilliard,* Case No. 05–C–694, filed suit on July 1, 2005, and on November 16, 2005, the court consolidated *Calnin, et al.* with four other actions: *Butz, et al. v. Hilliard,* Case No. 05–C–784; *DeCleene, et al. v. Hilliard,* Case No. 05–C–958; *Downham, et al. v. Hilliard,* Case No. 05–C–1092; and *Larsen v. Hilliard,* Case No. 05–C–1148. On May 2, 2006, the plaintiffs in this consolidated action filed a third amended complaint, setting forth the following causes of action:

1. Alleged misrepresentations in connection with sales and purchases of securities contrary to 17 C.F.R § 240.10b–5(b); 15 U.S.C. § 78j(b);

2. Alleged misrepresentations in connection with sales and purchases of securities contrary to Wis. Stat. § 551.41(2) (2005–06);

3. Alleged misrepresentations in connection with sales and purchases of securities contrary to Fla. Stat. § 517.301(a) (2)(2006);

4. Alleged failure to register securities contrary to Wis. Stat. § 551.21(1);

5. Alleged failure to register securities contrary to Fla. Stat. § 517.07(1);

6. Alleged failure to obtain a license to sell securities contrary to Wis. Stat. § 551.31(1);

7. Alleged failure to register to sell securities contrary to Fla. Stat. § 517.12(1);

8. Alleged misrepresentations to induce members of the public to purchase securities contrary to Wis. Stat. § 100.18;

9. Alleged strict liability misrepresentations; and

10. Alleged negligent misrepresentations.

The third amended complaint named 42 plaintiffs. Several plaintiffs voluntarily dismissed their claims and the following plaintiffs remain: John and Yvonne Calnin (the "Calnins"), Greg and Ann DeCleene (the "DeCleenes"), Flanagan Brothers, Inc. ("Flanagan Brothers"), the Alfred H. and Jeane K. Fleck Revocable Trust (the "Fleck Trust"), Alfred H. and Jeane K. Fleck (the "Flecks"), Thomas J. and Sarah Hahn (the "Hahns"), the Kenneth L. and Lucille C. Jossart Revocable Trust of January 29, 1994 (the "Jossart Trust"), Kenneth L. and Lucille C. Jossart (the "Jossarts"), David W. and Yvonne M. Krutz Revocable Trust (the "Krutz Trust"), David W. and Yvonne M. Krutz (the "Krutzes"), Janice and David Schonke (the "Schonkes"), Stephen F. Schonke, Paul and Dawn Soletski (the "Soletskis"), Daniel Whetter ("Mr.Whetter"), and Donald and Rita Zellner (the "Zellners").

**\*2** This case arises out of the plaintiffs' purchase of stock in Florida Air Holdings, Inc. ("FAH"), a Florida corporation that is now dissolved. Beginning in early 2001, Hilliard and others solicited a number of individuals, including the plaintiffs, to purchase stock in FAH. FAH's original business plan was to fly as a charter airline and as a regional commuter airline to provide services between cities in Florida otherwise lacking commuter air services. (Hilliard Aff. ¶ 9.) FAH had regulatory authority permitting it to fly as a charter airline, which FAH utilized until it went out of business in June 2004. FAH, however, did not have authority permitting it to fly as a scheduled commuter airline.

In February 2001, Hilliard acquired Sunrise Airlines, Inc. ("Sunrise"), which had filed for bankruptcy protection. Sunrise owned a Federal Aviation Regulation Part 121 Commuter Air Carrier Operating Certificate ("Certificate") which gave Sunrise regulatory authority to fly as a commuter airline. The Certificate, however, was suspended as a result of Sunrise's bankruptcy filing. In March 2001, Hilliard transferred his ownership of Sunrise capital stock to FAH and began efforts to activate Sunrise's commuter air carrier authority. If the U.S. Department of Transportation ("DOT") approved the Certificate for reinstatement, FAH would be

able to operate as planned, as a commuter airline with scheduled routes between Florida cities.

On February 8, 2002, the DOT issued an "Order to Show Cause" tentatively approving the Certificate unless cause was shown indicating that the application for reinstatement should not be approved. In response to the Order to Show Cause, the Federal Aviation Administration ("FAA") notified the DOT that there were pending regulatory sanctions against another company owned by Hilliard, Plane–1 Leasing, Co. ("Plane–1"). The DOT requested an explanation concerning these pending regulatory sanctions against Plane–1. After the DOT received the explanation in May 2002, the DOT withdrew its tentative approval of the Certificate for reinstatement, citing the unresolved FAA allegations against Plane–1 as a significant contributing factor. (LaFramboise May 4, 2007 Decl. Exs. B and C.) Ultimately, as a result of the DOT's dismissal of the application for reinstatement, FAH went out of business in June 2004, when it was sold to Golden Airways, Inc.

Hilliard began soliciting funding for FAH in Wisconsin and Florida in early 2001. Hilliard distributed business plans, subscription agreements, and prospective investor letters to potential investors. The plaintiffs purchased stock in FAH at various times between February 2001 and March 2003. The plaintiffs allege that Hilliard misrepresented material facts and omitted facts material to the financial solvency of FAH and the ability of FAH to gain approval from the DOT to fly regularly scheduled commuter flights. For example, the plaintiffs contend that Hilliard made misrepresentations and omissions by: (1) failing to disclose the pending regulatory sanctions against Plane–1; (2) overstating FAH's assets such as the value of the airplanes and airplane parts that FAH purchased; and (3) omitting facts regarding the substantial liabilities of Sunrise and FAH such as Sunrise's failure to pay payroll taxes to the Internal Revenue Service. The plaintiffs assert that these actions caused them to suffer financial losses.

## ANALYSIS

**\*3** Summary judgment is appropriate where the moving party establishes that there is no genuine issue of material fact and that the party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Material facts" are those facts which "might affect the outcome of the suit," and a dispute about a material fact is "genuine" if a

reasonable finder of fact could find in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is appropriate where a party has failed to make "a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322–23. A party opposing summary judgment may not rest upon the mere allegations or denials of the adverse party's pleading, but must set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e). Any doubt as to the existence of a material fact is to be resolved against the moving party. *Anderson,* 477 U.S. at 255.

Hilliard moves for partial summary judgment pursuant to Fed.R.Civ.P. 56 on all the claims alleged by the plaintiffs, with the exception of some of the plaintiffs' claims alleged under the Wisconsin Securities Law and the Florida Securities Act; Hilliard concedes that genuine issues of material fact exist in regards to these claims. Hilliard sets forth several arguments in support of his motion for partial summary judgment. Specifically, Hilliard asserts: (1) the plaintiffs' claims under Rule 10b–5 and the plaintiffs' common law claims of strict liability misrepresentation and negligent misrepresentation should be dismissed because the plaintiffs cannot prove any actual loss or any causal connection between the plaintiffs' actual loss and any misrepresentation or omission by Hilliard; (2) certain plaintiffs' claims are barred by the applicable statutes of limitations set forth in the Wisconsin Uniform Securities Law and the Florida Securities Act; (3) the Wisconsin Uniform Securities Law claims alleged by Stephen F. Schonke and the Hahns should be dismissed because these plaintiffs purchased FAH stock from outside Wisconsin; (4) plaintiffs' "failure to register" claims should be dismissed because the securities at issue were exempt from the registration requirements under the Wisconsin Uniform Securities Law and the Florida Securities Act; (5) plaintiffs' claims that Hilliard was required to obtain a license to sell securities under Wisconsin and Florida laws should be dismissed because Hilliard was exempt from the licensing requirements; (6) plaintiffs' claims of misrepresentation under Wis. Stat. § 100.18 should be dismissed; (7) the claims of plaintiffs the Perrets and Stephen F. Schonke should be dismissed for lack of reliance; and (8) the individual plaintiffs who were never owners of any FAH stock should be dismissed under Fed. R. Civ. P 17(a). The court will address Hilliard's arguments in turn.

**\*4** First, Hilliard argues that the plaintiffs' Rule 10b–5 claims should be dismissed because "[t]he Plaintiffs have failed to produce any evidence of any actual out-of-pocket loss or evidence of any causal connection between any alleged misrepresentation or omission and any loss." (Def.'s Br. 10, May 4, 2007.) In order to prevail on a private cause of action under Rule 10b–5, plaintiffs must prove six basic elements: (1) a material misrepresentation (or omission); (2) scienter; (3) a connection with the purchase or sale of a security; (4) justifiable reliance; (5) economic loss; and (6) " 'loss causation,' i.e., a causal connection between the material misrepresentation and the loss." *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 341–42, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005) (citations omitted); *see also Tricontinental Indus. v. Price waterho use Coopers, LLP,* 475 F.3d 824, 842 (7th Cir.2007), *Caremark, Inc. v. Coram HealthCare.,* 113 F.3d 645, 648 (7th Cir.1997). Hilliard argues that expert testimony is necessary to prove the fifth and sixth, economic loss and loss causation, and that the plaintiffs have failed to offer any admissible evidence of economic loss or loss causation.

With respect to Rule 10b–5 causes of action, causation has two necessary components: "transaction causation" and "loss causation ." *Caremark, Inc.,* 113 F.3d at 648. "To plead transaction causation, the plaintiff must allege that it would not have invested in the instrument if the defendant had stated truthfully the material facts at the time of the sale." *Id.* "To plead loss causation, the plaintiff must allege that it was the very facts about which the defendant lied which caused its injuries." *Id.* The statute expressly imposes on the plaintiff "the burden of proving" that the defendant's misrepresentations "caused the loss for which the plaintiff seeks to recover." *Dura Pharm,* 544 U.S. at 345–46 (quoting 15 U.S.C. § 78u–4(a)(4)).

The plaintiffs contend that they have presented evidence of transaction causation and loss causation. The plaintiffs assert that they presented evidence demonstrating that Hilliard made material misrepresentations and omissions regarding FAH, and that these misrepresentations and omissions caused them to suffer financial loss. Specifically, the plaintiffs allege Hilliard told the plaintiffs that they were purchasing an airline that would begin scheduled commuter service soon. (Plaintiffs' Proposed Findings of Fact ("PPFOF") ¶¶ 30, 31; Laframboise May 4, 2007 Decl. Ex. A–1, p. 4 ("Final DOT approval is pending but expected momentarily").) The plaintiffs also allege Hilliard failed to disclose significant problems with FAH and Hilliard's affiliated companies when

he was soliciting their investments. The plaintiffs state that these hidden problems included the pending FAA sanctions against Plane–1, the fact that Sunrise owed approximately $300,000 in back payroll taxes, bank loan defaults of FAH and affiliated companies reaching approximately $8,000,000, and the financial problems of Discover Air, a company that FAH merged with in May 2002. (PPFOF ¶¶ 29, 48, 50, 67, 72.) The plaintiffs also state that they relied upon Hilliard's material misrepresentations and omissions regarding FAH's ability to obtain DOT approval to fly scheduled commuter flights when they purchased FAH stock. The plaintiffs state by affidavit that this omission caused them to suffer their financial losses. Specifically, the plaintiffs state that if "Hilliard had informed us of his problems with the Federal Aviation Administration, we would not have invested in the airline." (Affidavits of Flecks, Schonkes, Perrets, Krutzes, Calnins, Soletski, Downs, Whetter, Zellners, DeCleenes, Jossarts, Stephen F. Schonke, and Hahns at ¶ 2.) Hilliard disputes these allegations and notes that the plaintiffs were provided with written materials that disclosed that FAH did not have DOT approval to fly as a commuter airline and that FAH might not ever receive such approval. (LaFramboise May 4, 2007 Decl. Exs. T and Y.)

**\*5** Hilliard asserts that the plaintiffs have failed to present evidence of loss causation. Hilliard states that the plaintiffs' sole expert witness presented no testimony to help a fact finder determine whether matters allegedly concealed or something else caused FAH to fail. Hilliard argues that the plaintiffs' failure to present any expert testimony regarding the cause of FAH's demise should be dispositive of their Rule 10b–5 claims because, in order to prove loss causation, the plaintiffs must distinguish between the fraud-related and non-fraud-related reasons behind the failure of an investment. In support of this position, Hilliard cites to *In re Imperial Credit Indus. Sec. Litig.,* 252 F.Supp.2d 1005, 1015 (C.D.Cal.2003). The plaintiffs contend that *Imperial Credit* is inapposite because *Imperial Credit,* unlike the instant case, dealt with publicly traded stocks. This case, the plaintiffs assert, is a simple case where FAH's inability to obtain DOT approval to fly scheduled commuter flights led to its demise. The plaintiffs argue that their loss was entirely caused by the fraud-related reasons.

The parties disagree as to what caused FAH to fail as a business. The plaintiffs assert that FAH's inability to obtain DOT approval to fly scheduled commuter flights doomed FAH as a business. The plaintiffs also assert that FAH failed to obtain the DOT approval primarily because of the pending FAA sanctions against Plane–1. Indeed, the DOT cited the unresolved FAA allegations against Plane–1 as a significant contributing factor to its decision to withdraw its tentative approval. (LaFramboise Decl. Exs. B and C.) Hilliard contends that DOT's decision was based on several factors in addition to the FAA's allegations. (*Id.* at Ex. C.)

Hilliard cites no binding authority that requires the plaintiffs to produce an event study conclusively demonstrating that Hilliard's alleged fraud-related conduct caused the plaintiffs' damages. The plaintiffs are required to demonstrate a "legally sufficient evidentiary basis" that would permit a reasonable finder of fact to conclude that Hilliard's alleged fraud-related conduct caused the plaintiffs' damages. *See Imperial Credit,* 252 F.Supp.2d at 1014. The plaintiffs presented evidence suggesting that they relied upon Hilliard's material omissions described above when they invested in FAH, and they presented evidence suggesting that the FAA's pending regulatory sanctions against Plane–1, which were allegedly hidden from the plaintiffs when they invested, caused the plaintiffs to suffer pecuniary loss. Indeed, even though some of the plaintiffs may have offered various opinions at their depositions regarding the cause of FAH's demise, a reasonable finder of fact could conclude from the DOT letters (LaFramboise May 4, 2007 Decl. Exs. B and C) that the pending regulatory sanctions against Plane–1, and FAH's subsequent inability to obtain DOT approval to fly commuter flights, caused FAH to go out of business. Thus, viewing the facts in the light most favorable to the plaintiffs, as the court must, a reasonable finder of fact could conclude that Hilliard hid material facts from the plaintiffs in soliciting their investments and that the plaintiffs' losses were caused by these hidden facts. Furthermore, to defeat the plaintiffs' Rule 10b–5 claim at the summary judgment stage, Hilliard would have to establish that, as a matter of undisputed fact, the depreciation in the value of FAH's shares could not have resulted from the alleged fraud-related conduct. *See Caremark,* 113 F.3d at 650. Hilliard, however, has not established that FAH's demise was not caused by any of the alleged fraud-related conduct.

**\*6** The parties also dispute the actual value of the FAH shares purchased by the plaintiffs. The plaintiffs assert that the FAH shares they purchased were worthless in light of the alleged misrepresentations and omissions. Hilliard asserts that the shares had value at the time the plaintiffs invested because FAH operated as a charter airline and still had the potential to operate as a commuter airline. Although the plaintiffs have not presented expert testimony as to the specific amount of damages they suffered as a direct result of the alleged misrepresentations and omissions, the plaintiffs

Case 2:20-cv-00869-JPS Filed 09/28/20 Page 11 of 109 Document 7

may be able to "establish 'facts and circumstances tending to show the probable amount of ... damages' sufficient to allow the trier of fact to form a 'reasonable and probable estimate' of recoverable damages." *Miller v. Asensio & Co.,* 364 F.3d 223, 231 (4th Cir.2004) (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 565, 51 S.Ct. 248, 75 L.Ed. 544 (1931)). In sum, genuine issues of material fact exist as to the cause of FAH's demise and the amount of damages that the plaintiffs would have incurred but for the alleged fraud-related conduct. In light of the foregoing, the court is obliged to deny Hilliard's motion for summary judgment on the plaintiffs' Rule 10b–5 claim.

Hilliard also asserts that plaintiffs' common law claims of strict liability misrepresentation and negligent misrepresentation should be dismissed because the plaintiffs cannot prove any actual loss or any causal connection between the plaintiffs' actual loss and any alleged fraud-related conduct by Hilliard. However, as noted above, the plaintiffs presented evidence from which a reasonable finder of fact could conclude that Hilliard hid material facts from the plaintiffs in soliciting their investments and that the plaintiffs' losses were caused by these hidden facts. Accordingly, the court is obliged to deny Hilliard's motion for summary judgment on the plaintiffs' common law claims of strict liability misrepresentation and negligent misrepresentation.

Second, Hilliard argues that several of the plaintiffs' claims are barred by the applicable statutes of limitations. Prior to the Sarbanes–Oxley Act of 2002, securities fraud claims under Rule 10b–5 were subject to a one-year/three-year statute of limitations scheme, requiring a plaintiff to bring suit within one year of the discovery of facts constituting a violation, and within three years of the actual violation. *See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 364, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991). However, the Sarbanes–Oxley Act lengthened this statute of limitations period by replacing the one-year/three-year scheme with a two-year/five-year scheme. *See* 28 U.S.C. § 1658(b). Hilliard concedes that all the plaintiffs commenced their respective actions within five years of their purchases of FAH stock. As such, Hilliard does not argue that the plaintiffs' Rule 10b–5 claims are time-barred. However, Hilliard does argue that the some of the plaintiffs' claims under the Wisconsin Uniform Securities Law and the Florida Securities Act are time-barred by the applicable statutes of limitations.

**\*7** Claims brought under the Wisconsin Uniform Securities Law are subject to a three-year statute of limitations. Wis.

Stat. § 551.59(5) ("[n]o action shall be maintained under this section unless commenced before the expiration of 3 years after the act or transaction constituting the violation...."). The plaintiffs did not respond to Hilliard's argument that some of the plaintiffs' claims under the Wisconsin Uniform Securities Law, Wis. Stat. §§ 551 .21, 554.31, and 554.41, are time-barred by the three-year statute of limitations. Thus, pursuant to Wis. Stat. § 551.59(5), all the plaintiffs' Wisconsin Uniform Securities Law claims arising from stock purchases occurring more than three years before the filing of their claims are time-barred by the statute of limitations. The affected claims are as follows:

The Calnins' Wisconsin Uniform Securities Law claims filed on July 1, 2005, regarding stock purchased on March 28, 2002, and June 6, 2002;

The DeCleenes' Wisconsin Uniform Securities Law claims filed on September 6, 2005, regarding stock purchased on August 15, 2002;

The Flanagan Brothers' Wisconsin Uniform Securities Law claims filed on July 21, 2005, regarding stock purchased on January 17, 2002;

The Fleck Trust's Wisconsin Uniform Securities Law claims filed on September 16, 2005, regarding stock purchased on October 26, 2001, and February 16, 2001;

The Hahns' Wisconsin Uniform Securities Law claims filed on September 16, 2005, regarding stock purchased on May 7, 2001;

The Jossart Trust's Wisconsin Uniform Securities Law claims filed on September 16, 2005, regarding stock purchased on August 17, 2001, and December 14, 2001;

The Krutz Trust's Wisconsin Uniform Securities Law claims filed on September 16, 2005, regarding stock purchased on May 31, 2002;

The Perrets' Wisconsin Uniform Securities Law claims filed on September 16, 2005, regarding stock purchased on January 4, 2002;

The Schonkes' Wisconsin Uniform Securities Law claims filed on July 1, 2005, regarding stock purchased on April 9, 2001, and June 12, 2001;

The Soletskis' Wisconsin Uniform Securities Law claims filed on July 1, 2005, regarding stock purchased on May 4, 2002;

Mr. Whetter's Wisconsin Uniform Securities Law claims filed on July 21, 2005, regarding stock paid for[1] on July 12, 2002; and

The Jossarts' Wisconsin Uniform Securities Law claims filed on September 16, 2005, regarding the unpaid amount of $80,000 on the loan as of October 2001.

Because the plaintiffs do not dispute that these claims are time-barred by the three-year statute of limitations under Wis. Stat. § 551.59(5), the court will grant summary judgment in favor of Hilliard on these claims. For the sake of clarity, the court notes that the following Wisconsin Uniform Securities Law claims are not time-barred by Wis. Stat. § 551.59(5):

The Calnins' Wisconsin Uniform Securities Law claims filed on July 1, 2005, regarding stock purchased on January 31, 2003, in the amount of $20,000;

**\*8** The Flanagan Brothers' Wisconsin Uniform Securities Law claims filed on July 21, 2005, regarding stock purchased on July 31, 2002, in the amount of $100,000;

The Krutz Trust's Wisconsin Uniform Securities Law claims filed on September 16, 2005, regarding stock purchased on February 26, 2003, in the amount of $20,000;

The Perrets' Wisconsin Uniform Securities Law claims filed on September 16, 2005, regarding stock purchased on March 11, 2003, in the amount of $20,000;

Stephen F. Schonke's Wisconsin Uniform Securities Law claims filed on July 1, 2005, regarding stock purchased on August 29, 2002, in the amount of $50,000; and

The Zellners' Wisconsin Uniform Securities Law claims filed on July 1, 2005, regarding stock purchased on October 1, 2002, in the amount of $50,000.

Hilliard also argues that the Florida Securities Act claims of the following plaintiffs are time-barred by the statute of limitations set forth in Fla. Stat. § 95.11(4)(e): the De Cleenes, the Flanagan Brothers, The Krutz Trust, Stephen F. Schonke, Mr. Whetter, and the Zellners. The statute of limitations for securities fraud under the Florida Securities Act has two components. First, "the law suit must be commenced within two years 'from the time the facts giving rise to the cause of action were discovered or should have been discovered

with the exercise of due diligence.' " *Byrne v. Golfstream First Bank & Trust Co.,* 528 F.Supp. 692, 695 (S.D.Fla.1981) (quoting Fla. Stat. § 95.11(4)(e)). "[T]he second prong of the test ... requires that actions of this type be instituted 'not more than five years from the date [the] violation occurred.' " *Id.* The "violation" that starts the limitations period is when the purchaser contracts to buy the security. *Armbrister v. Roland International Corp.,* 667 F.Supp. 802, 823 (M.D.Fla.1987).

Although all the plaintiffs commenced their respective actions within five years of their purchases of FAH stock, Hilliard asserts that plaintiffs the De Cleenes, the Flanagan Brothers, The Krutz Trust, Stephen F. Schonke, Mr. Whetter, and the Zellners all received a letter and additional "compensatory" stock in April 2003 that should have put these plaintiffs on notice of their claims more than two years before they filed their Florida Securities Act claims. The April 2003 letter to these plaintiffs provides, in relevant part:

Wally Hilliard has appealed to the board of directors of Florida Air Holdings, Inc. to offer compensation to the investors who purchased stock at the price of $400.00 per share during the period of May to December, 2002. The price per share was predicated on the value that Discovery Air brought to the company.

(Ostrow Aff. Ex. H.) Hilliard asserts that the April 2003 letter should have indicated to these plaintiffs that they were being compensated for untrue representations regarding the value of FAH's stock. Hilliard asserts that because these plaintiffs waited for over two years from the date of this letter to file their Uniform Florida Securities Act claims, the claims are barred by Fla. Stat. § 95.11(4)(e).

**\*9** In response, the plaintiffs note that their claims are based on more than just the allegedly hidden financial problems of Discover Air and FAH's acquisition of Discover Air. And the plaintiffs point out that the April 2003 letter does not mention anything about the facts underlying the plaintiffs' claims regarding the FAA allegations against Plane–1, the approximately $300,000 in back payroll taxes owed by Sunrise, or the bank loan defaults of FAH and affiliated companies reaching approximately $8,000,000. According to the plaintiffs, the April 2003 letter did not put them on notice of their claims because it did not suggest any wrong-doing or misrepresentation; rather, the letter appeared to simply be correcting a mistake. The plaintiffs state that they did not learn of the alleged misrepresentations and omissions giving rise to their claims until after FAH went out of business in June 2004. (Affidavits of Flecks, Schonkes, Perrets, Krutzes, Calnins, Soletski, Downs, Whetter, Zellners,

DeCleenes, Jossarts, Stephen F. Schonke, and Hahns at ¶ 4.) Thus, viewing the facts in the light most favorable to the plaintiffs, a reasonable finder of fact could conclude that the plaintiffs who received the April 2003 letter were not put on notice of their Florida Securities Act claims by receiving that letter. As such, these claims may not be time-barred by the statute of limitations, Fla. Stat. § 95.11(4)(e), and the court is obliged to deny Hilliard's motion for summary judgment on these claims.

Third, Hilliard argues that the Wisconsin Uniform Securities Law claims alleged by Stephen F. Schonke and the Hahns should be dismissed because these plaintiffs purchased FAH stock from outside Wisconsin and that Act does not apply to transactions occurring outside Wisconsin. These plaintiffs have alleged Wisconsin Uniform Securities Law claims under Chapter 551 of the Wisconsin Statutes. The territorial scope of Chapter 551 is as follows:

> (1) The provisions of this chapter concerning sales and offers to sell apply when a sale or offer to sell is made in this state or when an offer to purchase is made and accepted in this state. The provisions concerning purchases and offers to purchase apply when a purchase or offer to purchase is made in this state or an offer to sell is made and accepted in this state.

Wis. Stat. § 551.66(1). Hilliard asserts that Stephen F. Schonke and the Hahns cannot raise claims under the Wisconsin Uniform Securities Law because they purchased FAH stock outside Wisconsin, FAH is a Florida corporation, Hilliard is a resident of Florida, and the only contact between Hilliard and Stephen F. Schonke and Mr. Hahn was by telephone, facsimile, or mail from Florida, when Stephen F. Schonke was in Germany and Mr. Hahn was in Guam. (Hilliard Aff. ¶¶ 38, 39.) To the best of his recollection, Hilliard believes that any communications from him to these plaintiffs originated in Florida. (*Id.*) Thus, Hilliard asserts, because there was no contact between the State of Wisconsin and Mr. Hahn's or Stephen F. Schonke's transactions, the plain language of Wis. Stat. § 551.66 requires the dismissal of the Hahns' and Stephen F. Schonke's claims under the Wisconsin Uniform Securities Law.

**\*10** In response, the plaintiffs contend that Hilliard's affidavit, indicating that, to the best of his recollection, any communications from him to Stephen F. Schonke or Mr. Hahn originated in Florida, offers insufficient evidence to warrant summary judgment on these claims. (Hilliard Aff. ¶¶ 38, 39.) The plaintiffs suggest that in order for Hilliard to be entitled to summary judgment on these claims, he must offer proof that he did not make an offer of FAH stock to Stephen F. Schonke or the Hahns from Wisconsin.

While it is true that any doubt as to the existence of a material fact is to be resolved against Hilliard, the moving party, the plaintiffs may not rest upon the mere allegations or denials of the adverse party's pleading, but must set forth specific facts showing that there is a genuine issue for trial. *See Anderson,* 477 U.S. at 255; Fed.R.Civ.P. 56(e). Here, the plaintiffs offer no evidence suggesting that Hilliard initiated any communication with Stephen F. Schonke or the Hahns from Wisconsin. Because the plaintiffs failed to present any evidence sufficient to establish that there was any relevant contact between the State of Wisconsin and Stephen F. Schonke's or the Hahns' transactions, an element essential to these plaintiffs' Wisconsin Uniform Securities Law claims, *see* Wis. Stat. § 551.66(1)-(4), the court is obliged to grant summary judgment in favor of Hilliard on these claims. *See Celotex,* 477 U.S. at 322–23. Accordingly, Stephen F. Schonke's and the Hahns' Wisconsin Uniform Securities Law claims will be dismissed.

Fourth, Hilliard argues that the plaintiffs' "failure to register" claims should be dismissed because the securities at issue were exempt from the registration requirements under the Wisconsin Uniform Securities Law and the Florida Securities Act. The plaintiffs' third amended complaint raises "failure to register" claims under Wisconsin and Florida laws. Wis. Stat. § 551.21; Fla. Stat. § 517.07. Under Wis. Stat. § 551.21, securities sold in the State of Wisconsin must be registered with the Department of Financial Institutions. However, registration is not required if the security or transaction is exempt under § 551.22 or § 551.23. *See* Wis. Stat. § 551.21(1)(b). Wisconsin Statute § 551.23 exempts from registration "[a]ny offer or sale of a security to ... [a]n accredited investor." Wis. Stat. § 551.23(8)(g). Similarly, under Fla. Stat. § 517.07, securities sold in the State of Florida must also be registered. *See* Fla. Stat. § 517.07(1). However, registration is not required if the security or transaction is exempt under § 517.061. *See id.* Florida statute § 517.061 exempts securities offerings involving no more than 35 purchasers. *See* Fla. Stat. § 517.061(11)(a)(1). And accredited investors are excluded from the purchasers counted toward calculation of the total number of purchasers. Fla. Stat. § 517.061(11)(b)(5). Hilliard asserts that because the plaintiffs were accredited investors, the securities at issue were exempt from the registration requirements under the Wisconsin Uniform Securities Law and the Florida Securities Act, and, therefore, the plaintiffs' "failure to register" claims should be dismissed.

**\*11** It is undisputed that upon purchasing stock in FAH, each of the plaintiffs signed a Subscription Agreement in which they represented and warranted that they were accredited investors. The plaintiffs did not respond to this argument in their brief in opposition to Hilliard's motion for partial summary judgment, but in their brief in support of their motion for summary judgment, they state that Stephen F. Schonke and the Hahns were not accredited investors when they purchased FAH stock. However, as noted above, these plaintiffs cannot raise claims under the Wisconsin Uniform Securities Law. In addition, even if Stephen F. Schonke and the Hahns were not accredited investors, they would have been the only two unaccredited investors, and, therefore, the sales of FAH stock fell within the 35 purchaser requirement in Fla. Stat. § 517.061(11)(a)(1) rendering the transactions exempt. In light of the foregoing, the court is obliged to conclude that the securities at issue were exempt from each state's securities registration requirements. Accordingly, the court will grant summary judgment in favor of Hilliard on the plaintiffs' "failure to register" claims, and these claims, the fourth and fifth causes of action in the plaintiffs' third amended complaint, will be dismissed.

Fifth, Hilliard argues that the plaintiffs' claims that he was required to obtain a license to sell securities under Wisconsin and Florida laws should be dismissed because he was exempt from the licensing requirements. The plaintiffs allege Hilliard was required under Wisconsin and Florida laws to register to sell securities. Agent licensing in Wisconsin is required under Wis. Stat. § 551.31. The plaintiffs allege Hilliard was an "agent" within the meaning of Wis. Stat. § 551.02(2), and that he failed to obtain a license as required by Wis. Stat. § 551.31(1). Wisconsin Statute § 551.02(2) defines an "agent" as follows:

"Agent" means any individual other than a broker-dealer who represents a broker-dealer or issuer in effecting or attempting to effect transactions in securities. A partner, officer or director of a broker-dealer or issuer, or a person occupying a similar status or performing similar functions, is an agent if he or she is within this definition. "Agent" does not include an individual who represents an issuer in doing any of the following:

(a) Effecting transactions in a security exempted by s. 551.22.

(b) Effecting transactions exempted by s. 551.23, other than transactions exempted under s. 551.23(8)(g), (10) or (19)

in which the individual receives a commission or other remuneration directly or indirectly for soliciting or selling to any person in this state.

(c) Effecting other transactions if no commission or other remuneration is paid or given directly or indirectly for soliciting any person in this state.

Wis. Stat. § 551.02(2).

It is undisputed that Hilliard did not receive any commission or other remuneration directly or indirectly for soliciting or selling FAH stock. Accordingly, Hilliard was not an "agent" within the meaning of Wis. Stat. § 551.02(2). Furthermore, licensing is not required if the person is exempt under Wis. Stat. § 551.31(1)(d). Wisconsin Statute § 551.31(1)(d) exempts an "agent who is acting exclusively as an agent representing an issuer of securities and who makes offers and sales of the issuer's securities in transactions that are exempt under s. 551.23(8)(g)...." Wis. Stat. § 551.31(1)(d). As noted above, all of the transactions were exempt under Wis. Stat. § 551.23(8)(g) because the transactions were sales to accredited investors. As such, the court concludes that Hilliard was exempt from the licensing requirements under Wis. Stat. § 551.31. In addition, the plaintiffs did not respond to Hilliard's argument that he was also exempt from the licensing requirements under the Florida Securities Act. See Fla. Stat. § 517.12(3) ("registration requirements of this section do not apply in a transaction exempted by s. 517.061(1)-(12)....") Accordingly, the court will grant summary judgment in favor of Hilliard on the plaintiffs' claims that Hilliard failed to obtain a license under Wis. Stat. § 551.31(1) and Fla. Stat. § 517.12, and these claims, the sixth and seventh causes of action in the plaintiffs' third amended complaint, will be dismissed.

**\*12** Sixth, Hilliard raises several arguments against the plaintiffs' claims of misrepresentation under Wis. Stat. § 100.18. Wisconsin Statute § 100.18(1) prohibits the making "to the public" of an advertisement, statement, or representation which "contains any assertion, representation or statement of fact which is untrue, deceptive or misleading." Id. Hilliard asserts that all the plaintiffs' claims under Wis. Stat. § 100.18 should be dismissed because the claims are based on alleged failures to disclose, not misrepresentations, and nondisclosures are not actionable under § 100.18. See Tietsworth v. Harley Davidson, 2004 WI 32, ¶ 40, 270 Wis.2d 146, 677 N.W.2d 233 ("Silence—an omission to speak—is insufficient to support a claim under Wis. Stat. § 100.18(1)."). Hilliard also argues that the plaintiffs' Wis. Stat. § 100.18 claims should be dismissed because the plaintiffs have failed

to produce evidence of any pecuniary loss caused by any misrepresentation by Hilliard. Section 100.18(11)(b)2 creates a cause of action in favor of "[a]ny person suffering pecuniary loss because of a violation of this section by any other person," to "recover such pecuniary loss, together with costs, including reasonable attorney fees...." *Id.*

The plaintiffs contend that they presented evidence demonstrating that their claims are based on Hilliard's material misrepresentations, in addition to omissions. For example, the plaintiffs allege Hilliard told them that they were purchasing an airline that would begin scheduled commuter service soon. (PPFOF ¶¶ 30, 31; Laframboise May 4, 2007 Decl. Ex. A–1, p. 4 ("Final DOT approval is pending but expected momentarily").) In addition, the plaintiffs presented evidence to support their claim that Hilliard misrepresented the financial status of FAH by inflating the value of his contribution to the airline. (LaFramboise May 4, 2007 Decl. Exs. X and Y.) And, as noted above, the plaintiffs presented evidence to support their claims that they relied upon Hilliard's alleged misrepresentations (and omissions) when they invested in FAH, and that these material misrepresentations (and omissions) caused the plaintiffs to suffer pecuniary loss. (PPFOF ¶¶ 29, 48, 50, 67, 72; Affidavits of Flecks, Schonkes, Perrets, Krutzes, Calnins, Soletski, Downs, Whetter, Zellners, DeCleenes, Jossarts, Stephen F. Schonke, and Hahns at ¶ 2.) Although these material facts are disputed, viewing the facts in the light most favorable to the plaintiffs, a reasonable finder of fact could conclude that Hilliard made misrepresentations which caused the plaintiffs to suffer pecuniary loss. Accordingly, the court will deny Hilliard's motion to dismiss all the plaintiffs' claims under Wis. Stat. § 100.18.

However, Hilliard has demonstrated that, for the reasons stated below, he is entitled to summary judgment on all but one of the plaintiffs' Wis. Stat. § 100.18 claims. Wisconsin Statute § 100.18 only applies to statements made "to the public," and statements made to persons with whom a contractual relationship exists are not statements made "to the public" within the meaning of § 100.18. *See Kailin v. Armstrong,* 2002 WI App. 70, ¶ 44, 252 Wis.2d 676, 643 N.W.2d 132 (2002). Hilliard asserts that, under the holding in *Kailin,* once the plaintiffs purchased FAH shares and became co-owners of FAH, their subsequent additional purchases were not subject to § 100.18. The plaintiffs contend that § 100.18 does apply to their subsequent additional purchases, because the subsequent purchases required the plaintiffs to enter into new Subscription Agreements. However, it is

undisputed that at the time the plaintiffs made the subsequent purchases, they had a "particular relationship" with Hilliard (as co-owners) and FAH (as owners). And "the important factor in defining 'the public' is 'whether there is some particular relationship between the parties.' " *Kailin,* 2002 WI App. 70, ¶ 44, 252 Wis.2d 676, 643 N.W.2d 132 (quoting *State v. Automatic Merchandisers of Am., Inc.,* 64 Wis.2d 659, 664, 221 N.W.2d 683 (1974)). Therefore, under the holding of *Kailin,* once the plaintiffs purchased FAH stock, they did not qualify as "the public" under the statute for their subsequent purchases. *See id.* As such, the court concludes that the plaintiffs' Wis. Stat. § 100.18 claims involving the following purchases should be dismissed as "second purchases" outside of the scope of Wis. Stat. § 100.18:

**\*13** The Calnins' purchases on June 6, 2002, and January 31, 2003;

The Flanagan Brothers' purchase on July 31, 2002;

The Fleck Trust's purchase on October 26, 2001;

The Jossart Trust's purchase on December 14, 2001;

The Krutz Trust's purchase on February 26, 2003;

The Perrets' purchase on March 11, 2003; and

Mrs. Schonke's purchase on June 12, 2001.

In addition, the plaintiffs do not dispute that all their § 100.18 claims arising from stock purchases occurring more than three years before the filing of their claims are time-barred by the three-year statute of limitations set forth in § 100.18(11)(b)3. Thus, the following Wis. Stat. § 100.18 claims are time-barred by Wis. Stat. § 100.18(11)(b)3:

The Calnins' Wis. Stat. § 100.18 claims filed on July 1, 2005, regarding stock purchased on March 28, 2002, and June 6, 2002;

The DeCleenes' W is. Stat. § 100.18 claims filed on September 6, 2005, regarding stock purchased on August 15, 2002;

The Flanagan Brothers' Wis. Stat. § 100.18 claims filed on July 21, 2005, regarding stock purchased on January 17, 2002;

The Fleck Trust's Wis. Stat. § 100.18 claims filed on September 16, 2005, regarding stock purchased on February 16, 2001, and October 26, 2001;

The Hahns' Wis. Stat. § 100.18 claims filed on September 16, 2005, regarding stock purchased on May 7, 2001;

The Jossart Trust's Wis. Stat. § 100.18 claims filed on September 16, 2005, regarding stock purchased on August 17, 2001, and December 14, 2001;

The Krutz Trust's Wis. Stat. § 100.18 claims filed on September 16, 2005, regarding stock purchased on May 31, 2002;

The Perrets' Wis. Stat. § 100.18 claims filed on September 16, 2005, regarding stock purchased on January 4, 2002;

The Schonkes' Wis. Stat. § 100.18 claims filed on July 1, 2005, regarding stock purchased on April 9, 2001, and June 12, 2001;

The Soletskis' Wis. Stat. § 100.18 claims filed on July 1, 2005, regarding stock purchased on May 4, 2002;

Mr. Whetter's Wis. Stat. § 100.18 claims filed on July 21, 2005, regarding stock paid for (*see* footnote no. 1 on p. 16 above) on July 12, 2002; and

The Jossarts' Wis. Stat. § 100.18 claim filed on September 16, 2005, regarding the unpaid amount of $80,000 on the loan as of October 2001.

Because the plaintiffs do not dispute that these claims are time-barred by the three-year statute of limitations under Wis. Stat. § 100.18(11)(b)3, the court will grant summary judgment in favor of Hilliard on these claims.

The plaintiffs also do not contest Hilliard's argument that "compensatory" stock issued to certain plaintiffs on April 25, 2003, was not induced by statements or advertisements and thus, is excluded from the scope of Wis. Stat. § 100.18. In addition, although Stephen F. Schonke's § 100.18 claim filed on July 1, 2005, regarding stock purchased on August 29, 2002, is not time-barred by Wis. Stat. § 100.18(11)(b)3, or a "second purchase" outside of the scope of Wis. Stat. § 100.18, as noted above, the plaintiffs presented no evidence sufficient to establish that there was any relevant contact between Wisconsin and Stephen F. Schonke's transactions. The scope of Wis. Stat. § 100.18(1) is limited to publications "in this state." *Id.* Accordingly, Stephen F. Schonke's § 100.18 claim will be dismissed because there is no evidence of contact between the State of Wisconsin and Stephen F. Schonke' transactions, an element essential to his § 100.18 claim. *See Celotex,* 477 U.S. at 322–23. In light of the foregoing, the

court notes that the Zellners' § 100.18 claim filed on July 1, 2005, regarding stock purchased on October 1, 2002, in the amount of $50,000, is the only § 100.18 claim that is not time-barred by Wis. Stat. § 100.18(11)(b)3, or dismissed as a "second purchase" or otherwise outside of the scope of Wis. Stat. § 100.18.

**\*14** Seventh, Hilliard argues that all the claims of the Perrets and Stephen F. Schonke should be dismissed for lack of reliance. Proof of reliance on a misrepresentation is a requirement for a cause of action under Rule 10b–5, as well as for a claim under the Wisconsin Uniform Securities Law, the Florida Securities Act, and under the common law of misrepresentation. *See TriContinental,* 475 F.3d at 842; *Carney v. Mantuano,* 204 Wis.2d 527, 554 N.W.2d 854 (Wis.Ct.App.1996) (Wisconsin Uniform Securities Law); *E.F. Hutton & Co. v. Rousseff,* 537 So.2d 978 (Fla.1989) (Florida Securities Act); *Lewis v. Paul Revere Life Ins. Co.,* 80 F.Supp.2d 978, 999 (E.D.Wis.2000) (misrepresentation); *Whipp v. Iverson,* 43 Wis.2d 166, 169–70, 168 N.W.2d 201 (1969) (misrepresentation). "A fraudulent representation ... is actionable only if there is reasonable reliance, a requirement intended in part to screen out trivial or concocted fraud claims." *In re Barnes,* 969 F.2d 526, 529 (7th Cir.1992) (applying Wisconsin law).

Hilliard states that he did not speak to the Perrets or Stephen F. Schonke or send them written documents regarding FAH before these plaintiffs purchased FAH shares. In fact, these plaintiffs purchased FAH shares based upon conversations they had with relatives who already owned FAH shares. Hilliard asserts that since he had no direct contact with these plaintiffs before they purchased FAH shares, there is no way they could have relied upon any alleged misrepresentation or omission by Hilliard. And any alleged misrepresentation or omission that occurred after these plaintiffs purchased their shares cannot provide a basis for their claims. *See APA Excelsior III L.P.,* 476 F.3d at 1267 (quoting *SEC v. Nat'l Student Mktg. Corp.,* 457 F.Supp. 682, 703–04 (D.D.C.1978) (" 'there is little justification for penalizing alleged omissions or misstatements which occur thereafter and which have no effect on the decision.' ")). As such, Hilliard asserts, the claims of these plaintiffs should be dismissed for lack of reliance.

The plaintiffs agree that reliance is a necessary element of their claims; however, they contend that there is no requirement that the alleged misrepresentations or omissions be *directly* communicated to the plaintiff. The plaintiffs

allege that the Perrets and Stephen F. Schonke relied upon misrepresentations and omissions made by Hilliard when they purchased their FAH shares, and these misrepresentations and omissions were communicated to these plaintiffs through other individuals. The plaintiffs assert that the injuries of the Perrets and Stephen F. Schonke were a direct result of the actions of Hilliard, and the fact that Hilliard's communications did not come directly from him should not be fatal to their claims. *See, e.g, Schaefer v. First Nat'l Bank,* 326 F.Supp. 1186, 1193 (N.D.Ill.1970) ("privity is not required for an action to be maintainable under Rule 10b–5"); *Geo. H. McFadden & Bro., Inc. v. Home–Stake Production Co.,* 295 F.Supp. 587, 589 (N.D.Okl.1968) ("one may recover for an SEC violation falling under Rule 10b–5 even though there is no direct personal relationship.").

**\*15** Hilliard cites no binding authority suggesting that an alleged misrepresentation or omission must be communicated directly from the defendant to the plaintiff in order to establish reliance. Indeed, Rule 10b–5 provides that it is "unlawful for any person, *directly or indirectly* " to make any material misrepresentation or omission in connection with the sale of securities. 17 C.F.R. § 240.10b–5 (emphasis added); *see also Anixter v. Home–Stake Prod. Co.,* 77 F.3d 1215, 1226 (10th Cir.1996) ("[t]here is no requirement that the alleged violator directly communicate misrepresentations to plaintiffs for primary liability to attach.") (citing *SEC v. Holschuh,* 694 F.2d 130, 142 (7th Cir.1982)). Stephen F. Schonke's father, David Schonke, testified at his deposition that Hilliard failed to disclose the FAA allegations to him before he invested in FAH. (Laframboise June 11, 2007 Decl. Ex. JJ.) And Stephen F. Schonke testified at his deposition that he relied upon conversations with his father when he purchased FAH stock. (Ostrow Aff. Ex. CC.) Similarly, David Perret testified at his deposition that he learned from his brother-in-law, Kenneth Jossart, that according to Hilliard, FAH was about to start flying. (LaFramboise June 11, 2007 Decl. Exs. GG and II; PPFOF ¶¶ 82, 84.) The fact that the alleged misrepresentations or omissions were not directly communicated to these plaintiffs by Hilliard does not require the court to conclude that these plaintiffs cannot establish that they relied upon the alleged misrepresentations or omissions made by Hilliard. Indeed, viewing the facts in the light most favorable to the plaintiffs, a reasonable finder of fact could conclude that Hilliard made the alleged misrepresentations or omissions knowing they would be communicated to other investors, and that the Perrets and Stephen F. Schonke

relied upon these alleged misrepresentations or omissions. Accordingly, the court will deny Hilliard's motion for summary judgment on all the claims of the Perrets and Stephen F. Schonke for lack of reliance.

Finally, Hilliard argues that the individual plaintiffs who were never owners of any FAH stock should be dismissed under Fed. R. Civ. P 17(a). Rule 17(a) requires that claims be prosecuted in the name of the real party in interest. It is undisputed that the Jossart Trust and the Krutz Trust were shareholders in FAH and are, therefore, real parties in interest. Hilliard asserts that the Jossarts and the Krutzes, as beneficiaries of their respective trusts, are not real parties in interest. However in addition to being beneficiaries of their respective trusts, the Jossarts and the Krutzes are also trustees of their respective trusts, authorized to pursue claims on behalf of the trusts. (Third Am. Compl. ¶¶ 17, 23.) Therefore, as the trustees of their respective trusts, it appears the Jossarts and the Krutzes are also real parties in interest. *See, e.g, Navarro Sav. Ass'n v. Lee,* 446 U.S. 458, 465, 100 S.Ct. 1779, 64 L.Ed.2d 425 (1980) (holding that a trustee is a real party to the controversy when he possesses certain customary powers to hold, manage, and dispose of assets for the benefit of others). Accordingly, even though the plaintiffs did not respond to this argument, the court will deny Hilliard's motion for summary judgment on the individual claims of the Jossarts and the Krutzes.

**\*16** Accordingly,

**IT IS ORDERED** that the defendant's motion for partial summary judgment (Docket # 77) be and the same is hereby **GRANTED** in part, and **DENIED** in part, as set forth above;

**IT IS FURTHER ORDERED** that the fourth, fifth, sixth, and seventh causes of action in the plaintiffs' third amended complaint be and the same be and the same is hereby DISMISSED for the reasons set forth above;

**IT IS FURTHER ORDERED** that the plaintiffs' motion for summary judgment (Docket # 81) be and the same is hereby **DENIED** as moot.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 336892, Fed. Sec. L. Rep. P 94,572

Footnotes

1    Although Mr. Whetter signed the Subscription Agreement on July 24, 2002, he paid for his stock on July 12, 2002. The
     plaintiffs do not contest Hilliard's assertion that the date on which Mr. Whetter paid for the stock, July 12, 2002, is the
     date on which the statute of limitations started to run under the "commitment theory" of securities law. *See APA Excelsior
     III L.P. v. Premiere Techs.,* 476 F.3d 1261, 1267 (11th Cir.2007).

**End of Document**                                      © 2020 Thomson Reuters. No claim to original U.S.
                                                                            Government Works.

No *Shepard's* Signal™
As of: September 28, 2020 1:53 PM Z

# *Childers v. Menard, Inc.*

United States District Court for the Western District of Wisconsin

September 3, 2020, Decided; September 4, 2020, Filed

20-cv-107-jdp

**Reporter**
2020 U.S. Dist. LEXIS 162283 *

AMY CHILDERS, BARRY EARLS, THOMAS FETSCH, CODY ITALIA, DAVID KIEL, NAZAR MANSOOR, DEBBIE RIDER, TRENT SHORES, STEVE SCHUSSLER, CASSIE LIETAERT, RYAN INGALLS, CHRIS JESSE, and KAREN FLECKENSTEIN, individually and on behalf of a class of similarly situated individuals, Plaintiffs, v. MENARD, INC., and JOHN DOES 1-10, Defendants.

## Core Terms

rebate, arbitration, unconscionable, consumer-fraud, advertisement, customers, modification, good-faith, contractual, vouchers, unjust-enrichment

**Counsel:** [*1] For Amy Childers, Individually and on behalf of a class of similarly situated individuals, Barry Earls, Individually and on behalf of a class of similarly situated individuals, Thomas Fetsch, Individually and on behalf of a class of similarly situated individuals, Cody Italia, Individually and on behalf of a class of similarly situated individuals, David Kiel, Individually and on behalf of a class of similarly situated individuals, Nazar Mansoor, Individually and on behalf of a class of similarly situated individuals, Debbie Rider, Individually and on behalf of a class of similarly situated individuals, Trent Shores, Individually and on behalf of a class of similarly situated individuals, Steve Schussler, Individually and on behalf of a class of similarly situated individuals, Cassie Lietaert, Individually and on behalf of a class of similarly situated individuals, Ryan Ingalls, Individually and on behalf of a class of similarly situated individuals, Chris Jesse, Individually and on behalf of a class of similarly situated individuals, Karen Fleckenstein, Individually and on behalf of a class of similarly situated individuals, Plaintiffs: Eric J. Haag,

LEAD ATTORNEY, Atterbury, Kammer [*2] & Haag, S.C., Middleton, WI; Maren I Christensen, Sabita J. Soneji, Tycko and Zavareei LLP, Oakland, CA.

For Menard, Inc., A Delaware corporation, Defendant: Brian Peter Norton, James John Boland, LEAD ATTORNEYS, Andrew C. Nordahl, Freeborn & Peters, LLP, Chicago, IL.

**Judges:** JAMES D. PETERSON, District Judge.

**Opinion by:** JAMES D. PETERSON

## Opinion

OPINION and ORDER

This proposed class action concerns a promotion offered by defendant Menard, Inc., owner of Menards home improvement stores. Plaintiffs, a group of Menards customers, say that Menards promised to give them vouchers for use on future purchases, but then gave smaller vouchers than promised or no vouchers at all. They bring claims against Menards for breach of contract, breach of the implied duty of good faith and fair dealing, and unjust enrichment, as well as claims under the consumer-fraud laws of each of the six states where plaintiffs live.[1]

Two motions are before the court. First, Menards asks

---

[1] Plaintiffs also name "John Does 1-10" as defendants in their complaint, but none of plaintiffs' claims or allegations are directed at or even mention any Doe defendants. The parties do not address this issue, but it is not relevant to this opinion.

the court to compel six of the 13 plaintiffs to arbitrate their claims because they signed forms containing arbitration clauses. Dkt. 7. The court agrees that these plaintiffs must arbitrate their claims, so it will grant the motion and dismiss their claims without [*3] prejudice. Second, Menards asks the court to dismiss the remaining plaintiffs' claims. Plaintiffs' consumer-fraud claims fail to comply with the Federal Rules of Civil Procedure, so the court will dismiss those claims without prejudice. But, for reasons explained below, the court will not dismiss the other claims.

BACKGROUND

Menards periodically offers promotions in which a customer can obtain a voucher applicable to future Menards purchases. Although the customers receive vouchers, not money back, both sides refer to this as a "rebate," so the court will do the same. The promotion typically offers a rebate in the amount of 11 percent of the customer's total purchase, but Menards sometimes offers promotions specific to particular products for rebates in other amounts. Both sides provide similar descriptions of the basic steps that a customer must follow to receive a rebate—plaintiffs in their complaint, Dkt. 1, ¶¶ 38-42, and Menards in a declaration from marketing manager Michael Every, Dkt. 9, ¶¶ 5-6. After customers purchase products that are subject to a rebate, they are given two receipts—a purchase receipt and what Menards calls a "rebate receipt." After making their purchases, [*4] customers take their rebate receipts to a customer service desk to obtain a rebate form. Before a date specified on the rebate form, customers must complete the form and mail it, along with their purchase receipts, to a Wisconsin post office box.

All of Menards' rebate forms after December 3, 2017, included an arbitration provision stating, in relevant part, "By submitting the rebate form, you agree to resolve any disputes related to rebate redemption by binding arbitration and you waive any right to file or participate in a class action." Dkt. 9, ¶ 8. The rebate form directs customers to a website, www.rebateinternational.com, containing further terms and conditions regarding arbitration.

Plaintiffs plausibly allege that this court has jurisdiction over this action under the Class Action Fairness Act, *28 U.S.C. § 1332(d)(2)* and *(6)*, because the amount in controversy exceeds $5,000,000, because the putative class exceeds 100 members, and because a number of the named plaintiffs and putative class members are diverse in citizenship from Menards.

ANALYSIS

**A. Choice of law**

The parties disagree about what states' laws the court should apply to plaintiffs' claims. Menards says that the law of the state in which each [*5] plaintiff made his or her purchase should apply to that plaintiff. Plaintiffs don't dispute the point as it concerns their statutory consumer-protection claims, but they say that Wisconsin law should apply to Menards' motion to compel arbitration and to plaintiffs' other common-law claims.

The court's jurisdiction over this case is based on diversity, so the court must apply the choice-of-law rules of the forum state. *S.A. Healy Co. v. Milwaukee Metro. Sewerage Dist., 50 F.3d 476, 478 (7th Cir. 1995)*. "The first rule in Wisconsin choice of law rules is 'that the law of the forum should presumptively apply unless it becomes clear that nonforum contacts are of the greater significance.'" *State Farm Mut. Auto. Ins. Co. v. Gillette, 2002 WI 31, ¶ 51, 251 Wis. 2d 561, 641 N.W.2d 662* (quoting *Hunker v. Royal Indem. Co., 57 Wis. 2d 588, 204 N.W.2d 897, 902 (1973))*. But even if nonforum contacts have greater than significance than Wisconsin contacts, the court will apply Wisconsin law if it does not conflict with the other state's law. *Sharp ex rel. Gordon v. Case Corp., 227 Wis. 2d 1, 595 N.W.2d 380, 384 (1999)*. The court can resolve most of the questions raised in Menards' motions on basic legal principles that do not differ across the states where the plaintiffs made their purchases, so the court will apply Wisconsin law unless it conflicts with another state's law with a stronger connection to a particular claim. At this point, the court sees no reason to look to the law of any state besides Wisconsin, with [*6] the exception of the statutory consumer-protection claims, which are governed by the law of the state where the purchase was made.

**B. Motion to compel arbitration**

Menards says that six of the plaintiffs—Amy Childers, Cody Italia, Nazar Mansoor, Debbie Rider, Ryan Ingalls, and Karen Fleckenstein—should be required to arbitrate their claims because they completed rebate forms that contained an arbitration clause. Plaintiffs don't dispute that these six plaintiffs signed rebate forms containing an arbitration clause that applies to their claims, so they bear the burden of demonstrating that the clause is

unenforceable. *Green Tree Fin. Corp.-Ala. v. Randolph, 531 U.S. 79, 91-92, 121 S. Ct. 513, 148 L. Ed. 2d 373 (2000)*. They contend that the arbitration clause is unenforceable for two reasons: (1) it is an after-the-fact modification of a material term of their purchase contracts; and (2) it is procedurally unconscionable.

### 1. Modification of the purchase contract

Plaintiffs contend that the arbitration clause is invalid because it is an after-the-fact modification of contracts to purchase goods from Menards. They argue that the rebate was a material term of the purchase contracts because Menards advertised the rebate to induce them to buy products from Menards. In their complaint, plaintiffs [*7] include an example of a Menards advertisement that lists certain terms of the rebate but does not mention the arbitration clause. Dkt. 1, ¶ 51-52. They say that Menards was prohibited from adding the arbitration clause to the terms of the rebate without their assent after they completed their purchases.

This argument fails for two reasons. First, as Menards notes, plaintiffs' complaint describes a purchase contract that wasn't completed until plaintiffs completed the rebate forms, which contained the arbitration clause:

> Based on the rebate forms that they filled out and submitted, Plaintiffs . . . agreed to purchase the products that were eligible for rebate. That is, Plaintiffs . . . paid, and Menards accepted, the purchase price for the products and submitted valid rebate applications, and therefore performed their obligations under the specific rebate forms.

Dkt. 1, ¶ 184. If the rebate forms were part of the purchase contracts, as plaintiffs' complaint says, then terms contained on those rebate forms cannot be after-the-fact modifications, as the contracts described in the complaint were not formed until plaintiffs signed the rebate forms.

Second, even if the arbitration clause was [*8] an after-the-fact modification to the purchase contract, Menards was allowed to make such a modification because plaintiffs still had the opportunity to return their purchases when they signed the rebate forms. *Hill v. Gateway 2000, Inc., 105 F.3d 1147 (7th Cir. 1997)*, shows why this is so.[2] In that case, the plaintiffs

purchased a computer over the phone. When their computer arrived, the packaging contained a list of terms, including an arbitration clause, that purported to bind the plaintiffs unless they returned the computer within 30 days. *Id. at 1148*. The court noted that there are "many commercial transactions in which people pay for products with terms to follow," and held that the seller was free to include additional purchase terms in the packaging because the plaintiffs had the opportunity to reject the terms after reviewing them by returning their computer. *Id.*

Here, plaintiffs contend that the arbitration clause is unconscionable because they "were deceived into filling out a form—in order to get the bargain they had already paid for—which stripped them of their rights without notice or consent." Dkt. 19, at 20. But under *Hill*, Menards was free to disclose some terms of the rebate—including the arbitration provision—after the sale [*9] was made, so long as plaintiffs had a reasonable opportunity to return their purchases. Menards gave plaintiffs the rebate forms containing the arbitration clause while they were still in the store and could easily have returned their purchases. *Hill* shows that this was enough to prevent the clause from being invalidated as a modification to the purchase contract.

### 2. Procedural unconscionability

Plaintiffs contend that the arbitration clause is procedurally unconscionable—that is, that they were unfairly compelled to accept it—because they had to accept it to receive the rebates they were promised. Plaintiffs rely exclusively on Wisconsin law in support of their argument for unconscionability, and Menards contends that the law of each plaintiff's state should apply to that plaintiff's claims. But even assuming that all of plaintiffs' purchases were governed by the Wisconsin law on which they rely, their argument still fails because they haven't shown that the substance of the arbitration clause is also unconscionable, as required by Wisconsin law. This failure dooms plaintiffs' argument, so the court does not need to consider Menards' alternative argument that plaintiffs have not adduced [*10] sufficient factual evidence of the arbitration clause's procedural unconscionability.

Under Wisconsin law, unconscionability is "the absence of meaningful choice on the part of one of the parties,

---

[2] *Hill*'s holding was based on the Uniform Commercial Code (UCC), not state law. *Hill, 105 F.3d at 1149*. All five of the states at issue in this motion have adopted the UCC. *See Wis. Stat. ch. 401 et seq.; 810 Ill. Comp. Stat. 5; Mich. Comp. Laws ch. 440; Mo. Rev. Stat. ch. 400; Ohio Rev. Code ch. 1301 et seq.*

together with contract terms that are unreasonably favorable to the other party." *Wis. Auto Title Loans, Inc. v. Jones, 2006 WI 53, ¶ 32, 290 Wis. 2d 514, 714 N.W.2d 155*. In other words, unconscionability has both a procedural component, which concerns whether the contract was formed fairly, and a substantive component, which concerns whether the contractual provision itself is reasonable. *Id., ¶¶ 34-35*. A court must find both "a certain quantum of procedural plus a certain quantum of substantive unconscionability" to conclude that a contract provision is unconscionable. *Id., ¶ 33* (quoting *Discount Fabric House of Racine, Inc. v. Wis. Tel. Co., 117 Wis. 2d 587, 345 N.W.2d 417, 425 (1984))*. If more procedural unconscionability is found, less substantive unconscionability will be required to hold a provision unconscionable, and vice versa, but "a mixture of both" is required. *Id.*

Plaintiffs contend only that the arbitration clause is procedurally unconscionable; they do not address its substantive unconscionability at all. *See* Dkt. 18, at 13-16. Without any showing that the arbitration clause is substantively unconscionable—that is, that its terms unreasonably favor Menards—the [*11] court cannot find it unconscionable, regardless of plaintiffs' contention that its formation was procedurally unconscionable. *See Cottonwood Fin., Ltd. v. Estes, 2012 WI App 12, ¶ 7, 339 Wis. 2d 472, 810 N.W.2d 852* (if contract provision is not substantively unconscionable, court need not consider whether it was procedurally unconscionable).

Neither of plaintiffs' arguments for the unenforceability of the arbitration clause succeeds. So the court will grant Menards' motion to compel arbitration. A court granting a motion to compel arbitration will usually stay the arbitrable claims pursuant to *9 U.S.C. § 3*. But "there is a growing trend among federal courts . . . favoring dismissal of a case when all of the claims are subject to arbitration." *Felland v. Clifton, No. 10-cv-664-slc, 2013 U.S. Dist. LEXIS 100197, 2013 WL 2778967, at *11 (W.D. Wis. July 18, 2013)* (collecting cases). And the court of appeals "has repeatedly affirmed district courts' decisions to dismiss suits where all claims are arbitrable." *Chambers v. Aviva Life & Annuity Co., No. 12 C 9589, 2013 U.S. Dist. LEXIS 47246, 2013 WL 1345455, at *5 (N.D. Ill. Mar. 26, 2013)* (collecting cases). All of these plaintiffs' claims are subject to arbitration, so the court will dismiss the claims of these plaintiffs without prejudice.

## C. Motion to dismiss

Menards moves to dismiss each of the remaining plaintiffs' claims on various grounds, which the court addresses in the sections that follow.

### 1. Breach of contract

Menards raises [*12] two challenges to plaintiffs' breach of contract claims. First, it contends that the most of the plaintiffs' allegations show that they failed to attach receipts to their rebate applications as required by the rebate's terms. An act that must occur before a party is required to perform under a contract is called a condition precedent. *See, e.g., Anderson v. Aul, 2015 WI 19, ¶ 66, 361 Wis. 2d 63, 862 N.W.2d 304*. Under *Federal Rule of Civil Procedure 9(c)*, plaintiffs need not affirmatively allege that they have complied with each specific condition precedent; rather, "it suffices to allege generally that all conditions precedent have occurred or been performed."

In their complaint, plaintiffs allege that they "submitted valid rebate applications" and "performed their obligations under the specific rebate forms." Dkt. 1, ¶ 184. These general allegations are enough to comply with *Rule 9(c)*'s requirements for conditions precedent. Menards says that because two of the plaintiffs (Rider and Childers, whose claims are subject to arbitration as addressed above) specifically alleged that they attached their receipts to their rebate forms, *see id., ¶¶ 63* and 161, the other plaintiffs have pleaded themselves out of court by failing to allege that they also included their receipts. But the authorities on [*13] which Menards relies for this argument say only that plaintiffs may plead themselves out of court by making affirmative allegations showing that they have no claim, *Thomas v. Farley, 31 F.3d 557, 558-59 (7th Cir. 1994)*, or by making factual allegations that contradict their legal conclusions, *Steidl v. Gramley, 151 F.3d 739, 741 (7th Cir. 1998)*. These cases do not say that if one plaintiff unnecessarily alleges that she performed a specific condition precedent, the court must infer that the other plaintiffs did not perform that condition precedent. *Rule 9(c)* required plaintiffs only to allege generally that they complied with all conditions precedent, which they have done.

Second, Menards contends that six of the plaintiffs' claims for breach of contract should be dismissed because those plaintiffs allege that they inquired about the status of their rebates and found that there was no record of their rebate submissions. Three of those plaintiffs' claims are subject to arbitration (the claims of

Ingalls, Italia, and Fleckenstein), so the court does not need to consider Menards' motion as it concerns those plaintiffs. That leaves the other three plaintiffs Menards identifies—Trent Shores, Cassie Lietaert, and Thomas Fetsch.

Menards says that because these plaintiffs allege that there was no record [*14] of their rebate submissions, Menards was excused from having to send them their rebates. Menards relies on the Restatement (Second) of Contracts, which says that a party is excused from performance if performance becomes impracticable because of "the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made." *Restatement (Second) of Contracts § 261* (Am. Law. Inst. 1981). Menards suggests that these plaintiffs' rebate forms may not have been received because they were improperly addressed, lacked adequate postage, or were otherwise lost in the mail. But plaintiffs allege generally that "for many Menards' rebate customers, Menards fails to acknowledge the receipt of their rebate form submissions" on its online rebate tracker." Dkt. 1, ¶ 50. In other words, plaintiffs allege that Menards sometimes receives rebate forms but fails to record them. Plaintiffs will, of course, have to support this allegation with evidence later in this lawsuit, but on a motion to dismiss, the court must take it as true. Based on this allegation, the court may infer that there was no record of their rebate submissions because Menards failed to record their submissions. The court will not dismiss these [*15] plaintiffs' claims for breach of contract.

## 2. Breach of the implied duty of good faith and fair dealing

Wisconsin, like other jurisdictions, recognizes an implied duty of good faith and fair dealing in every contract. *Home Valu, Inc. v. Pep Boys—Manny, Moe and Jack of Del., Inc., 213 F.3d 960, 965-66 (7th Cir. 2000)*. Courts use this duty as a rule of construction to "fill contractual gaps," *id.* at 597 (quoting *Cont'l Bank, N.A. v. Everett, 964 F.2d 701, 705 (7th Cir. 1992))*, to prevent parties from acting in a manner that "follow[s] the letter but not the spirit of an agreement," *Beidel v. Sideline Software, Inc., 2013 WI 56, ¶ 27, 348 Wis. 2d 360, 842 N.W.2d 240*.

Menards contends that plaintiffs' good-faith claim should be dismissed because the duty doesn't create a standalone obligation that exists independently of the

parties' contractual obligations.[3] Menards is correct that breach of the duty of good faith isn't a separate claim from breach of contract. Rather, a good-faith claim is essentially a claim that a party has breached a contract's implicit obligations instead of the explicit ones. See *id., ¶¶ 27-28*. As plaintiffs note, they are free to plead this claim in the alternative to their claim that Menards breached the explicit terms of its contracts with plaintiffs, even if those claims are inconsistent with one another. *Fed. R. Civ. P. 8(d)(2), (3)*. Of course, if plaintiffs prove that Menards has breached an express term of the [*16] contract, they cannot recover under the duty of good faith for the same breach. See *Home Valu, 213 F.3d at 966*.

Menards says that plaintiffs did not plead their good-faith claim in the alternative to their claim for breach of contract for two reasons. First, they note that plaintiffs expressly stated in the title of their unjust-enrichment claim that it was pleaded in the alternative but did not do so for their good-faith claim. And second, noting that the first paragraph of plaintiffs' good-faith claim incorporates plaintiffs' previous allegations, they say that this includes plaintiffs' allegations that Menards expressly breached the contract. Both of these formalistic arguments ignore the fact that plaintiffs expressly allege that "[i]f the Court finds Menards ultimately fulfilled the terms of its contracts, then Menards has still breached the implied covenant of good faith and fair dealing," Dkt. 1, ¶ 188. This plainly describes a claim in the alternative to plaintiffs' claim for breach of contract. So the court will not dismiss this claim.

## 3. Unjust enrichment

Menards contends that plaintiffs' unjust-enrichment claim should be dismissed because such a claim is "quasi-contractual . . . and can be invoked only [*17] in the absence of an enforceable contract," *Carroll v. Stryker Corp., 658 F.3d 675, 682 (7th Cir. 2011)* (applying Wisconsin law). Menards acknowledges that plaintiffs have the right to plead this claim in the alternative to their contractual claims and that plaintiffs' complaint purports to do so. But Menards contends that plaintiffs have not pleaded this claim in the alternative

---

[3] Menards also contends that the court should dismiss the good-faith claims of the plaintiffs who did not allege that they submitted receipts because Menards was permitted to reject their rebate applications for that reason. This duplicates Menards' argument regarding plaintiffs' claims for breach of contract, and it fails here for the same reasons.

for two reasons.

First, as with plaintiffs' good-faith claim, Menards contends that plaintiffs' unjust-enrichment claim isn't pleaded in the alternative because it incorporates plaintiffs' previous allegations, including the allegation that plaintiffs "entered into specific agreements with Menards," Dkt. 1, ¶ 182. But again, plaintiffs expressly say that their unjust-enrichment claim will apply only if the court finds their "contracts with Menards invalid, non-existent, or unenforceable." *Id.*, ¶ 193. So this argument fails for the same reason it failed regarding plaintiffs' good-faith claim.

Second, Menards relies on *Harley Marine Services, Inc. v. Manitowoc Marine Group, LLC, 759 F. Supp. 2d 1059, 1062-63 (E.D. Wis. 2010)*, in which the court dismissed an unjust-enrichment claim because the plaintiffs had "assert[ed] a breach of contract claim and fail[ed] to allege any facts from which it could at least be inferred that the contract on which that claim is based might be [*18] invalid." But in that case, the defendants had already submitted an answer in which they didn't dispute the alleged contract's existence or validity. *Id.* Here, Menards has not yet answered plaintiffs' complaint, so it is too early to tell whether it will dispute that the rebate forms are valid contracts. Dismissal of plaintiffs' alternative claim would be inappropriate at this early stage. *See Diamond Ctr., Inc. v. Leslie's Jewelry Mfg. Corp., 562 F. Supp. 2d 1009, 1017 (W.D. Wis. 2008)* ("Although plaintiff would not be able to recover under its quasi-contract claims if there was in fact a contract governing its relationship with defendant, it is free to plead such alternative theories at this stage of the litigation.").

## 4. Consumer fraud

Plaintiffs bring claims against Menards under six states' consumer-fraud statutes that prohibit false or fraudulent advertisements. Dkt 1, ¶¶ 198-281. The only plaintiffs bringing claims under Missouri law (Italia) and Ohio law (Fleckenstein) must arbitrate their claims, so plaintiffs' consumer-fraud claims under those states' laws are dismissed as discussed above. This leaves plaintiffs' claims under the laws of Wisconsin, Illinois, Michigan, and North Dakota. Although these claims differ in their particulars, they are based on the same alleged [*19] conduct: that Menards falsely advertised that customers who purchased products during the rebate promotions and timely submitted valid rebate forms would receive rebate vouchers worth a particular amount within a

given time. Menards says that these claims should be dismissed for three reasons.

First, Menards contends that plaintiffs have improperly repackaged their basic breach-of-contract claims as consumer-fraud claims. In essence, Menards says that these laws require more than allegations that a party promised to perform under a contract but failed to perform. It argues that because "[p]laintiffs have failed to allege any unfair or deceptive conduct distinct from [Menards'] alleged breach of a contractual promise," their consumer-fraud claims must be dismissed. Dkt. 11, at 20.

Menards primarily relies on *Greenberger v. GEICO Gen. Ins. Co., 631 F.3d 392 (7th Cir. 2011)*. In that case, the plaintiff alleged that the defendant insurance company had violated Illinois's consumer-fraud law "by falsely promising to restore its insureds' vehicles to their preloss condition and failing to disclose to policyholders that it would not keep this promise." *Id. at 399*. The court upheld the dismissal of this claim based on *Avery v. State Farm Mut. Auto. Ins. Co., 216 Ill. 2d 100, 835 N.E.2d 801, 844, 296 Ill. Dec. 448 (Ill. 2005)*, which held that "[a] breach of contractual promise, [*20] without more, is not actionable" under Illinois's consumer-fraud law. The court held that the plaintiff's allegations of "a 'widespread' or 'systematic' breach of contract" didn't state a consumer-fraud claim because the plaintiff hadn't alleged any "affirmative acts of misrepresentation," only "a simple breach of contract multiplied over a prospective plaintiff class." *Greenberger, 631 F.3d at 400*.

Menards says that the principles in *Greenberger* are applicable to all of plaintiffs' consumer-fraud claims, but plaintiffs say that it applies only to their claim based on Illinois's statute. But even assuming that *Greenberger's* principles apply generally, plaintiffs have satisfied its requirements by alleging that Menards falsely advertises that customers will receive certain rebates but "systematically and routinely denies or substantially underpays promised rebates and takes steps to further drive down the redemption rate." Dkt. 1, ¶ 59. These allegations accuse Menards of engaging in affirmative acts of misrepresentation in its advertisements, which is enough to state a claim under *Greenberger*.

Second, Menards contends that plaintiffs haven't complied with the heightened pleading standards for claims of fraud. Plaintiffs [*21] don't dispute that the heightened pleading standards of *Federal Rule of Civil Procedure 9(b)* apply to these claims. *Rule 9(b)* requires

plaintiffs to allege the circumstances of fraud "with particularity," which the court of appeals has described as the details contained in "the first paragraph of any newspaper story: 'the who, what, when, where, and how.'" *Wigod v. Wells Fargo Bank, N.A., 673 F.3d 547, 569 (7th Cir. 2012)*.

Plaintiffs argue that their complaint satisfies this standard because it contains three examples of advertisements for Menards' rebate promotions, *see* Dkt. 1, ¶¶ 51, 53, and because each plaintiff identifies the date on which he or she purchased goods from Menards. It is true that plaintiffs alleging that they have been deceived by an advertisement need not "provide the precise date, time, and location that [they] saw the advertisement or every word that was included on it." *Camasta v. Jos. A. Bank Clothiers, Inc., 761 F.3d 732, 737 (7th Cir. 2014)*. But as Menards notes, plaintiffs don't allege that they saw *any* Menards advertisements, including the examples in their complaint. They say only that they purchased goods from Menards on a particular date that fell during a rebate promotion. *See, e.g.*, Dkt. 1, ¶ 60. This doesn't meet *Rule 9(b)*'s heightened pleading standards.

Third, Menards says that plaintiffs have failed to state claims under these statutes [*22] because they didn't allege that they relied on Menards' misrepresentations in making their purchases. Plaintiffs contend that they do not have to plead actual reliance, but this misconstrues Menards' argument. Menards argues that because plaintiffs' consumer-fraud claims are premised on the allegation that Menards engaged in deceptive advertisement, plaintiffs must allege that their damages were caused by those advertisements. All of the state consumer-fraud statutes on which plaintiffs rely require plaintiffs to show such a causal connection between Menards' misrepresentations and their damages.[4] None of the plaintiffs allege that they saw an advertisement for a Menards' rebate promotion or that any advertisement

factored into their decisions to purchase goods from Menards. So plaintiffs have failed to state claims upon which relief may be granted, which warrants dismissal under *Federal Rule of Civil Procedure 12(b)(6)*.

Because plaintiffs' consumer-fraud claims do not comply with *Rule 9(b)* and *12(b)(6)*, the court will dismiss them. This litigation is still in its early stages and it would be possible for plaintiffs to cure these defects in an amended complaint, so the court will dismiss these claims without prejudice to plaintiffs' repleading [*23] them. *See Abu-Shawish v. United States, 898 F.3d 726, 738 (7th Cir. 2018)* ("The usual standard in civil cases is to allow defective pleadings to be corrected, especially in early stages, at least where amendment would not be futile.").

CONCLUSION

Six of the plaintiffs have entered into enforceable arbitration agreements with Menards, so those plaintiffs must arbitrate their claims. The remaining plaintiffs' consumer-fraud claims under Wisconsin, Illinois, Michigan, and North Dakota law fail to comply with the Federal Rules of Civil Procedure. The court will dismiss those claims without prejudice and give the remaining plaintiffs a short time to replead them in an amended complaint. But the remaining plaintiffs have properly pleaded claims for breach of contract, breach of the implied duty of good faith and fair dealing, and unjust enrichment, so the court will not dismiss those claims.

ORDER

IT IS ORDERED that:

    1. Defendant Menard, Inc.'s motion to compel arbitration, Dkt. 7, is GRANTED. All claims of plaintiffs Amy Childers, Cody Italia, Nazar Mansoor, Debbie Rider, Ryan Ingalls, and Karen Fleckenstein are dismissed without prejudice.

    2. Menards' motion to dismiss the remaining plaintiffs' claims, Dkt. 10, is GRANTED in part. The remaining plaintiffs' [*24] claims under Wisconsin, Illinois, Michigan, and North Dakota consumer-fraud law are DISMISSED without prejudice. The remainder of Menards' motion is DENIED.

3. Plaintiffs may have until September 17, 2020 to file an amended complaint repleading their consumer-fraud claims. If they do not do so, the court will dismiss these claims with prejudice. If plaintiffs file an amended complaint, defendant may have until October 1, 2020 to file a renewed motion to dismiss.

---

[4] *Wis. Stat. § 100.18(11)(b)* (action may be brought by "[a]ny person suffering pecuniary loss because of a violation of this section"); *815 Ill. Comp. Stat. 505/10a(a)* (action may be brought by "[a]ny person who suffers actual damage as a result of a violation of this Act"); *Mich. Comp. Laws § 445.911(2), (3)* (action may be brought by "person who suffers loss as a result of a violation of this act"); *N.D. Cent. Code § 51-15-09* (statute authorizing state attorney general to enforce consumer-fraud laws "does not bar any claim for relief by any person against any person who has acquired any moneys or property by means of any practice declared to be unlawful in this chapter").

Entered September 3, 2020.

BY THE COURT:

/s/ JAMES D. PETERSON

District Judge

---

KeyCite Yellow Flag - Negative Treatment

Declined to Follow by Glenn v. Hyundai Motor America, C.D.Cal., June 24, 2016

2013 WL 2420455
United States District Court, D. Minnesota.

Tracie CHIN and Salvatore Montalbano,
individually, and on behalf of
other members of the general
public similarly situated, Plaintiffs,

v.

GENERAL MILLS, INC., Defendant.

Civil No. 12–2150 (MJD/TNL).
|
June 3, 2013.

**Attorneys and Law Firms**

Andrea Clisura, Antonio Vozzolo, and Juan E. Monteverde, Faruqi & Faruqi, LLP, and Shawn M. Perry, Perry & Perry PLLP, for Plaintiffs.

Jerry W. Blackwell, Benjamin W. Hulse, Emily A. Babcock, and Mary S. Young, Blackwell Burke PA, for Defendant.

**MEMORANDUM ORDER**

MICHAEL J. DAVIS, Chief Judge.

**I. INTRODUCTION**

**\*1** This matter is before the Court on Defendant's Motion to Dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). [Docket No. 20] The Court heard oral argument on March 15, 2013. For the reasons that follow, the Court grants Defendant's motion to dismiss.

**II. BACKGROUND**

**A. Factual Background**

**1. Parties**

Defendant General Mills is a Delaware corporation with its principal place of business in Minnesota. (Compl.¶ 9.) General Mills produces, markets, and sells Nature Valley products, including "Protein Chewy Bars," "Chewy Trail Mix

Granola Bars," "Yogurt Chewy Granola Bars," "Sweet & Salty Nut Granola Bars," and "Granola Thins." (Id. at ¶ 1.)

Plaintiffs are consumers who purchased one or more of the Nature Valley products. (Id. at ¶¶ 8–9.) Plaintiff Tracie Chin is a resident of Brooklyn, New York. (Id. at ¶ 7.) She purchased and consumed Nature Valley products on multiple occasions during the identified class period from various retailors, including Duane Reade, Pathmark, and Costco. (Id.) Chin purchased Nature Valley Granola Thins from a Costco store in Brooklyn, New York during the summer of 2012. (Id.) Chin purchased Nature Valley "Sweet & Salty Nut Granola Bars" from a Duane Reade store in New York, New York during the summer of 2011 and from a Pathmark store in Staten Island, New York at least four different times between 2011 and the spring of 2012. (Id.)

Plaintiff Salvatore Montalbano is a resident of East Brunswick, New Jersey. (Id. at ¶ 8.) On multiple occasions, Montalbano purchased and consumed Nature Valley "Chewy Trail Mix Granola Bars," "Sweet & Salty Nut Granola Bars," and "Granola Thins" from a Shop Rite store in New Jersey. (Id.)

**2. Allegations of Misconduct**

Plaintiffs allege that General Mills has engaged in unfair, unlawful, deceptive, and misleading practices in violation of Federal law, Minnesota state law, New York state law, New Jersey state law, and common law. (Id. at ¶¶ 1, 35–128.) Plaintiffs maintain that General Mills markets its Nature Valley products as "100% Natural" or "Natural." (Id. at ¶¶ 2–3, 15–18.) Plaintiffs assert that the Nature Valley products are not "natural" because the products contain "highly processed and non-natural sugar substitutes high fructose corn syrup and high maltose corn syrup, as well as the highly processed and non-natural texturizer Maltodextrin." (Id. at ¶¶ 4–5, 19–34.)

Plaintiffs maintain that General Mills represents that the products are "100% Natural" in order to command a premium price for the products, take away market share from its competitors, and increase its own profits." (Id. at ¶¶ 3, 42–46.) Plaintiffs Chin and Montalbano assert that they relied on General Mills' representations that the products were "100% Natural" when they purchased the products. (Id. at ¶¶ 7–8.) Plaintiffs Chin and Montalbano also assert that they would not have purchased the products under the same terms if they had known that they contained "highly processed and non-natural sugar substitutes high fructose corn syrup and high maltose

corn syrup, as well as the highly processed and non-natural texturizer Maltodextrin." (*Id.*)

### B. Procedural Background

**\*2** On August 31, 2012, Plaintiffs filed a Complaint in this Court against General Mills alleging nine counts relating to the Nature Valley Granola Bars. [Docket No. 1] On November 26, 2012, General Mills moved to dismiss the Complaint for lack of jurisdiction. [Docket No. 8] On December 17, 2012, the parties filed a stipulation with the Court whereby the parties agreed to continue General Mills' motion to dismiss pending the filing of Plaintiffs' Amended Complaint. [Docket No. 15]

On January 4, 2013, Plaintiffs filed their Amended Complaint. [Docket No. 19] The Amended Complaint alleges Count I: Violation of Written Warranty under the Magnuson–Moss Warranty Act, 15 U.S.C. § 2301, *et seq.;* Count II: Violation of Implied Warranty of Merchantability under the Magnuson–Moss Warranty Act, 15 U.S.C. § 2301, *et seq.* and under New York and New Jersey State Law; Count III: Unjust Enrichment under state law; Count IV: Breach of Express Warranty under state law; Count V: Breach of Implied Warranty of Merchantability under state law; Count VI: Fraudulent Misrepresentation under state law; Count VII: Violation of Minnesota Consumer Protection Laws; Count VIII: Violation of the New York Unfair and Deceptive Business Practices Law, N.Y. Gen. Bus. Law § 349, *et seq.;* Count IX: Violation of the False Advertising Law, N.Y. Gen. Bus. Law § 350, *et seq.;* Count X: Violation of the New Jersey Consumer Fraud Act, Stat. Ann.. § 56:8–1, *et seq.*

Plaintiffs seek to sue on behalf of "all persons in the United States who, within the relevant statute of limitations period, purchased Nature Valley products that contained high fructose corn syrup or high maltose corn syrup or Maltodextrin and were packaged, labeled, marketed, or advertised as being "100% Natural." (Compl. at ¶ 48.) Plaintiff Chin also seeks to represent a "subclass defined as all members of the Class who purchased Nature Valley products in New York. (*Id.* at ¶ 49.) Plaintiff Montalbano also seeks to represent a "subclass defined as all members of the Class who purchased Nature Valley products in New Jersey." (*Id.* at ¶ 50.)

On January 22, 2013, Defendants filed the current motion to dismiss and allege that the Complaint should be dismissed pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

## III. DISCUSSION

### A. Motion to Dismiss for Lack of Standing

General Mills argues that this Court does not have subject matter jurisdiction over Plaintiffs' claims relating to Nature Valley products that they did not purchase because Plaintiffs have failed to plead facts demonstrating their standing to seek such relief.

"A plaintiff has the burden of establishing subject matter jurisdiction, for which standing is a prerequisite." *Jones v. Gale,* 470 F.3d 1261, 1265 (8th Cir.2006) (citations omitted). The Eighth Circuit has explained:

> [t]o establish standing, a plaintiff is required to show that he or she had 'suffered an injury in fact, meaning that the injury is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical.' Second, the injury must be traceable to the defendant's challenged action. Third, it must be 'likely' rather than 'speculative' that a favorable decision will redress the injury.
> **\*3** *Id.* (quoting *South Dakota Farm Bureau, Inc. v. Hazeltine,* 340 F.3d 583, 591 (8th Cir.2003)).

In order to properly dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the complaint must be successfully challenged on its face or on the factual truthfulness of its averments. In a facial challenge to jurisdiction, all of the factual allegations concerning jurisdiction are presumed to be true and the motion is successful if the plaintiff fails to allege an element necessary for subject matter jurisdiction. *Titus v. Sullivan,* 4 F.3d 590, 593 (8th Cir.1993) (citations omitted). Here, the Court is presented with a facial challenge as General Mills does not contest the validity of the Amended Complaint's factual allegations for the purpose of their standing argument.

General Mills maintains that Plaintiffs seek relief for alleged false representations made on Protein Chewy Bars and Yogurt Chewy Granola Bars even though Plaintiffs do not allege in their Amended Complaint that they ever purchased these products. General Mills argues that Plaintiffs lack Article III standing for these products and Plaintiffs improperly seek to represent a class of consumers who purchased products that the named Plaintiffs did not purchase.

The Court agrees with General Mills and dismisses Plaintiffs' claims relating to the alleged false representations made in

regard to the Protein Chewy Bars and Yogurt Chewy Granola Bars for lack of standing. It is clear from the face of Plaintiffs' Complaint that neither Chin nor Montalbano purchased the Protein Chewy Bars or Yogurt Chewy Granola Bars. The named plaintiffs in a class action may not rely on injuries that the putative class may have suffered, but instead must allege that they personally have been injured. *Lewis v. Casey,* 518 U.S. 343, 357 (1996) ("That a suit may be a class action ... adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.' ") (quotations omitted); *Thunander v. Uponor, Inc.,* 887 F.Supp.2d 850, 863 (D .Minn.2012) ("A class representative must have standing to assert claims on his or her own behalf in order to have standing to assert claims as a class representative"). The Court notes that other courts routinely dismiss claims in consumer class actions that attempt to seek relief relating to products that the named plaintiffs have not purchased. *See Carrea v. Dreyer's Grand Ice Cream, Inc.,* No. C 10–01044 JSW, 2011 WL 159380, at *3 (N.D.Cal. Jan. 10, 2011) (dismissing claims without prejudice as to products that the named plaintiff did not purchase); *Hemy v. Perdue Farms, Inc.,* Civil Action No. 11–888(FLW), 2011 WL 6002463, at *11 (D.N.J. Nov. 30, 2011) (dismissing claims with prejudice as to products that named plaintiff did not purchase); *Lieberson v. Johnson & Johnson Consumer Co., Inc.,* 865 F.Supp.2d 529, 537 (D.N.J.2011) (dismissing allegations regarding products that Plaintiff did not purchase and only considering allegations regarding products that Plaintiff alleges she purchased and used).

 **\*4** Plaintiffs have not identified any case law from the Eighth Circuit or the District of Minnesota that would permit them to assert claims relating to products that they themselves did not purchase. Plaintiffs point to one Eighth Circuit case and maintain that "a plaintiff may be able to assert causes of action which are based on conduct that harmed him, but which sweep more broadly than the injury he personally suffered." *Braden v. Wal–Mart Stores, Inc.,* 588 F.3d 585, 591–92 (8th Cir.2009) (holding that an ERISA plaintiff may seek relief under § 1132(a)(2) for the entire plan). As the Court stated during oral argument and Plaintiffs' counsel agreed, this case was decided in the context of an ERISA class action and does not directly relate to the underlying facts in this case.

Therefore, the Court grants General Mills' motion to dismiss and dismisses Counts I through X of Plaintiffs' Complaint to

the extent that the respective Counts seek relief relating to the Protein Chewy Bars and Yogurt Chewy Granola bars.

## B. Rule 12(b)(6)

### 1. Standard

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a party may move the Court to dismiss a claim if, on the pleadings, a party has failed to state a claim upon which relief may be granted. In reviewing a motion to dismiss, the Court takes all facts alleged in the complaint to be true. *Zutz v. Nelson,* 601 F.3d 842, 848 (8th Cir.2010).

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. Thus, although a complaint need not include detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.

*Id.* (citations omitted).

In deciding a motion to dismiss, the Court considers "the complaint, matters of public record, orders, materials embraced by the complaint, and exhibits attached to the complaint." *PureChoice, Inc. v. Macke,* Civil No. 07–1290, 2007 WL 2023568, at *5 (D.Minn. July 10, 2007) (citing *Porous Media Corp. v. Pall Corp.,* 186 F.3d 1077, 1079 (8th Cir.1999)).

### 2. Count I: Violation of Written Warranty under the Magnuson–Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*

The Magnuson–Moss Warranty Act ("MMWA") creates a private federal cause of action for "a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this chapter, or under a written warranty, implied warranty, or service contract." 15 U.S.C. § 2310(d)(1). The MMWA includes a cause of action for breach of a written warranty. *Id.* The MMWA defines "written warranty" as:

> Any written affirmation of fact or written promise made in connection with the sale of a consumer product by a supplier to a buyer which relates to the nature of the material or workmanship and affirms or promises that such material or workmanship is defect free or will meet a

specified level of performance over a specified period of time.

**\*5** 15 U.S.C. § 2301(6)(A). Therefore, to constitute a written warranty, a statement must either affirm or promise that such material or workmanship (1) is defect free, or (2) will meet a specified level of performance over a specified period of time. *Id.* The Federal Trade Commission's regulation interpreting the statutory language states that "[c]ertain representations, such as energy efficiency ratings for electrical appliances, care labeling of wearing apparel, and other product information disclosures, may be express warranties under the Uniform Commercial Code" but "these disclosures alone are not written warranties under this Act." 16 C.F.R. § 700.3(a) (2012).

Plaintiffs concede that they have only brought claims under the "defect free" prong of the MMWA's written warranty definition. [Docket No. 19 at ¶¶ 56–64; Docket No. 27 at 9] Therefore, the Court will analyze whether Plaintiffs have stated a claim that "100% Natural" constitutes a "written affirmation of fact or written promise [that] ... affirms or promises that such material or workmanship is defect free." 15 U.S.C. § 2301(6)(A).

General Mills argues that the Court should dismiss Count I as to all products because Plaintiffs cannot allege the existence of an actionable warranty. The Court agrees with General Mills. Labeling a product "100% Natural" is not a written warranty under the MMWA. *See Jones v. ConAgra Foods, Inc.,* No. C 12–01633 CRB, 2012 WL 6569393, at \*12 (N.D.Cal. Dec. 17, 2012) (holding that 100% natural descriptions on PAM cooking spray, Hunt's canned tomato products, and Swiss Miss cocoa did not constitute written warranties under MMWA); *see also Anderson v. Jamba Juice Co.,* 888 F.Supp.2d 1000, 1004 (N.D.Cal.2012) ("The statement "All Natural" is a general product description rather than a promise that the product is defect free.... Therefore the language "All Natural" on the smoothie kits' labels did not create a written warranty within the meaning of the MMWA."). Instead, this type of statement is a product description that does not constitute a "written warranty." *See Jamba Juice Co.,* 888 F.Supp.2d at 1004 (dismissing MMWA claim and holding that "all natural" statement was a general product description and not a written warranty); *Astiana v. Dreyer's Grand Ice Cream, Inc.,* Nos. C–11–2910 EMC, C–11–3164 EMC, 2012 WL 2990766, at \*3 (N.D.Cal. July 20, 2012) (dismissing MMWA claim holding that "all natural" statement on ice cream products is a product description and does not constitute a written warranty). Further, the Court

finds that in this case, the knowing inclusion of specific ingredients in a food product that are part of the recipe does not constitute a written warranty under the "defect" prong. *Astiana,* 2012 WL 2990766, at \*3.

The Court rejects Plaintiffs argument that they have sufficiently pled a "defect free" claim. Plaintiffs have not identified any caselaw in support of their position. Instead, Plaintiffs rely on the plain meaning of the statute. The Court disagrees with Plaintiffs' interpretation and grants Defendant's motion to dismiss Count I of the Complaint.

### 3. Count II: Violation of Implied Warranty of Merchantability under the Magnuson–Moss Warranty Act, 15 U.S.C. § 2301, *et seq.* and Count V: Breach of Implied Warranty of Merchantability under state law

**\*6** Plaintiffs' Amended Complaint alleges that General Mills breached an implied warranty of merchantability under MMWA and state laws. (Compl.¶¶ 65–77, 89–93.)

The MMWA defines an "implied warranty" as an implied warranty arising under state law. 15 U.S.C. § 2301(7). Plaintiffs' Amended Complaint does not identify which state laws apply to their implied warranty claims. The parties' briefs, however, specifically address New York and New Jersey state law, and therefore the Court will limit its analysis to those state laws. The parties agree that a full choice of law analysis is not required to resolve the issues presented in a motion to dismiss. [Docket No. 22 at 13; Docket No. 27 at 10]

New Jersey and New York law both provide that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." N.J. Stat. Ann.. § 12A:2–314(1); N.Y. McKinney's U.C.C . § 2–314(1). New Jersey and New York law further provide that in order for goods to be merchantable, they must:

  (a) pass without objection in the trade under the contract description; and

  (b) in the case of fungible goods, are of fair average quality within the description; and

  (c) are fit for the ordinary purposes for which such goods are used; and

  (d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

(e) are adequately contained, packaged, and labeled as the agreement may require; and

(f) conform to the promises or affirmations of fact made on the container or label if any.

N.J. Stat. Ann.. § 12A:2–314(2); N.Y. McKinney's U.C.C. § 2–314(2). A product is not merchantable if it fails to meet any of the above criteria. N.J. Stat. Ann. § 12A:2–314(2); N.Y. McKinney's U.C.C. § 2–314(2).

Plaintiffs' Amended Complaint alleges that General Mills violated subsections (a), (e), and (f). (Compl.¶¶ 74, 92.) Plaintiffs allege that the packaging of the Nature Valley products states that the products are "100% Natural" and the products are not in fact "100% Natural." *Id.*

General Mills argues that the Court should dismiss Counts II and V as to all products because Plaintiffs cannot allege a violation of subsections (a), (e), or (f) as these subsections do not apply to remote purchasers of products. The Court agrees with General Mills. Subsection (a) requires the existence of a contract between General Mills and Plaintiffs. *See* N.J. Stat. Ann.. § 12A:2–314(a) (requiring that the product "pass without objection in the trade *under the contract description*") (emphasis added); N.Y. McKinney's U.C.C. § 2–314(2)(a) (same). Likewise, subsection (e) requires the existence of an "agreement" between General Mills and Plaintiffs. *See* N.J. Stat. Ann. § 12A:2–314(e) (requiring product to be "adequately contained, packaged, and labeled *as the agreement may require*") (emphasis added); N.Y. McKinney's U.C.C . § 2–314(2)(e) (same). Although subsection (f) does not expressly require an agreement or contract between Plaintiffs and General Mills, the Official Comment 10 confirms that subsection (f) also applies only to direct purchasers. *See* N.J. Stat. Ann. § 12A:2–314, cmt. 10; N.Y. McKinney's U.C.C. § 2–314, cmt. 10.

**\*7** Plaintiffs have not pled that a contract or agreement existed between themselves and General Mills and the Court finds that Plaintiffs were not direct purchasers. Therefore, Plaintiffs have failed to state a claim for breach of the implied warranty of merchantability under New York and New Jersey law. Because the MMWA's implied warranty of merchantability is based on state law, Plaintiffs have also failed to state a claim under the MMWA. Therefore the Court dismisses Counts II and V from Plaintiff's Complaint.

4. Count IV: Breach of Express Warranty under state law

Plaintiffs' Amended Complaint alleges that General Mills breached an express warranty under state laws. (Compl.¶¶ 84–88.)

An express warranty is any affirmation of fact or promise that relates to the goods or any description of the goods that becomes part of the basis of the bargain. *See* N.Y. McKinney's U.C.C. § 2–313; N.J. Stat. Ann. § 12A:2–313. Plaintiffs allege that General Mills expressly warranted that the Nature Valley products were "100% Natural." (Compl.¶ 86.) Plaintiffs allege, however, that the Nature Valley products are not 100% natural. [*Id.* at ¶ 87] Plaintiffs' Amended Complaint does not identify which state laws apply to their express warranty claims. Plaintiffs' opposition to the motion to dismiss presents arguments relating to New York and New Jersey state law, and therefore the Court will only address those state laws.

General Mills argues that "100% Natural" cannot be viewed in isolation and must be read in the context of the entire package, including the ingredient panel. General Mills further argues that the specific terms included in the ingredient list must inform the more general term "100% Natural." *See* Stat. Ann.. § 12A:2–317 ("Warranties whether express or implied shall be construed as consistent with each other and as cumulative.... Exact or technical specifications displace ... general language of description); N.Y. McKinney's U.C.C. § 2–317 (same). The Court agrees with General Mills and finds that the specific terms determine the scope of the express warranty that was allegedly made to the Plaintiffs. As such, General Mills cannot be in breach of an express warranty by including an ingredient that it expressly informed consumers was included. The Court, therefore, dismisses Count IV of Plaintiffs' Complaint.

**C. Rule 9(b) Particularity**

General Mills' also asserts that Plaintiffs' fraud-based claims in Counts III, VI, VII, and X fail to meet the requirements of Rule 9(b) of the Federal Rules of Civil Procedure and therefore should be dismissed. Count III alleges unjust enrichment under unidentified state law. Count VI alleges fraudulent misrepresentation under unidentified state law. Count VII alleges violations of Minnesota consumer protection laws. Count X alleges violations of the New Jersey Consumer Fraud Act, Stat. Ann.. § 56:8–1, *et seq.*

**1. Standard**

Case 2:20-cv-00869-JPS Filed 09/28/20 Page 32 of 109 Document 7

31

**\*8** Plaintiffs must plead allegations of fraud with particularity. Fed R. Civ. P. 9(b). A pleading which alleges fraud or mistake must identify "who, what, where, when and how." *Bank of Montreal v. Avalon Capital Grp., Inc.,* 743 F.Supp.2d 1021, 1028 (D.Minn.2010) (quoting *Parnes v. Gateway 2000, Inc.,* 122 F.3d 539, 550 (8th Cir.1997)). The facts alleged must "give Defendants notice of what conduct is complained of and [allow them] to prepare a defense to such claim of misconduct." *First Presbyterian Church of Mankato, Minn. v. John G. Kinnard & Co.,* 881 F.Supp. 441, 445 (D.Minn.1995) (citation omitted).

The heightened pleading standard in Rule 9(b) applies to claims of unjust enrichment (Count III), claims of fraudulent misrepresentation (Count VI), and claims under Minnesota's, New York's, and New Jersey's consumer protection statutes (Counts VII and X). *See Cox v. Mortgage Elec. Registration Sys., Inc.,* 685 F.3d 663, 672–73 (8th Cir.2012) ("Under Minnesota law, any allegation of misrepresentation, whether labeled as a claim of fraudulent misrepresentation or negligent misrepresentation, is considered an allegation of fraud which must be pled with particularity."); *Khoday v. Symantec Corp.,* 858 F.Supp.2d 1004, 1011 n. 5 (D.Minn.2012) ("The Court will apply the heightened pleading standard of Rule 9(b) to the unjust enrichment claim because allegations of fraud underlie the unjust enrichment claim."); *Soroof Trading Dev. Co., Ltd. v. GE Fuel Cell Sys., LLC,* 842 F.Supp.2d 502, 513 (S.D.N.Y.2012) (dismissing misrepresentation claim under New York state law for failure to satisfy the Rule 9(b) pleading requirements); *Smajlaj v. Campbell Soup Co.,* 782 F.Supp.2d 84, 98 (D.N.J.2011) (reasoning that Rule 9(b) applies to claims under the New Jersey consumer fraud statutes); *Tuttle v. Lorillard Tobacco Co.,* 118 F.Supp.2d 954, 963 (D.Minn.2000) (reasoning that Rule 9(b) applies to allegations under Minnesota's consumer fraud statutes).

#### 2. Merits

General Mills argues that Plaintiffs fail to satisfy the Rule 9(b) pleading requirements because the Amended Complaint does not allege how the Plaintiffs were allegedly deceived by the "100% Natural" statement. General Mills reasons that Plaintiffs do not explain what they believed "natural" meant when they bought the products. Likewise, Plaintiffs do not allege with any specificity that high maltose corn syrup

and maltodextrin are "unnatural" and instead plead that the ingredients are "highly processed."

Plaintiffs argue that they have satisfied Rule 9(b) and have adequately pled "how" the "100% Natural" statement misled themselves and other consumers. Plaintiffs reason that they pled that the products contain non-natural ingredients that are manufactured by chemical processes. (Compl. at ¶ 2, 20–25.) Plaintiffs further reason that General Mills misleads consumers to believe that the products are high quality and healthy when they are not. (*Id.* ¶ 3.) Plaintiffs maintain that reasonable consumers, like themselves, believe that a food product represented as "100% Natural" does not contain highly processed, non-natural sugar substitutes such as high fructose corn syrup and high maltose corn syrup, and the non-natural texturizer Maltodextrin. Plaintiffs allege that they relied on General Mills' "100% Natural" representations and would not have paid the premium price for the products had they known the products contained the nonnatural ingredients. Plaintiffs maintain that these allegations satisfy the Rule 9(b) pleading requirements.

**\*9** The Court agrees with General Mills and will dismiss Counts III, VI, VII, and X for failure to satisfy the heightened pleading requirements of Rule 9(b). Plaintiffs have failed to plead how they were deceived by the "100% Natural" statement. Relatedly, Plaintiffs have not alleged with any specificity what they believed "100% Natural" to mean. Plaintiffs make several statements regarding ingredients that are "highly processed," but fail to plead what they understood this term to mean and how it does or does not relate to the "100% Natural" statement. Therefore, the Court dismisses Counts III, VI, VII, and X of Plaintiffs' Complaint.

Accordingly, based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED:**

Defendant's Motion to Dismiss [Docket No. 33] is **GRANTED.**

#### All Citations

Not Reported in F.Supp.2d, 2013 WL 2420455, 80 UCC Rep.Serv.2d 1034

---

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 4729302
Only the Westlaw citation is currently available.
United States District Court, N.D. California,
San Jose Division.

Cindy COLEMAN-ANACLETO, Plaintiff,

v.

SAMSUNG ELECTRONICS
AMERICA, INC., Defendant.

Case No. 16-CV-02941-LHK
|
Signed 09/12/2016

**Attorneys and Law Firms**

Andre Michel Mura, Eric H. Gibbs, Dylan Hughes, Eric
H. Gibbs, Steven Augustine Lopez, Gibbs Law Group LLP,
Oakland, CA, for Plaintiff.

Nicole Susan Phillis, Jacob Michael Harper, Russell Ira
Glazer, Tony Dong Shin, Troy & Gould, P.C., Los Angeles,
CA, for Defendant.

**ORDER DENYING PLAINTIFF'S MOTION TO
REMAND; GRANTING IN PART AND DENYING IN
PART DEFENDANT'S MOTION TO DISMISS**

[PUBLIC REDACTED VERSION]

Re: Dkt. Nos. 13, 16

LUCY H. KOH, United States District Judge

**\*1** Defendant Samsung Electronics America, Inc.
("Defendant") removed this action from Santa Clara County
Superior Court based on diversity jurisdiction under the Class
Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). ECF No.
1. Plaintiff Cindy Coleman-Anacleto ("Plaintiff") now moves
to remand the case to state court. ECF No. 13. Also before the
Court is Defendant's motion to dismiss Plaintiff's complaint.
ECF No. 16. Having considered the parties' briefing, the
relevant law, and the record in this case, the Court hereby
DENIES Plaintiff's motion to remand, and GRANTS in part
and DENIES in part Defendant's motion to dismiss.

# I. BACKGROUND

## A. Factual Background
This case arises out of an alleged defect in the "Ultra Slim"
wall mounts manufactured by Defendant beginning in 2009.
Compl. ¶ 8. Ultra Slim wall mounts—models WMN1000A,
WMN1000B, WMN1000C, WMN2000A, WMN2000B,
WMN2000C, WMN3000A, WMN3000B, and WMN3000C
—are designed to hang various flat panel televisions on the
wall. *Id.* ¶ 11. Hanging a television with an Ultra Slim wall
mount involves screwing two plastic disks onto the back of
the television. *Id.* ¶¶ 9, 21. The plastic disks hold a metal cable
between them. After the plastic disks and cable are attached to
the television, the cable is hung onto two metal disks that are
screwed into the wall. *Id.* ¶¶ 9–10. The television thus hangs
from the cable, which hangs from the two wall-mounted metal
disks. *Id.*

Each Ultra Slim wall mount package is labeled with the "safe
working load" (the weight that the wall mount can safely
lift without breaking), and the "minimum breaking load" (the
minimum strength of a product when tested to failure), as
well as with the televisions with which the wall mount is
compatible. *See id.* ¶ 12 (examples of Ultra Slim wall mount
packaging); ECF No. 16 ("Mot. Dismiss"), at 5 nn. 1–2
(explaining packaging terms). However, "[t]he plastic disks
[in Ultra Slim wall mounts]...break under the regular pressure
of holding a Samsung television of the appropriate weight and
size, as stated on the package." Compl. ¶ 13.

When the plastic disks in an Ultra Slim wall mount break, the
television falls off of the wall mount. *Id.* A falling television
"presents a serious safety hazard to those nearby, including
children and pets." *Id.* ¶ 14. Indeed, falling televisions have
caused over 150 fatalities between 2000 and 2013, and
over 15,000 injuries requiring emergency-room treatment
between 2011 and 2013. *Id.* ¶¶ 14–15. In addition to the
safety risks, falling televisions cause damage to both the
television and any items that the television hits, including
stereo systems, video game consoles, and furniture. *Id.* ¶ 17.
Because televisions "typically cost thousands of dollars," the
damage to a television from a fall "is often too expensive to
repair" and the television has to be replaced. *Id.*

According to Plaintiff, Defendant knew of, yet failed to
disclose, the defect in the plastic disks of Ultra Slim wall
mounts. *Id.* ¶¶ 18–19. Since at least 2012, purchasers of Ultra
Slim wall mounts have reported on Amazon.com the plastic
disk failures in their Ultra Slim wall mounts. *Id.* ¶ 18 (listing

11 consumer complaints from Amazon.com). Many of these consumers expressed concern that the failure of the Ultra Slim wall mount posed a safety risk due to the falling of the television mounted on the Ultra Slim wall mount. *Id.* Plaintiff alleges that "[i]t is likely that [Defendant] knew that its wall mounts were prone to failure well before 2012, as the complaints above demonstrate, Ultra Slim wall mounts can break at any time after installation." *Id.* ¶ 19.

**\*2** In September 2010, Plaintiff purchased an Ultra Slim wall mount (model WMN1000C) to hang her $3,200 television. *Id.* ¶ 21. On January 7, 2016, one of the Ultra Slim wall mount's plastic disks failed, causing Plaintiff's television to fall off of the wall and break. *Id.* ¶ 22. Although Plaintiff contacted Defendant, Defendant refused to repair the television. *Id.* ¶ 23.

### B. Procedural Background

On April 29, 2016, Plaintiff filed the instant complaint in Santa Clara County Superior Court seeking to represent a putative class of "[a]ll persons who purchased a Samsung Ultra Slim wall mount in California." Compl. ¶ 24. The complaint asserts six causes of action: (1) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*; (2) violation of the Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 *et seq.*; (3) breach of implied warranties under the Song-Beverly Consumer Warranty Act (the "Song-Beverly Act"), Cal. Civ. Code § 1790 *et seq.*; (4) strict liability for design defect; (5) strict liability for failure to warn; and (6) negligence. Plaintiff requests that Defendant "[r]eimburse class members who have already incurred personal injury or damage to property as a result of Ultra Slim wall mount failures," "[r]epair or replace Samsung televisions that have been damaged by Ultra Slim wall mount failures," and "[r]eimburse or refund Plaintiff and all Ultra Slim wall mount purchasers the amount they paid to purchase the wall mounts." However, Plaintiff does not specify an amount of damages. Plaintiff also seeks restitution, disgorgement of profits, attorney's fees and costs, and declaratory and injunctive relief.

On June 1, 2016, Defendant removed the case to this Court based on CAFA jurisdiction. ECF No. 1. On July 1, 2016, Plaintiff filed the instant motion to remand. ECF No. 13 ("Mot. Remand"). Defendant opposed the motion to remand on July 28, 2016. ECF No. 25 ("Remand Opp."). That same day, Defendant filed a request for judicial notice. ECF No. 25-2. Plaintiff replied on August 4, 2016. ECF No. 29 ("Remand Reply").

On July 5, 2016, Defendant moved to dismiss, ECF No. 16 ("Mot. Dismiss"), and filed a request for judicial notice. ECF No. 16-1.[1] On August 2, 2016, Plaintiff opposed the motion to dismiss. ECF No. 27 ("Dismiss Opp."). Defendant replied on August 16, 2016. ECF No. 34.

## II. LEGAL STANDARD

### A. Motion to Remand

**\*3** A suit may be removed from state court to federal court only if the federal court would have had subject matter jurisdiction over the case in the first instance. 28 U.S.C. § 1441(a); *see Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987) ("Only state-court actions that originally could have been filed in federal court may be removed to federal court by the defendant."). "In civil cases, subject matter jurisdiction is generally conferred upon federal district courts either through diversity jurisdiction, 28 U.S.C. § 1332, or federal question jurisdiction, 28 U.S.C. § 1331." *Peralta v. Hispanic Bus., Inc.*, 419 F.3d 1064, 1068 (9th Cir. 2005). If it appears at any time before final judgment that the federal court lacks subject matter jurisdiction, the federal court must remand the action to state court. 28 U.S.C. § 1447(c).

There is no presumption against removal jurisdiction in CAFA cases. *See Dart Cherokee Basin Operating Co., LLC v. Owens*, 135 S. Ct. 547, 554 (2014) (vacating district court's remand order in putative class action on the ground that "a defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold"). The defendant, however, still bears the burden of establishing federal jurisdiction. *See id.* A notice of removal must contain a "short and plain statement of the grounds for removal," a requirement that tracks the general pleading standard of Rule 8(a) of the Federal Rules of Civil Procedure. *Id.* at 553 (citing 28 U.S.C. § 1446(a)).

### B. Rule 12(b)(1)

A defendant may move to dismiss an action for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. While lack of statutory standing requires dismissal for failure to state a claim under Rule 12(b)(6), lack of Article III standing requires dismissal for want of subject matter jurisdiction under Rule 12(b)(1). *See Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011). "A Rule 12(b)(1) jurisdictional attack may be facial or factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035,

1039 (9th Cir. 2004). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Id.* The Court "resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6): Accepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor, the court determines whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014). "[I]n a factual attack," on the other hand, "the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Safe Air for Everyone*, 373 F.3d at 1039. "In resolving a factual attack on jurisdiction," the Court "may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment." *Id.*

Once a defendant has moved to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the plaintiff bears the burden of establishing the Court's jurisdiction. *See Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010). The plaintiff carries that burden by putting forth "the manner and degree of evidence required" by whatever stage of the litigation the case has reached. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). At the motion to dismiss stage, Article III standing is adequately demonstrated through allegations of "specific facts plausibly explaining" why the standing requirements are met. *Barnum Timber Co. v. EPA*, 633 F.3d 894, 899 (9th Cir. 2011).

### C. Rule 12(b)(6) Motion to Dismiss

**\*4** Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." A complaint that fails to meet this standard may be dismissed pursuant to Rule 12(b)(6). Rule 8(a) requires a plaintiff to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted).

For purposes of ruling on a Rule 12(b)(6) motion, the Court "accept [s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). The Court, however, need not accept as true allegations contradicted by judicially noticeable facts, *see Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000), and it "may look beyond the plaintiff's complaint to matters of public record" without converting the Rule 12(b)(6) motion into a motion for summary judgment, *Shaw v. Hahn*, 56 F.3d 1128, 1129 n.1 (9th Cir. 1995). Nor must the Court "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (per curiam). Mere "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004).

### D. Rule 9(b)

Claims sounding in fraud or mistake are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), which require that a plaintiff alleging fraud "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); *see also Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009). To satisfy the heightened standard under Rule 9(b), the allegations must be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985). Thus, claims sounding in fraud must allege "an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (per curiam) (internal quotation marks omitted). "A plaintiff must set forth what is false or misleading about a statement, and why it is false." *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994) (en banc), *superseded by statute on other grounds as stated in SEC v. Todd*, 642 F.3d 1207, 1216 (9th Cir. 2011). However, "intent, knowledge, and other conditions of a person's mind" need not be stated with particularity, and "may be alleged generally." Fed. R. Civ. P. 9(b).

### E. Leave to Amend

If the Court concludes that the complaint should be dismissed, it must then decide whether to grant leave to amend. Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend "shall be freely given when justice so requires," bearing in mind "the underlying purpose of Rule 15...

[is] to facilitate decision on the merits, rather than on the pleadings or technicalities." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (ellipsis in original). Nonetheless, a district court may deny leave to amend a complaint due to "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." *See Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008).

### III. DISCUSSION

**\*5** The Court first addresses Plaintiff's motion to remand. Because the Court concludes that remand is unwarranted, the Court then considers Defendant's motion to dismiss.

#### A. CAFA Jurisdiction

CAFA gives federal courts jurisdiction over certain class actions if (1) "the class has more than 100 members"; (2) "the parties are minimally diverse"; and (3) "the amount in controversy exceeds $5 million." *Dart Cherokee*, 135 S. Ct. at 552 (citing 28 U.S.C. § 1332(d)(2), (5)(B)). Of these requirements, Plaintiff challenges only Defendant's contention that the amount in controversy exceeds $5 million. *See* Mot. Remand at 1 & n.1.

Where, as here, the amount in controversy is contested and the complaint does not plead a specific amount in controversy, the proponent of federal jurisdiction must establish the amount in controversy by a preponderance of the evidence. *Rodriguez v. AT & T Mobility Servs. LLC*, 728 F.3d 975, 981 (9th Cir. 2013); *see also Dart Cherokee*, 135 S. Ct. at 554 ("Evidence establishing the amount [in controversy] is required...only when the plaintiff contests, or the court questions, the defendant's allegation."). Under the preponderance of the evidence standard, the removing party must "provide evidence establishing that it is more likely than not that the amount in controversy exceeds [the jurisdictional amount]." *Sanchez v. Monumental Life Ins. Co.*, 102 F.3d 398, 404 (9th Cir. 1996) (internal quotation marks omitted).

In determining whether the removing party has satisfied this burden, the district court may consider facts in the removal petition and "summary-judgment-type evidence relevant to the amount in controversy at the time of removal." *Ibarra v. Manheim Invs., Inc.*, 775 F.3d 1193, 1197 (9th Cir. 2015). Mere conclusory allegations are insufficient, as are "speculative and self-serving assumptions." *Garibay v.*

*Archstone Communities LLC*, 539 Fed.Appx. 763, 764 (9th Cir. 2013). The court must assume that the allegations of the complaint are true, and that a jury will return a verdict for the plaintiff on all claims made. *Kenneth Rothschild Tr. v. Morgan Stanley Dean Witter*, 199 F. Supp. 2d 993, 1001 (C.D. Cal. 2002). "The ultimate inquiry is what amount is put 'in controversy' by the plaintiff's complaint, not what a defendant will actually owe." *Korn v. Polo Ralph Lauren Corp.*, 536 F. Supp. 2d 1199, 1205 (E.D. Cal. 2008) (emphasis omitted) (citing *Rippee v. Bos. Mkt. Corp.*, 408 F. Supp. 2d 982, 986 (S.D. Cal. 2005)). "[T]he claims of the individual class members shall be aggregated to determine whether the matter in controversy exceeds the sum or value of $5,000,000." 28 U.S.C. § 1332(d)(6).

To demonstrate the amount in controversy in the instant case, Defendant offers three calculations: (1) the cost of reimbursing or refunding the price of the allegedly defective Ultra Slim wall mounts; (2) the damages for televisions that fell and broke as a result of the failure of the Ultra Slim wall mounts; and (3) anticipated attorney's fees. Defendant also highlights that Plaintiff seeks additional relief, including injunctive relief. Because the Court concludes that Defendant's first two calculations put at least $5 million in controversy, the Court need not analyze additional calculations.

#### 1. Reimbursement or Refund of the Price of Ultra Slim Wall Mounts

**\*6** In the complaint, Plaintiff requests that Defendant "[r]eimburse or refund Plaintiff and all Ultra Slim wall mount purchasers the amount they paid to purchase the wall mounts." *See* Compl. at 19. Defendant estimates that this demand puts [redacted text] in controversy. To make this estimate, Defendant relies on a declaration from Director of Visual Display Product Support Ilhyun Ryu, who supervises product quality and reviewed Defendant's financial and sales information regarding the Ultra Slim wall mounts. ECF No. 24-6 ("Ryu Decl.").

In the Ryu Declaration, Defendant represents that Defendant sold approximately [redacted text] Ultra Slim wall mounts in the United States during the class period. *Id.* ¶ 2. Although the complaint includes allegations about nine models of Ultra Slim wall mount—WMN1000A, WMN1000B, WMN1000C, WMN2000A, WMN2000B, WMN2000C, WMN3000A, WMN3000B, and WMN3000C—two models ([redacted

text] ) were not sold in the United States during the class period, and are excluded from Defendant's calculations. *Id.* Because California comprises approximately 11% of the U.S. retail market, Defendant estimates that [redacted text] Ultra Slim wall mounts of seven different models were sold in California from 2009 to 2015. *Id.* ¶¶ 3, 5. Plaintiff does not challenge Defendant's estimate of [redacted text] Ultra Slim wall mounts sold.

Next, Defendant calculates the average price for each Ultra Slim wall mount model according to [redacted text] Ultra Slim Wall Mounts sold between 2009 and 2015." *Id.* ¶ 4. For example, Defendant estimates that from 2009 to 2015 Defendant sold [redacted text] WMN3000C Ultra Slim wall mounts, at an average price of [redacted text] per wall mount. During that same time period, Defendant sold [redacted text] WMN2000A Ultra Slim wall mounts, at an average price of [redacted text] per wall mount. *Id.* As another example, Defendant sold [redacted text] WMN1000C Ultra Slim wall mounts, at an average price of [redacted text] per wall mount. *Id.* Using the average prices and sales volumes of the seven Ultra Slim wall mount models sold in the United States from 2009 to 2015, Defendant calculates that [redacted text] per wall mount reflects the "weighted average of [Defendant's] best estimation of [the] retail price of the Ultra Slim Wall Mounts" across all seven models. *Id.* ¶ 4. Multiplying the average cost per wall mount ( [redacted text] ) by the number of wall mounts sold in California ( [redacted text] ), Defendant calculates that refunding all class members' wall mounts would cost approximately [redacted text]. *Id.* ¶ 5.

Plaintiff challenges Defendant's reliance on the [redacted text]. According to Plaintiff, Defendant's [redacted text] do not necessarily reflect the actual price paid for an Ultra Slim wall mount. Remand Reply at 6. Plaintiff cites the website "CamelCamelCamel," which "purports to track the prices of goods offered for sale on Amazon.com." ECF No. 29-1 ("Lopez Decl."). According to CamelCamelCamel, the average historic price on Amazon.com of the Ultra Slim wall mount WMN1000C is $200.43, while the average price of the same model from unnamed third-party retailers is $94.03. *Id.* ¶¶ 3–4. Because these numbers are lower than Defendant's average price of WMN1000C models ( [redacted text] ), Plaintiff contends that Defendant's weighted average price across all models is speculative.

The Court credits the evidence offered by Defendant regarding the estimated price of Ultra Slim wall mounts. The weighted average retail price reflects Defendant's "best

estimation of actual retail price," Ryu Decl. ¶ 4, and Defendant has the knowledge and expertise to make such an estimate. *See Quintana v. Claire's Stores, Inc.*, 2013 WL 1736671, at *6 (N.D. Cal. Apr. 22, 2013) (crediting evidence presented by the defendant's vice president of store operations and a director of payroll services, who "appear to have the requisite knowledge to provide this information"). Additionally, the average weighted price relies on records and sales data kept in the regular course of Defendant's business. Ryu Decl. ¶¶ 1, 4. These sources are sufficiently credible. *See Arreola v. Finish Line*, 2014 WL 6982571, at *4 (N.D. Cal. Dec. 9, 2014) (crediting evidence from the defendant's human resources department, including time and payroll records).

**\*7** Further, the Court is not convinced of the reliability of Plaintiff's data from CamelCamelCamel, which is a website that Plaintiff describes as "*purport[ing]* to track the prices of goods offered for sale on Amazon.com." Lopez Decl. ¶ 2. Plaintiff provides no explanation of CamelCamelCamel's methodology or its reliability. *See generally id.* Moreover, Plaintiff offers CamelCamelCamel data from just one Ultra Slim wall mount model. Plaintiff fails to show that consumers generally pay less than Defendant's [redacted text] price, and does not allege that Amazon.com is representative of all places that sell Ultra Slim wall mounts. Thus, Plaintiff's reliance on CamelCamelCamel does not undermine Defendant's evidence of the average weighted price of Ultra Slim wall mounts.

Multiplying Defendant's average weighted price ( [redacted text] ) by the uncontested number of Ultra Slim wall mounts sold in California during the class period ( [redacted text] ) yields slightly more than [redacted text]. Thus, the Court finds that Defendant has shown by a preponderance of the evidence that Plaintiff's request for a reimbursement or refund of the price of all Ultra Slim wall mounts puts [redacted text] in controversy.

## 2. Damages to Televisions

In addition to a reimbursement or refund for the Ultra Slim wall mounts, Plaintiff requests that Defendant "[r]epair or replace Samsung televisions that have been damaged by Ultra Slim wall mount failures." Compl. at 19. Defendant offers three separate calculations of the amount that this request puts in controversy. Plaintiff does not dispute any of the numbers in one of Defendant's calculations, which results in [redacted text] in controversy. Added to the [redacted text] in

potential damages for reimbursing or refunding the price of Ultra Slim wall mounts, [redacted text] would meet CAFA's jurisdictional requirement. Accordingly, the Court considers only the [redacted text] calculation, and need not consider the other two calculations.[2]

Defendant's [redacted text] calculation has three components: (1) the number of Ultra Slim wall mounts sold in California; (2) the average price per television compatible with Ultra Slim wall mounts; and (3) the failure rate of Ultra Slim wall mounts. Plaintiff does not dispute any of these three components, which the Court addresses respectively.

First, Defendant offers the Ryu Declaration to prove that [redacted text] Ultra Slim wall mounts were sold in California from 2009 to 2015. Ryu Decl. ¶¶ 3, 5. Plaintiff does not dispute this number. Accordingly, the Court credits Defendant's unchallenged evidence establishing the number of Ultra Slim wall mounts sold in California from 2009 to 2015. *See* *Arreola*, 2014 WL 6982571, at *4 (crediting evidence from the defendant's human resources department, including time and payroll records).

Next, Defendant cites the Ryu Declaration to show that Defendant's "best estimation of retail price of all television models compatible with the Ultra Slim Wall Mounts sold between 2009 and 2015 is [redacted text]" per television. Ryu Decl. ¶ 6. Plaintiff also does not dispute this number. Accordingly, the Court credits Defendant's undisputed evidence. *See* *Arreola*, 2014 WL 6982571, at *4 (crediting evidence from the defendant's human resources department, including time and payroll records). Further, the Court notes that Plaintiff does not dispute that every Ultra Slim wall mount failure results in a broken television that puts the entire television price in controversy. *See generally* Remand Reply; *see also* Compl. ¶¶ 13–16, 22 (failure of an Ultra Slim wall mount causes the television to fall off the mount); *id.* ¶ 17 (alleging that televisions damaged as a result of Ultra Slim wall mount failure often must be replaced completely).

 **\*8** Third, Defendant conservatively assumes that 3% of Ultra Slim wall mounts failed and resulted in broken televisions. *See* Remand Opp. at 11. Plaintiff does not dispute this failure rate.

Nonetheless, the Court must still consider the reasonableness of the 3% failure rate. When a defendant removing an action under CAFA makes assumptions when calculating the amount in controversy, the "assumptions must be reasonable ones."

*LaCross v. Knight Transp. Inc.*, 775 F.3d 1200, 1202 (9th Cir. 2015); *see also* *Altamirano v. Shaw Indus., Inc.*, 2013 WL 2950600, at *5 (N.D. Cal. June 14, 2013) (collecting cases where defendant permissibly assumed that each member of the class experienced some type of violation). Such assumptions are based on the principle that a "plaintiff [is] the master of the claim" and may avoid federal jurisdiction by pleading different facts. *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987). In addition, courts emphasize that "a removing defendant is *not* obligated to research, state, and prove the plaintiff's claims for damages." *Coleman v. Estes Express Lines, Inc.*, 730 F. Supp. 2d 1141, 1148 (C.D. Ca. 2010) (internal quotation marks omitted). Therefore, the issue here becomes whether Defendant's 3% assumption is "reasonable in light of the allegations in [Plaintiff's] complaint." *Altamirano*, 2013 WL 2950600, at *6.

Plaintiff does not dispute the reasonableness of Defendant's 3% assumption. The Court agrees that the assumption is reasonable, and finds *Branch v. PM Realty Grp., L.P.*, — Fed.Appx. —, 2016 WL 1298017 (9th Cir. 2016), instructive. In *Branch*, the plaintiff alleged that the defendant failed to provide meal and rest breaks to employees as required by law. In a declaration, the plaintiff stated that the plaintiff and class members "frequently" had interrupted meal breaks and "rarely" took rest breaks. The defendant assumed that two meal and two rest break violations occurred per workweek per putative class member. *Id.* at *1. The district court concluded that the assumption of two meal and two rest break violations per week was unreasonable because the evidence said "nothing of the frequency of which [the defendant] would deprive class members of their entitled meal periods or rest periods." *Id.* at *2. The Ninth Circuit reversed. Given the evidence of extensive meal and rest break violations, the Ninth Circuit concluded that the defendant's "extrapolated violation rate" of two meal period violations per week (40% violation rate, given the number of meal periods the class members should have taken) and two rest break violations per week (20% violation rate) was reasonable. *Id.*

In the instant case, the Court finds that Defendant's assumed 3% failure rate is reasonable in light of the allegations of the complaint. Similar to *Branch*, Plaintiff's complaint does not specify the frequency of Ultra Slim wall mount failure, but does indicate that failure was frequent. In particular, Plaintiff alleges that her television was damaged and that "Plaintiff's claims are typical of the claims of the proposed class." Compl. ¶¶ 22, 26(c). Moreover, the complaint asserts that "Ultra Slim wall mounts are susceptible to breaking

at any time." *Id.* ¶ 13. Further, the complaint alleges that "Plaintiff[ ] and the members of the California class have been damaged...because wall mount failures *have damaged their televisions* and other property" and "Plaintiff and members of the proposed California Class *suffered damages, including to their televisions.*" *Id.* ¶¶ 51, 58 (emphases added); *see also id.* ¶ 50; ("Plaintiff and the proposed California Class members have been harmed because wall mount failures have damaged their televisions and other property."); *id.* ¶ 66 ("Plaintiff and members of the proposed California Class suffered damages, including to their televisions."). The Court assumes the truth of these allegations, which suggest that Plaintiff and many, if not all, putative class members have suffered damage to their televisions due to the failure of an Ultra Slim wall mount. *See Kenneth Rothschild Tr.*, 199 F. Supp. at 1001. Thus, the Court finds that it is reasonable to conservatively assume a 3% failure rate for purposes of determining the amount in controversy.

**\*9** Multiplying the undisputed number of Ultra Slim wall mounts sold in California during the class period ( [redacted text] ) by an undisputed 3% failure rate ( [redacted text] failed wall mounts), and then by the undisputed price of the televisions damaged by the failure ( [redacted text] ) results in over [redacted text] to repair or replace class members' broken televisions. Added to the [redacted text] in potential damages for reimbursing or refunding the price of Ultra Slim wall mounts, Defendant proves [redacted text] in controversy by a preponderance of the evidence. Accordingly, the Court DENIES Plaintiff's motion to remand.

The Court next considers Defendant's motion to dismiss. The Court first addresses Plaintiff's standing under Article III of the U.S. Constitution. The Court then considers Plaintiff's claim under the CLRA; the Song-Beverly Act; and the UCL; followed by Plaintiff's claims for strict liability for failure to warn, strict liability for design defect, and negligence.

### B. Standing

Defendant first contends that Plaintiff lacks Article III standing to assert claims related to Ultra Slim wall mount models that she did not purchase.[3] Mot. Dismiss at 22–24. Defendant does not challenge Plaintiff's standing to sue regarding the Ultra Slim wall mount that Plaintiff did purchase (WMN1000C). To satisfy Article III standing, a plaintiff must allege that he or she "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a

favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). In the instant case, Defendant specifically argues that Plaintiff did not suffer injury in fact with respect to products that Plaintiff did not purchase.

The majority of the courts in this district and elsewhere in California reject the proposition that a plaintiff can not suffer injury in fact based on products that the plaintiff did not buy. Some courts decline to address this issue until ruling on a motion for class certification, *see, e.g., Forcellati v. Hyland's, Inc.*, 876 F. Supp. 2d 1155, 1161–62 (C.D. Cal. 2012); *Cardenas v. NBTY, Inc.*, 870 F. Supp. 2d 984, 992 (E.D. Cal. 2012), while others "hold that a plaintiff may have standing to assert claims for unnamed class members based on products he or she did not purchase so long as the products and alleged misrepresentations are substantially similar," *Miller v. Ghirardelli Chocolate Co.*, 912 F. Supp. 2d 861, 869 (N.D. Cal. 2012) (citing cases); *see also, e.g., Colucci v. ZonePerfect Nutrition Co.*, 2012 WL 6737800, at \*4 (N.D. Cal. Dec. 28, 2012); *Astiana v. Dreyer's Grand Ice Cream, Inc.*, 2012 WL 2990766, at \*11–13 (N.D. Cal. July 20, 2012). In either case, these courts allow a plaintiff to proceed past the motion to dismiss stage with claims based on products that a plaintiff did not purchase, at least so long as the products and claims at issue are "substantially similar."[4]

**\*10** This Court has consistently applied the "substantially similar" approach when analyzing standing challenges in the food-misbranding context, *see, e.g., Bruton v. Gerber Prods. Co.*, 2014 WL 172111, at \*8 (N.D. Cal. Jan. 15, 2014); *Kane v. Chobani, Inc.*, 2013 WL 5289253, at \*10–11 (N.D. Cal. Sept. 19, 2013); *Brazil v. Dole Food Co.*, 2013 WL 5312418, at \*7–8 (N.D. Cal. Sept. 23, 2013), and recently applied the same approach in a products liability case, *Philips v. Ford Motor Co.*, 2015 WL 4111448, at \*6 (N.D. Cal. July 7, 2015). As explained in these prior orders, "in asserting claims based on products a plaintiff did not purchase, but which are nevertheless substantially similar to products a plaintiff *did* purchase, a plaintiff is not suing over an injury she did not suffer. Rather, a plaintiff in that scenario is suing over an injury she personally suffered and asserting that others who purchased similar products suffered substantially the same injury, even if the products that caused the injury were not identical in every respect." *Bruton*, 2014 WL 172111, at \*8.

Moreover, this Court has previously explained that the substantially similar approach is consistent with the Ninth Circuit's admonition that courts "should not be too rigid in applying standing requirements to proposed classes." *Brazil,*

2013 WL 5312418, at *4 (quoting *Lanovaz v. Twining's N. Am., Inc.*, 2013 WL 2285221, at *2 (N.D. Cal. May 23, 2013)). In particular, when evaluating whether a plaintiff has standing to sue on behalf of others who have suffered similar, but not identical injuries, the Ninth Circuit has held that in "determining what constitutes the same type of relief or the same kind of injury, we must be careful not to employ too narrow or technical an approach. Rather, we must examine the questions realistically: we must reject the temptation to parse too finely, and consider instead the context of the inquiry." *Id.* (quoting *Armstrong v. Davis*, 275 F.3d 849, 867 (9th Cir. 2001), *abrogated on other grounds by Johnson v. California*, 543 U.S. 499, 504–05 (2005)).

In the instant case, Defendant does not draw any distinction between the instant case and the cases in which this Court applied the substantially similar approach. *See generally* Mot. Dismiss at 22–24. Nor does Defendant attack the reasoning of the Court's prior orders. Further, Defendant does not dispute that the Ultra Slim wall mount models alleged in the complaint are substantially similar to the Ultra Slim wall mount purchased by Plaintiff. Accordingly, the Court rejects Defendant's contention that Plaintiff lacks Article III standing to sue over substantially similar products merely because Plaintiff did not personally purchase every model of Ultra Slim wall mount alleged in the complaint. Thus, the Court DENIES Defendant's motion to dismiss Plaintiff's claims based on products that Plaintiff did not purchase. The Court next considers the merits of Plaintiff's individual causes of action.

### C. CLRA

The Court first addresses Plaintiff's claim under the CLRA. Plaintiff alleges that Defendant violated the CLRA in two ways: (1) failing to disclose the Ultra Slim wall mounts' propensity to fail when used properly; and (2) misrepresenting the load-bearing capacity of the Ultra Slim wall mounts on the wall mounts' packaging. Compl. ¶¶ 40–41. Defendant contends that Plaintiff lacks statutory standing under the CLRA because Plaintiff fails to allege that she relied upon any omissions or misrepresentations by Defendant. In addition, Defendant moves to dismiss Plaintiff's fraudulent omission and affirmative misrepresentation theories for failing to state a claim. The Court addresses Defendant's arguments in turn.

### 1. Reliance

To have statutory standing under the CLRA, a plaintiff must allege that she relied on the defendant's alleged misrepresentation. *See Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1367 (2010) (holding that plaintiff's CLRA claim failed because plaintiff failed to allege facts showing that he "relied on any representation by" defendant). To establish reliance, a plaintiff must allege that "the defendant's misrepresentation or nondisclosure was 'an immediate cause' of the plaintiff's injury-producing conduct." *In re Tobacco II Cases*, 46 Cal. 4th 298, 326 (2009). "A plaintiff may establish that the defendant's misrepresentation is an 'immediate cause' of the plaintiff's conduct by showing that in its absence the plaintiff 'in all reasonable probability' would not have engaged in the injury-producing conduct." *Id.* (quoting *Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1110–11 (1993)). In other words, a plaintiff may show actual reliance by alleging that "had the omitted information been disclosed, one would have been aware of it and behaved differently." *Mirkin*, 5 Cal. 4th at 1093; *see also Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015) (finding that plaintiffs had sufficient evidence of reliance to survive summary judgment when plaintiffs offered "a plausible method of disclosure and...that they would have been aware of information disclosed using that method").

**\*11** Here, the gravamen of Plaintiff's CLRA claim is that Defendant's Ultra Slim wall mount packaging contains false representations and omissions. However, the complaint does not allege that Plaintiff relied upon, or even saw, any representations on Ultra Slim wall mount packaging. *See generally* Compl. In addition, Plaintiff does not allege that she used the Ultra Slim wall mount as directed on the packaging, which may give rise to an inference of reliance. According to the example packaging provided in the complaint, the WMN1000C Ultra Slim wall mount is "suitable for 60–65" Samsung LED televisions (5000 series and above) and 58–63" PDP televisions (850 series and the 6000 series and above)," and has a 110 pound "safe working load." *Id.* ¶ 12. Plaintiff alleges that she bought a WMN1000C Ultra Slim wall mount for the "63-inch plasma Samsung television that she had recently purchased." *Id.* ¶ 21. However, Plaintiff fails to allege that her television was "LED" or "PDP"; the "series" number of the television; or that the television weighed less than the advertised safe working load.

Although Plaintiff asserts in the opposition to the motion to dismiss that Plaintiff purchased a "63-inch 8000 series Samsung PDP TV," Dismiss Opp. at 5, Plaintiff can not avoid dismissal by alleging new facts in an opposition, *see Schneider v. Cal. Dep't of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998) ("In determining the propriety of a Rule 12(b) (6) dismissal, a court *may not* look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss."). Based on the allegations in the complaint, the Court can not infer that Plaintiff relied upon any representations on, or omissions from, the packaging of Ultra Slim wall mounts. *See Punian v. Gillette Co.*, 2015 WL 4967535, at *8 (N.D. Cal. Aug. 20, 2015) (finding plaintiff alleged reliance when plaintiff "saw the deceptive...package label prior to purchasing" the product, believed the representation on the package, was reasonable in relying on the package, and would not have purchased the product had the packaging not been deceptive).

Because Plaintiff fails to allege reliance on any misrepresentation or omission of Defendant, Plaintiff lacks statutory standing under the CLRA, and the Court GRANTS Defendant's motion to dismiss. This dismissal is with leave to amend as Plaintiff may be able to allege reliance through additional facts. *See Lopez*, 203 F.3d at 1127 (holding that "a district court should grant leave to amend...unless it determines that the pleading could not possibly be cured by the allegation of other facts").

Nevertheless, in anticipation that Plaintiff will file a First Amended Complaint, the Court identifies other deficiencies in Plaintiff's CLRA claim. The Court first addresses Plaintiff's fraudulent omission theory, then Plaintiff's affirmative misrepresentation theory.

**2. Fraudulent Omission**

Plaintiff alleges that Defendant fraudulently failed to disclose the Ultra Slim wall mounts' propensity to fail. To state a valid claim for a fraudulent omission under the CLRA, Plaintiff must allege "an omission of a fact the defendant was obliged to disclose." *Daugherty v. Am. Honda Motor Co.*, 144 Cal. App. 4th 824, 835 (2006). "California federal courts have generally interpreted *Daugherty* as holding that '[a] manufacturer's duty to consumers is limited to its warranty obligations absent either an affirmative misrepresentation or a safety issue.' " *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1141 (9th Cir. 2012) (quoting *Oestreicher v. Alienware Corp.*, 322 Fed.Appx. 489, 493 (9th Cir. 2009)). In addition, "plaintiffs must sufficiently allege that a defendant was aware of a defect at the time of sale to survive a motion to dismiss." *Id.* at 1145.

Defendant argues that Plaintiff's fraudulent omission claim is legally insufficient for two reasons: (1) Plaintiff fails to sufficiently plead that Defendant had a duty to disclose any defect in Ultra Slim wall mounts; and (2) Plaintiff fails to sufficiently plead that Defendant had knowledge of the defect at the time of sale. The Court addresses these arguments respectively.

**a. Duty to Disclose**

**\*12** The parties appear to agree that Plaintiff's Ultra Slim wall mount was not covered by any written or express warranty from Defendant. Thus, under California law, Defendant had no duty to disclose a defect in Ultra Slim wall mounts unless the defect implicates "either an affirmative misrepresentation or a safety issue." *Wilson*, 668 F.3d at 1141. Plaintiff asserts that the defective Ultra Slim wall mounts pose a safety hazard because the failure of the wall mount results in the television falling off of the wall mount, which poses a danger to anyone nearby. Thus, Plaintiff argues, Defendant had a duty to disclose the potential for Ultra Slim wall mounts to fail.

To support Plaintiff's claim of a safety hazard, Plaintiff alleges that the failure of an Ultra Slim wall mount causes the television mounted on the wall mount—which can weigh over 80 pounds—to fall. Compl. ¶ 13. Plaintiff highlights various studies, including by the Consumer Product Safety Commission, that document injuries and fatalities caused by falling televisions. *Id.* ¶¶ 14–16. Plaintiff also offers various consumer complaints posted to Amazon.com, in which customers expressed safety concerns with respect to the failure of Ultra Slim wall mounts. For example, "mseanmcgee" wrote on August 16, 2013 that the Ultra Slim wall mount snapped and dropped the television onto the floor, and stated, "Luckily no one was home – no kids or dogs were hurt." *Id.* ¶ 18. As another example, "Kirk Bond" stated on January 23, 2016, that his Ultra Slim wall mount broke and "If someone had been near [the television falling from the wall mount], they could have been seriously injured." *Id.* Thus, Plaintiff asserts that the failure of an Ultra Slim wall mount poses the risk of physical injury.

Defendant counters that Plaintiff's allegations are insufficient because the Consumer Product Safety Commission report and other studies cited by Plaintiff considered televisions sitting on furniture, not mounted on a wall. Mot. Dismiss at 13–14. The Court is not persuaded. The studies cited by Plaintiff address the risks of falling televisions generally, and, for example, indicate that falling televisions may crush or strike a bystander. *See* ECF No. 16-1 Ex. A. These same risks of physical injury are plausibly present when a television falls off a wall.

Moreover, the fact that Plaintiff and the individuals posting on Amazon.com did not themselves suffer physical injury "does not alter the conclusion that the [complaint] plausibly alleges that the alleged defect could pose a safety hazard, which is all that is necessary to survive a motion to dismiss." *Butler v. Porsche Cars N.A., Inc.*, 2016 WL 4474630, at *4 (N.D. Cal. Aug. 25, 2016); *Cholakyan v. Mercedes-Benz USA, LLC*, 796 F. Supp. 2d 1220, 1236 (C.D. Cal. 2011) (finding that the plaintiff sufficiently alleged a safety hazard based on defects that could result in sudden engine failure while the car was in motion even though the complaint lacked any allegation that the plaintiff or any class member had ever experienced sudden engine failure while driving). Accordingly, the Court concludes that Plaintiff's allegations regarding the risk of physical injury suffice to allege a material safety hazard and a duty to disclose. *See Cholakyan*, 796 F. Supp. 2d at 1236 (finding a plausible safety hazard when the alleged defect "causes sudden and unexpected engine failure that could result in personal injury or death"); *Mui Ho v. Toyota Motor Corp.*, 931 F. Supp. 2d 987, 997–98 (N.D. Cal. 2013) (determining that plaintiff plausibly alleged safety hazard because of "the inherent risks of physical injury" resulting from the defect).

**b. Knowledge at Time of Sale**

**\*13**  Defendant next argues that Plaintiff has not adequately pled that Defendant had knowledge of the alleged defect in September 2010, when Plaintiff purchased her Ultra Slim wall mount. "[U]nder the CLRA, plaintiffs must sufficiently allege that a defendant was aware of a defect *at the time of sale* to survive a motion to dismiss." *Wilson*, 668 F.3d at 1145 (emphasis added).

To show that Defendant was aware of the defect in Ultra Slim wall mounts by September 2010, Plaintiff highlights the sampling of customer complaints posted on Amazon.com that describe the same defect that Plaintiff identifies—namely, the failure of the plastic disk component in Ultra Slim wall mounts. Compl. ¶ 18. Although these complaints were all posted after 2012, Plaintiff alleges that "[i]t is likely that [Defendant] knew that its wall mounts were prone to failure well before 2012, as the complaints above demonstrate, Ultra Slim wall mounts can break at any time after installation." *Id.* ¶ 19.

Similar allegations of knowledge were rejected by the Ninth Circuit in *Wilson v. Hewlett-Packard Co.* In *Wilson*, the plaintiffs asserted that the defendant was aware of a defect in its laptops based on fourteen customer complaints. Twelve of the complaints were undated and two of the complaints—like those offered by Plaintiff in the instant case—were dated over two years after the plaintiffs' purchase of the allegedly defective laptops. 668 F.3d at 1148. The plaintiffs also alleged that the defendant must have known of the defect due to the defendant's access to aggregate data regarding the risk of the defect. *Id.* at 1147. The Ninth Circuit found that such allegations "do not support an inference that [the defendant] was aware of the defect at the time it sold the Laptops to [the plaintiffs]." *Id.* at 1147–48 ("express[ing] doubt that customer complaints in and of themselves adequately support an inference that a manufacturer was aware of a defect" because general allegations of consumer complaints "provide no indication whether the manufacturer was aware of the defect *at the time of sale*").

Similarly, this Court has previously held that while "in some cases, allegations of consumer complaints posted on a defendant's own customer support website may be sufficient to raise a reasonable inference that the defendant knew of a product defect," such cases must typically be supported by "an additional basis for defendant's knowledge" of a defect at the time of sale. *Kowalsky v. Hewlett-Packard Co. ("Kowalsky I")*, 771 F. Supp. 2d 1138, 1145–46 (N.D. Cal. 2010), *vacated in part on other grounds by Kowalsky v. Hewlett-Packard Co. ("Kowalsky II")*, 771 F. Supp. 2d 1156 (N.D. Cal. 2011); *see also Kowalsky v. Hewlett-Packard Co.*, 2011 WL 3501715, at *4 (N.D. Cal. Aug. 10, 2011) (plaintiff sufficiently alleged knowledge of a defect in support of CLRA cause of action where plaintiff claimed: (1) industry standards required multiple tests of defective product; (2) the defendant made specific claims as to the capacity and speed of its allegedly defective product; (3) the alleged product defect was present "out of the box" in every product and "manifested on a regular basis"; and (4) "consumers complained of the defect both in third-party fora as well as directly to [the defendant]");

*Falk v. Gen. Motors Corp.*, 496 F. Supp. 2d 1088, 1096–97 (N.D. Cal. 2007) (finding plaintiff adequately alleged knowledge of a defect where, in addition to alleging that consumers made complaints to defendant, the plaintiff also alleged the defendant had knowledge of other information showing a product defect at the time of sale, including "information unavailable to the public").

**\*14** Here, Plaintiff's allegations of knowledge consist solely of consumer complaints that post-date Plaintiff's purchase of an Ultra Slim wall mount by two years.[5] Moreover, the consumer complaints were not sent directly to Defendant, and Plaintiff does not allege that Defendant monitored or was otherwise aware of complaints posted to Amazon.com. Accordingly, under Ninth Circuit precedent, Plaintiff fails to allege that Defendant was aware of any defect in Ultra Slim wall mounts at the time of the sale to Plaintiff. *See Wilson*, 668 F.3d at 1147–48 (holding that two consumer complaints made two years after the plaintiffs' purchase were insufficient to allege that the defendant was aware of the defect at the time of sale). Although the Court dismisses Plaintiff's CLRA claim based on lack of statutory standing, Plaintiff's failure to allege knowledge is an alternate, sufficient basis for dismissal.

**3. Affirmative Misrepresentation**

In addition to a fraudulent omission theory, Plaintiff asserts that Defendant violated the CLRA because Ultra Slim wall mount packaging affirmatively misrepresents the weight and type of television that an Ultra Slim wall mount can safely hold. Defendant moves to dismiss this claim on the grounds that Plaintiff fails to plead the affirmative misrepresentation with particularity, as required by Rule 9(b).

To satisfy Rule 9(b), Plaintiff must allege the "who, what, where, when, and how" and the "specific content of the false representations." *Swartz*, 476 F.3d at 764. Further, Plaintiff "must set forth what is false or misleading about a statement, and why it is false." *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d at 1548.

In the instant case, Plaintiff fails to plead the "specific content of the false representations" and "when" the misrepresentations were made. *Swartz*, 476 F.3d at 764. In particular, Plaintiff does not allege the content of the representation on the packaging of Plaintiff's Ultra Slim wall mount. Although the complaint provides examples of Ultra Slim wall mount packaging, the examples are undated and

Plaintiff does not allege that the example packaging is the same as the packaging from Plaintiff's Ultra Slim wall mount, or that Defendant has made identical representations on all Ultra Slim wall mount packaging. *See* Compl. ¶ 12.

In addition, Plaintiff fails to allege "what is false or misleading" about the Ultra Slim wall mounts' packaging. *See In re GlenFed, Inc. Sec. Litig.*, 42 F.3d at 1548. According to Plaintiff, the representations about the weight bearing capacity of the Ultra Slim wall mount and the compatibility of certain televisions must be false because Plaintiff's Ultra Slim wall mount failed. Dismiss Opp. at 5–6. As discussed above, however, Plaintiff does not allege the weight of the television that Plaintiff mounted on her Ultra Slim wall mount, or allege that the television used is the model recommended on the Ultra Slim wall mount packaging. *See* Compl. ¶ 12. Without such allegations, Plaintiff fails to allege that the representations on the Ultra Slim wall mount packaging are false, and thus fails to state a CLRA claim for affirmative misrepresentation. Although the Court dismisses Plaintiff's CLRA claim for lack of statutory standing, this provides an alternate basis for dismissal.

**D. The Song-Beverly Act**

**\*15** Plaintiff's next cause of action is for breach of the implied warranty of merchantability under the Song-Beverly Act. Defendant moves to dismiss this claim on two grounds. Mot. Dismiss at 19–20. First, Defendant claims that the claim is barred by the Song-Beverly Act's "duration provision," which states that:

> The duration of the implied warranty of merchantability and where present the implied warranty of fitness shall be coextensive in duration with an express warranty...but in no event shall such implied warranty have a duration of less than 60 days *nor more than one year following the sale* of new consumer goods to a retail buyer.

Cal. Civ. Code § 1791.1(c) (emphasis added). The parties do not dispute that the one-year duration provision applies in the instant case. Second, Defendant argues that Plaintiff's Ultra Slim wall mount must be fit for its ordinary purpose (and thus there was no breach of warranty) because Plaintiff's Ultra Slim wall mount worked for six years before failing.

Both of Defendant's arguments were rejected by the California Court of Appeal in *Mexia v. Rinker Boat Co.*, 95 Cal. Rptr. 3d 285 (Ct. App. 2009), a decision endorsed by the Ninth Circuit in *Daniel v. Ford Motor Co.*, 806 F.3d 1217 (9th Cir. 2015). In *Mexia*, plaintiff Jess Mexia

("Mexia") sued Rinker Boat Company, Inc. ("Rinker") and Miller's Landing ("Miller") for breach of the implied warranty of merchantability under the Song-Berverly Act. 95 Cal. Rptr. 3d at 287. "In essence, Mexia alleged that he purchased from Miller a boat manufactured by Rinker that was unmerchantable due to a latent defect, which...caused the boat's engine to corrode." *Id.* According to Mexia, the boat was operational at the time of purchase in 2003. However, by July 2005, significant "repairs to the boat were needed because of defects, nonconformities, misadjustments or malfunctions relating to corrosion in the engine." *Id.* at 288 (internal quotation marks omitted). By the time Mexia filed suit in November 2006, the boat was no longer merchantable. *Id.* at 289.

As to the duration provision, the *Mexia* court rejected Rinker and Miller's argument "that latent defects must be discovered and reported to the seller within" the one year duration period. *Id.* at 295. As the *Mexia* court explained, "[i]n the case of a latent defect, a product is rendered unmerchantable, and the warranty of merchantability is breached, by the existence of the unseen defect, not by its subsequent discovery." *Id.* at 291 ("[A]lthough a defect may not be discovered for months or years after a sale, merchantability is evaluated as if the defect were known."). Requiring individuals to assert an implied warranty claim within the one year duration period would, according to the *Mexia* court, contravene the California legislature's intent to provide consumers protection from latent defects. *See id.* at 295 (characterizing "Rinker and Miller's interpretation of the duration provision" as having "no support in the text of the statute.").

The *Mexia* court also rejected Rinker and Miller's argument that Mexia could not bring an implied warranty claim because "the boat was fit for its ordinary purpose" at the time of sale and that Mexia "did not seek repair from the defendants until over two years from the time of purchase." *Id.* at 293. "This argument," the court noted, "ignores the distinction between unmerchantability caused by a latent defect and the subsequent discovery of the defect." *Id.* "[T]he fact that the alleged defect resulted in destructive corrosion two years after the sale of the boat does not necessarily mean that the defect did not exist at the time of sale." *Id.*

**\*16** In 2015, the Ninth Circuit held that *Mexia* governs federal courts' interpretation of the Song-Berverly Act's duration provision "unless there is convincing evidence that the" California Supreme Court "would decide differently." *Daniel*, 806 F.3d at 1222. On this point, the Ninth Circuit

analyzed the procedural history of *Mexia* and its treatment by other California state courts, and found that there was no "convincing evidence that the California Supreme Court would decide the issue in *Mexia* differently." *Id.* at 1223. Accordingly, *Mexia*'s rule that the duration provision "does not create a deadline for discovering latent defects or for giving notice to the seller must be followed." *Id.* (internal quotation marks and citation omitted).

As in *Mexia*, Plaintiff here alleges that the Ultra Slim wall mount that she purchased contained a latent defect that caused the Ultra Slim wall mount to fail "under the regular pressure of holding a Samsung television of the appropriate weight and size, as stated on the package." Compl. ¶ 13. Plaintiff also alleges that purchasers of Ultra Slim wall mounts "are unable to reasonably discover this issue until they experience it first hand and are exposed to the resulting safety risks." *Id.* ¶ 20. Although the defect was not discovered until more than one year after Plaintiff's purchase, the defect itself apparently existed at the time of purchase. Thus, the Ultra Slim wall mount at issue was allegedly unmerchantable at the time of sale, *see* 95 Cal. Rptr. 3d at 290–91 ("The implied warranty of merchantability may be breached by a latent defect undiscoverable at the time of sale."), and Plaintiff's claim is not barred by the Song-Berverly Act's duration provision. *See Philips*, 2016 WL 1745948, at *6–9 (analyzing *Mexia* and *Daniel*, and finding that duration provision did not bar claims when defect was discovered more than one year after the purchase).

Further, as in *Mexia*, that Plaintiff's Ultra Slim wall mount worked for years before failing does not mean that the defect did not exist at the time of sale. *Mexia*, 95 Cal. Rptr. 3d at 293 ("[T]he fact that the alleged defect resulted in destructive corrosion two years after the sale of the boat does not necessarily mean that the defect did not exist at the time of sale."). Thus, the Court rejects Defendant's arguments as to both the duration provision and the fitness of Plaintiff's Ultra Slim wall mount for its ordinary use, and DENIES Defendant's motion to dismiss Plaintiff's claim under the Song-Berverly Act.

### E. UCL

The UCL creates a cause of action for business practices that are (1) unlawful, (2) unfair, or (3) fraudulent. Cal. Bus. & Prof. Code § 17200. Each "prong" of the UCL provides a separate and distinct theory of liability. *Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th Cir. 2007). "The UCL's coverage is sweeping, and its standard for wrongful

business conduct intentionally broad." *Moore v. Apple, Inc.*, 73 F. Supp. 3d 1191, 1204 (N.D. Cal. 2014) (internal quotation marks omitted). In the instant case, Plaintiff asserts claims under all three prongs. Compl. ¶¶ 29–36.

Defendant challenges Plaintiff's statutory standing to assert a UCL claim. Mot. Dismiss at 15–16. To establish statutory standing under the UCL, a plaintiff must demonstrate that she "suffered injury in fact and [ ] lost money or property as a result of the unfair competition." *Cal. Bus. & Prof. Code § 17204*. Interpreting this statutory language, California courts have held that when the "unfair competition" underlying a plaintiff's UCL claim consists of a defendant's misrepresentation, a plaintiff must have actually relied on the misrepresentation, and suffered economic injury as a result of that reliance, to have standing to sue. *See Tobacco II*, 46 Cal. 4th at 326. Such a showing of reliance is required under all three prongs of the UCL where such claims are premised on misrepresentations. *See, e.g., Doe v. Successfulmatch.com*, 2014 WL 1494347, at *4 (N.D. Cal. Apr. 16, 2014).

*\*17  Here, the gravamen of Plaintiff's claims under the UCL is that Defendant fraudulently misrepresented the weight bearing capacity of Ultra Slim wall mounts, and failed to disclose the propensity of Ultra Slim wall mounts to fail. *See* Compl. ¶¶ 31–34. Thus, Plaintiff's UCL claims sound in fraud, and Plaintiff must plead reliance on a misrepresentation or omission in order to have standing under the UCL. As explained with respect to Plaintiff's statutory standing under the CLRA, Plaintiff fails to plead reliance. *See supra* Section III.C.1. In particular, the complaint does not allege that Plaintiff relied upon, or saw, any misrepresentations by Defendant about Ultra Slim wall mounts. *See Doe*, 2014 WL 1494347, at *5 (dismissing UCL claim for lack of standing when the complaint "lacks allegations of what, if any, purported misrepresentations the two named Plaintiffs...actually read"). Nor does the complaint provide a reasonable basis to infer that Plaintiff relied upon any representations on the Ultra Slim wall mounts' packaging. Thus, Plaintiff fails to allege statutory standing under the UCL, and the Court GRANTS with leave to amend Defendant's motion to dismiss Plaintiff's UCL claim.

In anticipation of a First Amended Complaint the Court notes that Plaintiff fails to state a claim under the fraudulent prong of the UCL for reasons already stated in this order. Specifically, in the context of CLRA cases, "the standard for deceptive practices under the fraudulent prong of the UCL

applies equally to claims for misrepresentation under the CLRA" and "courts often analyze the two statutes together." *Kowalsky II*, 771 F. Supp. 2d at 1162; *see also Butler*, 2016 WL 4474630, at *7 (dismissing claim under the UCL's fraudulent prong when the complaint failed to state a claim under the CLRA). In the instant case, the parties' arguments regarding Defendant's alleged fraudulent practices mirror the arguments made regarding Plaintiff's CLRA claim. Mot. Dismiss at 9–16. Accordingly, because the Court finds that the complaint fails to state a claim under the CLRA, the complaint also fails a claim under the fraudulent prong of the UCL.

### F. Strict Liability

Plaintiff's fourth and fifth causes of action are for strict liability. Compl. ¶¶ 53–67. In California, "[a] manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being." *Vandermark v. Ford Motor Co.*, 61 Cal. 2d 256, 260–61 (1964). Strict liability may be imposed for three types of product defects: manufacturing defects, design defects, and "warning defects," i.e., failures to warn. *O'Neil v. Crane Co.*, 53 Cal. 4th 335, 347 (2012) (internal quotation marks omitted). Plaintiff asserts two strict liability theories: failure to warn and design defect. The Court addresses these theories in turn.

### 1. Failure to Warn

First, Plaintiff alleges that Defendant failed to warn purchasers of Ultra Slim wall mounts of "the substantial and dangerous risk of failure from foreseeable use of the product[s]." Compl. ¶¶ 63–65. Under California law, strict liability for a failure to warn is only imposed when the risk of harm is known or knowable. *Anderson v. Owens-Corning Fiberglas Corp.*, 53 Cal. 3d 987, 1000–04 (1991) ("[K]nowledge, actual or constructive, is a requisite for strict liability for failure to warn...."). Moreover, whether the risk was known or knowable is assessed at the time the product was distributed. *Johnson v. Am. Standard, Inc.*, 43 Cal. 4th 56, 64 (2008) ("Typically, under California law, we hold manufacturers strictly liable for injuries caused by their failure to warn of dangers that were known to the scientific community at the time they manufactured and distributed their product."); *Brown v. Superior Court*, 44 Cal. 3d 1049, 1060 n.8 (1988) ("[A] manufacturer's knowledge should be measured at the time a [product] is distributed because it is

at this point that the manufacturer relinquishes control of the product.").

Thus, under well-established principles of California law, Defendant's duty to warn under strict liability extends only to those risks of which it had actual or constructive knowledge at the time of sale. In the instant case, as discussed above in Section III.C.2.b, Plaintiff fails to allege that Defendant was aware of any defect in Ultra Slim wall mounts in September 2010, when Plaintiff purchased an Ultra Slim wall mount. Accordingly, Plaintiff fails to allege a strict liability claim for failure to warn. *See Hensley-Maclean v. Safeway, Inc.*, 2014 WL 1364906, at *2–3 (N.D. Cal. Apr. 7, 2014) (dismissing plaintiff's failure to warn claim because there was no evidence "that [Defendant] was aware of the [defect in tainted food] at the time it sold the [tainted food]"). Because Plaintiff may be able to allege additional facts to support Defendant's knowledge of the alleged defect, the Court GRANTS Defendant's motion to dismiss Plaintiff's strict liability claim for failure to warn with leave to amend. *See Lopez*, 203 F.3d at 1127.

### 2. Design Defect

**\*18** Second, Plaintiff alleges that Ultra Slim wall mounts are defective in design due to their risk of failure. Compl. ¶¶ 56–57. Under California law, "a product is defectively designed if [1] it fails to meet an ordinary consumer's expectations, or if [2] injury is attributable to a specific design feature of the product and the risks associated with the design outweigh its benefits." *Papike v. Tambrands Inc.*, 107 F.3d 737, 743 (9th Cir. 1997) (citing *Barker v. Lull Eng'g Co.*, 20 Cal. 3d 413 (1978)). The "consumer expectations" test and "risk-benefit" test provide "alternative means for a plaintiff to prove design defect and do not serve as defenses to one another." *McCabe v. Am. Honda Motor Co.*, 100 Cal. App. 4th 1111, 1121 (2002); *see also Chavez v. Glock, Inc.*, 207 Cal. App. 4th 1283, 1312 (2012) ("Risk-benefit and consumer expectation are alternative theories for establishing a cause of action for design defect strict liability, not independent causes of action."). The Court first addresses the consumer expectations test, then the risk-benefit test.

Under the consumer expectations test, "a product is defective in design if it failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner." *Smith v. Adobe Sys., Inc.*, 2011 WL 4404152, at *2 (N.D. Cal. Sept. 21, 2011).

Defendant contends that Plaintiff fails to meet the consumer expectations test because Plaintiff does not allege that she used the Ultra Slim wall mount in "an intended or reasonably foreseeable manner." Mot. Dismiss at 21.

The Court agrees. As discussed above, it is not clear that Plaintiff used the Ultra Slim wall mount with a compatible television of appropriate weight. Plaintiff alleges that the WMN1000C Ultra Slim wall mount is "suitable for 60–65" Samsung LED televisions (5000 series and above) and 58–63" PDP televisions (850 series and the 6000 series and above)." Compl. ¶ 12. Plaintiff alleges that she purchased a WMN1000C Ultra Slim wall mount for the "63-inch plasma Samsung television that she had recently purchased," without alleging the type, series, or weight of Plaintiff's television. *Id.* ¶ 21. Without such allegations, Plaintiff fails to allege that Plaintiff used the Ultra Slim wall mount in "an intended or reasonably foreseeable manner," and thus fails to allege a design defect under the consumer expectations test. *See Smith*, 2011 WL 4404152, at *2 (finding that plaintiff failed to allege a design defect under the consumer expectations test when "she has no allegations that she was using the Adobe product in an intended or reasonably foreseeable manner").

Under the risk-benefit test, "a product is defective in design if, on balance, the benefits of the challenged design outweigh the risk of danger inherent in such design." *Id.* (citing *Barker*, 20 Cal. 3d at 430–32). "To prove a defect under this test, a plaintiff need only demonstrate that the design proximately caused the injuries. Once proximate cause is demonstrated, the burden shifts to the defendant to establish that the benefits of the challenged design, when balanced against such factors as the feasibility and cost of alternative designs, outweigh its inherent risk of harm." *McCabe*, 100 Cal. App. 4th at 1121. In the instant case, Defendant contends that Plaintiff fails to allege that the risks of using the Ultra Slim wall mount outweigh the benefits. Mot. Dismiss at 21.

As to the risk-benefit test, the Court disagrees with Defendant. Plaintiff alleges that Plaintiff used the Ultra Slim wall mount to hang her television, which involves screwing two plastic disks onto the back of the television. Compl. ¶¶ 9, 21. The plastic disks hold a metal cable between them. After the plastic disks and cable are attached to the television, the cable is hung onto two metal disks that are screwed into the wall. *Id.* ¶¶ 9–10. The television thus hangs from the cable, which hangs from the two wall-mounted metal disks. *Id.*

**\*19** According to Plaintiff, the Ultra Slim wall mounts are defectively designed because the plastic disks "are susceptible to breaking at any time" and "break under the regular pressure of holding a Samsung television of the appropriate weight and size." *Id.* ¶ 13. This defect allegedly injured Plaintiff because one of the plastic disks on Plaintiff's Ultra Slim wall mount failed, "causing the wall mount's metal cable to separate from the plastic disk housing." *Id.* ¶ 22. In turn, this caused Plaintiff's television to fall and shatter its screen. *Id.* Taking these allegations as true—which the Court must on a motion to dismiss, *see Manzarek*, 519 F.3d at 1031—Plaintiff has adequately alleged that the failure of the plastic disks in the Ultra Slim wall mount caused Plaintiff's injury. *See Smith*, 2011 WL 4404152, at \*2 (finding causation sufficiently alleged when the plaintiff claimed that "security flaws [i.e., the defect] with Adobe's products...enabled the computer hacker to cause damage"). The Court notes that Defendant does not contest that the failure of the plastic disks in Plaintiff's Ultra Slim wall mount caused Plaintiff's television to fall and break.

Because Plaintiff has alleged that "the design [of Ultra Slim wall mounts] proximately caused the injuries," the burden shifts to Defendant to establish that the benefits of the challenged design, when balanced against such factors as the feasibility and cost of alternative designs, outweigh its inherent risk of harm." *McCabe*, 100 Cal. App. 4th at 1121. In the motion to dismiss, Defendant states only that Plaintiff does not "allege facts showing that the alleged benefits she obtained from the Wall Mount outweigh any risks or dangers." Mot. Dismiss at 21. This one sentence argument does not meet *Defendant's* burden to show that the benefits of the design outweigh the risks. *See McCabe*, 100 Cal. App. 4th at 1121; *Altman v. HO Sports Co.*, 2009 WL 4163512, at \*8 (E.D. Cal. Nov. 23, 2009) (holding that a plaintiff need not allege how the risks of the design outweigh the benefits, because burden is on defendant). Thus, the Court concludes that Plaintiff has sufficiently alleged a design defect under the risk-benefit test. *See McCabe*, 100 Cal. App. 4th at 1121; *cf. Berry v. Oshkosh Truck Corp.*, 2007 WL 174334, at \*4 (E.D. Cal. Jan. 22, 2007) (denying summary judgment on risk-benefit test when the plaintiff demonstrated the product design was a substantial cause of the plaintiff's injury, even though there was a dispute whether the plaintiff followed the appropriate safety instructions). Accordingly, the Court DENIES Defendant's motion to dismiss Plaintiff's strict liability claim for design defect.

**G. Negligence**

Plaintiff's last cause of action, for negligence, requires Plaintiff to allege: (1) the defendant's legal duty of care; (2) the defendant's breach of duty; (3) injury to the plaintiff as a result of the breach; and (4) damage to the plaintiff. *See Hoyem v. Manhattan Beach City Sch. Dist.*, 22 Cal. 3d 508, 513 (1978). In the instant case, Plaintiff asserts that Defendant was negligent in two ways: (1) failing to adequately warn purchasers of Ultra Slim wall mounts' propensity to fail, and (2) negligently designing Ultra Slim wall mounts with a "dangerous propensity of failure." Compl. ¶¶ 68–72.

The parties agree that, in this case, Plaintiff's negligence claim rises or falls with Plaintiff's strict liability claims. *See* Mot. Dismiss at 22; Dismiss Opp. at 17. The Court concludes that, similar to Plaintiff's strict liability claims, Plaintiff fails to state a claim for negligent failure to warn while Plaintiff sufficiently alleges a claim for negligent design.

As to Plaintiff's claim for negligent failure to warn, "[n]egligence law in a failure-to-warn case requires a plaintiff to prove that a manufacturer or distributor did not warn of a particular risk for reasons which fell below the acceptable standard of care, i.e., what a reasonably prudent manufacturer *would have known and warned about*." *Carlin v. Superior Court*, 13 Cal. 4th 1104, 1112 (1996) (emphasis added). As discussed above, Plaintiff fails to allege that Defendant knew of any defect in Ultra Slim wall mounts and thus that Defendant "would have known and warned about" the defect. *See id.* Accordingly, the Court GRANTS with leave to amend Defendant's motion to dismiss Plaintiff's negligence claim to the extent that the claim is founded on a failure to warn. *See Lopez*, 203 F.3d at 1127.

**\*20** As to Plaintiff's negligent design claim, "most of the evidentiary matters relevant to applying the risk[-]benefit test in strict liability cases are similar to the issues typically presented in a negligent design case." *Merrill v. Navegar, Inc.*, 26 Cal. 4th 465, 480 (2001) (internal quotation marks omitted). This is because, similar to the strict liability risk-benefit test, the test for negligent design "involves a balancing of the likelihood of harm to be expected from a [product] with a given design and the gravity of harm if it happens against the burden of the precaution which would be effective to avoid the harm." *Id.* at 479 (internal quotation marks omitted). Accordingly, design defect strict liability claims and negligent design claims often rise or fall together. *See Chavez*, 207 Cal. App. 4th at 1315 (concluding summary adjudication was not warranted on negligent design claim because summary

adjudication was not warranted on strict liability for design defect under the risk-benefit test).

Because the Court concludes above that Plaintiff sufficiently alleges a design defect under the risk-benefit test, the Court finds that Plaintiff sufficiently alleges negligent design to survive a motion to dismiss. *See Merrill*, 26 Cal. 4th at 481 ("Plaintiffs' claim that Navegar's decision to distribute [a certain weapon] to the general public was negligent given the weapon's particular design features is therefore simply a reformulated claim that the weapon, as designed, fails the risk-benefit test."); *Chavez*, 207 Cal. App. 4th at 1315 (finding same conclusion applied to negligent design and strict liability design defect claims). The Court thus DENIES Defendant's motion to dismiss Plaintiff's negligence claim to the extent that the claim is founded on negligent design.

## IV. CONCLUSION

For the foregoing reasons, the Court DENIES Plaintiff's motion to remand. The Court also GRANTS in part and DENIES in part Defendant's motion to dismiss, as follows:

- As to Plaintiff's claim under the CLRA, the Court GRANTS Defendant's motion to dismiss with leave to amend.

- As to Plaintiff's claim under the Song-Beverly Act, the Court DENIES Defendant's motion to dismiss.

- As to Plaintiff's claim under the UCL, the Court GRANTS Defendant's motion to dismiss with leave to amend.

- As to Plaintiff's claim for strict liability for failure to warn, the Court GRANTS Defendant's motion to dismiss with leave to amend.

- As to Plaintiff's claim for strict liability for design defect, the Court DENIES Defendant's motion to dismiss.

- As to Plaintiff's claim for negligence, the Court GRANTS with leave to amend Defendant's motion to dismiss to the extent that the claim is founded upon negligent failure to warn. The Court DENIES Defendant's motion to dismiss to the extent that the claim is founded upon negligent design.

Should Plaintiff elect to file an amended complaint curing the deficiencies identified in this order, Plaintiff shall do so within twenty-one (21) days of the date of this order. Failure to meet this deadline, or failure to cure the deficiencies identified in this order, will result in a dismissal with prejudice. Plaintiff may not add new parties or claims without leave of the Court or stipulation of the parties pursuant to Federal Rule of Civil Procedure 15.

**IT IS SO ORDERED.**

Dated: September 12, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 4729302

## Footnotes

1   The Court GRANTS Defendant's two unopposed requests for judicial notice. ECF Nos. 16-1, 25-2. In support of Defendant's motion to dismiss, Defendant requests judicial notice of four publications cited by the complaint. ECF No. 16-1; *see also* Compl. ¶¶ 14–16 (describing the contents of four publications). The complaint relies on these documents, and the documents' authenticity and relevance are uncontested. Accordingly, the Court may consider the documents under the doctrine of incorporation by reference. *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). In support of Defendant's motion to remand, Defendant requests judicial notice of data produced by the U.S. Census Bureau. This data "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned" and thus is judicially noticeable. Fed. R. Evid. 201(b); *see also United States v. Dreyer*, 767 F.3d 826, 834 n.12 (9th Cir. 2014) ("We may properly take judicial notice of United States Census Bureau data....").

2   As to Defendant's other two calculations, Defendant first argues that reasonable assumptions based only on the face of the complaint show that the potential cost of repairing or replacing class members' broken televisions is $6.4 million. Second, Defendant offers evidence to show the average price of televisions compatible with Ultra Slim wall mounts, and assumes that 100% of Ultra Slim wall mounts failed and resulted in broken televisions. This calculation results in [redacted text] in potential liability to repair or replace the broken televisions.

3   Models WMN1000A, WMN1000B, WMN2000A, WMN2000B, WMN2000C, WMN3000A, WMN3000B, and WMN3000C.

4   This is admittedly not the universal view in this district. Some courts have dismissed claims for lack of standing when the plaintiff did not purchase the product on which the claim is based. *See, e.g., Granfield v. NVIDIA Corp.*, 2012 WL

2847575, at *6 (N.D. Cal. July 11, 2012) ("[W]hen a plaintiff asserts claims based both on products that she purchased and products that she did not purchase, claims relating to products not purchased must be dismissed for lack of standing."); *Carrea v. Dreyer's Grand Ice Cream, Inc.*, 2011 WL 159380, at *3 (N.D. Cal. Jan. 10, 2011), *aff'd on other grounds*, 475 Fed.Appx. 113 (9th Cir. 2012).

5    In opposition to Defendant's motion to dismiss, Plaintiff contends that it is reasonable to infer that Defendant knew of the defect in Ultra Slim wall mounts in light of Defendant's assumption, in opposition to Plaintiff's motion to remand, that 100% of Ultra Slim wall mounts have failed. Dismiss Opp. at 7. However, Defendant's assumption for purposes of showing the potential damages in controversy was not a concession on the merits of Plaintiff's claims. *See Bryan v. Wal-Mart Stores, Inc.*, 2009 WL 440485, at *2 (N.D. Cal. Feb. 23, 2009) (noting that for purposes of demonstrating the amount in controversy under CAFA, "[t]he Court must assume the truth of the allegations in the complaint and that a jury will return a verdict for the plaintiff on all claims alleged"). Moreover, Plaintiff ignores that, to state a CLRA claim, Defendant must have known of the defect *at the time of the sale* to Plaintiff in September 2010. *Wilson*, 668 F.3d at 1145. Plaintiff cites nothing in Defendant's opposition to the motion to remand that indicates Defendant's knowledge in September 2010.

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2005 WL 955251
United States District Court,
W.D. Wisconsin.

Robert E. GILSON, M.D., Wisconsin
Alumni Research Foundation, Gilson
Inc., and Gilson S.A.S. Plaintiffs,

v.

RAININ INSTRUMENT, LLC,
Rainin Group, Inc., and Mettler-
Toledo, Inc., Defendants.

No. 04-C-852-S.
|
April 25, 2005.

**Attorneys and Law Firms**

Allen A. Arntsen, for Plaintiffs.

Bruce A. Schultz, Madison, WI, for Defendants.

MEMORANDUM AND ORDER

SHABAZ, J.

**\*1** Plaintiffs Robert E. Gilson, M.D., the Wisconsin Alumni Research Foundation, and Gilson Inc. commenced this civil action against defendants Rainin Instrument, LLC, Rainin Group, Inc., and Mettler-Toledo, Inc. alleging breach of contract, violation of Wis. Stat. § 100.18, unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A) & (B), and seeking a declaration that the parties' exclusive distributorship agreement is void and unenforceable. Jurisdiction is based on 28 U.S.C. §§ 1331 and 1332. The matter is presently before the Court on defendants' motion for judgment on the pleadings and cross-motions for summary judgment. The following facts are undisputed.

BACKGROUND

Pipettes are hand-held instruments that are typically used in laboratories to measure and transfer liquids. Pipettes are used to extract a precise volume of liquid from one container and then transfer and deposit it into another. A pipette's shape is similar to that of a large syringe, but pipettes are much more precise and durable.

Plaintiff Dr. Robert E. Gilson is a Wisconsin citizen. He and his father Dr. Warren E. Gilson are the named co-inventors on U.S. Patent No. 3,827,305, which issued on August 6, 1974 for certain adjustable volume manual pipettes. Plaintiff Gilson Inc. is a Wisconsin corporation with its principal place of business in Middleton, Wisconsin. Plaintiff Gilson S.A.S. is a French corporation with its principal place of business in France. Gilson S.A.S. is a wholly-owned subsidiary of Gilson Inc. Gilson Inc., directly and through its affiliate Gilson S.A.S., is a leading manufacturer of high-quality pipettes, liquid chromatography instruments and automated liquid handling instruments. Plaintiff Wisconsin Alumni Research Foundation (WARF) is a Wisconsin nonstock corporation with its principal place of business in Madison, Wisconsin. WARF is the successor to Dr. Warren Gilson's rights with respect to the present dispute.

Defendant Mettler-Toledo, Inc. is a Delaware corporation with its principal place of business in Ohio. Mettler sells pipettes, analytical instruments and products for laboratory and industrial weighing, automated chemistry, packaging control and other similar purposes. Defendant Rainin Instrument, LLC is a single-member limited liability company owned by Mettler. Rainin LLC is a successor to defendant Rainin Instrument, Inc. n/k/a Rainin Group, Inc., a Massachusetts corporation with its principal place of business in California. Rainin Inc. was in the business of selling pipettes and other products for laboratory use. Rainin LLC took over this business after Mettler acquired Rainin Inc.

In December 1972 Warren and Robert Gilson entered into a "Capital Gains License Agreement" with Rainin Instrument Co., Inc. Under this 1972 Agreement, the Gilsons granted Rainin the exclusive right in the United States to use the method described in the '305 patent and technical information relating to processes, invention and methods relating to the manufacture of pipettes under the patent, including "the exclusive and perpetual right to make, use and sell under the aforesaid technical information and patent application." Rainin agreed to pay the Gilsons a royalty for every pipette covered by the licensing agreement that it sold. The 1972 Agreement set this royalty at $8.00 per pipette. The parties later agreed to increase the royalty to $8.50 per pipette, where it remains today. Since 1975 Rainin has paid a total of $15,736,882 in royalties to plaintiffs. Since 1972 Gilson Inc., through its affiliate Gilson S.A.S., has manufactured

Gilson "Pipetman" pipettes, which Rainin has marketed and sold throughout the United States. As a result of the parties' relationship, the Gilson Pipetman pipette quickly became the largest selling pipette in the United States. Known for its reliability and durability, it became the industry standard. It remains so today.

**\*2** The '305 patent expired in 1991. In 2001 Mettler acquired Rainin Inc. and entered into an agreement with plaintiffs to assign Rainin Inc.'s rights under the 1972 Agreement to Mettler. This 2001 Assignment Agreement is prefaced by the following recital: "The parties have further engaged in discussions and negotiations concerning the [1972] Agreement, and have agreed on certain interpretations of the [1972] Agreement, as follows." The 2001 Agreement includes the following relevant provision:

3. *Term*

The parties confirm that the term of the [1972] Agreement with respect to Current Pipetman Products shall be in perpetuity. "Current Pipetman Products" means products being manufactured by Gilson France and distributed in the U.S. by Rainin as of the date of this Agreement. The term of the exclusive rights under the [1972] Agreement with respect to "Pipetman Ultra" products, other "Pipetman" line products developed in the future, "Pipetman" products which reflect a change from Current Pipetman Products, and all other current and future volume adjustable mechanical pipettes covered by Section 2 hereof shall be fifteen (15) years from and after the date of this Agreement, and thereafter shall be nonexclusive. Nothing herein shall be construed as requiring the Gilsons to supply any particular PRODUCT to Mettler after termination of the exclusive period with respect to such PRODUCT.

Provided that Mettler remains the exclusive distributor of all Gilson volume adjustable mechanical pipettes, if annual sales of PRODUCTS by Mettler in the U.S. in any calendar year are less than one half the unit sales of Current Pipetman Products in calendar year 2000, then the Gilsons shall have the right by written notice to Mettler to convert Mettler's rights under the [1972 Agreement] from exclusive to nonexclusive; provided, however, that such exclusivity shall not lapse in the event such volume limitations are not achieved as a result of significant quality problems, Acts of God, significant logistical problems, or similar events causing a significant disruption in supply.

The parties agree to enter into good faith negotiations regarding the extension of the exclusive term of the [1972] Agreement for additional 1-year periods. If the Gilsons do not desire to extend the exclusive term, they shall so advise Mettler in writing at least 1 year before the expiration of the exclusive term. Notwithstanding such notice of intention not to extend the exclusive term, the 1972 Agreement will remain in effect as provided herein and for the balance of the exclusive term Mettler will continue to carry and market PRODUCTS in accordance with its past practices.

In 2000 Rainin sold 86,892 Pipetman pipettes. Consequently, the agreement's reference to "one half the unit sales of Current Pipetman Products in calendar year 2000" equals 43,336 pipettes.

By a separate 2001 agreement, Gilson Inc. gave Mettler a 15-year exclusive license to use the "Gilson" trademark in the United States with respect to certain pipettes supplied by Gilson. Thereafter the agreement provides that "[i]f Mettler undertakes the manufacture of products and desires to use trademarks of Gilson, Inc. in connection therewith, then the parties will enter into good faith negotiations for a license agreement authorizing Mettler to use said trademarks."

**\*3** The parties agree that while the two 2001 Agreements modified the 1972 Agreement in several respects, they still required defendants, through Mettler's affiliate Rainin LLC, to serve as the exclusive distributor of certain Gilson pipette products in the United States. The parties also agree that the per-pipette royalty promised by defendants to the plaintiffs is the only compensation promised to them by defendants under the agreements. Further, the parties agree that defendants are not obliged to make minimum royalty payments to plaintiffs. Plaintiffs' only recourse if defendants fail to meet the minimum sales figure specified in the 2001 Assignment Agreement is to give notice and convert defendants' right to distribute Gilson pipettes from exclusive to nonexclusive.

Defendants have manufactured and sold their own electronic pipette since 1984. In 1998 they began to manufacture and sell their own "Pipet-Lite" manual pipette. From 1998 through 2000, plaintiffs noticed no appreciable decline in sales of Gilson Pipetman products in the United States. After 2001, however, sales of Gilson products in the United States began to decline significantly. Defendants sold 86,252 Pipetman pipettes in 1999. In 2004 defendants sold 30,000 fewer Pipetman pipettes. In 2004 defendants sold about 30,000 of their own pipettes in the United States. This represented about a 25% gain in market share for Rainin pipettes. A

relatively small number of the Rainin pipettes sold during this period were electronic. Despite diminished sales, however, defendants' yearly sales of Gilson pipettes has never fallen below 43,336 pipettes.

After 2001 plaintiffs began to receive complaints from their customers that led them to believe that defendants were refusing to provide potential customers with information about Gilson products or to sell Gilson products. Plaintiffs also discovered information which led them to believe that defendants were marketing their "Pipet-Lite" pipettes as "the new Pipetman" and conducting an organized campaign to disparage Gilson pipettes and to convert Gilson pipette customers into Rainin pipette customers. Consequently, plaintiffs brought the present action.

MEMORANDUM

Presently before the Court are defendants' motion for judgment on the pleadings, Fed.R.Civ.P. 12(c), and cross-motions for summary judgment, Fed.R.Civ.P. 56.

Motions pursuant to Rule 12(c) are reviewed under the same standard as Rule 12(b)(6) motions. *See N. Ind. Gun & Outdoor Shows, Inc. v. South Bend,* 163 F.3d 449, 452 (7th Cir.1998). A complaint should be dismissed only if it appears beyond a reasonable doubt that the plaintiffs can prove no set of facts in support of the claim which would entitle them to relief. *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). A complaint "must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1106 (7th Cir.1984). Plaintiffs need not demonstrate their entitlement to a favorable judgment, only that they have a cognizable claim. *See Trevino v. Union Pac. R. Co.,* 916 F.2d 1230, 1234 (7th Cir.1990).

**\*4** Summary judgment is appropriate when, after both parties have the opportunity to submit evidence in support of their respective positions and the Court has reviewed such evidence in the light most favorable to the nonmovant, there remains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

A fact is material only if it might affect the outcome of the suit under the governing law. Disputes over unnecessary or irrelevant facts will not preclude summary judgment. A factual issue is genuine only if the evidence is such that a reasonable factfinder, applying the appropriate evidentiary standard of proof, could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Under Rule 56(e) it is the obligation of the nonmoving party to set forth specific facts showing that there is a genuine issue for trial.

*Count I: Breach of Contract*

Plaintiffs move for summary judgment on Count 1 of their amended complaint. Count 1 alleges defendants' breach of contract. Specifically, plaintiffs allege defendants' violation of an implied duty to use best efforts to promote the sale of the Gilson products for which they are the exclusive distributor, Wis. Stat. § 402.306, and defendants' violation of the implied duty of good faith and fair dealing, Wis. Stat. § 401.203.

Defendants move for judgment on the pleadings and summary judgment on Count 1 of plaintiffs' amended complaint. They argue that the parties' agreement does not include a duty to use best efforts because the parties otherwise agreed to an objective performance standard. They argue that this objective performance standard also provides the standard by which their compliance with the implied duty of good faith and fair dealing should be measured, Wis. Stat. § 401.102(3). They allege that they have always satisfied this performance standard. They argue also that the parties' course of performance limits any implied obligation of best efforts. Moreover, they argue that plaintiffs' claim should fail because the implied duty of good faith and fair dealing does not provide an "independent" cause of action. Finally, they argue that they have not breached either implied duty and that plaintiffs are estopped or otherwise unable to prove a breach based on conduct in which defendants had engaged prior to the 2001 Assignment Agreement.

*Whether Article 2 of the Uniform Commercial Code Applies?*

The parties' agreement is governed by Wisconsin law. Defendants initially question whether Article 2 of the Uniform Commercial Code (UCC), as codified in Chapter 402 of the Wisconsin Statutes, applies to the parties' agreement. Article 2 applies to transactions in goods. Wis. Stat. § 402.102. The parties' agreement is a "mixed" agreement. It provides for the exchange of goods, services and rights to use intellectual property. Where an agreement is mixed, Wisconsin courts apply the predominant purpose test to determine whether Article 2 is applicable:

**\*5** The test for inclusion or exclusion is not whether they are mixed, but, granting that they are mixed, whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved (*e.g.,* contract with artist for painting) or is a transaction of sale, with labor incidentally involved (*e.g.,* installation of a water heater in a bathroom):

*Bonebrake v. Cox,* 499 F.2d 951, 960 (8th Cir.1974) (footnotes omitted), *quoted in Van Sistine v. Tollard,* 95 Wis.2d 678, 684, 291 N.W.2d 636, 639 (Ct.App.1980).

The UCC defines "agreement" as "the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance." Wis. Stat. § 401.201(3). The predominant purpose of plaintiffs and defendants' bargain-in-fact was to establish defendants as the exclusive distributor of Gilson pipettes in the United States.

Pursuant to the 1972 Agreement, the Gilsons transferred to Rainin the "exclusive and perpetual" right in the United States to use the method described in the '305 patent and technical information relating to processes, invention and methods relating to the manufacture of pipettes under the patent. Neither plaintiffs nor defendants dispute that the purpose of this transfer was to secure capital gains treatment of the payment stream that would result from Rainin's sale of Gilson pipettes.

The transfer of the '305 patent rights from plaintiffs to defendants in the 1972 Agreement was not the predominant purpose for which the transaction was undertaken. The text of the 1972 Agreement, the text of the two 2001 Agreements and the parties' course of performance consistently demonstrate that the transfer of the '305 patent rights was collateral to the predominant purpose of the parties' agreement: the establishment of defendants as the exclusive distributor of Gilson-brand pipettes. For thirty years, plaintiffs manufactured Gilson pipettes under the parties' agreement, which defendants distributed. None of the written agreements permits defendants to place the "Gilson" or "Pipetman" trademark on pipettes that they might manufacture. Consequently, if defendants wish to sell "Gilson" pipettes under the parties' agreement, then plaintiffs must supply them. This was the predominant purpose for which the parties entered into their agreement. Plaintiffs contributed "Gilson" pipettes. Defendants contributed their promotional efforts. Article 2 applies to such distributorship agreements. The predominant purpose of such agreements is

the transaction of the sale of goods. *Am. Suzuki Motor Corp. v. Bill Kummer, Inc.,* 65 F.3d 1381, 1385-86 (7th Cir.1995).

*Best Efforts, Good Faith and Fair Dealing*

Under Article 2 of the UCC, an exclusive dealing agreement "imposes unless otherwise agreed an obligation by the seller to use best efforts to supply the goods and by the buyer to use best efforts to promote their sale." Wis. Stat. § 402.306. The effect of this provision is expressly variable by agreement of the parties. Defendants argue that the parties otherwise agreed to disclaim this obligation when they agreed to an express "performance standard" in the 2001 Assignment Agreement.

**\*6** Neither party disputes that the 1972 Agreement included an obligation to use best efforts. The agreement made Rainin the exclusive dealer of Gilson Pipetman pipettes in the United States. In exchange, Gilson received a per-pipette payment from Rainin. This was the only remuneration that Gilson received from Rainin. As a consequence of this exclusive dealer arrangement, Gilson was obligated to use best efforts to supply the pipettes and Rainin was obligated to use best efforts to promote their sale. Wis. Stat. § 402.306(2). The parties' course of performance is consistent with this understanding. Neither party disputes that Gilson used best efforts to supply its pipettes and that Rainin used best efforts to promote their sale for over twenty-five years. As a result of their efforts, the Gilson Pipetman pipette became the industry standard and remains so today.

Under the 2001 Assignment Agreement, defendants remain the exclusive dealer of Gilson pipettes in the United States. Defendants argue, however, that the parties disclaimed their obligation to use best efforts by establishing an express "performance standard." Specifically, defendants point to the following clause within the agreement:

Provided that Mettler remains the exclusive distributor of all Gilson volume adjustable mechanical pipettes, *if annual sales of PRODUCTS by Mettler in the U.S. in any calendar year are less than one half the unit sales of Current Pipetman Products in calendar year 2000, then the Gilsons shall have the right by written notice to Mettler to convert Mettler's rights under the [1972 Agreement] from exclusive to nonexclusive;* provided, however, that such exclusivity shall not lapse in the event such volume limitations are not achieved as a result of significant quality problems, Acts of God, significant logistical problems, or similar events causing a significant disruption in supply.

(emphasis added.)

The implied duty of best efforts is a gap-filling provision. Defendants argue that this clause displaces their obligation to use best efforts because it fills the gap for which the duty would otherwise be supplied. Specifically, defendants argue that this clause provides the quantity of pipettes that they must sell each year in consideration of the right to operate as plaintiffs' exclusive distributor: one half the unit sales of Current Pipetman Products in calendar year 2000 or 43,336 pipettes. Plaintiffs disagree. They argue that this clause permits them to convert defendants' distributorship rights from exclusive to nonexclusive if defendants are unable to sell 43,336 Gilson pipettes per year despite their best efforts.

At its heart, the parties' dispute concerns the degree of discretion that the agreement permits defendants to exercise in determining the extent of their performance. Plaintiffs construe the disputed clause to give defendants little discretion to determine the extent of their performance. Plaintiffs argue that defendants must use reasonable efforts and due diligence as well as good faith in the promotion and sale of their product. The market, not defendants, will then determine the quantity sold and plaintiffs' resulting remuneration. To the contrary, defendants' interpretation suggests that they believe themselves to have complete discretion to determine the extent of their performance. If they decide to sell fewer than 43,336 Gilson pipettes, then they permit plaintiffs to convert their distributorship rights from exclusive to nonexclusive. If they decide to sell more than 43,336 Gilson pipettes, then they prevent plaintiffs from converting their distributorship rights to nonexclusive.

**\*7** This dispute mirrors that resolved by Justice Cardozo in the paradigm best-efforts case: *Wood v. Lucy, Lady Duff-Gordan,* 222 N.Y. 88, 118 N.E. 214 (N.Y.1917). Lady Duff-Gordon Lucy was a well-known fashion designer who gave a licensee the exclusive right to place her endorsements on the designs of others and to sell and license her designs. In return, she was to receive one-half of "all profits and revenues" that he might make. The licensee sued her for breach of contract alleging that she had placed her endorsements on goods without his knowledge. She responded that the parties' agreement was unenforceable because it lacked mutuality of obligation. While the agreement expressly disabled her from placing her endorsements on goods and from granting that right to another, it did not expressly obligate him to do anything. Writing for the New York Court of Appeals, Justice Cardozo implied in the parties' agreement an obligation

on the licensee's part to use reasonable efforts to place her endorsements and market her designs. This obligation supplied the consideration. Accordingly, the Court found the parties' agreement to be valid and enforceable. *Lucy, Lady Duff-Gordan,* 118 N.E. at 215.

Like the defendant in *Lucy, Lady Duff-Gordan,* defendants suggest that one party to the agreement has been given unfettered discretion to determine the extent of its performance. On the one hand, defendants disclaim any obligation to use best efforts or to perform in good faith. Their performance, they argue, must be judged by whether they sold 43,336 Gilson pipettes each year. On the other hand, they do not argue that they were obligated to sell 43,336 units per year or that their failure to do so would constitute a breach of contract. Indeed, the parties' written agreement contains no suggestion that the occurrence of the condition stated in the disputed clause would constitute a breach of the agreement.

A common type of promise that is too indefinite to be enforceable is that where the promisor retains unlimited discretion to decide later the nature and extent of its performance. Restatement (Second) of Contracts §§ 34, cmt. b, 77, illus. 1 (1979); 1 Samuel Williston, *A Treatise on the Law of Contracts* § 4:24 (Richard A. Lord ed., 4th ed.1990). Such an "agreement" may not only fail to be enforceable, it may fail to be an agreement at all. If the parties' "agreement" makes performance entirely optional with the "promisor," then there is no agreement. Restatement (Second) of Contracts §§ 2, cmt. e, 77, cmt. a.

As Justice Cardozo showed in *Lucy, Lady Duff-Gordon,* however, courts are hesitant to interpret agreements to place one party at the mercy of the other, especially when to do so would render the parties' agreement invalid, unenforceable or both. 118 N.E. at 214. Wherever possible, the Court will interpret the parties' agreement to be valid and enforceable. *Variance, Inc. v. Losinske,* 71 Wis.2d 31, 36-37, 237 N.W.2d 22, 24 (1976). The UCC provides several gap-filling provisions that permit courts to supply missing terms and render agreements valid and enforceable. One such provision is § 402.306(2), which supplies the exclusive dealer's obligation where none is otherwise expressly stated. Wis. Stat. § 402.306(2), cmt. 5. Section 402.306(2) fetters the exclusive dealer's discretion and thereby provides the requisite obligation to render the agreement valid and enforceable. *See also* Restatement (Second) of Contracts § 77, cmt. d.

 **\*8** The disputed clause in the parties' 2001 Assignment Agreement provides that plaintiffs shall have the right by written notice to defendants to convert defendants' rights under the agreement from exclusive to nonexclusive if their annual sales are less than 43,336 Gilson pipettes. The occurrence of this condition does not, as such, signal a breach of the parties' agreement. Nor does this clause obligate defendants to sell a certain number of pipettes or pay a certain minimum royalty. It guarantees no performance on the part of defendants. Consequently, the parties' written agreement remains silent as to defendants' obligation. In this silence, Wis. Stat. § 402.306(2) continues to supply an obligation to use best efforts.

In this silence, the UCC also continues to supply an obligation to perform in good faith. Wis. Stat. §§ 401.203, 402.306(2). In a transaction between merchants governed by Article 2, "good faith" "means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." Wis. Stat. § 402.103(1)(b). Unlike the obligation to exercise best efforts, the obligation to perform in good faith may not be disclaimed by agreement. Wis. Stat. § 401.102(3). The parties may agree to determine the standard by which the performance of this obligation is to be measured, *id.,* but defendants' argument that the parties here intended to set such a standard is unpersuasive. It would be manifestly unreasonable to say that a provision of the agreement which does not obligate a party to act or refrain from acting provides the measure by which that party's good faith is to be judged. Were this clause to provide the sole measure of defendants' good faith, then defendants would not be obligated to act in good faith. In effect, defendants' interpretation disclaims the duty of good faith contrary to Wis. Stat. § 401.102(3), which expressly precludes such a result.

Defendants are correct that the implied duty of good faith and fair dealing does not provide an "independent" cause of action. Wis. Stat. § 401.203 cmt.; *Hauer v. Union State Bank,* 192 Wis.2d 576, 597, 532 N.W.2d 456, 464 (Ct.App.1995). A failure to perform a specific obligation under the agreement in good faith constitutes not an independent breach but a breach of that obligation. Wis. Stat. § 401.203 cmt. Plaintiffs allege defendants' failure to perform in good faith their obligation to use best efforts to promote plaintiffs' product. Under the parties' exclusive dealing arrangement, defendants' exercise of discretion in the promotion and sale of plaintiffs' product is fettered not only by the obligation that they use reasonable diligence but also by the obligation that they perform in good faith. Wis. Stat. § 2-306(2), cmt. 5. Consequently, defendants'

motion for judgment on the pleadings as to Count 1 of plaintiffs' amended complaint must be denied.

There is no dispute that the parties' agreement permits defendants to manufacture pipettes which compete with Gilson pipettes. Nevertheless, defendants' privilege to compete with plaintiffs is not absolute. The means that defendants may employ to compete with plaintiffs are limited by defendants' obligation to use reasonable efforts and due diligence as well as good faith in the promotion and sale of plaintiffs' pipettes. Although defendants have a general right to promote the sale of a competing brand of pipettes and thereby lessen plaintiffs' share of the market, there will be a point where defendants' methods are so manifestly harmful to plaintiffs as to justify the finding that defendants have breached their obligation to plaintiffs. *See, e.g., Bloor v. Falstaff Brewing Corp.,* 601 F.2d 609, 614-15 (2d Cir.1979); *Joyce Beverages v. R. Royal Crown Cola Co.,* 555 F.Supp. 271, 275 (S.D.N.Y.1983); *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Pub. Co.,* 30 N.Y.2d 34, 330 N.Y.S.2d 329, 281 N.E.2d 142, 145 (N.Y.1972).

 **\*9** The application of the best efforts standard to the particular circumstances of this case presents a question of fact ill-suited for resolution on summary judgment. Plaintiffs allege, for example, that defendants are engaged in an organized campaign to convert Gilson customers to Rainin customers through means that include the promotion of the Ranin pipettes as an "upgraded version of the Pipetman," the disparagement of Gilson pipettes as "long in the tooth," the training of the Rainin sales force to sell Gilson pipettes "only as a last resort," the incentivization of the Rainin sales force to promote Rainin pipettes and disparage Gilson pipettes including the use of disparate sales commissions and awards, and the disparate use of special offers to customers including discount coupons, trade-in programs, volume incentives and calibration services. Plaintiffs' evidence consists in large part of conversations by telephone and at trade shows between members of defendants' sales force and potential customers.

Defendants argue estoppel and suggest that the parties' course of performance prior to the 2001 agreements precludes plaintiffs from now challenging defendants' promotion of competing product lines, but defendants have not satisfied their burden to prove that plaintiffs were aware of those methods which they now challenge prior to the 2001 Agreements. Defendants also dispute that they are waging any organized campaign against plaintiffs and dismiss plaintiffs'

evidence as at best a collection of isolated incidents that do not amount to a breach.

The facts thus far presented when viewed in a light most favorable to either party are sufficient to permit a reasonable factfinder to find in favor of that party. Accordingly, both parties' motions for summary judgment will be denied as they relate to Count 1 of plaintiffs' amended complaint.

*Lanham Act*

Defendants move for judgment on the pleadings and summary judgment on Count 3 of plaintiffs' amended complaint. Count 3 alleges defendants' violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A) & (B).

Plaintiffs first allege a false or deceptive advertising claim, 15 U.S.C. § 1125(a)(1)(B).

> To establish a claim under the false or deceptive advertising prong of § 43(a) of the Lanham Act, a plaintiff must prove: (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products.

*Hot Wax, Inc. v. Turtle Wax, Inc.,* 191 F.3d 813, 819 (7th Cir.1999).

 **\*10** In response to defendants' motion for summary judgment, plaintiffs have abandoned all but the following allegations as the basis for their Lanham Act false advertising claim:

- At a trade show in Chicago, a Rainin representative introduced the Rainin LTS series pipette to Gilson employee Dennis Claspell as "the new Pipetman."

- In July of 2003, Rich Gray, a Rainin salesperson e-mailed his colleagues: "It has been my experience with academic accounts, that selling the Pipette Lite as an upgraded version of the Pipetman, rather than an ergonomic pipette, works better. I use that tool to generate interest...."

- A Rainin sales representative described the Pipette Lite as the "newer model" of Pipetman to customers. One call center report states: "Alice called for a quote on Pipetman®. I asked to see if I could come by and show her the newer model, the Pipet-lite...."

Defendants argue that these alleged misrepresentations do not constitute "commercial advertising or promotion."

That the communication be "commercial advertising or promotion" is an essential element of any false advertising claim under 15 U.S.C. § 1125(a)(1)(B). *First Health Group Corp. v. BCE Emergis Corp.,* 269 F.3d 800, 803 (7th Cir.2001). The Seventh Circuit has defined "commercial advertising or promotion" as follows:

> Advertising is a form of promotion to anonymous recipients, as distinguished from face-to-face communication. In normal usage, an advertisement read by millions (or even thousands in a trade magazine) is advertising, while a person-to-person pitch by an account executive is not. So we have held in a series of disputes that require a definition of "advertising injury" under insurance policies.... Advertising is a subset of persuasion and refers to dissemination of prefabricated promotional material.

*Id.* at 803-04 (citations and internal quotation marks omitted).

By this definition, the communications on which plaintiffs rely are not "commercial advertising or promotion." Each communication was in the form of a person-to-person pitch, not a dissemination of prefabricated promotional material to anonymous recipients. Accordingly, defendants' motion for summary judgment on plaintiffs' false or deceptive advertising claim, 15 U.S.C. § 1125(a)(1)(B), will be granted.

Plaintiffs also allege that defendants have violated the false designation prong of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A). It provides in relevant part:

> (1) Any person who, on or in connection with any goods, ... uses in commerce ... any false designation of origin ... which -

> (A) is likely to cause confusion, or to cause mistake, or to deceive ... as to the origin, sponsorship, or approval of his or her goods ... shall be liable in a civil action by any such person who believes that he or she is likely to be damaged by such act.

Plaintiffs must prove three elements:

(1) that the defendant used a false designation of origin or false description or representation in connection with goods or services; (2) that such goods or services entered interstate commerce; and (3) that the plaintiff is a person who believes he is likely to be damaged as a result of the misrepresentation.

*11 *Kennedy v. Nat'l Juvenile Det. Ass'n,* 187 F.3d 690, 695-96 (7th Cir.1999) (citing *Web Printing Controls Co., Inc. v. Oxy-Dry Corp.,* 906 F.2d 1202, 1204 (7th Cir.1990)).

Defendants argue that plaintiffs have no evidence that defendants sold or attempted to sell Rainin pipettes under the Gilson trademark. In response, plaintiffs propose the following facts:

• Ranin prominently displays the Pipetman trademark and the Rainin name in large type in its catalogs, with the Gilson trademark nowhere to be found on the page;

• Rainin uses the Pipetman mark in Rainin catalogs, particularly on the covers, without the Gilson trademark on the same page;

• Rainin places the Pipetman and Rainin marks proximate to each other in bold type in Rainin catalogs with the Gilson name included in small type, generally in the middle of text some distance away from the Pipetman name;

• Ranin advertises the Pipetman without the Gilson mark on Rainin web pages;

• At a trade show in Chicago, a Rainin representative introduced the Rainin LTS series pipette to Gilson employee Dennis Claspell as "the new Pipetman."

• In July of 2003, Rich Gray, a Rainin salesperson e-mailed his colleagues: "It has been my experience with academic accounts, that selling the Pipette Lite as an upgraded version of the Pipetman, rather than an ergonomic pipette, works better. I use that tool to generate interest...."

• A Rainin sales representative described the Pipette Lite as the "newer model" of Pipetman to customers. One call center report states: "Alice called for a quote on Pipetman®. I asked to see if I could come by and show her the newer model, the Pipet-lite...."

Plaintiffs' first four concerns are without merit. Plaintiffs expressly licenced defendants to display Pipetman pipettes in Ranin advertising materials. Rainin is the exclusive distributor of Pipetman pipettes. Consequently, some association of the Rainin name with the Pipetman name is necessary to inform the public that Rainin, not Gilson, is the company to which their Pipetman purchase requests should be directed. Having reviewed the disputed catalogs and advertising materials, the Court concludes that no reasonable juror could find a false designation of origin in any of these materials.

Defendants have little to say regarding plaintiffs' remaining three concerns. This is understandable given the fluid nature of plaintiffs' claim. Defendants argue that plaintiffs have failed to offer sufficient evidence of "likelihood of confusion." However, this argument is raised for the first time in their reply brief. Plaintiffs have not had a meaningful opportunity to respond. Consequently, this argument will not be considered for the purposes of defendants' motion. Defendants' motion for summary judgment on plaintiffs' false designation claim, 15 U.S.C. § 1125(a)(1)(B), will be denied.

*Wis. Stat. § 100.18/815 Ill. Comp. Stat. 510/2*

*12 Defendants move for judgment on the pleadings and summary judgment on Count 2 of plaintiffs' amended complaint. Count 2 alleges defendants' violation of Wis. Stat. § 100.18(1), which provides in relevant part:

No person ... with intent to sell ... shall make, publish, disseminate, circulate, or place before the public, or cause, directly or indirectly, to be made, published, disseminated, circulated or placed before the public, in this state, in a newspaper, magazine, or other publication ... or in any other way similar or dissimilar to the foregoing, an advertisement, announcement, statement or representation of any kind to the public relating to such purchase, sale, hire, use or lease ... which advertisement, announcement, statement or representation contains any assertion, representation, or statement of fact which is untrue, deceptive or misleading.

However convoluted the language of the statute one thing is clear: in order for liability to attach there must be some statement made in Wisconsin. It is undisputed that the alleged misrepresentations took place in Illinois, not Wisconsin. Consequently, plaintiffs seek amendment to conform to the evidence and plead a violation of the equivalent Illinois statute: the Illinois Uniform Deceptive Trade Practices Act,

*815 Ill. Comp. Stat. 510/2.* The parties agree that the legal inquiry is the same under both the Illinois Uniform Deceptive Trade Practices Act and the Lanham Act. *SB Designs v. Reebok Intern., Ltd.,* 338 F.Supp.2d 904, 914 (N.D.Ill.2004) (citing *Gimix, Inc. v. JS & A Group, Inc.,* 699 F.2d 901, 908 (7th Cir.1983)). Amendment would not prejudice defendants and would promote a complete resolution of the parties' dispute. Accordingly, leave will be granted pursuant to Rule 15 of the Federal Rules of Civil Procedure. Because the legal inquiry is the same, defendants' motions for judgment on the pleadings and summary judgment on plaintiffs' state law false designation claim will be denied in tandem with their motions for judgment on the pleadings and summary judgment on plaintiffs' Lanham Act false designation claim.

*Declaratory Relief*

Count 4 of plaintiffs' amended complaint seeks a declaration that the parties' agreement is void and unenforceable because it is an unreasonable restraint on trade and because it constitutes patent misuse. Defendants move for judgment on the pleadings and summary judgment on each of these issues. Plaintiffs move for summary judgment on their patent misuse claim.

Analogizing to employment and sale-of-business contracts, plaintiffs argue that the parties' agreement is an unreasonable restraint of trade under Wisconsin law. This argument is unpersuasive. Wisconsin law allows "a much greater scope of restraint in contracts between vendor and vendee than between employer and employee." *IDX Systems Corp. v. Epic Systems Corp.,* 285 F.3d 581, 585 (7th 2002) (construing *Fullerton Lumber Co. v. Torborg,* 270 Wis. 133, 139, 70 N.W.2d 585, 588 (1955)). Plaintiffs have failed identify any Wisconsin case in which a similar exclusive distributorship agreement has been held to be an unenforceable restrictive covenant, nor do they make a persuasive argument that this Court should be the first to so hold.

 **\*13** Plaintiffs' federal antitrust claim relies on its assertion that the parties' agreement is a horizontal restraint. Whether a restraint is horizontal depends upon whether it is the product of a horizontal agreement, not whether its effects are horizontal. *Bus. Elecs. Corp. v. Sharp Elecs. Corp.,* 485 U.S. 717, 730 n. 4, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988). The parties agreement is a vertical agreement. It establishes defendants as the exclusive distributor of Gilson pipettes in the United States. With this determination, plaintiffs' federal antitrust argument fails.

Plaintiffs also argue that the parties' agreement is void and unenforceable under the doctrine of patent misuse. The predominant purpose of the parties' 1972 Agreement was to establish Rainin as the exclusive distributor of Gilson pipettes. As previously discussed, however, the parties structured their written agreement as a "Capital Gains Licencing Agreement" in which Gilson licenced its '305 patent to Rainin in order to achieve capital gains treatment of the resulting payment stream from Rainin to Gilson. Plaintiffs now seek to use this arrangement to argue that the parties' agreement extended the payment of patent royalties beyond the expiration of the patent. Such an extension would implicate the patent misuse doctrine. *See, e.g., Brulotte v. Thys Co.,* 379 U.S. 29, 85 S.Ct. 176, 13 L.Ed.2d 99 (1964); *Scheiber v. Dolby Labs., Inc.,* 293 F.3d 1014 (7th Cir.2002). The '305 patent expired in 1991. Plaintiffs' argument, however, is unpersuasive.

In substance, Rainin paid Gilson for the right to be the exclusive distributor of the "Gilson" and "Pipetman" brand pipettes, which Gilson, not Rainin, manufactured using the '305 patent. In 1991 the '305 patent expired. The only remaining restriction on Rainin's ability to manufacture and sell pipettes substantially similar to the Gilson Pipetman pipettes was its inability to market them under the Gilson and Pipetman names. This restriction was not inconsequential. The Gilson name by then had acquired considerable value as the dominant brand in the United States pipette market. Accordingly, Gilson continued to manufacture its Pipetman pipettes and Rainin continued to pay for the exclusive right to distribute them. The parties continued in this manner for a decade. The parties then entered into the 2001 Agreements.

The principle underlying the patent misuse doctrine is that the leverage of the patent monopoly cannot lawfully be used to negotiate royalty payments beyond the life of the monopoly. *Aronson v. Quick Point Pencil Co.,* 440 U.S. 257, 265, 99 S.Ct. 1096, 59 L.Ed.2d 296 (1979). In 2001, Gilson had no patent, no monopoly, and no resulting leverage to negotiate royalty payments beyond the life of the monopoly. The parties' 2001 Agreements can only reasonably be read to confer existing rights and assign existing obligations. Plaintiffs had the valuable "Gilson" and "Pipetman" trademarks. Defendants had the distribution infrastructure. These items, not the '305 patent, are the subjects specifically mentioned in the 2001 Agreements. These items, not any residual rights relating to the '305 patent, were the concerns bargained for and given in exchange in the 2001 Agreements. Although the 2001 Agreements speak

in general terms of a "royalty" being paid "pursuant to the [1972] Agreement," neither party could reasonably have understood this "royalty" payment to be in consideration for Rainin's purchase of the '305 patent rights.

**\*14**  Defendants' motion for summary judgment on plaintiffs' unreasonable restraint of trade and patent misuse claims will be granted. Plaintiffs' cross-motion on its patent misuse claim will be denied.

Count 4 of plaintiffs' amended complaint also seeks declarations that they have the right to sell, directly or through third parties, their spare parts in the United States and that the Agreement does not limit their right to sell any product in Wisconsin.

Spare parts are not mentioned among the products covered by the parties agreement. Accordingly, the agreement does not prohibit plaintiffs from selling, directly or through third parties, their spare parts in the United States. Plaintiffs' motion for summary judgment will be granted as it relates to this determination.

The parties' written agreements are silent as to any special exception allowing plaintiffs to sell their products in Wisconsin. Apparently, however, there is an oral understanding between the parties on this issue. The Court is unable to determine the content of this understanding on summary judgment. Consequently, both parties' motions will be denied as they relate to this determination.

Finally, defendants' seek summary judgment on their counterclaim that plaintiffs have breached their obligations to provide technical information and negotiate a licensing agreement in good faith for defendants' use of the Pipetman trademark. As a preliminary matter, plaintiffs move to strike defendants' counterclaim arguing that defendants have failed to provide a damages calculation and have delayed in providing certain other disclosures. The Court does not

believe dismissal of the counterclaim to be an appropriate sanction for defendants' conduct. Defendants will not be permitted to use at trial in support of their counterclaim those items, if any, that they fail to produce in discovery. If they fail to produce evidence of damages, then they will be unable to prove damages at trial. The resolution of defendants' counterclaim will first require a determination as to whether defendants have materially breached the agreement so as to excuse plaintiffs' continuing performance. This dispute cannot be resolved on summary judgment. Defendants' motion for summary judgment will be denied as it relates to their counterclaim.

ORDER

IT IS ORDERED that defendants' motion for judgment on the pleadings is DENIED.

IT IS FURTHER ORDERED that defendants' motion for summary judgment is GRANTED insofar as it relates to plaintiffs' claims for false or deceptive advertising, state and federal unreasonable restraint on trade and patent misuse. Defendants' motion is in all other respects DENIED.

IT IS FURTHER ORDERED that plaintiffs' motion to strike is DENIED.

IT IS FURTHER ORDERED that plaintiffs' motion for summary judgment is GRANTED insofar as it seeks a declaration that the agreement does not prohibit plaintiffs from selling, directly or through third parties, their spare parts in the United States. Plaintiffs' motion is in all other respects DENIED.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 955251, 57 UCC Rep.Serv.2d 361

End of Document                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Jou v. Kimberly-Clark Corp.

United States District Court for the Northern District of California

December 10, 2013, Decided; December 10, 2013, Filed

Case No.:C-13-03075 JSC

**Reporter**

2013 U.S. Dist. LEXIS 173216 *; 2013 WL 6491158

DIANNA JOU, et al., Plaintiffs, v. KIMBERLY-CLARK CORPORATION, et al., Defendants.

**Subsequent History:** Motion denied by *Jou v. Kimberly-Clark Corp., 2015 U.S. Dist. LEXIS 97817 (N.D. Cal., July 27, 2015)*

that Act by selling its products in California, and the buyers did not suffer pecuniary loss because of the placement of the allegedly deceptive products in Wisconsin.

**Outcome**

Defendants' motion to dismiss granted in part and denied in part.

## Core Terms

consumer, diapers, ingredients, packaging, labeled, deceptive, cotton, wipes, misleading, front, advertising, non-natural, fruit, Soft, misrepresentations, deceived, environmental, misrepresent, injunctive, synthetic, puffery, quotation, misled, disclosures, sodium, box, fraudulent, displayed, conveys, website

## Case Summary

**Overview**

HOLDINGS: [1]-Where buyers alleged that the branding and marketing of diapers and baby wipes were misleading to consumers, their claims under California's consumer laws, including California's False Advertising Law, survived in part because they alleged facts that plausibly suggested that a reasonable consumer would be misled into believing that the "pure and natural" diapers contained no non-natural ingredients, but it was not plausible that a reasonable consumer would likely be misled to believe that the diapers were made exclusively of "soft organic cotton"; [2]-The buyers did not state a claim under Wisconsin's Deceptive Trade Practices Act, because the manufacturer did not violate

## LexisNexis® Headnotes

Civil
Procedure > ... > Justiciability > Standing > General Overview

Civil Procedure > ... > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Motions to Dismiss

*HN1*[⬇] **Justiciability, Standing**

Pursuant to *Fed. R. Civ. P. 12(b)(1)*, a district court must dismiss an action if it lacks jurisdiction over the subject matter of the suit. For the court to exercise proper subject matter jurisdiction over an action, the parties must have standing. The rules of standing are threshold determinants of the propriety of judicial intervention. It is

the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers. The standing question is whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction and to justify the exercise of the court's remedial powers on his behalf.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

*HN2*[ ] **Motions to Dismiss, Failure to State Claim**

Even if a plaintiff adequately alleges standing, a complaint may still be dismissed under *Fed. R. Civ. P. 12(b)(6)* for failure to state a claim. A complaint fails to state a claim upon which relief may be granted if the plaintiff fails to allege the "grounds" of his "entitlement to relief." A plaintiff must plead factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

*HN3*[ ] **Motions to Dismiss, Failure to State Claim**

A court should dismiss a complaint for failure to state a claim if, taking all factual allegations as true, it does not contain enough facts to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Motions to Dismiss

Constitutional Law > ... > Case or Controversy > Standing > General Overview

*HN4*[ ] **Defenses, Demurrers & Objections, Motions to Dismiss**

A lack of Article III standing requires dismissal for lack of subject matter jurisdiction under *Fed. R. Civ. P.*

*12(b)(1)*.

Constitutional Law > ... > Case or Controversy > Standing > Elements

*HN5*[ ] **Standing, Elements**

Article III standing requires that litigants demonstrate a "personal stake" in the suit. The party invoking the court's authority has such a stake when three conditions are satisfied: The petitioner must show that he has suffered an injury in fact that is caused by the conduct complained of and that will be redressed by a favorable decision.

Civil Procedure > ... > Justiciability > Standing > Burdens of Proof

Constitutional Law > ... > Case or Controversy > Standing > General Overview

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Motions to Dismiss

*HN6*[ ] **Standing, Burdens of Proof**

When ruling on a motion to dismiss for lack of standing, the court must accept as true all material allegations of the complaint and must construe the complaint in favor of the complaining party. Nonetheless, the plaintiff has the burden of establishing Article III standing.

Antitrust & Trade Law > ... > Trade Practices & Unfair Competition > State Regulation > Claims

Civil Procedure > ... > Justiciability > Standing > General Overview

Antitrust & Trade Law > Consumer Protection > Deceptive & Unfair Trade Practices > State Regulation

Antitrust & Trade Law > Consumer Protection > False Advertising > State Regulation

*HN7*[ ] **State Regulation, Claims**

In addition to Article III standing, a plaintiff must establish statutory standing to bring claims under California's Unfair Competition Law (UCL), *Cal. Bus. & Prof. Code §§ 17200*-17210, California's Consumers Legal Remedies Act (CLRA), *Cal. Civ. Code §§ 1750*-1785, and California's False Advertising Law (FAL), *Cal. Bus. & Prof. Code § 17500 et seq. Cal. Bus. & Prof. Code §§ 17204*, *17535*; *Cal. Civ. Code § 1780(a)*. These statutes require the plaintiff to show that he or she has suffered an "economic injury." The economic injury requirement under the UCL is substantially narrower than federal standing which may be predicated on a broader range of injuries.

Antitrust & Trade Law > Consumer Protection > General Overview

Civil Procedure > ... > Justiciability > Standing > Injury in Fact

**HN8**[ ] **Antitrust & Trade Law, Consumer Protection**

Allegations that plaintiffs would not have purchased a product if the product had been labeled accurately is sufficient to establish injury under California's consumer laws. For each consumer who relies on the truth and accuracy of a label and is deceived by misrepresentations into making a purchase, the economic harm is the same: the consumer has purchased a product that he or she paid more for than he or she otherwise might have been willing to pay if the product had been labeled accurately.

Civil Procedure > ... > Justiciability > Standing > General Overview

**HN9**[ ] **Justiciability, Standing**

That a party may ultimately be unable to prove a right to damages (or restitution) does not demonstrate that it lacks standing to argue for its entitlement to them.

Civil Procedure > ... > Justiciability > Standing > General Overview

Civil Procedure > Remedies > Injunctions > General Overview

**HN10**[ ] **Justiciability, Standing**

To establish standing for prospective injunctive relief, a plaintiff must demonstrate that he has suffered or is threatened with a "concrete and particularized" legal harm coupled with a sufficient likelihood that he will again be wronged in a similar way. A plaintiff must establish a real and immediate threat of repeated injury.

Antitrust & Trade Law > Consumer Protection > General Overview

Civil Procedure > ... > Justiciability > Standing > General Overview

Constitutional Law > ... > Case or Controversy > Standing > Particular Parties

Civil Procedure > Remedies > Injunctions > General Overview

**HN11**[ ] **Antitrust & Trade Law, Consumer Protection**

Guided by the United States Court of Appeals for the Ninth Circuit's interpretation of Article III's standing requirements, a plaintiff does not have standing to seek prospective injunctive relief against a manufacturer or seller engaging in false or misleading advertising unless there is a likelihood that the plaintiff would suffer future harm from the defendant's conduct—i.e., the plaintiff is still interested in purchasing the product in question. The harm California's consumer protection statutes are meant to redress continues even after a person is aware of a product's deceptiveness.

Antitrust & Trade Law > Consumer Protection > False Advertising > State Regulation

Civil Procedure > Remedies > Injunctions > General Overview

**HN12**[ ] **False Advertising, State Regulation**

It is an exaggeration to claim that injunctive relief would never be available in false advertising cases. There are

cases where a consumer would still be interested in purchasing the product if it were labeled properly—for example, if a food item accurately stated its ingredients.

Civil Procedure > ... > Pleadings > Heightened Pleading Requirements > Fraud Claims

**HN13**[⬇] **Heightened Pleading Requirements, Fraud Claims**

Under *Fed. R. Civ. P. 9(b)*, in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. In particular, the complaint must include specificity regarding the charged conduct, including the "who, what, when, where, and how." The circumstances constituting the alleged fraud must be specific enough to give defendants notice of the particular misconduct so that they can defend against the charge and not just deny that they have done anything wrong. When alleging that fraudulent statements were made, a plaintiff must identify the false statements and indicate why they were false.

Civil Procedure > ... > Pleadings > Heightened Pleading Requirements > Fraud Claims

**HN14**[⬇] **Heightened Pleading Requirements, Fraud Claims**

The goal of *Fed. R. Civ. P. 9(b)* is to provide the defendant with notice, not to ensure that the plaintiff has adequately pled causation.

Antitrust & Trade Law > ... > Trade Practices & Unfair Competition > State Regulation > Scope

**HN15**[⬇] **Trade Practices & Unfair Competition, State Regulation**

California's Unfair Competition Law, *Cal. Bus. & Prof. Code §§ 17200*-17210, prohibits any unlawful, unfair or fraudulent business act or practice. *Cal. Bus. & Prof. Code § 17200*.

Antitrust & Trade Law > Consumer Protection > False Advertising > State Regulation

**HN16**[⬇] **False Advertising, State Regulation**

California's False Advertising Law (FAL), *Cal. Bus. & Prof. Code § 17500 et seq.*, prohibits any unfair, deceptive, untrue, or misleading advertising. *Cal. Bus. & Prof. Code § 17500*.

Antitrust & Trade Law > ... > Trade Practices & Unfair Competition > State Regulation > Scope

Antitrust & Trade Law > Consumer Protection > Deceptive & Unfair Trade Practices > State Regulation

**HN17**[⬇] **Trade Practices & Unfair Competition, State Regulation**

California's Consumers Legal Remedies Act (CLRA), *Cal. Civ. Code §§ 1750*-1785, prohibits unfair methods of competition and unfair or deceptive acts or practices. *Cal. Civ. Code § 1770*.

Antitrust & Trade Law > Consumer Protection > Deceptive & Unfair Trade Practices > State Regulation

**HN18**[⬇] **Deceptive & Unfair Trade Practices, State Regulation**

California's Environmental Marketing Claims Act, *Cal. Bus. & Prof. Code §§ 17580*-17581, prohibits any untruthful, deceptive, or misleading environmental marketing claim. *Cal. Bus. & Prof. Code § 17580.5(a)*. While an "environmental marketing claim" includes any claim contained in the "Guides for the Use of Environmental Marketing Claims" published by the Federal Trade Commission.

Antitrust & Trade Law > Consumer Protection > False Advertising > State Regulation

**HN19**[⬇] **False Advertising, State Regulation**

Wisconsin's Deceptive Trade Practices Act, *Wis. Stat. § 100.18*, prohibits the making "to the public" of an advertisement, statement, or representation which contains any assertion, representation or statement of fact which is untrue, deceptive or misleading. *Wis. Stat. § 100.18(1)*.

Antitrust & Trade Law > ... > Trade Practices & Unfair Competition > State Regulation > Claims

Antitrust & Trade Law > Consumer Protection > Deceptive & Unfair Trade Practices > State Regulation

Antitrust & Trade Law > Consumer Protection > False Advertising > State Regulation

**HN20**[⬇] **State Regulation, Claims**

Claims under California's Unfair Competition Law (UCL), *Cal. Bus. & Prof. Code §§ 17200*-17210, California's Consumers Legal Remedies Act (CLRA), *Cal. Civ. Code §§ 1750*-1785, and California's False Advertising Law (FAL), *Cal. Bus. & Prof. Code § 17500 et seq.*, and California's Environmental Marketing Claims Act (EMCA), *Cal. Bus. & Prof. Code § 17580*-17581, are assessed under the objective standard of the reasonable consumer; namely, plaintiffs must adequately allege that members of the public are likely to be deceived. A plaintiff's EMCA claim must satisfy the reasonable consumer standard as expressed in the Federal Trade Commission guides and as used in California's consumer laws (UCL, FAL, CLRA).

Antitrust & Trade Law > ... > Trade Practices & Unfair Competition > State Regulation > Claims

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Demurrers

Antitrust & Trade Law > Consumer Protection > Deceptive & Unfair Trade Practices > State Regulation

Antitrust & Trade Law > Consumer Protection > False Advertising > State Regulation

**HN21**[⬇] **State Regulation, Claims**

In the context of California's Unfair Competition Law (UCL), *Cal. Bus. & Prof. Code §§ 17200*-17210, California's Consumers Legal Remedies Act (CLRA), *Cal. Civ. Code §§ 1750*-1785, and California's False Advertising Law (FAL), *Cal. Bus. & Prof. Code § 17500 et seq.*, and California's Environmental Marketing Claims Act (EMCA), *Cal. Bus. & Prof. Code §§ 17580*-17581, the California Supreme Court has recognized

that these laws prohibit not only advertising which is false, but also advertising which, although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public. In addition, while it is true that the primary evidence in a false advertising case is the advertising itself, California courts have recognized that whether a business practice is deceptive will usually be a question of fact not appropriate for decision on demurrer.

Antitrust & Trade Law > Consumer Protection > False Advertising > State Regulation

Antitrust & Trade Law > Consumer Protection > Deceptive & Unfair Trade Practices > State Regulation

**HN22**[⬇] **False Advertising, State Regulation**

The common theme that seems to run through cases considering puffery in a variety of contexts is that consumer reliance will be induced by specific rather than general assertions. Consequently, advertising which merely states in general terms that one product is superior is not actionable. However, misdescriptions of specific or absolute characteristics of a product are actionable.

Antitrust & Trade Law > Consumer Protection > False Advertising > General Overview

Antitrust & Trade Law > Consumer Protection > Deceptive & Unfair Trade Practices > General Overview

**HN23**[⬇] **Consumer Protection, False Advertising**

Nor is "natural" mere puffery because the Federal Trade Commission (FTC) has declined to provide "general guidance" on the use of that term. As the FTC explained, it did not provide guidance because it lacked consumer perception evidence indicating how consumers understand the term "natural." In addition, the FTC has noted that natural may be used in numerous contexts and may convey different meanings depending on that context.

Antitrust & Trade Law > Consumer Protection > False Advertising > General Overview

Antitrust & Trade Law > Consumer
Protection > Deceptive & Unfair Trade
Practices > General Overview

**HN24**[⬇] **Consumer Protection, False Advertising**

Far from deeming "natural" mere non-actionable puffery, the Federal Trade Commission statement goes on to explicitly warn marketers that the use of "natural" may be deceptive: Marketers that are using terms such as natural must ensure that they can substantiate whatever claims they are conveying to reasonable consumers. If reasonable consumers could interpret a natural claim as representing that a product contains no artificial ingredients, then the marketer must be able to substantiate that fact. Similarly, if, in a given context, a natural claim is perceived by reasonable consumers as a general environmental benefit claim or as a comparative claim (e.g., that the product is superior to a product with synthetic ingredients), then the marketer must be able to substantiate that claim and all attendant reasonably implied claims.

Antitrust & Trade Law > Consumer
Protection > Deceptive Labeling &
Packaging > General Overview

Antitrust & Trade Law > Consumer
Protection > Deceptive & Unfair Trade
Practices > General Overview

Antitrust & Trade Law > Consumer
Protection > False Advertising > General Overview

**HN25**[⬇] **Consumer Protection, Deceptive Labeling & Packaging**

The United States Court of Appeals for the Ninth Circuit has already rejected a defendant's argument that reasonable consumers should be expected to look beyond misleading representations on the front of the box to discover the truth from the ingredient list in small print on the side of the box. The Ninth Circuit does not think that the FDA requires an ingredient list so that manufacturers can mislead consumers and then rely on the ingredient list to correct those misinterpretations and provide a shield for liability for the deception. Instead, reasonable consumers expect that the ingredient list contains more detailed information about the product that confirms other representations on the packaging.

Antitrust & Trade Law > Consumer
Protection > False Advertising > State Regulation

Antitrust & Trade Law > Consumer
Protection > Deceptive & Unfair Trade
Practices > State Regulation

Antitrust & Trade Law > Consumer
Protection > Deceptive Labeling &
Packaging > State Regulation

**HN26**[⬇] **False Advertising, State Regulation**

Reasonable consumers should not be expected to look beyond misleading representations on the front of the box to discover the truth from the ingredient list in small print on the side of the box.

Civil Procedure > ... > Defenses, Demurrers &
Objections > Motions to Dismiss > Failure to State
Claim

Civil Procedure > ... > Federal & State
Interrelationships > Choice of Law > General
Overview

**HN27**[⬇] **Motions to Dismiss, Failure to State Claim**

Regarding choice of law, the court is not convinced that such an analysis is an appropriate vehicle for dismissing an individual plaintiff's claim. A choice of law analysis appears necessary when determining whether common issues of law predominate in proposed class actions involving class members from different states. Further, the court is aware of no case that holds that an individual plaintiff, under choice of law principles applied on a *Fed. R. Civ. P. 12(b)(6)* motion, cannot simultaneously, or in the alternative, bring two causes of action under different states' consumer protection statutes.

Antitrust & Trade Law > Consumer
Protection > False Advertising > State Regulation

Antitrust & Trade Law > Consumer
Protection > Deceptive & Unfair Trade
Practices > State Regulation

**HN28**[⬇] **False Advertising, State Regulation**

See *Wis. Stat. § 100.18(1)*.

**Opinion by:** JACQUELINE SCOTT CORLEY

Antitrust & Trade Law > Consumer Protection > False Advertising > State Regulation

Antitrust & Trade Law > Consumer Protection > Deceptive & Unfair Trade Practices > State Regulation

Antitrust & Trade Law > Consumer Protection > Deceptive Labeling & Packaging > State Regulation

**HN29**[⤓] **False Advertising, State Regulation**

Wisconsin's Deceptive Trade Practices Act, *Wis. Stat. § 100.18*, does not "focus" on where the deceptive label is made and enters the stream of commerce; rather, the statute forbids the making, publishing, disseminating, circulating, or placing before the public an untrue or misleading advertisement or representation in a newspaper, magazine or other publication in Wisconsin. The scope of *§ 100.18(1)* is limited to publications "in this state." A Wisconsin corporation does not violate the statute if it creates a deceptive label in Wisconsin and then places the label in a publication outside of Wisconsin; the deceptive label must be placed before the public in Wisconsin.

**Counsel:** [*1] For Dianna Jou, Jaynry Young, Plaintiffs: Michael Robert Reese, LEAD ATTORNEY, Kim E. Richman, Gutride Safier LLP, New York, NY.

For Kimberly-Clark Corporation, Kimberly-Clark Worldwide, Inc., Kimberly-Clark Global Sales, LLC., Defendants: Timothy Tully Scott, LEAD ATTORNEY, King & Spalding LLP, Redwood Shores, CA; Geoffrey M. Ezgar, King & Spalding LLP, San Francisco, CA; Madison Hunter Kitchens, King and Spalding LLP, Atlanta, GA; Stephen Boyce Devereaux, Atlanta, GA.

**Judges:** JACQUELINE SCOTT CORLEY, UNITED STATES MAGISTRATE JUDGE.

# Opinion

### ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS (Dkt. No. 8)

In this putative class action, Plaintiffs Diana Jou and Jaynry Young allege that the branding and marketing of some of Defendants' Huggies diapers and baby wipes are misleading to consumers. Now pending before the Court is Defendants' motion to dismiss Plaintiffs' Complaint or, in the alternative, motion to strike. Having carefully considered the parties' briefing, and having had the benefit of oral argument on December 5, 2013, the Court grants in part and denies in part the motion.

### ALLEGATIONS OF THE COMPLAINT

Defendant Kimberly-Clark manufactures Huggies "pure [*2] & natural" Diapers and Huggies "Naural Care" Wipes. Regarding the diapers, Defendant markets them as "pure & natural," a phrase which is displayed prominently on the front of the product's packaging. (Dkt. No. 1 ¶ 23.) The front of the packaging also informs the consumer, without qualification, that the diapers are made of "soft organic cotton." (*Id.*) In addition, green coloring, trees, and leaves, are displayed on the front of the product's packaging. This marketing is an attempt to contrast the "pure & natural" diapers with Defendant's other, conventional diaper offerings. (*Id.* at ¶ 24.)

The "pure & natural" diapers, however, do not differ materially from other of Defendant's diaper products. The "pure & natural" diapers differ in only two insignificant ways. First, while the product contains organic cotton, the cotton is only on the outside of the diaper and therefore never actually comes into contact with the ultimate user, the baby. "As a result, the marketing does not match the reasonable expectation of consumers created by Defendant: that the diaper—in total, not in small, immaterial part—is made of organic cotton." (*Id.* at ¶ 28.) Second, the "pure & natural" diapers include [*3] a liner that "includes some materials that are potentially less harmful to the environment than materials used in traditional diapers."

(*Id.* at ¶ 29.) However, the "pure & natural" diapers also contain "unnatural and potentially harmful ingredients, such as polypropylene and sodium polyacrylate, which are components of Defendant's traditional diapers." (*Id.*) Nowhere on the packaging does Defendant disclose the actual composition of the diapers, including polypropylene or sodium polyacrylate.

As for the "Natural Care" wipes, the "Natural Care" term is displayed prominently on the front of the packaging, along with green coloring and leaves. Despite these representations, the "Natural Care" wipes contain two substances, sodium methylparaben and methylisothiazolinone, "that are not natural and that are hazardous." (*Id.* at ¶ 34.) For example, the European Union has banned sodium methylparaben and the Federal Drug Administration has restricted its use in food and beverages; Canada and Japan restrict the use of methylisothiazolinone in cosmetics. (*Id.*)

Plaintiffs purchased the diapers and the wipes at a premium in reliance on the marketing described above. Specifically, "Plaintiff Jou relied [*4] on Defendant's false, misleading, and deceptive representations that Huggies Natural Diapers and Huggies Natural Wipes would provide natural, relatively safe, environmentally sound, and (in the case of the diapers) organic alternatives to traditional diaper and wipe offerings." (*Id.* at ¶ 11.) In addition, "Plaintiff Young relied on Defendant's false, misleading, and deceptive representations that Huggies Natural Diapers would provide natural, relatively safe, environmentally sound, and organic alternatives to traditional diaper offerings." (*Id.* at ¶ 13.)

## LEGAL STANDARD

*HN1*[ ] Pursuant to *Federal Rule of Civil Procedure 12(b)(1)*, a district court must dismiss an action if it lacks jurisdiction over the subject matter of the suit. For the Court to exercise proper subject matter jurisdiction over an action, the parties must have standing. *See White v. Lee, 227 F.3d 1214, 1242 (9th Cir. 2000)*; *see also Warth v. Seldin, 422 U.S. 490, 517-18, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975)* ("The rules of standing . . . are threshold determinants of the propriety of judicial intervention. It is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute [*5] and the exercise of the court's remedial powers."). "[T]he standing question is whether the plaintiff has alleged such a personal stake in the outcome of the controversy

as to warrant his invocation of federal-court jurisdiction and to justify the exercise of the court's remedial powers on his behalf." *Warth, 422 U.S. at 498-99* (internal quotation marks omitted).

*HN2*[ ] Even if a plaintiff adequately alleges standing, a complaint may still be dismissed under *Federal Rule of Civil Procedure 12(b)(6)* for failure to state a claim. A complaint fails to state a claim upon which relief may be granted if the plaintiff fails to allege the "grounds" of his "entitlement to relief." *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*. A plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*. Additionally, *HN3*[ ] a court should dismiss a complaint for failure to state a claim if, taking all factual allegations as true, it does not contain "enough facts to state a claim to relief that is plausible on its face." *Id. at 662*; *see also Coto Settlement v. Eisenberg, 593 F.3d 1031, 1034 (9th Cir. 2010)*. [*6] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Caviness v. Horizon Cmty. Learning Ctr., Inc., 590 F.3d 806, 812 (9th Cir. 2010)* (internal quotation marks omitted).

## DISCUSSION

Defendant moves to dismiss all five of Plaintiffs' causes of action.[1] Defendant contends that the claims, all fraud-based, fail to satisfy the heightened pleading standard for fraud claims contained in *Federal Rule of Civil Procedure 9(b)*. In addition, Defendant asserts that the claims are implausible and therefore insufficient under *Federal Rule of Civil Procedure 12(b)(6)*. Finally, Defendant argues that Plaintiffs' Wisconsin-law claims, and the nationwide class based on those claims, should be dismissed and/or stricken. The court will address

---

[1] Plaintiffs' claims are based on violations of the following five statutes: (1) California's Consumers Legal Remedies Act ("CLRA"), *Cal. Civ. Code §§ 1750-1785*; (2) California's False Advertising Law ("FAL"), *Cal. Bus. & Prof. Code § 17500 et seq.*; [*7] (3) California's Environmental Marketing Claims Act ("EMCA"), *Cal. Bus. & Prof. Code §§ 17580-17581*; (4) California's Unfair Competition Law ("UCL"), *Cal. Bus. & Prof. Code §§ 17200-17210*; and (5) Wisconsin's Deceptive Trade Practices Act ("WDTPA"), *Wis. Stat. § 100.18*.

each of these issues in turn after addressing the threshold jurisdictional issue of standing.

## A. Standing

*HN4*[⬆️] A "lack of Article III standing requires dismissal for lack of subject matter jurisdiction under *Federal Rule of Civil Procedure 12(b)(1)*." *Maya v. Centex Corp., 658 F.3d 1060, 1067 (9th Cir. 2011)*. *HN5*[⬆️] Article III standing requires that litigants demonstrate a "personal stake" in the suit. *Summers v. Earth Island Institute, 555 U.S. 488, 493, 129 S. Ct. 1142, 173 L. Ed. 2d 1118 (2009)* (internal quotation marks omitted). "The party invoking the Court's authority has such a stake when three conditions are satisfied: The petitioner must show that he has 'suffered an injury in fact' that is caused by 'the conduct complained of and that 'will be redressed by a favorable decision.'" *Camreta v. Greene, 131 S. Ct. 2020, 2028, 179 L. Ed. 2d 1118 (2011)* (quoting *Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-561, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992))*. *HN6*[⬆️] When ruling on a motion to dismiss for lack of standing, the Court "must accept as true all material allegations of the complaint and must construe the complaint [*8] in favor of the complaining party." *Warth, 422 U.S. at 501*. Nonetheless, the plaintiff has the burden of establishing Article III standing. *See Thompson v. McCombe, 99 F.3d 352, 353 (9th Cir. 1996)*.

*HN7*[⬆️] In addition to Article III standing, a plaintiff must establish statutory standing to bring claims under the UCL, CLRA, and FAL. *See Cal. Bus. & Prof. Code §§ 17204, 17535; Cal. Civ. Code § 1780(a)*. These statutes require the plaintiff to show that he or she has suffered an "economic injury." *See Kwikset Corp. v. Superior Court, 51 Cal. 4th 310, 323, 120 Cal. Rptr. 3d 741, 246 P.3d 877 (2011)*. The economic injury requirement under the UCL is "substantially narrower than federal standing . . . which may be predicated on a broader range of injuries." *Id. at 324*.

Defendant first argues that Plaintiffs lack Article III and statutory standing to seek restitution. The Court disagrees. Plaintiffs allege that they were injured by Defendant's unlawful conduct because they would not have purchased the products if they did not include the alleged misrepresentations. Plaintiffs further allege that the diapers and the wipes are sold at a premium because they are labeled "natural." Taking these allegations as true and construing them in the [*9] light most favorable to Plaintiffs, Plaintiffs have adequately alleged standing. *See Manchouck v. Mondelez Int'l Inc.,*

*2013 U.S. Dist. LEXIS 138877, 2013 WL 5400285, at *2 (N.D. Cal. Sept. 26, 2013)* (finding standing under Article III and the UCL where complaint alleged that "plaintiff paid a 'price premium' because the product claimed to be 'made with real fruit,'" and that "[p]laintiff would not have purchased the two products at that price point absent the alleged misstatements"); *see also Jones v. ConAgra Foods, Inc., 912 F. Supp. 2d 889, 901 (N.D. Cal. Dec. 17, 2012)* (holding *HN8*[⬆️] allegations "that plaintiffs would not have purchased a product if the product had been labeled accurately is sufficient to establish injury under California's consumer laws"); *see also Kwikset, 51 Cal. 4th at 329* ("For each consumer who relies on the truth and accuracy of a label and is deceived by misrepresentations into making a purchase, the economic harm is the same: the consumer has purchased a product that he or she paid more for than he or she otherwise might have been willing to pay if the product had been labeled accurately.").

Defendant fails to persuade the Court that Plaintiffs' allegations that they paid a premium for the [*10] products are inadequate. Defendant's argument overlooks that Plaintiff's allegations regarding their reliance on the misrepresentations *alone* satisfy the economic injury requirement. *See Kwikset, 51 Cal. 4th at 329*. Moreover, Defendant's contention that Plaintiffs have not properly demonstrated the value of the product they received in order to be entitled to restitution "conflates the issue of standing with the issue of the remedies to which a party may be entitled. *HN9*[⬆️] That a party may ultimately be unable to prove a right to damages (or, here, restitution) does not demonstrate that it lacks standing to argue for its entitlement to them." *Id.* (internal quotation marks omitted). Finally, Defendant's reliance on *Figy v. Amy's Kitchen, Inc., 2013 U.S. Dist. LEXIS 167723, 2013 WL 6169503, at *4 (N.D. Cal. Nov. 25, 2013)* is unhelpful because, unlike here, the plaintiff there failed to allege that he relied on the alleged misrepresentations.

Defendant next argues that Plaintiffs lack standing to seek injunctive relief "because they do not allege that they continue to purchase the Products (or that they would resume purchasing them if they were labeled differently)." (Dkt. No. 8 at 19.) *HN10*[⬆️] To establish standing for prospective [*11] injunctive relief, a plaintiff must demonstrate that "he has suffered or is threatened with a 'concrete and particularized' legal harm . . . coupled with 'a sufficient likelihood that he will again be wronged in a similar way.'" *Bates v. United Parcel Service, Inc., 511 F.3d 974, 985 (9th Cir. 2007)* (quoting

City of Los Angeles v. Lyons, 461 U.S. 95, 111, 103 S. Ct. 1660, 75 L. Ed. 2d 675 (1983)). A plaintiff must establish a "real and immediate threat of repeated injury." Bates, 511 F.3d at 985.

Plaintiffs here do not identify any facts in their Complaint that allege a sufficient likelihood that they will again be wronged in a similar way. Specifically, Plaintiffs do not identify any allegation that suggests they will purchase the same products again. Rather, Plaintiffs cite to, among others, Henderson v. Gruma Corp., 2011 U.S. Dist. LEXIS 41077, 2011 WL 1362188, at *8 (CD. Cal. Apr. 11, 2011), which held that "[w]hile Plaintiffs may not purchase the same Gruma products as they purchased during the class period, because they are now aware of the true content of the products, to prevent them from bringing suit on behalf of a class in federal court would surely thwart the objective of California's consumer protection laws." See also Larsen v. Trader Joe's Co., 2012 U.S. Dist. LEXIS 162402, 2012 WL 5458396, at *3-4 (N.D. Cal. June 14, 2012) [*12] (following Henderson). This Court, however, disagrees with Henderson to the extent it holds that a plaintiff may seek injunctive relief even if she fails to allege any interest in purchasing the product in the future. See Bates, 511 F.3d at 985; see also Mason v. Nature's Innovation, Inc., 2013 U.S. Dist. LEXIS 68072, 2013 WL 1966957, at *4 (S.D. Cal. May 13, 2013) (collecting cases and concluding that HN11[↑] "[g]uided by the Ninth Circuit's interpretation of Article III's standing requirements, this Court agrees with the courts that hold that a plaintiff does not have standing to seek prospective injunctive relief against a manufacturer or seller engaging in false or misleading advertising unless there is a likelihood that the plaintiff would suffer future harm from the defendant's conduct—i.e., the plaintiff is still interested in purchasing the product in question"). As explained in Ries v. Arizona Beverages USA LLC, 287 F.R.D. 523, 533 (N.D. Cal. 2012), the harm California's consumer protection statutes is meant to redress continues even after a person is aware of a product's deceptiveness: "Should plaintiffs encounter the denomination 'All Natural' on an AriZona beverage at the grocery store today, they could not [*13] rely on that representation with any confidence. This is the harm California's consumer protection statutes are designed to redress."

Thus, while the Court rejects Defendant's suggestion that harm to Plaintiffs cannot continue to the extent they have already discovered the alleged deception, the Court also rejects Plaintiffs' contention that it is unnecessary for them to maintain any interest in purchasing the products in the future. Placing this requirement on Plaintiffs does not thwart the objective of California consumer protection laws since it is not impossible that a consumer would be interested in purchasing the products at issue if they were labeled correctly. See Mason, 2013 U.S. Dist. LEXIS 68072, 2013 WL 1966957 at *4 (HN12[↑] "[I]t is an exaggeration to claim that injunctive relief would never be available in false advertising cases. There are cases where a consumer would still be interested in purchasing the product if it were labeled properly—for example, if a food item accurately stated its ingredients."); Ries, 287 F.R.D. at 532 (finding standing to seek class-wide injunctive relief where named plaintiffs had a "stated intent to purchase" the challenged product in the future).

Because Plaintiffs fail to [*14] identify any allegation in their Complaint that suggests that they maintain an interest in purchasing the diapers or wipes, or both, in the future, Plaintiffs have not sufficiently alleged standing to pursue injunctive relief. The demand for injunctive relief is dismissed with leave to amend.

**B. Whether Plaintiffs State a Claim**

**1. Rule 9(b)**

Plaintiffs concede that their claims are grounded in fraud and therefore governed by Rule 9(b)'s heightened pleading standard. HN13[↑] Under Rule 9(b), "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." In particular, the complaint must include specificity regarding the charged conduct, including the "who, what, when, where, and how." Reed v. Wells Fargo Bank, 2011 U.S. Dist. LEXIS 117229, 2011 WL 4802542, at *3 (N.D. Cal. Oct. 11, 2011). "[T]he circumstances constituting the alleged fraud must be specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong." Kearns v. Ford Motor Co., 567 F.3d 1120, 1124 (9th Cir. 2009). When alleging that fraudulent statements were made, a plaintiff must identify the false statements [*15] and indicate why they were false. In re GlenFed, Inc. Sec. Litig., 42 F.3d 1541, 1548 (9th Cir. 1994).

Defendant argues that the Complaint is deficient under Rule 9(b) because Plaintiffs do not offer details of "their

own purchasing decisions;" rather, "Plaintiffs rely almost exclusively on conclusory assertions regarding what a generic 'reasonable consumer' would expect and rely upon." (Dkt. No. 8 at 5.) The Court is not persuaded. It is undisputed that the Complaint alleges the who and when in paragraphs 10-13. (See Dkt. No. 1 ¶¶ 10-13 (alleging that Plaintiff Jou purchased Defendant's diapers and the wipes from a Target in Alameda County in October 2011 and that Plaintiff Young purchased Defendant's diapers and wipes from a Target in San Mateo County in September 2011).) Paragraphs 11 and 13 also include allegations that the Plaintiffs "relied on Defendant's false, misleading, and deceptive representations" that the products were, among other things, "natural" and "relatively safe." (*Id.* at ¶¶ 11-13). While it is true that these allegations are not specific as to *what* representations were false and misleading, *where* those representations were on the packaging, or as to *how* such representations [*16] are fraudulent, those specific allegations are made in paragraphs 20-38 under the "Common Factual Allegations" section. Defendant does not explain why these specific allegations are deficient under *Rule 9(b)*. Thus, although Defendant contends that it is unclear whether Plaintiffs relied on the same representations that are specifically identified, it is logical to infer that the specific allegations regarding the what, where, and how of the fraud refer to Plaintiffs' earlier allegations concerning the "false" and "misleading" representations they relied upon. Plaintiffs have accordingly satisfied *Rule 9(b)*. *See Chacanaca v. Quaker Oats Co., 752 F. Supp. 2d 1111, 1126 (N.D. Cal. 2010)* (finding *Rule 9(b)* satisfied where "plaintiffs have identified the particular statements they allege are misleading, the basis for that contention, where those statements appear on the product packaging, and the relevant time period in which the statements were used"); *see also Clancy v. The Bromley Tea Co., 2013 U.S. Dist. LEXIS 112722, 2013 WL 4081632, at *10-11 (N.D. Cal. Aug. 9, 2013)* (same where 'the 'who' is Bromley Tea Company and other defendants; the 'what' is nine discrete types of unlawful and deceptive claims by Defendants [*17] on the labeling and packaging of its products, including Pure Green Tea and 100% Organic Pure Black Tea, as well as on its website; the 'when' is since 2008 and throughout the class period; the 'where' is Bromley's package labels and website").

Defendant's cited authority is inapposite. The court in *Pardini v. Unilever U.S., Inc., 961 F. Supp. 2d 1048, 2013 U.S. Dist. LEXIS 95756, 2013 WL 3456872, at *8 (N.D. Cal. July 9, 2013)* held that the plaintiff did not satisfy *Rule 9(b)* where she alleged that the nutrition panel on the back of a butter product was deceptive, but

failed to state that she actually looked at the panel. Thus, "it [was] implausible that she was deceived by its lack of disclosures." *Id.* Here, the alleged fraudulent statements—"pure & natural," "soft organic cotton," "Natural Care"—are all contained on the front of the packaging; Plaintiffs do not allege any misrepresentations on the back of the products. Because Plaintiffs have alleged that they purchased these products in person at a store, and that they relied on the representations that the products were, among other things, "natural," it is plausible to infer that Plaintiffs looked at and relied on the alleged misrepresentations on the front of the packaging. [*18] Plaintiffs could not have relied on the representation that the products were "natural" without reading the terms "pure & natural" and "Natural Care." In addition, *Samet v. Procter & Gamble Co., 2013 U.S. Dist. LEXIS 86432, 2013 WL 3124647, at *8 (N.D. Cal. June 18, 2013)* is distinguishable because, unlike the court there, this Court has concluded that Plaintiffs have adequately alleged how they were "actually misled," *e.g.*, the wipes were labeled "Natural Care" but contained two non-natural ingredients. Finally, *Maple v. Costco Wholesale Corp., 2013 U.S. Dist. LEXIS 157201, 2013 WL 5885389, at *5-6 (E.D. Wash. Nov. 1, 2013)* concerned the plaintiff's failure to plead causation; namely, that he actually read the allegedly fraudulent statements on the drink bottle. Because the *Maple* court does not discuss *Rule 9(b)*, that case does not support Defendant's contention that Plaintiffs' allegations are deficient under that rule. After all, HN14[⬆] the goal of *Rule 9(b)* is to provide the defendant with notice, not to ensure that the plaintiff has adequately pled causation. *See Kearns, 567 F.3d at 1124*.

**2. Whether Plaintiffs plausibly allege that a reasonable consumer would likely be deceived by the products' labeling**

HN15[⬆] California's Unfair Competition Law ("UCL") [*19] prohibits any "unlawful, unfair or fraudulent business act or practice." *Cal. Bus. & Prof. Code § 17200*. HN16[⬆] The False Advertising Law ("FAL") prohibits any "unfair, deceptive, untrue, or misleading advertising." *Id. § 17500*. HN17[⬆] California's Consumer Legal Remedies Act ("CLRA") prohibits "unfair methods of competition and unfair or deceptive acts or practices." *Cal. Civ. Code § 1770*. HN18[⬆] California's Environmental Marketing Claims Act ("EMCA") prohibits "any untruthful, deceptive, or misleading environmental marketing claim." *Cal. Bus. & Prof. Code § 17580.5(a)*. While an "environmental

marketing claim" includes "any claim contained in the 'Guides for the Use of Environmental Marketing Claims' published by the Federal Trade Commission." *Id.* Finally, **HN19**[⬆] Wisconsin's Deceptive Trade Practices Act ("WDTA") prohibits the making "to the public" of an advertisement, statement, or representation which "contains any assertion, representation or statement of fact which is untrue, deceptive or misleading." *Wis. Stat. § 100.18(1).*

As the parties appear to agree for purposes of the present motion, **HN20**[⬆] Plaintiffs' four California claims are assessed under the objective standard of the reasonable consumer; namely, Plaintiffs [*20] must adequately allege "that members of the public are likely to be deceived." *Williams v. Gerber Prods. Co., 552 F.3d 934, 938 (2008)* (assessing claims, like Plaintiffs, under the UCL, FAL, and CLRA) (internal quotation marks omitted); *see also Hill v. Roll Intern. Corp., 195 Cal. App. 4th 1295, 1304, 128 Cal. Rptr. 3d 109 (2011)* (holding that plaintiff's EMCA claim must satisfy the reasonable consumer standard "as expressed in the FTC guides and as used in our state's consumer laws [UCL, FAL, CLRA]" (citations omitted)). Because the parties do not discuss whether the standard differs for Plaintiffs' Wisconsin law claim, the Court will assume for the purposes of this motion that the same reasonable consumer standard applies.

**HN21**[⬆] "The California Supreme Court has recognized that these laws prohibit not only advertising which is false, but also advertising which, although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public." *Williams, 552 F.3d at 938* (internal quotation marks and alterations omitted). In addition, while "[i]t is true that the primary evidence in a false advertising case is the advertising itself," California courts "have recognized [*21] that whether a business practice is deceptive will usually be a question of fact not appropriate for decision on demurrer." *Id.* (internal quotation marks omitted). In *Williams,* the Ninth Circuit reversed a district court's dismissal of the plaintiff's false labeling claims, explaining that the facts of that case—namely, the product's packaging—"d[id] not amount to the rare situation in which granting a motion to dismiss is appropriate." *Id. at 939.* The *Williams* court distinguished *Freeman v. Time, Inc., 68 F.3d 285, 289 (9th Cir. 1995),* a case where the Ninth Circuit upheld the dismissal of a UCL action under *Rule 12(b)(6).* The *Williams* court observed that the mailer at issue in *Freeman,* which suggested that the recipient had won a million dollars, also included multiple explicit statements

that the recipient's prize was conditioned on him having the winning sweepstakes number. "Thus, it was not necessary to evaluate additional evidence regarding whether the advertising was deceptive, since the advertisement itself made it impossible for the plaintiff to prove that a reasonable consumer was likely to be deceived." *Williams, 552 F.3d at 939.*

Defendant argues that "no [*22] reasonable consumer" could mistake the "pure & natural" diapers "as anything more than what they are: diapers with both natural and synthetic materials." (Dkt. No. 8 at 8.) In addition, Defendant contends that "no reasonable consumer" would conclude that the "Natural Care" wipes are "entirely composed of natural ingredients." The Court is not persuaded that, as a matter of law, no reasonable consumer could be deceived by the packaging of Defendant's diapers and wipes.

### a) "pure & natural" diapers

Plaintiffs allege that the "pure and & natural" diapers are deceptive in two distinct, though somewhat overlapping, ways: 1) the packaging misrepresents that the diapers are free of unnatural ingredients, and 2) the packaging misrepresents that the diapers, "in total," are made of organic cotton. The Court discusses each in turn.

### 1) Non-natural ingredients

The packaging for Defendant's "pure & natural" diapers contains representations that could plausibly deceive a reasonable consumer. The packaging prominently displays the term "pure & natural," which could lead a reasonable consumer to believe that the product is free of non-natural ingredients when it actually contains polypropylene and [*23] sodium polyacrylate. The reasonable consumer's incorrect belief could be reinforced by the representation on the front of the packaging of "Soft Organic Cotton." While the diapers do in fact contain some soft organic cotton, only part of the *outside* of the diaper includes the cotton, meaning that the cotton does not touch the baby's skin as the inside, non-natural portions of the diaper do. In addition, Plaintiffs allege that the front of the packaging is adorned with a green banner and images of leaves. This "green" marketing strategy further reinforces the reasonable consumer's belief that the diapers are entirely natural. Together, the terms "pure & natural" and "Soft Organic Cotton," in the context of product packaging that includes green coloring and images of

leaves, plausibly conveys to a reasonable consumer that the diapers are pure and natural and do not contain synthetic ingredients.

Defendant's arguments to the contrary are unpersuasive. As an initial matter, Defendant appears to concede that if the phrase "pure & natural" was modified to include the word "only", "all," or "100%" the consumer could plausibly be misled. (*See* Dkt. No. 8 at 9 ("For a consumer to be misled by [*24] the Huggies® Pure & Natural Diapers packaging, they would have to commit the same linguistic error as Plaintiffs: *i.e.*, convert the phrase "Pure & Natural" into *"Only* Pure & Natural," *"All* Pure & Natural," or *"100%* Pure & Natural"). [2]) Indeed, several courts—including the Ninth Circuit—have found that similar "all natural" terms can cause confusion. *See, e.g., Williams, 552 F.3d at 939* ("Further, the statement that Fruit Juice Snacks was made with 'fruit juice and other all natural ingredients' could easily be interpreted by consumers as a claim that all the ingredients in the product were natural, which appears to be false."); *see also Astiana v. Ben & Jerry's Homemade, Inc., 2011 U.S. Dist. LEXIS 57348, 2011 WL 2111796, at *5-6 (N.D. Cal. May 26, 2011)* (denying motion to dismiss where plaintiff alleged that ice cream labeled "all natural" contained synthetic ingredients); *Hitt v. Ariz. Beverage Co., LLC, 2009 U.S. Dist. LEXIS 16871, 2009 WL 449190, at *7 (S.D. Cal. Feb.4, 2009)* (denying motion to dismiss where the plaintiff alleged, among other things, that a reasonable consumer would find the "All Natural" labeling on the defendant's drink products, which contained high fructose corn syrup, deceptive). The question accordingly becomes, [*25] why would the use of "all pure & natural" state a claim but not just "pure & natural"? Although the parties do not cite any case on point, the Court is aware of one recent case in this District where a court analyzed the phrases "100%

---

[2] Defendant confusingly cites to *Astiana v. Kashi Co., 291 F.R.D. 493 (S.D. Cal. 2013)* as being "highly instructive [*26] on this point." (*Id.*) *Astiana* does not distinguish between the terms "natural" and "all natural;" rather, the *Astiana* court simply held that on a motion for class certification plaintiff had failed to produce evidence that showed that "All Natural," as opposed to "Nothing Artificial," had a uniform definition among class members. To the extent Defendant cites *Astiana* for the proposition that even claims based on the term "all natural" necessarily fail on a *Rule 12(b)(6)* motion, that argument is rejected since *Astiana* was a class certification motion based on evidence produced in that case beyond the pleadings. In addition, as discussed above, several courts have found the term "all natural" to be potentially deceptive when used in products that contain non-natural ingredients.

Natural," "All Natural," and "Natural" interchangeably in denying the defendant's motion to dismiss. *See Janney v. Mills, 944 F.Supp.2d 806, 2013 U.S. Dist. LEXIS 67187, 2013 WL 1962360, at *1 n.1 (N.D. Cal. May 10, 2013)*. At no point in the analysis was the absence of "100%" or "All" from the term "Natural" significant in determining the deceptiveness of the "Natural" representation on the packaging of a granola bar that included synthetic ingredients. Whether one labels a product "natural" or "all natural," the same plausible inference can be drawn—that the product is natural, meaning it is not made with any non-natural ingredients. While the use of "all" in "all natural" may make the inference *even more* plausible than the inference arising from the use of just "natural," the use of "natural" still provides the plausible inference required to defeat a *Rule 12(b)(6)* motion.

Moreover, at least with the diapers, "natural" is not used standing alone; rather, the diapers are labeled *"pure* & natural." Similar to "all," "only," and "100%," "pure" emphasizes the natural state of the product—the product's naturalness is pure. At the hearing on the motion, Defendant argued that the use of "pure" in "pure & natural" could not plausibly represent to a reasonable consumer that the diaper was [*27] made of only natural ingredients. However, Defendant conceded that if the diapers were labeled "purely natural," then a consumer could plausibly expect the diaper to free of synthetic ingredients. This Court fails to see how, for purposes of a *Rule 12(b)(6)* motion, a court could correctly conclude that the term "purely natural," but not "pure & natural," stated a claim.

Defendant's primary contention is that the unmodified use of "pure & natural" is, at least in the world of consumers, devoid of a well-defined meaning and therefore a claim based on its use is not actionable. In other words, it is the type of "[g]eneralized, vague, and unspecified assertions [that] constitute 'mere puffery' upon which a reasonable consumer could not rely." *Annunziato v. eMachines, Inc., 402 F. Supp. 2d 1133, 1139 (C.D. Cal. 2005)*. As the Ninth Circuit explained in *Cook, Perkiss and Liehe, Inc. v. Northern California Collection Service Inc., 911 F.2d 242, 246 (9th Cir. 1990), HN22* [t]he common theme that seems to run through cases considering puffery in a variety of contexts is that consumer reliance will be induced by specific rather than general assertions." Consequently, "[a]dvertising which merely states [*28] in general terms that one product is superior is not actionable. However, misdescriptions of specific or absolute characteristics of a product are actionable." *Id.* (internal quotation marks

omitted); *see also Consumer Advocates v. Echostar Satellite Corp., 113 Cal. App. 4th 1351, 1361, 8 Cal. Rptr. 3d 22 (2003)* (finding that the descriptions of a satellite television system as possessing "crystal clear digital video" and "CD quality audio" were nonactionable, as the representations were nothing more than "boasts, all-but-meaningless superlatives," and "claim[s] which no reasonable consumer would take as anything more weighty than an advertising slogan"). Here, Defendant fails to provide any explanation, beyond its bald assertions, as to why "pure & natural" is mere puffery. Even without the use of the word "all" or "100%," describing a product as "natural" or "pure & natural" is not generalized and vague. Defendant even acknowledges this when it argues that "pure & natural" accurately represents the composition of the product because the diapers include some natural ingredients. Thus, the issue is not whether the unmodified use of "pure & natural" is devoid of meaning; it is *which* meaning a reasonable [*29] consumer would ascribe to it. Whether a reasonable consumer would agree with Plaintiffs ("natural" means no non-natural ingredients) or with Defendant ("natural" means at least one natural ingredient among other, possibly non-natural ingredients) or with neither is not a question that can be resolved on a *Rule 12(b)(6)* motion.

In support of its puffery argument, Defendant cites to *Rooney v. Cumberland Packing Corp., 2012 U.S. Dist. LEXIS 58710, 2012 WL 1512106 (S.D. Cal. Apr. 16, 2012)*, a case where puffery is mentioned only in the court's summary of the law, but not applied in its analysis. Moreover, the Court fails to see the applicability of *Rooney* to the present case. In *Rooney*, the court dismissed the plaintiff's claims that the product "Sugar in Raw" misled consumers to believe that the product was raw, unprocessed, and unrefined. The Court concluded that there was no misrepresentation as a matter of law because the sugar was in fact raw, and, in the context of sugar manufacturing, raw sugar does not equate to unprocessed and unrefined sugar. Thus, because the product did not state that it was unprocessed and unrefined, plaintiff's claims failed. Thus, *Rooney* has nothing to do with puffery .

Defendant also [*30] contends that its marketing is non-actionable puffery because "reasonable consumers know" that the term "natural" "is not a literal description of the Products, since diapers and wipes do not spring directly from the ground or grow on trees." (Dkt. No. 37 at 7-8.) Defendant's argument, however, is a caricature of Plaintiffs' allegations. As already discussed above, Plaintiff alleges that consumers would likely be misled in

believing that "natural" means the diapers have no non-natural ingredients—not that the diapers are fruits of the earth.

HN23[↑] Nor is "natural" mere puffery because the Federal Trade Commission ("FTC") has declined to provide "general guidance" on the use of that term. *See 75 Fed. Reg. 63552 (2010)*. As the FTC explained, it did not provide guidance because it lacked "consumer perception evidence indicating how consumers understand the term 'natural.'" *Id.* In addition, the FTC noted that "natural may be used in numerous contexts and may convey different meanings depending on that context." *Id.* It does not follow from these statements that the use of "natural" in connection with Defendant's "pure & natural" diapers is not likely to mislead a reasonable consumer; rather, the [*31] statement conveys the unremarkable fact that the use of "natural" may be deceptive in some instances, but not in others. Indeed, HN24[↑] far from deeming "natural" mere non-actionable puffery, the FTC statement goes on to explicitly warn marketers that the use of "natural" may be deceptive:

> Marketers that are using terms such as natural must ensure that they can substantiate whatever claims they are conveying to reasonable consumers. *If reasonable consumers could interpret a natural claim as representing that a product contains no artificial ingredients, then the marketer must be able to substantiate that fact.* Similarly, if, in a given context, a natural claim is perceived by reasonable consumers as a general environmental benefit claim or as a comparative claim (e.g., that the product is superior to a product with synthetic ingredients), then the marketer must be able to substantiate that claim and all attendant reasonably implied claims.

*Id.* (emphasis added).

Defendant's reliance on *Pelayo v. Nestle USA, Inc., 2013 U.S. Dist. LEXIS 154434, 2013 WL 5764644 (C.D. Cal. Oct. 25, 2013)* does not persuade the Court to the contrary. Without explanation, the *Pelayo* court concluded that "[g]iven the FTC's findings that the term [*32] 'natural' can be used in numerous contexts, it is implausible that 'a significant portion of the general consuming public or of targeted consumers' would be deceived or mislead by the use of the term 'All Natural' on the Buitoni Pastas." *2013 U.S. Dist. LEXIS 154434, 2013 WL 5764644 at *5*. As explained above, this conclusion is at odds with basic logic, contradicts the

FTC statement on which it relies, and appears in conflict with the holdings of many other courts, including the Ninth Circuit. This Court accordingly declines to follow *Pelayo's*, holding.

In addition, Defendant contends that the product packaging "clears up any possible misconception by identifying which components of the diaper are natural." (Dkt. No. 8 at 10.) Specifically, Defendant identifies the statements "Soft Outer Cover With Organic Cotton," "Aloe & Vitamin E," and "Liner Includes Renewable Materials,"[3] which all appear on the back or side panels of the packaging. However, *HN25*[⬆] the Ninth Circuit has already rejected a defendant's argument that "reasonable consumers should be expected to look beyond misleading representations on the front of the box to discover the truth from the ingredient list in small print on the side of the box." *Williams, 552 F.3d at 939-40* [*33] ("We do not think that the FDA requires an ingredient list so that manufacturers can mislead consumers and then rely on the ingredient list to correct those misinterpretations and provide a shield for liability for the deception. Instead, reasonable consumers expect that the ingredient list contains more detailed information about the product that confirms other representations on the packaging."). Further, at least one court in this District has already applied *Williams* in rejecting the argument that the "natural" representations on the front of the packaging must be viewed in combination with the back of the packaging to resolve any "ambiguity." *See Wilson v. Frito-Lay N. Am., Inc., 2013 U.S. Dist. LEXIS 47126, 2013 WL 1320468, at * 12-13 (N.D. Cal. Apr. 1, 2013)* ("[T]he Court finds that Plaintiffs have adequately pled that a reasonable consumer could interpret a bag of chips claiming to have been 'Made with ALL NATURAL Ingredients' to consist exclusively of natural ingredients, contrary to the reality described in the nutrition box. Even though the nutrition box could resolve any ambiguity, the Court cannot conclude as a matter of law, in the context of a *Rule 12(b)(6)* motion, that no reasonable consumer would [*34] be deceived by the 'Made with ALL NATURAL Ingredients' labels." (citations omitted)).

As already explained above, Plaintiffs have alleged facts that plausibly suggest that a reasonable consumer would be misled into believing that the "pure & natural"

diapers contained no non-natural ingredients. Thus, under *Williams*, Defendant cannot rely on disclosures on the back or side panels of the packaging to contend that any misrepresentation on the front of the packaging is excused. Further, the Court fails to see how the disclosures necessarily inform the consumer that the diapers include non-natural ingredients. Taken together, the phrases "Soft Outer Cover With Organic Cotton" and "Liner Includes Renewable Materials" suggest that the entire diaper is not made of organic cotton; however, the packaging does not disclose what the "Renewable Materials" are or what other ingredients are included in the diapers—such [*35] as polypropylene and sodium polyacrylate. Thus, a reasonable consumer could still believe that the "pure & natural" diapers included only natural ingredients, notwithstanding Defendant's proposed exculpating disclosures.

Defendant insists that *Williams's* holding is restricted to cases where the ingredient list is correcting "affirmative misrepresentations." (Dkt. No. 37 at 3.) The Court disagrees. As an initial matter, the Court has already concluded that Plaintiffs have stated a claim that the front of the packaging is likely to misrepresent to a reasonable consumer that the diapers contain only natural ingredients; that is, that the packaging includes an affirmative misrepresentation. Thus, this case falls within even Defendant's reading of *Williams*. In addition, Plaintiffs' claim is not that the diapers misrepresent that they contain *any* natural ingredients; rather, the claim is that the diapers misrepresent that they contain *only* natural ingredients. Thus, it is irrelevant that the disclosures "confirm" that the product does indeed contain some natural ingredients or that the disclosures "clarify" which ingredients are natural.

Defendant's reliance on other cases that it asserts [*36] have distinguished *Williams* is inapposite. *See Hairston v. S. Beach Beverage Co., Inc., 2012 U.S. Dist. LEXIS 74279, 2012 WL 1893818, at *5 (CD. Cal. May 18, 2012)* (finding *Williams* distinguishable where the phrase "all natural with vitamins" was consistent with the ingredient label that listed only natural ingredients and vitamins); *see also Manchouck v. Mondelez Int'l Inc, 2013 U.S. Dist. LEXIS 138877, 2013 WL 5400285, at *3 (N.D. Cal. Sept. 26, 2013)* (distinguishing *Williams* where the representation "made with real fruit" on the front of the packaging was confirmed by the disclosure of fruit puree in the ingredients list; rejecting argument that fruit puree cannot be classified as "real fruit"); *Bruton v. Gerber Prods. Co., 961 F.Supp.2d 1062, 2013 U.S. Dist. LEXIS 129241, 2013 WL 4833413, at *21 (N.D. Cal. Sept. 6, 2013)* (granting defendant's motion to

---

[3] Defendant, citing to FTC guidelines, also contends that this phrase—"Liner Includes Renewable Materials"—is not deceptive as a matter of law. (Dkt. No. 8 at 11 n.4.) However, because Plaintiffs do not allege that this term is a misrepresentation, the Court need not address the issue.

dismiss where plaintiff failed to explain why a label claiming "that a product is 'Made with 100% Natural *Fruit'* plausibly implies that the entire product—which contains ingredients other than fruit—is free of synthetic ingredients or ingredients not normally expected to be in food"; noting that "[i]f Defendants' labels claimed that the products were '100% natural,' Bruton's allegations might be sufficient"); *Viggiano v. Hansen Natural Corp., 944 F.Supp.2d 877, 2013 U.S. Dist. LEXIS 70003, 2013 WL 2005430, at *9 (CD. Cal. May 13, 2013)* [*37] (dismissing plaintiff's UCL, FAL, and CLRA claims because the defendant's "natural flavors" label conformed to FDA regulations regarding artificial flavoring and any labeling requirement beyond those regulations was preempted); *Arroyo v. Pfizer, Inc., 2013 U.S. Dist. LEXIS 13789, 2013 WL 415607, at *6 (N.D. Cal. Jan. 31, 2013)* (distinguishing *Williams* since Arroyo's complaint "d[id] not take issue with the content of Pro Nutrients, but rather with its efficacy"); *Werbel ex rel. v. Pepsico, Inc., 2010 U.S. Dist. LEXIS 76289, 2010 WL 2673860, at *4 (N.D. Cal. July 2, 2010)* (concluding that packaging for "Cap'n Crunch's Crunch Berries" did not misrepresent that the product contained real fruit because the product did not claim it was made with real fruit or that it was nutritious, and because the Crunch Berries were "described as a 'SWEETENED CORN & OAT CEREAL' and shown as brightly-colored balls of cereal that no reasonable consumer would believe [we]re made from real berries"); *Videtto v. Kellogg USA, 2009 U.S. Dist. LEXIS 43114, 2009 WL 1439086, at *3 (E.D. Cal. May 21, 2009)* (rejecting plaintiff's reliance on *Williams* in contending that the packaging for "Froot Loops" misled consumers since the packaging "truthfully depicts that cereal in the shape of multi-colored [*38] rings, rings that do not resemble any known fruit" and because the "fanciful use of [the] nonsensical word [Froot] cannot reasonably be interpreted to imply that the Product contains or is made from actual fruit"); *Red v. Kraft Foods, Inc., 2012 U.S. Dist. LEXIS 164461, 2012 WL 5504011, at *3 (C.D. Cal. Oct. 25, 2012)* (granting defendant's motion to dismiss and concluding that packaging that claims that crackers are made with "real vegetables" and depicts images of vegetables is not likely to mislead consumers into believing that the product is healthy and contains a "significant amount" of vegetables).

Finally, the California Court of Appeal's decision in *Hill v. Roll Int'l Corp., 195 Cal. App. 4th 1295, 1298-99, 1304-05, 128 Cal. Rptr. 3d 109 (2011)* is not on point. The *Hill* plaintiff contended that a bottle of Fiji water was misleading because (1) its packaging included a "green drop" that inaccurately conveyed to a reasonable

consumer that the product was endorsed by a third-party environmental organization, and (2) the packaging invited consumers to visit the website "fijigreen.com." The *Hill* court dismissed the plaintiff's complaint, reasoning that, while a reasonable consumer would likely view the green drop as referring to the [*39] environment, it did not follow that the consumer would also likely view the green drop as an endorsement from a third-party environmental organization. In addition, the court explained that "fijigreen.com" was simply a website that consumers could visit to obtain information on the defendant's environmental activities; the plaintiff had not alleged that anything on the website was false or misleading. Unlike in *Hill*, Plaintiffs here are not alleging that the green leaves on the product packaging *alone* constitute the product's misrepresentations; rather, as already explained, the green leaves and coloring are *in addition to* the "pure & natural" and "Soft Organic Cotton" representations located alongside those images.

## 2) Organic cotton

Defendant contends that it is not plausible that a reasonable consumer would likely be misled to believe that the diapers were made exclusively of "Soft Organic Cotton." The Court agrees. The front of the packaging includes the statement "Soft Organic Cotton," which is included in the diapers, albeit on the outside of the diaper where it does not come into contact with the baby's skin. Contrary to Plaintiffs' contentions, the phrase "Soft Organic Cotton" [*40] does not in any way connote that the entire diaper is made of only that material; the phrase simply communicates the presence of that ingredient, which is true. Whereas the term "pure & natural" at least implicitly represents that the product is not impure or unnatural, and thus does not contain synthetic ingredients, the same cannot be said of the term "Soft Organic Cotton." The latter phrase's negative representation is simply that there is not no soft organic cotton, which does not suggest the absence of any other ingredient besides organic cotton. The Court accordingly grants Defendant's motion to dismiss to the extent Plaintiffs allege that the diapers are likely to misrepresent to a reasonable consumer that the product is made entirely of organic cotton.

## b) "Natural Care" wipes

As with the diapers, it is plausible that the packaging for Defendant's "Natural Care" wipes would likely deceive a

reasonable consumer. The front of the packaging prominently displays the term "Natural Care" on an image of a green leaf under the name "Huggies." At least one version of the product also contains background images of green leaves. (*See* Dkt. No. 1 ¶ 33.) By labeling these wipes as "Natural [*41] Care," and superimposing that term on an image of a green leaf, it is plausible that a reasonable consumer would likely be led to believe that the wipes contained only natural ingredients. The "Natural Care" wipes, however, contain two non-natural ingredients that Plaintiffs allege are hazardous, including one ingredient—sodium methylparaben—that the European Union has banned and that the Federal Drug Administration has restricted in food and beverages. It is plausible that a reasonable consumer purchasing wipes for his or her baby would rely on Defendant's natural and "green" representations to reasonably conclude that the wipes would offer a natural and toxic-free option among other non-natural conventional wipes. Accordingly, Plaintiffs have adequately alleged that the "Natural Care" wipes are likely to misrepresent to a reasonable consumer that the product does not contain any non-natural ingredients, particularly toxic synthetic ingredients.

Defendant's arguments to the contrary are all rehashings of their contentions with respect to the "pure & natural" diapers discussed above. For instance, Defendant asserts that the "Natural Care" representation is "not made in a vacuum," and [*42] the ingredient list on the back or side of the packaging explicitly discloses the non-natural ingredients about which Plaintiffs complain. (Dkt. No. 8 at 13.) However, as already explained above, **HN26**[↑]] "reasonable consumers should [not] be expected to look beyond misleading representations on the front of the box to discover the truth from the ingredient list in small print on the side of the box." *Williams*, 552 F.3d at 939; *see* *Wilson, 2013 U.S. Dist. LEXIS 47126, 2013 WL 1320468, at \*12-13*.

### 3. Whether Plaintiffs State a Claim under the WDTPA

Defendant argues that Plaintiffs' claim under the WDTPA fails because, pursuant to a choice of law analysis, only California's consumer protection statutes apply to Plaintiffs. Defendant also contends that dismissal is warranted for the additional reason that Plaintiffs "lack standing" to assert claims under the consumer protection statutes of any state other than California. (Dkt. No. 8 at 23.) Plaintiffs respond that a choice of law analysis is premature and that Wisconsin's

consumer protection law applies in this action because the WDTPA "focuses on where the deceptive label is made and enters the stream of commerce" and Defendant devised and implemented its marketing program [*43] from its headquarters in Neenah, Wisconsin. (Dkt. No. 32 at 19.)

**HN27**[↑]] Regarding choice of law, the Court is not convinced that such an analysis is an appropriate vehicle for dismissing an individual plaintiff's claim. While a choice of law analysis appears necessary when determining whether common issues of law predominate in proposed class actions involving class members from different states, *see* *Mazza v. Am. Honda Motor Co., Inc., 666 F.3d 581, 589-90 (9th Cir. 2012)*, this case has not yet reached that stage of litigation. Further, the Court is aware of no case that holds that an individual plaintiff, under choice of law principles applied on a *Rule 12(b)(6)* motion, cannot simultaneously, or in the alternative, bring two causes of action under different states' consumer protection statutes.

Defendant's argument that the WDTPA claim should be dismissed for lack of "standing" also misses the mark. The cases Defendant cites involve class actions where the courts dismissed the named plaintiffs' statutory claims under the laws of numerous states in which the named plaintiffs did not reside. *See, e.g.,* *Pardini, 2013 U.S. Dist. LEXIS 95756, 2013 WL 3456872 at \*9* (concluding single named plaintiff lacked "standing" to assert [*44] violations of other 49 state's consumer protection statute where plaintiff purchased the product in California only). The rationale underlying this "standing" determination is that the proposed class lacked a representative plaintiff from those other states, and "[a] class cannot assert a claim on behalf of an individual that they cannot represent." *In re Graphics Processing Units Antitrust Litig., 527 F. Supp. 2d 1011, 1026 (N.D. Cal. 2007)*; *see also* *In re Flash Memory Antitrust Litig., 643 F. Supp. 2d 1133, 1163-64 (N.D. Cal. 2009)*. The issue here, however, is not that Plaintiffs lack a representative plaintiff from Wisconsin; it is whether Plaintiffs *themselves* can assert a claim under the WDTPA. While that issue may have been presumed, or not argued, in the cases Defendant cites, it is squarely before the Court here.

Thus the proper question is whether Plaintiffs, who purchased the products at issue in California, have alleged facts that constitute a violation of the WDTPA. They have not. Plaintiffs argue that the WDTPA is violated if deceptive marketing is created in Wisconsin

and "enters the stream of commerce" from Wisconsin. (Dkt. No. 32 at 19.) They further contend that, even [*45] as non-Wisconsin residents, they may sue under the statute because they are "person[s] suffering pecuniary loss because of a violation of [the WDTPA]." (*Id.* (quoting *Wis. Stat. § 100.18(11)(b)*).) The plain language of the WDTPA forecloses Plaintiffs' argument:

[HN28[↑]] No person, firm, corporation or association . . . shall make, publish, disseminate, circulate, or place before the public, or cause, directly or indirectly, to be made, published, disseminated, circulated, or placed before the public, *in this state*, in a newspaper, magazine or other publication, . . . which advertisement, announcement, statement or representation contains any assertion, representation or statement of fact which is untrue, deceptive or misleading.

*Wis. Stat. § 100.18(1)* (emphasis added). Contrary to Plaintiffs' argument, HN29[↑] the WDTPA does not "focus" on where the deceptive label is made and enters the stream of commerce; rather, the statute forbids the making, publishing, disseminating, circulating, or placing before the public an untrue or misleading advertisement or representation in a newspaper, magazine or other publication *in Wisconsin*. See *Calnin v. Hilliard, 2008 U.S. Dist. LEXIS 8590, 2008 WL 336892, at *13 (E.D. Wis. Feb. 5, 2008)* ("The [*46] scope of *Wis. Stat. § 100.18(1)* is limited to publications 'in this state.'"); *see also Force v. ITT Hartford Life & Annuity Ins. Co., 4 F. Supp. 2d 843, 857-58 (D. Minn. 1998)* (concluding that similar Minnesota consumer protection statute was limited to misrepresentations made "in this state," and rejecting plaintiff's "tortured argument" that the statute reached defendant's conduct because its "uniform scheme" originated from its home office in Minnesota). A Wisconsin corporation does not violate the statute if it creates a deceptive label in Wisconsin and then places the label in a publication outside of Wisconsin; the deceptive label must be placed before the public in Wisconsin. Since Defendant did not violate the WDTPA by selling its products in California and because Plaintiffs have not suffered pecuniary loss because of the placement of the allegedly deceptive products in Wisconsin, Plaintiffs have not stated a claim under the WDTPA.[4]

---

[4] Because Plaintiffs fail to allege a claim under the WDTPA, the Court need not address Defendant's argument that Plaintiffs cannot assert their Wisconsin-law claims as a nationwide class.

**CONCLUSION**

For the reasons stated above, Defendants' motion [*47] to dismiss is GRANTED in part and DENIED in part. Specifically, Defendants' motion is granted as to 1) Plaintiffs' lack of standing to pursue injunctive relief, 2) Plaintiffs' claims to the extent they allege that the "pure & natural" diapers are likely to misrepresent to a reasonable consumer that they are made entirely of organic cotton, and 3) Plaintiffs' WDTPA claim. An amended complaint, if any, shall be filed no later than 30 days from the date of this Order.

IT IS SO ORDERED.

Dated: December 10, 2013

/s/ Jacqueline S. Corley

JACQUELINE SCOTT CORLEY

UNITED STATES MAGISTRATE JUDGE

---

End of Document

Kisting v. Gregg Appliances, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 5875007

KeyCite Yellow Flag - Negative Treatment

Declined to Follow by In re Vizio, Inc., Consumer Privacy Litigation, C.D.Cal., March 2, 2017

2016 WL 5875007
Only the Westlaw citation is currently available.
United States District Court, E.D. Wisconsin.

John KISTING, on behalf of himself and all others similarly situated, Plaintiff,

v.

GREGG APPLIANCES, INC.
d/b/a hhgregg, Defendant.

Case No. 16–CV–141
|
Signed 10/07/2016

## DECISION AND ORDER ON DEFENDANT'S PARTIAL MOTION TO DISMISS COMPLAINT

NANCY JOSEPH, United States Magistrate Judge

*1 John Kisting filed a class action complaint alleging breach of express warranty; breach of the implied warranty of merchantability; breach of contract; unjust enrichment; and violations of the Magnuson–Moss Act (15 U.S.C. §§ 2301, et seq.), Wisconsin's Deceptive Trade Practices Act ("DTPA") (Wis. Stat. § 100.18), and Wis. Stat. §§ 895.446 and 943.20(1)(d) against Gregg Appliances, Inc. d/b/a hhgregg arising out of injuries sustained as a result of Gregg's alleged false advertising relating to the sale of Samsung 4K televisions to consumers in the State of Wisconsin. Gregg has moved to limit Kisting's putative class to those who purchased the same model of television; to dismiss Kisting's claims pursuant to Wis. Stat. §§ 100.18, 895.446, and 943.20(1)(d); and to dismiss Kisting's claim for equitable relief, pursuant to Fed. R. Civ. P. 12(b)(1) and Fed. R. Civ. P. 12(b)(6). Kisting opposes the motion. The motion has been fully briefed and is ready for disposition. For the reasons that follow, the defendant's motion is granted in part and denied in part.

## BACKGROUND

In his complaint, Kisting alleges that on December 9, 2015, he visited one of the five hhgregg stores in Wisconsin operated by Gregg. (Compl. ¶ 10, Docket # 1.) Kisting alleges that in front of each of the Samsung 4K televisions at issue (the "Subject Televisions"), in-store advertisements listed information regarding the features and capabilities of each particular television model. (Id. ¶ 11.) Kisting viewed these advertisements. (Id.) The primary feature of the in-store advertisements of Subject Televisions are three to four large, red circles conspicuously centered below each Subject Television. In one of the red circles, in large and bold print, the purported refresh rate of each particular model is advertised. (Id. ¶ 12.)

Kisting explains that generally, televisions regenerate, or refresh, the picture multiple times each second and that this is done to keep up with the images that are broadcast and to reduce or eliminate motion blur when fast moving scenes appear on screen. (Id. ¶ 7.) Kisting states that the more often a television can refresh the picture, the better and more clearly a television is able to display moving objects on screen. (Id.) Kisting states that the refresh rate of a television is a specification that is measured in Hertz ("Hz") and the Hz of a television corresponds exactly to the number of times a particular television can refresh the picture, i.e., a 60Hz television has a refresh rate of 60, a 120Hz television has a refresh rate of 120, and a 240Hz television has a refresh rate of 240. (Id. ¶ 8.) The Hz measurement of a television equals the refresh rate, and the refresh rate of a television equals the Hz. (Id.) The complaint alleges that generally, the higher the refresh rate of a particular television model, the better the television is able to display motion on screen resulting in a better picture. (Id.)

Kisting alleges that partly based on the refresh rate listed on the in-store advertisement, he selected and purchased a Subject Television. (Id. ¶ 13.) He alleges that he purchased the television without knowledge that the actual refresh rate specification was only one-half of the refresh rate advertised to the public in-store by Gregg. (Id. ¶ 14.) Kisting alleges that none of the advertisements he viewed or representations he received contained any disclosure of the accurate refresh rate of the television. (Id. ¶ 15.)

*2 Kisting further alleges that he purchased the Subject Television on the reasonable, but mistaken, belief that the refresh rate advertised by Gregg was, in fact, the refresh rate of the Subject Television. Kisting alleges that had Gregg advertised the accurate refresh rate of the Subject Television, Kisting would have had the opportunity to consider other televisions; pay much less for a television with a lower

**Kisting v. Gregg Appliances, Inc., Not Reported in Fed. Supp. (2016)**

2016 WL 5875007

refresh rate; or seek to purchase a television through a different retailer. (*Id.* ¶ 16.) Kisting alleges that at all five of Gregg's Wisconsin locations, Subject Televisions are being misrepresented as having twice their actual refresh rate. (*Id.* ¶ 19.) As a result of Gregg's actions, Kisting alleges that he and the putative class members have suffered damages. (*Id.* ¶¶ 21–23.)

**STANDARD OF REVIEW**

Gregg moves for partial dismissal of Kisting's complaint pursuant to Fed. R. Civ. P. 12(b)(1) (subject matter jurisdiction) and Fed. R. Civ. P. 12(b)(6) (failure to state a claim). On a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the Court may look beyond the allegations of the complaint and view other submitted evidence. *See Johnson v. Apna Ghar, Inc.*, 330 F.3d 999, 1001 (7th Cir. 2003). Jurisdiction is the "power to decide" and must be conferred upon a federal court. *See In re Chicago, Rock Island & Pacific R.R. Co.*, 794 F.2d 1182, 1188 (7th Cir. 1986). When jurisdictional allegations are questioned, the plaintiff has the burden of proving that the jurisdictional requirements have been met. *See Kontos v. United States Dept. of Labor*, 826 F.2d 573, 576 (7th Cir.1987).

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) challenges the sufficiency of the complaint on the basis that the plaintiff has failed to state a claim upon which relief can be granted. A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Supreme Court has interpreted this language to require that the plaintiff plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In *Ashcroft v. Iqbal*, the Supreme Court elaborated further on the pleadings standard, explaining that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," though this "standard is not akin to a 'probability requirement.' " 556 U.S. 662, 678 (2009). The allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (internal citation omitted).

When determining the sufficiency of a complaint, the court should engage in a two-part analysis. *See McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011). First, the court must "accept the well-pleaded facts in the complaint as true" while separating out "legal conclusions and conclusory allegations merely reciting the elements of the claim." *Id.* (citing *Iqbal*, 556 U.S. at 680). Next, "[a]fter excising the allegations not entitled to the presumption [of truth], [the court must] determine whether the remaining factual allegations 'plausibly suggest an entitlement to relief.' " *Id.* (citing *Iqbal*, 556 U.S. at 681). As explained in *Iqbal*, "[d]etermining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." 556 U.S. at 679.

If a party asserts fraud, the claim must be pleaded with particularity. Fed. R. Civ. P. 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Rule 9(b) requires a plaintiff to plead "the who, what, when, where, and how" of the allegedly fraudulent act. *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 569 (7th Cir. 2012) (internal quotations omitted).

**ANALYSIS**

**\*3** Gregg argues that Kisting lacks standing to represent individuals who purchased different products and viewed different advertisements than he did and thus the putative class should be limited to those who purchased the same model of television as Kisting. Gregg further argues that Kisting's fraud-based claims pursuant to Wis. Stat. §§ 100.18, 895.446, and 943.20(1)(d) must be dismissed because he failed to plead them with particularity. Finally, Gregg argues that Wisconsin law forbids equitable claims based on a contract; thus, Kisting's claim for unjust enrichment must be dismissed. I will address each in turn.

*1. Limiting Putative Class to Those Who Purchased the Same Model of Television as Kisting*

In his complaint, Kisting states that he brings this action as a class action pursuant to Fed. R. Civ. P. 23 and seeks class certification on behalf of purchasers of 70 different models of Samsung televisions purchased from five Wisconsin hhgregg stores. (Compl. ¶ 24.) Gregg moves pursuant to Fed. R. Civ. P. 12(b)(1) to dismiss those putative class members who purchased different televisions and viewed different advertisements than Kisting on the ground that Kisting lacks standing to represent them. To satisfy Article III standing, a plaintiff must allege that he or she "(1) suffered an injury

in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). In this case, Gregg argues that Kisting was not injured by advertising related to television models he did not purchase; therefore, has no standing to raise claims based on those models. Kisting argues that the focus of inquiry is on whether he individually has standing and whether the products and actionable conduct specific to each product are sufficiently similar.

The law on whether an individual has standing to represent putative class members for products he or she did not purchase is unsettled across the country and each party cites to the cases supporting their respective positions. Generally, courts fall into three categories in analyzing this issue. The first category are the courts holding that an individual does not have standing to brings claims for products he did not purchase, often times relying on *Lewis v. Casey*, 518 U.S. 343 (1996) in support. *See Ferrari v. Best Buy Co.*, Civil No. 14–2956, 2015 WL 2242128 (D. Minn. May 12, 2015); *Chin v. Gen. Mills, Inc.*, Civil No. 12–2150, 2013 WL 2420455 (D. Minn. June 3, 2013); *Pearson v. Target Corp.*, No. 11 CV 7972, 2012 WL 7761986 (N.D. Ill. Nov. 9, 2012); *Padilla v. Costco Wholesale Corp.*, No. 11 C 7686, 2012 WL 2397012 (N.D. Ill. June 21, 2012); *Hemy v. Perdue Farms, Inc.*, Civil Action No. 11–888, 2011 WL 6002463 (D.N.J. Nov. 30, 2011); *Lieberson v. Johnson & Johnson Consumer Co.*, 865 F. Supp. 2d 529 (D.N.J. 2011).

*Lewis* involved a class action of prisoners incarcerated by the Arizona Department of Corrections who alleged that the prisons were furnishing them with inadequate legal research facilities and thereby depriving them of their right of access to the courts, in violation of *Bounds v. Smith*, 430 U.S. 817 (1977). The district court the prisons violated *Bounds* and issued an injunction mandating detailed, system wide changes in the prison law libraries and in its legal assistance programs. The Ninth Circuit affirmed. In reviewing the grant of an injunction, the Court considered the requirement that the prisoners show an actual injury under *Bounds*. In analyzing this issue, the Court stated that one's remedy is limited to the inadequacy that produced the injury in fact and that this was "no less true with respect to class actions than with respect to other suits." 518 U.S. at 357. The Court continued:

**\*4** That a suit may be a class action ... adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.

*Id.* (internal quotations and citations omitted). The courts that have relied on *Lewis* cite the above language in support of their holdings that an individual does not have standing to brings claims for products he did not purchase.

In the second category of cases, courts have found that an individual does have standing to brings claims for products he did not purchase if the products are substantially similar. *See Mednick v. Precor, Inc.*, Case No. 14 C 3624, 2014 WL 6474915 (N.D. Ill. Nov. 13, 2014); *Quinn v. Walgreen Co.*, 958 F. Supp. 2d 533 (S.D.N.Y 2013); *Brown v. Hain Celestial Group, Inc.*, 913 F. Supp. 2d 881 (N.D. Cal. 2012).

Finally, in the third category of cases, courts have found that the issue is not one of standing but of class certification and is better addressed at the Rule 23 class certification stage. *See Weisblum v. Prophase Labs, Inc.*, 88 F. Supp. 3d 283 (S.D.N.Y. 2015); *In re L'Oreal Wrinkle Cream Marketing and Sales Practices Litigation*, Civ. No. 12–03571, 2013 WL 6450701 (D.N.J. Dec. 9, 2013); *Astiana v. Dreyer's Grand Ice Cream*, Nos. C–11–2910, C–11–3164, 2012 WL 2990766 (N.D. Cal. July 20, 2012); *Bruno v. Quten Research Institute, LLC*, 280 F.R.D. 524 (C.D. Cal. 2011).

The parties do not cite, and I have not found, any Seventh Circuit cases addressing the issue. However, after reviewing the cases and considering all three approaches, I agree with the courts that hold that an individual does not have standing to bring claims for products he did not purchase. I find that these cases comport with existing Supreme Court precedent on standing for an individual, which, as the Court stated in *Lewis*, does not change in the context of a class action suit. Further, I find the Seventh Circuit's decision in *Payton v. County of Kane*, 308 F.3d 673 (7th Cir. 2002) instructive. In *Payton*, the plaintiffs raised a challenge to the facial constitutionality of an Illinois state law that permitted counties to impose a bail fee above and beyond the set bail amount. *Id.* at 675. The named plaintiffs had individual claims against only two of the nineteen defendant counties. *Id.* The Seventh Circuit allowed the named plaintiffs to sue all nineteen defendants, reasoning that "[t]he constitutionality of a bond fee (whether it is $1 or $45) should not differ from one county to the next, when such fee is imposed pursuant to the same statute." *Id.* at 680.

Notably, the Seventh Circuit stated that:

Kisting v. Gregg Appliances, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 5875007

This is not a case where the named plaintiff is trying to piggy-back on the injuries of the unnamed class members. That, of course, would be impermissible, in light of the fact that "a named plaintiff cannot acquire standing to sue by bringing his action on behalf of others who suffered injury which would have afforded them standing had they been named plaintiffs; it bears repeating that a person cannot predicate standing on injury which he does not share. Standing cannot be acquired through the back door of a class action." *Allee v. Medrano*, 416 U.S. 802, 828–29, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974) (Burger, C.J., dissenting).

**\*5** *Id.* at 682. In this case, Kisting's claims relate to seventy different models of Samsung televisions, sixty-nine of which Kisting did not purchase. Kisting's alleged injury stems from the advertising that he saw and relied upon and the model of television that he purchased. Kisting would not individually have standing to pursue claims based on injuries sustained from television models he did not purchase and the fact that this is a class action suit does not change the standing analysis. In other words, Kisting cannot establish an injury-in-fact with regard to the other television models. Accordingly, Kisting may proceed only as to the television model he purchased.

*2. Failure to Plead Fraud Claims with Particularity*

Gregg argues that Count Six (violation of Wis. Stat. § 100.18—the Wisconsin Deceptive Trade Practices Act) and Count Seven (violation of Wis. Stat. §§ 895.446, 943.20(1)(d)) of Kisting's complaint should be dismissed for failing to plead the claims with particularity. Kisting responds that a claim under Wis. Stat. § 100.18 is not a fraud claim; thus, the requirements of Rule 9(b) do not apply. Kisting further argues that his claims under Wis. Stat. §§ 895.446 and 943.20(1)(d) are pleaded with particularity.

A claim under Wis. Stat. § 100.18 has three elements: (1) the defendant made a representation to the public with intent to induce an obligation; (2) the representation was untrue, deceptive or misleading; (3) the representation caused the plaintiff a pecuniary loss. *Miller v. Vonage Am., Inc.*, No. 14–CV–379, 2015 WL 59361, at \*5 (E.D. Wis. Jan. 5, 2015) (citing *K & S Tool & Die Corp. v. Perfection Machinery Sales, Inc.*, 2007 WI 70, ¶ 19, 301 Wis. 2d 109, 732 N.W.2d 792). Kisting cites *K&S* and *Kailin v. Armstrong*, 252 Wis. 2d 676, 643 N.W.2d 132 (Ct. App. 2002) in support of his argument that a Wis. Stat. § 100.18 claim does not sound in fraud and thus need not be pleaded with particularity. Neither of these cases, however, addressed the pleading standard for a Wis.

Stat. § 100.18 claim. Kisting ignores contrary authority in which the court found Wis. Stat. § 100.18 claims should be pleaded with particularity. *See Byrd v. Landowski*, 2010 WI App 120, ¶ 7, 329 Wis. 2d 271, 789 N.W.2d 755 (unpublished) (applying particularity standard of Wis. Stat. § 802.03(2) to claim under DTPA); *see also Am. Orthodontics Corp. v. Epicor Software Corp.*, 746 F. Supp. 2d 996, 999 (E.D. Wis. 2010) (applying Rule 9(b) to DTPA claim); *Miller v. Vonage Am., Inc.*, No. 14–CV–379, 2015 WL 59361, at \*5 (E.D. Wis. Jan. 5, 2015) ("Because a claim under the DTPA sounds in fraud, it must be pleaded with particularity."). Thus, I find that Kisting's Wis. Stat. § 100.18 claim is subject to the heightened pleading standard of Rule 9(b).

Under the heightened pleading standard of Rule 9(b), the pleading ordinarily requires describing the "who, what, when, where, and how of the fraud." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 737 (7th Cir. 2014) (internal quotation and citation omitted). Gregg argues that Kisting has failed to satisfy this standard because he did not state whether he actually purchased a television on December 9, 2015, does not specify which model of television he purchased, and does not articulate which advertisement he saw and considered in making his purchase. (Def.'s Br. in Supp. at 8–9, Docket # 15.) Kisting argues that his complaint clearly identifies the defendant as the "who," the doubling of the refresh rate as the "what," the five retail stores Gregg operated and the in-store advertisements as the "where," December 9, 2015 as the "when," and the advertisements themselves as the "how." (Pl.'s Resp. Br. at 13, Docket # 16.)

**\*6** A plaintiff who provides a "general outline of the fraud scheme" sufficient to "reasonably notify the defendants of their purported role" in the fraud, satisfies Rule 9(b). *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1020 (7th Cir. 1992). I find that the allegations in Kisting's complaint provide a general outline of the fraud and reasonably notify Gregg of its purported role in the fraud. Kisting's complaint alleges that he visited the hh gregg store in Racine on December 9, 2015. (Compl. ¶¶ 1, 10.) The complaint alleges that Kisting viewed an advertisement in front of the subject television and that the advertisement contained the purported refresh rate. (*Id.* ¶¶ 11–12.) Kisting alleges that he purchased a Samsung 4K television based partly on the refresh rate listed on the advertisement and without knowledge that the actual refresh rate was only one-half of the rate advertised to the public. (*Id.* ¶¶ 1, 13–14.) The complaint alleges that Gregg's in-store advertisement grossly inflated the refresh rate of the subject television with the intent to induce Wisconsin

Kisting v. Gregg Appliances, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 5875007

consumer to purchase the televisions. (*Id.* ¶¶ 70–71.) These facts sufficiently state the "who, what, where, when, and how" of the alleged fraud. Thus, Kisting's Wis. Stat. § 100.18 claim is pleaded with particularity and will not be dismissed.

To state a claim under Wis. Stat. §§ 895.446, 943.20(1)(d), which prohibits a type of fraud which is addressed by both criminal and civil tort law, the court looks to civil tort law as an aid to interpret the criminal fraud statutes. *See State v. Ploeckelman*, 2007 WI App 31, ¶ 17, 299 Wis. 2d 251, 262, 729 N.W.2d 784, 789. The elements of a fraud claim under Wisconsin law are: (1) the defendant made a representation of fact; (2) the representation was untrue; (3) the defendant made the representation either knowing that it was untrue, or recklessly not caring whether it was true or false; (4) the defendant made the representation with the intent to deceive the plaintiff in order to induce the plaintiff to act on it to plaintiff's pecuniary damage; and (5) the plaintiff believed that the representation was true and relied on it. *Malzewski v. Rapkin*, 2006 WI App 183, ¶ 17, 296 Wis. 2d 98, 111, 723 N.W.2d 156, 162. For the same reasons that I found Kisting's Wis. Stat. § 100.18 claim properly pleaded with particularity, I similarly find that Kisting's Wis. Stat. §§ 895.446, 943.20(1)(d) claim provides a general outline of the fraud and reasonably notifies Gregg of its purported role in the fraud. For these reasons, I will not dismiss Counts Six and Seven of Kisting's complaint at this stage.

### 3. Kisting's Claim for Equitable Relief

Finally, Gregg argues that Kisting's fifth claim for relief, unjust enrichment, must be dismissed because Wisconsin law forbids equitable claims based on contract. (Def.'s Br. in Supp. at 9.) Gregg further argues that the unjust enrichment claim is not merely a case of pleading in the alternative because Count Five expressly incorporates the complaint's allegations establishing the existence of a contract and because the claim itself is premised on the parties' contractual relationship. (*Id.*)

In Wisconsin, an action for unjust enrichment, or quasi contract, is based upon proof of three elements: (1) a benefit conferred on the defendant by the plaintiff, (2) appreciation or knowledge by the defendant of the benefit, and (3) acceptance or retention of the benefit by the defendant under circumstances making it inequitable for the defendant to retain the benefit. *Watts v. Watts*, 137 Wis. 2d 506, 531, 405 N.W.2d 303, 313 (1987). "In Wisconsin the quasi-contractual

theories of quantum meruit and unjust enrichment are legal causes of action grounded in equitable principles and can be invoked only in the absence of an *enforceable* contract." *Carroll v. Stryker Corp.*, 658 F.3d 675, 682 (7th Cir. 2011) (emphasis added). A purchase transaction, for example, forms a contract between the buyer and the seller. *Meyer v. The Laser Vision Inst.*, 2006 WI App 70, ¶ 25, 290 Wis.2d 764, 779, 714 N.W.2d 223, 230 (holding that the parties' purchase transactions formed a "valid and enforceable [contract]," thereby barring [the plaintiff's] equitable claims"). However, where there is not an underlying, enforceable contract between the parties, an unjust enrichment claim may lie. *See Archdiocese of Milwaukee v. Doe*, 743 F.3d 1101, 1105 (7th Cir. 2014) ("A contract induced by fraud is voidable at the option of the party whose assent was fraudulently induced.").

**\*7** Kisting has alleged that each and every sale or lease of a subject television constitutes a contract between Gregg and the purchaser and that Gregg breached the contract by misrepresenting the refresh rate of the televisions. (Compl. ¶ 61.) Kisting alleges that Gregg's misrepresentations caused him to purchase the subject television and absent the misrepresentation, he would not have purchased the television. (*Id.* ¶ 60.) Because Kisting's underlying purchase transaction may be voidable, I will not dismiss his unjust enrichment claim at this juncture. *See Le v. Kohls Dep't Stores, Inc.*, No. 15–CV–1171, 2016 WL 498083, at *15 (E.D. Wis. Feb. 8, 2016) (declining to dismiss unjust enrichment claim where contract was potentially voidable due to misrepresentation under the Wisconsin DTPA).

**NOW, THEREFORE, IT IS HEREBY ORDERED** that Gregg's partial motion to dismiss (Docket # 14) is **GRANTED IN PART AND DENIED IN PART**. Gregg's motion is **GRANTED** to the extent that Kisting's putative class is limited to those who purchased the same television model he did. However, Gregg's motion to dismiss Kisting's claims pursuant to Wis. Stat. §§ 100.18, 895.446, and 943.20(1)(d) and to dismiss Kisting's claim for equitable relief is **DENIED**.

**IT IS FURTHER ORDERED** that the clerk of court will contact the parties regarding scheduling a Rule 16 Scheduling Conference.

### All Citations

Not Reported in Fed. Supp., 2016 WL 5875007

**Kisting v. Gregg Appliances, Inc., Not Reported in Fed. Supp. (2016)**

2016 WL 5875007

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 59361
Only the Westlaw citation is currently available.
United States District Court,
E.D. Wisconsin.

Kevin MILLER et al., Plaintiffs,

v.

VONAGE AMERICA, INC., Defendant.

No. 14–CV–379.
|
Signed Jan. 5, 2015.

**Attorneys and Law Firms**

Laurie J. McLeroy, Von Briesen & Roper SC, Milwaukee, WI, Peter R. Heyne, Heyne Law Office, Green Bay, WI, for Plaintiffs.

Peter W. Carter, Leanne L. Matchen, Glenn M. Salvo, Dorsey & Whitney LLP, Minneapolis, MN, for Defendant.

**DECISION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS**

WILLIAM C. GRIESBACH, Chief Judge.

**\*1** This diversity case arises out of the inadvertent publication by the subcontractor of a telephone service provider of a new subscriber's home telephone number and address in various printed and online directories. The case is again before the court on a motion to dismiss for failure to state a claim. On August 21, 2014, the court issued a decision and order granting the defendant's Rule 12(b)(6) motion to dismiss all nine counts in the plaintiffs' original complaint without prejudice. (ECF No. 17.) Plaintiffs filed an amended complaint on September 19, 2014, and the defendant has again moved for dismissal, this time with prejudice, on the ground that even as amended the complaint still fails to state a claim for relief. For the reasons below, the motion will be granted.

**I. GENERAL ALLEGATIONS**

Dr. Kevin Miller is a psychologist who practices in and around seven counties in northeastern Wisconsin. As part of his practice Dr. Miller accepts court appointments to evaluate the mental status and level of dangerousness of individuals who are charged with criminal conduct or subject to civil commitment proceedings. He is also privately retained to perform such evaluations. The amended complaint alleges that "because a part of his practice deals with persons with violent, dangerous, and/or delusional propensities, Dr. Miller, at all times keeps his family's home information separate and secure, from his business information." (Am. Compl. ¶ 11, ECF No. 19.) The amended complaint also alleges that Dr. Miller's wife was sexually assaulted as a child and therefore "purposefully maintains herself and her home to provide utmost safety." (*Id.* ¶ 15.) The Millers also have an autistic child who is "unable to appreciate safety issues." (*Id.* ¶ 14.) For all of these reasons, it was important to Dr. Miller and his family to make sure that personal information, such as their home address and telephone number, was not published in any print or online telephone directories.

In April 2012, Dr. Miller switched his family's residential telephone service from TDS Metrocom to Defendant Vonage America Inc. Prior to switching to Vonage, Dr. Miller researched Vonage's residential calling plans on Vonage's website to determine whether Vonage would keep his family's home address and telephone number unpublished. After satisfying himself that his family's home address and telephone number would remain unpublished, Dr. Miller opened a Vonage account.

Beginning in July 2013, Dr. Miller and his family began receiving business calls from other professionals, patients and persons who were ordered to undergo court ordered assessments at his home. He discovered that his home address and telephone number had been published in various print and online telephone directories. After further investigation as to how this occurred, Dr. Miller discovered that his family's home address and telephone number had been "ported" by Choice One/One Communications (n/k/a Earthlink Business), Vonage's "subcontractor." (*Id.* ¶¶ 34–35.) A representative of Choice One "acknowledged it errantly issued service orders for the publication of the Miller's Personal Information in business listings." (*Id.* ¶ 36.) The error was compounded by Vonage's failure to take immediate steps to correct it. (*Id.* ¶ 57.)

**\*2** Fearful that they were no longer safe in their home as a result of their address having been published, Dr. Miller and his wife decided to move to a new home. They incurred significant expenses and expended numerous hours away from their respective jobs in searching for, purchasing, and moving into a new home that met their needs. To compound

their loss, they have elected not to put their old home on the market because of the "dangerous stigma currently attached to it," and instead are renting it at below market value after disclosing to the tenants the nature of Dr. Miller's practice and the fact that their home address had been published. Finally, the amended complaint alleges that the Miller's son has become stressed by the change in his routine and, as a result, injured himself, developed suicidal ideation and had to be admitted to a psychiatric hospital. (*Id.* ¶¶ 63–67.)

In their amended complaint, Plaintiffs (collectively, "the Millers") have asserted state law claims for negligent and strict responsibility misrepresentation; violation of Wisconsin's Deceptive Trade Practices Act (DTPA), Wis. Stat. § 100.18; negligent performance of services; and negligent infliction of emotional distress. They seek to recover damages for the expenses they incurred in buying and moving into a new home, the loss in value to their old home, the self-inflicted physical injuries to their son, and the emotional and psychological injuries they have all sustained as a result of the ordeal. They also seek punitive damages, attorneys fees and such other relief as the court deems just and reasonable.

## II. ANALYSIS

The rules governing the court's consideration of a Rule 12(b)(6) motion to dismiss were set forth in the court's decision granting Vonage's previous motion and need not be restated here. Instead, the court will proceed to address the claims asserted in Plaintiffs' amended complaint.

### A. Misrepresentation

The court previously granted Vonage's motion to dismiss the Millers' claims sounding in fraud because the allegations in the complaint failed to meet the heightened pleading standards under Fed.R.Civ.P. 9(b). Specifically, the court concluded that the Millers' vague allegations that Vonage published advertisements and representations stating it would keep customers' personal information private failed to particularly allege the contents of the alleged false representations and the dates the statements were made. (ECF No. 17 at 21–22.) In the amended complaint, the Millers have attempted to add the required detail, including the specific dates Dr. Miller read and relied on the alleged false statements and the content of those statements.

The amended complaint alleges that "[o]n or about March 30, 2012, Dr. Miller researched Vonage's residential calling plans on Vonage's website to determine whether Vonage would keep his family's personal information, namely their personal home telephone number and home address ("Personal Information"), unpublished as had been his practice with all prior phone companies since Dr. Miller entered the field of psychology on or about August 1988." (ECF No. 19, ¶ 21.) Vonage's website contained the following representation, which Plaintiffs refer to as the "Vonage Non–Publication Promise":

**\*3** Vonage does not publish or submit entries to phone books or directory assistance (411) listings. However, there are internet resources you can use to add, edit or remove your own listings.

If you are transferring your phone number to Vonage and your phone number was previously listed, specify Yes on the Number Transfer Authorization form when asked if you want to maintain your current directory listing with your incumbent carrier. Otherwise, if you select No, your listing is removed.

(*Id.* ¶ 22; ECF No. 19–1.)

Based upon this representation, Dr. Miller switched his family's residential telephone service from TDS Metrocom to Vonage on April 1, 2012. In doing so, he "checked all the appropriate boxes to ensure that Personal Information would not be published and would remain unlisted." That same day, Dr. Miller received an email from Vonage confirming that his account was in the process of being activated and reiterating its assurance that "we are committed to safeguarding your personal account information and protecting your privacy." The complaint alleges that Vonage employees later "confirmed that their records confirmed he had appropriately completed the registration to maintain Personal Information unpublished when establishing residential service with Vonage." (*Id.* ¶¶ 23–26.)

The amended complaint also alleges that as part of the registration process, Vonage requires subscribers to acknowledge and agree to Vonage's Terms of Service (TOS). (*Id.* ¶ 27.) As the court noted in its earlier decision, the TOS constitutes "the agreement between Vonage America ... and the user of Vonage's communications services and any related products or services." (TOS § 1, Snowden Decl. Ex. A, ECF No. 8–1.) With respect to directory listings, the TOS states: "The phone numbers you get from us will not be listed by us in any telephone directories. However, any phone numbers you transfer from your local phone company may be or remain

listed. We have no control over directory listings." (*Id.* § 5.6 .) Vonage's TOS also contains an integration clause:

> This agreement, including any future modifications to its terms, and the rates for services found on our web site constitute the entire agreement between you and Vonage. This agreement governs your use of our service, and the use of our services by the members of your household and your guests and employees. This agreement supersedes any prior agreements between you and Vonage. It also supersedes all prior or contemporaneous statements, understandings, writings, commitments, or representations concerning its subject matter.

(*Id.* § 13.6.) Finally, Vonage's TOS deny third party beneficiaries who are not parties to the agreement from "any remedy, claim, liability, reimbursement, or cause of action." (*Id* . § 13.4)

Despite these new allegations, Plaintiffs' claims for misrepresentation still fail to state a claim. Indeed, it is clear from the allegations of the amended complaint that the Plaintiffs have no claim for misrepresentation and that they have plead themselves out of court. *See Pugh v. Tribune Co.,* 521 F.3d 686, 699 (7th Cir.2008) (noting that "a plaintiff can plead himself out of court by alleging facts that show there is no viable claim"). The misrepresentation claims fail because it is clear from the complaint that no misrepresentation of fact was made.

**\*4** To prove a claim for misrepresentation, a plaintiff must establish that (1) the defendant made a factual representation that was untrue; (2) the plaintiff believed the statement to be true; and (3) the plaintiff relied on it to his or her detriment. *Ollerman v.. O'Rourke Co., Inc.,* 94 Wis.2d 17, 24, 288 N.W.2d 95 (1980). As Vonage points out, Plaintiffs fail to explain how the statement from its website is untrue. At the outset, only Dr. Miller viewed the website, and thus neither his wife nor his child could have relied on any information on the website to their detriment. But even aside from this problem, nothing in the complaint suggests that what Plaintiffs refer to as Vonage's Non–Publication Promise is untrue.

Under Wisconsin law, it is well-settled that liability for misrepresentation must be based on a false statement of present or pre-existing fact, not an unfulfilled promise or statement as to future events that turns out to be mistaken. *See Hartwig v. Bitter,* 29 Wis.2d 653, 656, 139 N.W.2d 644 (1966); *Badger Pharmacol, Inc. v. Colgate–Palmolive Co.,* 1 F.3d 621, 627 (7th Cir.1993). An exception to this "pre-existing fact" rule applies "where the promisor, at the time

of the promise or representation was made, had a present intent not to perform." *Badger Pharmacol,* 1 F.3d at 628 n. 7 (citing *Hartwig,* 29 Wis.2d at 657, 139 N.W.2d at 647). Thus, if Vonage had no intention of keeping Plaintiffs' personal information confidential, it could be liable for fraud.

Here, it is clear the exception does not apply. The Millers appear to theoretically straddle the rule and exception; they do not straightforwardly allege Vonage had a present intent not to perform. The closest the Millers come is to allege in the strict responsibility claim that "Vonage *should have known it did not intend* to honor its representation that it would not publish" the information. (ECF No. 19 at ¶ 90) (emphasis added). But this allegation is paradoxical; the promisor must know what it intended. Indeed, the confusing nature of this allegation seems to show the incompatibility of negligent and strict responsibility misrepresentation claims, which are all that are alleged here, with a misrepresentation theory based on the promisor's present intent not to perform. Although Wisconsin law does not explicitly so hold, the Seventh Circuit has recognized this point. *See Badger Pharmacol,* 1 F.3d at 628 n. 7 ("[I]t would appear that if one making representations had a present intention not to perform them, the aggrieved party's claim would properly and logically be one for intentional misrepresentation."). In any event, without any allegation that Vonage had a present intent not to perform, the Millers' allegations do not state a claim under the exception.

What is left is the fundamental requirement of misrepresentation that the Millers allege Vonage made a false representation of present or pre-existing fact. They have not done so. The Millers do not claim Vonage represented it did not publish information when at the time it actually was publishing information. Instead, the Millers cite Vonage's representation that it does not, as its practice, publish information, and then they allege that in this case Vonage, or Choice One, its subcontractor, actually did end up publishing their information. The complaint itself alleges this happened *after* Vonage's representation when its subcontractor "errantly" issued the service order. (ECF No. 19 at ¶¶ 23, 37.) The fact that the publication of Plaintiff's Personal Information occurred as a result of a mistake is logically inconsistent with their allegation that Vonage misrepresented its intent. And Vonage's theory that the TOS somehow rendered the "non-publication promise" actionable must also fail, because § 5.6 does not state Vonage lists phone numbers. Rather, like the website representation, it expressly states Vonage does not do so. For all of these

reasons, the Millers have failed to state a cognizable claim of misrepresentation and therefore counts two and three will be dismissed.

### B. Deceptive Trade Practices Act

**\*5** The Millers' DTPA claim similarly fails. A claim under Wis. Stat. § 100.18 has three elements: (1) the defendant made a representation to the public with intent to induce an obligation; (2) the representation was untrue, deceptive or misleading; (3) the representation caused the plaintiff a pecuniary loss. *K & S Tool & Die Corp. v. Perfection Machinery Sales, Inc.,* 2007 WI 70, ¶ 19, 301 Wis.2d 109, 732 N.W.2d 792. Because a claim under the DTPA sounds in fraud, it must be pleaded with particularity. *Pirelli Armstrong Tire Copr. Retiree Med. Benefits Trust v. Walgreen Co.,* 631 F.3d 436, 446 (7th Cir.2011); *see also Byrd v. Landowski,* No.2009 AP2504, at *2 (Wis.Ct.App. July 21, 2010) (applying particularity standard of Wis. Stat. § 802.03(2) to claim under DTPA). It is not clear that the pre-existing fact rule applies to a DTPA claim. *See Butteris v. Christiansen,* No. 98–1309 (Wis.Ct.App. Dec. 10, 1998) (applying pre-existing fact rule to DTPA claim). *But see Christense v. TDS Metrocom LLC,* No.2008AP554, at *3 n. 5 (Wis. Ct.App. Dec. 11, 2008) (noting no published Wisconsin Court of Appeals decisions applying pre-existing fact rule to DTPA claim).

Whether the pre-existing fact rule applies or not, however, the Millers' DTPA claim fails because the allegations in the amended complaint do not show how Vonage's website representation was untrue, deceptive or misleading. In the initial complaint, the Millers simply stated Vonage made representations it would keep customer information private upon request, and that such statements "were untrue or misleading." (ECF No. 101 at ¶ 55.) Vonage moved to dismiss the DTPA claim and argued § 5.6 "informed Plaintiffs that previously unpublished telephone numbers may be listed." (ECF No. 7 at 18.) The Millers now allege Vonage's interpretation of § 5.6 somehow renders the website representation untrue, deceptive or misleading. (*See* Am. Compl. ¶¶ 39, 74, ECF No. 19.) But Vonage's argument in support of its earlier motion is irrelevant. The question is whether the website statement—that "Vonage does not publish or submit entries to phone books or directory assistance (411) listings"—was untrue or misleading when made. Absent some allegation as to how the representation was untrue or confusing when made (rather than merely a description of the services Vonage does and does not offer), this statement cannot serve as the basis of a DTPA claim. The

Millers have provided no such allegation, and therefore count one will also be dismissed.

### C. Negligence

In their initial complaint, the Millers claimed negligence based on an alleged duty on Vonage's part to use reasonable care to protect them from the dissemination of their personal information, as requested by Dr. Miller. (ECF No. 1–1, ¶ 94.) When Vonage moved to dismiss, the Millers responded by citing the general principle under Wisconsin tort law that every person owes a duty of ordinary care to the world at large. The court rejected that argument, however, because Wisconsin courts have held that where an alleged tort is related to a contract, a cause of action in tort requires that "a duty must exist *independently of the performance of the contract.*" *Madison Newspapers, Inc. v. Pinkerton's 1–,* 200 Wis.2d 468, 473, 545 N.W.2d 843 (Wis.Ct.App.1996) (emphasis in original). This court noted that the Millers could identify no such independent duty because "[a]bsent a contract, the inadvertent release of a person's telephone number and address does not give rise to liability under Wisconsin statutory or common law." (ECF No. 17 at 23.) Accordingly, the negligence claims in the initial complaint were dismissed.

**\*6** The Millers' amended complaint includes claims of negligent performance of services and negligent infliction of emotional distress. Each count includes an allegation by the Millers that "Vonage had a duty to perform the contracted services free of negligence...." (ECF No. 19, ¶¶ 105, 116) (citing *Ins. Co. of N. Am. v. Cease Elec. Inc.,* 2004 WI 139, 276 Wis.2d 361, 688 N .W.2d 462). The Millers also allege Vonage had a duty to prevent the publication of the Millers' personal information "as requested by Dr. Miller"; a duty to use reasonable care to correct the wrongful publication once Dr. Miller informed them of it; and a duty to reasonably provide its services "as promised on its website." (ECF No. 19, ¶¶ 106–07, 109, 117–18.)

Vonage has moved to dismiss the new negligence claims for the same reason the initial claims were dismissed. The Millers respond by citing *Cease Electric* and *Colton v. Foulkes,* 259 Wis. 142, 47 N.W.2d 901 (1951). The Millers argue these cases stand for the principle that "[a]ccompanying every contract is a common-law duty to perform with care skill, reasonable expedience, and faithfulness the thing agreed to be done, and a negligent failure to observe any of these conditions is a tort, as well as a breach of the contract." *See Colton,* 259 Wis. at 146, 47 N.W.2d 901. Under this principle,

the Millers argue, they have pleaded viable causes of action for negligence.

Plaintiffs have read *Colton* and *Cease Electric* too broadly. The Wisconsin Supreme Court revisited *Colton* and elaborated on the relationship between contract and tort duties in *Landwehr v. Citizens Trust Co.,* 110 Wis.2d 716, 329 N.W.2d 411 (1983). In *Landwehr,* the court was asked to decide whether a cause of action in negligence arises out of a testator's failure to properly execute his will. In ruling that it did not, the court explicitly rejected the notion that negligence in the performance of a contract can by itself constitute a separate tort:

> Both parties have cited [*Colton* ], as authority for their respective positions. We stated in *Colton* that where there is a general duty, even though it arises from the terms of the contract, the breach of that duty may constitute actionable negligence. The plaintiff in *Colton v. Foulkes* was allowed to proceed on a tort theory even though a cause of action for breach of contract was apparently available. However, the facts in *Colton* are worth noting. In *Colton,* the defendants had contracted with the plaintiff to repair the porch railing on the plaintiff's house. It was alleged in the complaint that the defendants "carelessly and negligently" fastened the railing, that they used "unsuitable and unsafe materials" and that their negligence caused the plaintiff's bodily injuries....

*Id.* at 722. The court explained that in *Colton* it had adopted the rule that "[o]rdinarily, a breach of contract is not a tort, but a contract may create the state of things which furnishes the occasion of a tort." *Id.* (citations omitted). The court then adopted the principle that "there must be a duty existing

independently of the performance of the contract for a cause of action in tort to exist." *Id.* The court explained, citing Prosser: "[t]here will be liability in tort for misperformance of a contract whenever there would be liability for gratuitous performance without the contract—which is to say, whenever such misperformance involves a foreseeable, unreasonable risk of harm to the interest of the plaintiff." *Id.* This principle has been followed by Wisconsin courts since *Landwehr* was decided, including by the court of appeals in *Madison Newspapers,* and the principle was unaffected by *Cease Electric.* That case, as the Millers acknowledge, dealt with the economic loss doctrine and did not affect the *Landwehr* principle discussed above.

**\*7** The Millers have again failed to identify an independent duty that was breached by the inadvertent publication of their phone number and address. They cannot create a common law duty by alleging Vonage should have done the things "as requested by Dr. Miller" (*e.g.,* ECF No. 19 ¶ 106) or "as promised on [Vonage's] website" (*id.* ¶ 108). Thus, *Landwehr* controls, and the Millers' negligence claims will also be dismissed.

**THEREFORE, IT IS HEREBY ORDERED** that Vonage's motion to dismiss is hereby **GRANTED** and each of the claims in the amended complaint are hereby **DISMISSED WITH PREJUDICE.** The Clerk is instructed to enter judgment accordingly.

### All Citations

Not Reported in F.Supp.3d, 2015 WL 59361

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

⚠ Caution

As of: September 28, 2020 1:54 PM Z

## *Padilla v. Costco Wholesale Corp.*

United States District Court for the Northern District of Illinois, Eastern Division

June 21, 2012, Decided; June 21, 2012, Filed

Case No. 11 C 7686

**Reporter**

2012 U.S. Dist. LEXIS 87222 *; 2012 WL 2397012

RAY PADILLA, on behalf of himself and all others similarly situated, Plaintiffs, v. COSTCO WHOLESALE CORP., Defendant.

**Subsequent History:** Dismissed by, in part, Without prejudice *Padilla v. Costco Wholesale Corp., 2013 U.S. Dist. LEXIS 7990 (N.D. Ill., Jan. 16, 2013)*

## Core Terms

Glucosamine, Chondroitin, labeling, deception, Consumer, cartilage, packaging, clinical

**Counsel:** [*1] For Ray Padilla, On Behalf of Himself and All Other Similarly Situated Residents, Plaintiff: Stewart M. Weltman, LEAD ATTORNEY, Dana Marie Pesha, Futterman Howard Ashley Watkins & Weltman, P.C., Chicago, IL; Charles C. Sweedler, Howard J. Sedran, Keith J. Verrier, PRO HAC VICE, Levin, Fishbein, Sedran & Berman, Philadelphia, PA.

For Costco Wholesale Inc, a Washington corporation, Defendant: Kara L McCall, LEAD ATTORNEY, Shelby Kay Feuerbach, Sidley Austin LLP, Chicago, IL; James D. Arden, PRO HAC VICE, Sidley Austin Brown & Wood LLP, New York, NY.

**Judges:** JOHN W. DARRAH, United States District Court Judge.

**Opinion by:** JOHN W. DARRAH

## Opinion

**MEMORANDUM OPINION AND ORDER**

Plaintiff Ray Padilla ("Padilla") filed an Amended Complaint against Costco Wholesale, Inc. ("Costco"), challenging the effectiveness of the dietary supplement glucosamine, which Costco sells in the Kirkland Signature™ Extra Strength Glucosamine HCL line of joint-health dietary supplements. Padilla's Amended Complaint alleges only one count against Costco, a violation of the Illinois Consumer Fraud Act (the "ICFA").

**BACKGROUND**

The following facts are taken from Padilla's Amended Complaint and are accepted as true for purposes of resolving this Motion [*2] to Dismiss. *See Reger Dev., LLC v. Nat'l City Bank, 592 F.3d 759, 763 (7th Cir. 2010)*.

Padilla is a resident of Cook County, IL. (Am. Compl. ¶ 17.) Costco is a Wisconsin corporation. (*Id.* ¶ 18.) This Court has federal jurisdiction pursuant to *28 U.S.C. § 1332*. Costco distributes, markets, and sells the Kirkland Signature™ line of dietary supplements in stores and online. (*Id.* ¶¶ 18-20.) These Kirkland products include Kirkland Signature™ Extra Strength Glucosamine HCL with MSM ("Glucosamine with MSM") and Kirkland Signature™ Extra Strength Glucosamine/Chondroitin Sulfate ("Glucosamine Chondroitin") (together, the "Products"). (*Id.* ¶ 19.) "MSM" refers to Methylsulfonylmethane. (*Id.* ¶ 24.)

The Products convey the message to consumers that the effects of taking these supplements include delivering optimum mobility while protecting and building cartilage. (*Id.* ¶ 21.) Specifically, the Products' packaging and labeling represent that the ingredient glucosamine, an amino sugar, is a "basic building block for cartilage, synovial fluid and other connective tissues, which are needed for healthy structure and function of joints." (*Id.* ¶ 22.) Regarding the ingredient chondroitin sulfate, a complex [*3] carbohydrate, Glucosamine Chondroitin's packaging and labeling represents that it "protects existing cartilage and serves as a building block for healthy new cartilage" and is "clinically proven effective." (*Id.* ¶¶ 3, 23.) MSM, an organic sulfur, which is in Glucosamine with MSM, is represented on the packaging and labeling as "a necessary component that works in conjunction with Glucosamine to provide the building blocks of collagen, an important component of healthy joints and connective tissue. Clinical research shows MSM increases glucosamine's effectiveness." [1] (*Id.* ¶ 24.)

Padilla alleges that although the packaging and labeling of the Products make claims as to the effectiveness, "numerous clinical [*4] cause and effect studies have found no causative link between MSM supplementation and joint renewal or rejuvenation or the relief of the two major symptoms of arthritis." (*Id.* ¶ 25.) Additionally, Padilla alleges that the Products are not an effective remedy for the symptoms of arthritis and other joint-related ailments. (*Id.* ¶ 5.) Symptoms of osteoarthritis, a degenerative joint tissue disease, include cartilage damage and limited motion. (*Id.* ¶ 1.) Padilla alleges that the Products promise relief for the two symptoms of osteoarthritis. (*Id.*)

In March 2011, after reading each side of the products label, Padilla purchased Glucosamine with MSM for approximately twenty-five dollars from a Costco in Chicago, Illinois. (*Id.* ¶ 17.)

## LEGAL STANDARD

A motion under *Rule 12(b)(6)* challenges the sufficiency of the complaint. *Christensen v. Cnty. of Boone, 483 F.3d 454, 458 (7th Cir. 2007).* Under the federal notice pleading standards, "a plaintiff's complaint need only provide a short and plain statement of the claim showing that the pleader is entitled to relief, sufficient to provide the defendant with fair notice of the claim and its basis." *Tamayo v. Blagojevich, 526 F.3d 1074, 1081 (7th Cir. 2008)* [*5] (internal quotations omitted). When considering a motion to dismiss under *Rule 12(b)(6)*, the complaint is construed in the light most favorable to the plaintiff; all well-pleaded factual allegations are accepted as true, and all reasonable inferences are construed in the plaintiff's favor. *Id.* However, a complaint must allege "enough facts to state a claim to relief that is plausible on its face" to survive a motion to dismiss. *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 547, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)* (*Twombly*). For a claim to have facial plausibility, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).* Thus, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Further, the amount of factual allegations required to state a plausible claim for relief depends on the complexity of the legal theory alleged. *Limestone Dev. Corp. v. Vill. of Lemont, 520 F.3d 797, 803 (7th Cir. 2008).*

## ANALYSIS

In Count I, Padilla alleges that Costco sold Kirkland products, specifically Glucosamine Chondroitin and [*6] Glucosamine with MSM, with product labels and/or packaging containing deceptive misrepresentations and omissions in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"). [2] (Am. Compl. ¶¶ 43-55.)

The ICFA provides a cause of action for "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact." *815 ILCS 505/2.* To state a claim under the ICFA, the plaintiff must allege: "(1) a deceptive act or practice

---

[1] Using an asterisk, the label ties the phrase "Clinically Proven Effective" to a statement that that the most recent evidence of the benefits of this formula comes from a landmark NIH-sponsored study." (*See* Dkt. No. 19, Ex. B.) Costco notes that in this study, a daily dose of 1500 mg glucosamine combined with 1200 mg chondroitin sulfate — the amounts contained in Glucosamine Chondroitin — was found to provide statistically significant relief to arthritis patients with moderate-to-severe pain.

[2] Padilla incorrectly cites the ICFA statute as *815 Ill. Comp. Stat. 502/1.* (Am. Compl. ¶ 44.)

by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage to the plaintiff (5) proximately caused by the deception." *Oliveira v. Amoco Oil Co., 201 Ill. 2d 134, 776 N.E.2d 151, 160, 267 Ill. Dec. 14 (Ill. 2002)*.

Padilla fails to state an ICFA claim as to Glucosamine Chondroitin. To bring an ICFA claim, a plaintiff must either allege it was a consumer of the defendant or allege a nexus with [*7] Illinois consumers. *See Gold v. Golden G.T., LLC, No. 05 C 228, 2005 U.S. Dist. LEXIS 22691, 2005 WL 2465815, at *4 (N.D. Ill. Oct. 4, 2005)*. The ICFA defines "consumer" as "any person *who purchases or contracts for the purchase* of merchandise not for resale in the ordinary course of trade or business but for his use or that of a member of his household." *815 ILCS 505/1(e)* (emphasis added). Padilla concedes that he has not alleged that he *purchased* Glucosamine Chondroitin. Therefore, Padilla has not sustained any actual damage.

In response, Padilla argues that whether he is "entitled to represent purchasers of Glucosamine Chondroitin does not turn on Plaintiffs' standing to sue Costco . . . but rather, on whether, under *Rule 23(a)*, his claims are common and typical of purchasers of all of Costco's Products." (Resp. at 5.) Padilla's reliance upon *Payton v. County of Kane, 308 F.3d 673 (7th Cir. 2002)* (*Payton*), is not persuasive. In *Payton*, the plaintiffs raised a challenge to the facial constitutionality of an Illinois state law that permitted counties to impose a bail fee above and beyond the set bail amount. *Id. at 675*. The named plaintiffs had individual claims against only two of the nineteen defendant counties. [*8] *Id.* The Court of Appeals allowed the named plaintiffs to sue all nineteen defendants, reasoning that "the constitutionality of a bond fee (whether it is $1 or $45) should not differ from one county to the next, when such fee is imposed pursuant to the same statute." *Id. at 679-80*.

Importantly, in *Payton*, the Seventh Circuit cautioned:

> This is not a case where the named plaintiff is trying to piggy-back on the injuries of the unnamed class members. That, of course, would be impermissible, in light of the fact that a named plaintiff cannot acquire standing to sue by bringing his action on behalf of others who suffered injury which would have afforded them standing had they been named plaintiffs; it bears repeating that a person cannot

predicate standing on injury which he does not share. Standing cannot be acquired through the back door of a class action.

*Id. at 682* (internal citation and quotation omitted).

In this case, by contrast, Padilla's ICFA misrepresentation claim relates to two different products that have different product formulations and labels, one of which he never purchased. Padilla cannot use the class-action device to "predicate standing on injury which he does not share" [*9] with respect to Glucosamine Chondroitin. Therefore, Costco's Motion to Dismiss is granted without prejudice with respect to Padilla's ICFA claim that is based on the Glucosamine Chondroitin product.

As to Padilla's ICFA claim based on Glucosamine with MSM, Padilla also fails to plausibly allege that he has suffered actual damages from taking Glucosamine with MSM. Padilla alleges only that: "Defendant misrepresented and deceptively concealed, suppressed and/or omitted the material information known to Defendant as set forth above concerning its Kirkland Glucosamine products which has caused damage and injury to Plaintiff and the class." (Am. Compl. ¶ 51.) Padilla fails to include any allegations that the product did not work for him. Therefore, Padilla's ICFA claim as to Glucosamine with MSM also fails.

In addition, Costco argues that it fails to satisfy *Federal Rule of Civil Procedure 9(b)*. The parties agree that Padilla's ICFA claim, because it is based on fraud, is subject to the heightened-pleading requirement of *Rule 9(b)*. *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co., 631 F.3d 436, 446 (7th Cir. 2011)* (explaining that although *Rule 8* governs ICFA claims [*10] premised on "an unfair practice," *Rule 9(b)* applies to ICFA claims based on fraudulent activity). "Under the heightened federal pleading standard of *Rule 9(b) of the Federal Rules of Civil Procedure*, a plaintiff 'alleging fraud . . . must state with particularity the circumstances constituting fraud.'" *Wigod v. Wells Fargo Bank, N.A., 673 F.3d 547, 569 (7th Cir. 2012)* (citing *Borsellino v. Goldman Sachs Group, Inc., 477 F.3d 502, 507 (7th Cir. 2007))*. *Rule 9(b)* "particularity" means "the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990)*.

Padilla alleges only "numerous clinical studies" have shown that the Products are not efficacious and that

"scientific evidence" shows that the "Products do not work." Costco argues that these allegations fail to satisfy *Rule 9(b)* because they do not allege *how* Costco's representations were fraudulent. Padilla responds that it is not required to identify, discuss, or attach studies that he refers to in the Amended Complaint.

But because Padilla is subject to *Rule 9(b)*, some level of detail of the fraud beyond what he has pled is required. Padilla fails to allege "how" [*11] Costco's product labels were fraudulent. Padilla repeatedly alleges that "numerous" clinical studies do not show that Kirkland Glucosamine products help "*joint renewal and rejuvenation.*"

However, Padilla does not allege that the Glucosamine with MSM label contains any references to "joint renewal or rejuvenation." Padilla fails to allege the precise wording of Glucosamine with MSM's label but alleges that it is "similar" to the labeling of Glucosamine Chondroitin, which states that it "nourishes joint and connective tissue" and "supports joint cushioning." (Am. Compl. ¶ 2.) Padilla further alleges that Glucosamine with MSM states, "noticeable improvement in flexibility and range of motion should be expected after taking this supplement as directed on a consistent basis." (*Id.* ¶ 3.) Thus, Padilla's fraud allegations fail to satisfy the level of particularity required by *Rule 9(b)*. Costco's Motion to Dismiss is also granted without prejudice with respect to Padilla's ICFA claim that is based on the Glucosamine with MSM product.

**CONCLUSION**

For the reasons set forth above, Costco's Motion to Dismiss is granted without prejudice. Padilla may file an Amended Complaint, if he can do so consistent [*12] with the requirements of *Federal Rule of Civil Procedure 11*, within thirty days of the date of this Order.

Date: June 21, 2012

/s/ John W. Darrah

JOHN W. DARRAH

United States District Court Judge

⚠ Caution
As of: September 28, 2020 1:55 PM Z

# *Pearson v. Target Corp.*

United States District Court for the Northern District of Illinois

November 9, 2012, Decided; November 9, 2012, Filed

11 CV 7972

**Reporter**
2012 U.S. Dist. LEXIS 187208 *; 2012 WL 7761986

PEARSON v. TARGET CORPORATION

**Subsequent History:** Costs and fees proceeding at, Settled by, Motion granted by *Pearson v. NBTY, Inc., 2014 U.S. Dist. LEXIS 357 (N.D. Ill., Jan. 3, 2014)*

## Core Terms

labeling, deception, clinical, disclaimer, packaging, ineffective, beneficial, disease, ingredients—Glucosamine, osteoarthritis—which, joint-health, symptoms, dietary, cure

**Counsel:** [*1] For Nick Pearson, Plaintiff: Charles C. Sweedler, PRO HAC VICE, Howard J. Sedran, Levin, Fishbein, Sedran & Berman, Philadelphia, PA; Stewart M. Weltman, Levin Fishbein Sedran & Berman, Chicago, IL.

For Target Corporation, Defendant: Bradley Joseph Andreozzi, LEAD ATTORNEY, Benjamin Todd Vinson, David B. Sudzus, Justin O'Neill Kay, Drinker Biddle & Reath LLP, Chicago, IL; Kara L McCall, LEAD ATTORNEY, Shelby Kay Feuerbach, Sidley Austin LLP, Chicago, IL.

**Judges:** James B. Zagel, Magistrate Judge.

**Opinion by:** James B. Zagel

## Opinion

### STATEMENT

On June 14, 2012, Plaintiff filed a one-count First Amended Complaint alleging that Defendant violated the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") by selling and distributing a joint-health dietary supplement that Defendant knew to be ineffective. Before the Court is Defendant's motion to dismiss based on lack of standing and failure to state a claim under *Fed. R. Civ. P. 9(b)*. For the following reasons Defendant's motion to dismiss is GRANTED in part and DENIED in part.

Background

The following facts are taken from Plaintiff's First Amended Complaint and are accepted as true for purposes of this motion.

Defendant markets, sells, and distributes a line [*2] of joint-health dietary supplements called "Up & Up Glucosamine." Within this line are two separate products. The first is Triple Strength Glucosamine Chondroitin plus MSM ("Up & Up Triple Strength"). The second is Advanced Glucosamine Chondroitin Complex ("Up & Up Advanced"). The labeling of both products makes similar representations as to the beneficial effect the product has on joint health. For example, both products' labeling states that the supplement helps to "maintain the structural integrity of joints." The Up & Up Advanced label also states that it will "help rebuild cartilage" and "lubricate joints." The Up & Up Triple Strength label states that the supplement "supports mobility and flexibility."

In or around June 2011, Plaintiff decided to purchase a bottle of Up & Up Triple Strength based on the representations made on the product's labeling. Plaintiff used the product as directed but did not experience any of the beneficial effects represented on its packaging. Subsequently, Plaintiff became aware of several clinical studies that suggested the active ingredients in the supplement, Glucosamine and Chondroitin, are ineffective in relieving symptoms of or actually curing [*3] joint-related ailments. Plaintiff alleges that, had he known that Defendant's representations about Glucosamine and Chondroitin were false, he would not have purchased Up & Up Triple Strength. He claims he has therefore suffered injury through loss of the money he spent on the product.

Analysis

To state a claim under the ICFA, the Plaintiff must allege: "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the Plaintiff rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damages to the plaintiff (5) proximately caused by the deception." *Oliveira v. Amoco Oil Co., 201 Ill.2d 134, 776 N.E.2d 151, 267 Ill. Dec. 14 (Ill. 2002)*.

Before addressing the adequacy of the complaint, I turn to Defendant's standing argument. Defendant argues that Plaintiff lacks both ICFA and Article III standing to bring a claim based on representations made on the Up & Up Advanced labeling because he did not purchase that product. I agree. Plaintiff is mixing up the concept standing with *Rule 23* class representation in the exact same way as was recently discussed by this Court in *Padilla v. Costco Wholesale Corp., No. 11-7686, 2012 U.S. Dist. LEXIS 87222, 2012 WL 2397012 (N.D. Ill. June 21, 2012)*. [*4] Plaintiff himself admits that the injury in ICFA cases stems from the loss of money associated with the purchase—how could he possibly have been injured by representations made on a product he did not buy? Defendant's motion to dismiss claims based on misleading representations made on the Up & Up Advanced labeling is granted.

The claim survives as it relates to Up & Up Triple Strength. Unlike in *Padilla,* Plaintiff has satisfied the heightened pleading standards of Fed. R. Civ. P. by pointing to specific clinical studies (¶¶ 22-29) and alleging with particularity how the results of these studies refute specific representations made on Up & Up Triple Strength's packaging. Plaintiff has also

adequately alleged actual damages by claiming that he 1) purchased the product, and 2) would not have purchased the product had he known the representations contained on its packing were untrue.

Defendant argues that Plaintiff's claim should nevertheless be dismissed because 1) Up & Up Triple Strength's packaging does not contain any representation that its purported effects have been clinically proven; 2) the packaging contains a disclaimer which states that the product is "not intended to diagnose, [*5] treat, cure, or prevent any disease"; and 3) the studies Plaintiff points to did not examine the product at issue here. I reject these arguments. First, Plaintiff is not claiming that Defendant wrongfully represented that its product had been clinically tested. He is simply arguing that Defendant made representations about the effect of its product that it knew to be false. Under Defendant's interpretation of the law, it would be free to go out and make knowingly false representations about its products so long as it never falsely claimed that these representations were backed up by clinical testing. That is an absurd result that the Illinois legislature did not intend.

Second, the disclaimer is ineffective here. If all of the aches, pains and other conditions that Up & Up Triple Strength claims to ameliorate are necessarily associated with osteoarthritis—which is effectively what Defendant argues—then the disclaimer is contradicted by the product's representations, which reflect that it can in fact be used to treat symptoms of the disease. If these conditions are not necessarily associated with osteoarthritis (or any other disease), the disclaimer is inapplicable.

Third, whether or [*6] not the proffered studies are applicable to Up & Up Triple Strength is a question of fact that I do not decide at this stage. The fact that these studies looked at products that shared the same active ingredients—Glucosamine, Chondroitin, and MSM—makes Plaintiff's claim facially plausible. That is where my inquiry ends for purposes of this motion. I do not pause to consider what proof may be required to show that Plaintiff did not experience any of the beneficial effects represented.

Conclusion

For the foregoing reasons, Defendant's motion to dismiss is GRANTED in part and DENIED in part.

**End of Document**

## *Tarzian v. Kraft Heinz Foods Co.*

United States District Court for the Northern District of Illinois, Eastern Division

October 10, 2019, Decided

18 C 7148

**Reporter**

2019 U.S. Dist. LEXIS 175670 *; 2019 WL 5064732

KATRINA TARZIAN and SENIA HARDWICK, individually and on behalf of all others similarly situated, Plaintiffs, v. KRAFT HEINZ FOODS COMPANY, Defendant.

**Subsequent History:** The Name of this Case has been Corrected by the Court October 14, 2019.

## Core Terms

citric, acid, deceptive, misrepresentation, injunctive, nonresident, artificial, misleading, consumer

**Counsel:** [*1] For Katrina Tarzian, on behalf of themselves and others similarly situated, Senia Hardwick, on behalf of themselves and others similarly situated, Plaintiffs: C.K. Lee, Lee Litigation Group, PLLC, Chicago, IL.

For Kraft Heinz Food Company, Defendant: Kara L McCall, Daniel Adam Spira, LEAD ATTORNEYS, Sidley Austin LLP (Chicago), Chicago, IL.

**Judges:** Charles P. Kocoras, United States District Judge.

**Opinion by:** Charles P. Kocoras

## Opinion

**MEMORANDUM OPINION**

**CHARLES P. KOCORAS, District Judge:**

Before the Court is Defendant Kraft Heinz Foods Company's ("Kraft") motion to dismiss Plaintiffs Katrina Tarzian and Senia Hardwicks' (collectively, "Plaintiffs") class-action complaint under *Federal Rule of Civil Procedure 12(b)(6)*. For the following reasons, the Court grants the motion.

## BACKGROUND

For purposes of this motion, the Court accepts as true the following facts from the amended complaint. *Murphy v. Walker, 51 F.3d 714, 717 (7th Cir. 1995)*. All reasonable inferences are drawn in Plaintiffs' favor. *Tamayo v. Blagojevich, 526 F.3d 1074, 1081 (7th Cir. 2008)*.

Kraft is a limited-liability company organized under the laws of Pennsylvania with its principal places of business in Pittsburg and Chicago. It is a large-scale food manufacturer that markets to all states, including Illinois and New York. Kraft produces "Capri Sun" beverages in a wide variety of flavors. Plaintiff [*2] Katrina Tarzian ("Tarzian") is an Illinois citizen and a resident of Cook County. Plaintiff Senia Hardwick ("Hardwick") is a citizen of New York State and a resident of Queens County.

Plaintiffs Tarzian and Hardwick both purchased 10-packs of Capri Sun beverages bearing a label stating the products contain "no artificial preservatives." Plaintiffs allege these claims are "deceptive and

misleading," as Capri Sun beverages contain citric acid, a preservative alleged to be artificially produced on an industrial scale.

Specifically, Plaintiffs allege that citric acid can be produced in several ways. Until the early 1900s, citric acid was mainly produced by extraction from fresh fruits, such as lemons and limes. In 1917, researcher James Currie discovered that citric acid could be produced by "cultivating Aspergillus Niger and allowing it to metabolize sucrose or glucose to yield citric acid." Plaintiffs do not specifically allege that Kraft uses citric acid produced through Aspergillus Niger fermentation; rather, they allege that it is more economically viable to produce citric acid for industrial use through this fermentation process. They further allege that Capri Sun contains industrially [*3] produced citric acid.

As a result of Kraft's allegedly misleading labeling, Plaintiffs allege that they sustained an injury by being denied the benefit of their bargain. They assert that they would not have purchased the Capri Sun beverages had they known that the drinks contained citric acid.

Based on these allegations, Plaintiffs filed their first amended class action complaint on March 03, 2019. Count I asserts violations of the *Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA")* and seeks monetary damages and injunctive relief on behalf of a nationwide class ("nonresident Plaintiffs").[1] *815 ILCS §§ 505/1 et seq.* Count II asserts violations of New York's Deceptive and Unfair Trade Practices Act and seeks injunctive relief on behalf of a New York class under New York's General Business Law ("NY GBL") *§*

349. Count III asserts violations of New York's False Advertising Law and seeks monetary damages on behalf of the New York class and Plaintiff Hardwick. On March 21, 2019, Defendants moved to dismiss all three counts under *Federal Rule of Civil Procedure 12(b)(6)*.

## LEGAL STANDARD

A motion to dismiss under *Federal Rule of Civil Procedure 12(b)(6)* "tests the sufficiency of the complaint, not the merits of the case." *McReynolds v. Merrill Lynch & Co., 694 F.3d 873, 878 (7th Cir. 2012)*. The allegations in the complaint [*4] must set forth a "short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)(2)*. Plaintiffs need not provide detailed factual allegations but must provide enough factual support to raise their right to relief above a speculative level. *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*.

A claim must be facially plausible, meaning that the pleadings must "allow . . . the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*. A complaint that contains factual allegations that are "merely consistent with a defendant's liability . . . stops short of the line between possibility and plausibility of entitlement to relief." *Id. at 677* (internal quotations omitted). The claim must be described "in sufficient detail to give the defendant 'fair notice of what the . . . claim is and the grounds upon which it rests.'" *E.E.O.C. v. Concentra Health Servs., Inc., 496 F.3d 773, 776 (7th Cir. 2007)* (quoting *Twombly, 550 U.S. at 555*). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient to withstand a 12(b)(6) motion to dismiss. *Iqbal, 556 U.S. at 678*.

A party "must state with particularity the circumstances constituting fraud." *Fed. R. Civ.P. 9(b)*. That fraud must be pled with particularity "ensures that plaintiffs do their homework before filing suit and protects [*5] defendants from baseless suits that tarnish reputations." *Pirelli Armstrong Tire Corp. Retiree Med. Ben. Trust v. Walgreen Co., 631 F.3d 436, 439 (7th Cir. 2011)*. The requirement is not rigid, and what must be alleged will vary depending on the facts of the case. *Id. at 442*. The heightened pleading standard applies to all *allegations* of fraud (such as a misrepresentation), not merely *claims* labeled fraud. *Id. at 447*.

---

[1] Count I asserts claims only on behalf of a nationwide class. Although Plaintiff Tarzian is named in the complaint, there are no counts asserting claims on her behalf or on behalf of any other Illinois plaintiff. *Compare Count I with Counts II & III* (asserting claims on behalf of Plaintiff Hardwick individually, as well as on behalf of members of the New York class). To the extent Plaintiffs attempt to assert claims under the laws of the 50 other states, they fail to state a cognizable claim. Plaintiffs' empty assertion that the laws of other states are substantively like Illinois law is insufficient to meet the pleading standards for fraud claims. *Spector v. Mondelez Int'l Inc., 178 F. Supp. 3d 657, 664-65 (N.D. Ill. 2016)* ("A complaint alleging a violation of consumer fraud must be plead with . . . particularity and specificity."). The Seventh Circuit has made clear that actions such as the one plaintiff proposes are disfavored. *In re Bridgestone/Firestone, Inc., 288 F.3d 1012, 1015 (7th Cir. 2002)* ("No class action is proper unless all litigants are governed by the same legal rules.")

## DISCUSSION

Kraft urges the Court to dismiss Plaintiffs' class-action complaint for three reasons. First, Kraft argues that the ICFA does not apply to Plaintiffs injured outside of Illinois. Second, Kraft argues Plaintiffs lack standing to seek injunctive relief for their claims. Third, Kraft argues Plaintiffs have failed to allege an actionable misrepresentation. The Court addresses each argument in turn.

### I. Claims Under the Illinois Consumer Fraud Act

Kraft argues that nonresident Plaintiffs have no standing to assert claims under the ICFA. They contend that Capri Sun purchases by out-of-state putative class members have no connection to Illinois, and the fact that one of Kraft's two headquarters is in Illinois is insufficient to confer ICFA standing on nonresident Plaintiffs. Plaintiffs concede that several factors weigh against the ICFA reaching their claims, but argue that Illinois is the [*6] location of Kraft's headquarters, it is where the deceptive claims were made, and the complaints and profits ensuing from the misrepresentation flowed back to Illinois. Plaintiffs assert that this is sufficient for the ICFA to reach their claims. Kraft replies that the complaint contains no factual allegations supporting Plaintiffs' argument about the flow of complaints and profits ensuing from the misrepresentation. The Court agrees with Kraft.

Illinois statutes usually have limited territorial reach. The ICFA is no exception, and it does not "apply to fraudulent transactions which take place outside Illinois." *Avery v. State Farm Mut. Auto. Ins. Co., 216 Ill. 2d 100, 835 N.E.2d 801, 853, 296 Ill. Dec. 448 (Ill. 2005).* In *Avery,* the Supreme Court of Illinois considered whether the ICFA applied to an insurance fraud claim based on alleged misrepresentations made by an Illinois insurer in four separate documents that the plaintiffs received at various times and locations throughout their course of dealings with the defendant. *Avery, 835 N.E.2d at 853.* The *Avery* court acknowledged that "it can be difficult to identify the situs of a consumer transaction when . . . the transaction is made up of components that occur in more than one state." *Id.* In such cases, the *Avery* court instructed courts to consider "[t]he place [*7] of injury or deception," among other factors, to decide whether "the circumstances relating to the transaction occur primarily and substantially" in Illinois. *Id. at 854.* Accordingly, a nonresident plaintiff has standing under the ICFA where

"the circumstances that relate to the disputed transaction," including the place of injury or deception, "occur[ed] primarily and substantially in Illinois.'" *Crichton v. Golden Rule Ins. Co., 576 F.3d 392, 396 (7th Cir. 2009)* (quoting *Avery, 835 N.E.2d at 853-54*).

When determining whether a nonresident plaintiff may bring an ICFA claim, courts engage in a highly fact-bound inquiry that considers several factors including: (1) the plaintiff's residence; (2) the defendant's place of business; (3) the location of the relevant item that is the subject of the disputed transaction; (4) the location of the Plaintiff's contacts with the defendant; (5) where the allegedly deceptive statements were made; (6) where payments for services were to be sent; and (7) where complaints about the goods or services were to be directed. *See Crichton, 576 F.3d at 396; see also Clearing Corp. v. Fin. & Energy Exch., Ltd., 2010 U.S. Dist. LEXIS 72429, 2010 WL 2836717, *6 (N.D. Ill. 2010)* (citing *Avery, 296 Ill.Dec. 448, 835 N.E.2d at 854-855*); *Haught v. Motorola Mobility, Inc., 2012 U.S. Dist. LEXIS 119575, 2012 WL 3643831, at *3 (N.D. Ill. 2012).*

Unlike *Avery* where the defendant made the alleged misrepresentations throughout its course of dealing with plaintiffs, the misrepresentations alleged here were made on product labels during straightforward retail [*8] purchases across the nation. Plaintiffs argue that the deception occurred in Illinois because the scheme allegedly originated here. This allegation is insufficient to show that the misrepresentation occurred in Illinois. *Haught, 2012 U.S. Dist. LEXIS 119575, 2012 WL 3643831 at *4* (finding the fact that scheme allegedly "emanated" from Illinois was insufficient to allow ICFA claims by nonresident) (internal citations omitted). Moreover, Kraft correctly points out that the complaint does not contain any allegations to support Plaintiffs' argument that profits or complaints that ensued from the alleged misrepresentation flowed back to Illinois. As such, the Court finds that Plaintiffs failed to allege that the situs of the transactions at issue occurred "primarily and substantially" in Illinois. *Avery, 835 N.E.2d at 853.* Accordingly, the Court will dismiss Count I on behalf of the nonresident Plaintiffs for lack of standing under the ICFA.

### II. Injunctive Relief Under *Section 349 of the NY GBL*

Kraft argues that Plaintiffs do not have standing to seek injunctive relief because they already know that Capri Sun contains citric acid and they are, therefore, unlikely to be harmed again. Plaintiffs respond that if Kraft were

correct, consumer protection statutes such as the ICFA could never be invoked [*9] to enjoin deceptive practices because a complaining consumer's standing would dissipate the moment she discovers the alleged deception. The Court agrees with Kraft.

To establish standing to seek injunctive relief, Plaintiffs must allege not only "past exposure to illegal conduct" but also that such conduct is accompanied either by "continuing, present adverse effects," *O'Shea v. Littleton, 414 U.S. 488, 494, 94 S. Ct. 669, 38 L. Ed. 2d 674 (1974)*, or, more relevant to this case, "a sufficient likelihood that [plaintiff] will again be wronged in a similar way," *City of Los Angeles v. Lyons, 461 U.S. 95, 111, 103 S. Ct. 1660, 75 L. Ed. 2d 675 (1983)*. The Seventh Circuit has held that a plaintiff who merely alleges past harm by a deceptive sales practice faces no real and immediate threat that the same practice will deceive him after he becomes aware of the deception, and he is therefore not entitled to pursue injunctive relief. *See Camasta v. Jos. A. Bank Clothiers, Inc., 761 F.3d 732, 734-35 (7th Cir. 2014)*; *see also In re Herbal Supplements Mktg. & Sales Practices Litig., 2017 U.S. Dist. LEXIS 76207, 2017 WL 2215025, at *8 (N.D. Ill. 2017)*; *Ulrich v. Probalance, Inc., 2017 U.S. Dist. LEXIS 132202, 2017 WL 3581183, at *7 (N.D. Ill. 2017)* (citing *Lyons, 461 U.S. at 102*).

Courts in this district have interpreted *Camasta* to allow plaintiffs standing to seek injunctive relief where it is plausible that the plaintiff will purchase the product again. *See, e.g., Curran v. Bayer Healthcare LLC, 2019 U.S. Dist. LEXIS 15362, 2019 WL 398685, at *5 (N.D. Ill. 2019)* (finding plaintiff alleged future harm sufficiently by expressing continued desire to purchase product if assured correct SPF rating is stated on packaging). But where the complaint failed to allege that the plaintiffs [*10] were likely to repurchase the products, courts concluded that plaintiffs had no standing to seek injunctive relief. *See, e.g., Bohn v. Boiron, Inc., 2013 U.S. Dist. LEXIS 107928, *711 (N.D. Ill. 2013)* (finding plaintiff did not have standing where she alleged that she "would not have purchased Defendants' Product" had she known the truth about its misrepresentations); *Mednick v. Precor, Inc., U.S. Dist. LEXIS 132038, 2016 WL 5390955, at *9 (N.D. Ill. 2016)* ("While it is desirable that Precor's prospective customers not be deceived by the company's allegedly false advertising, the named Plaintiffs 'cannot rely on the prospect that other consumers may be deceived' to boost their own standing.").

The complaint, in this case, alleges that "Plaintiffs and Class members did not know, and had no reason to know, that the Products were misbranded and misleading as set forth herein, *and would not have bought the Products had they known the truth about them.*" 1:18-cv-07148, Dkt. 22 at ¶ 53 (emphasis added). Given this allegation, the Court finds it implausible that the Plaintiffs would again purchase the products at issue here. Thus, Plaintiffs have not alleged "a sufficient likelihood that [they] will again be wronged in a similar way," *Lyons, 461 U.S. at 111 (1983)*. The Court accordingly will dismiss Count II for lack of standing to seek injunctive relief.

### III. *NY GBL § 350* and Common-Law Fraud

New [*11] York's General Business Law ("NY GBL") *§ 350* states that "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful." To state a claim under the *NY GBL § 350*, a plaintiff must allege that defendant engaged in "(1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Orlander v. Staples, Inc., 802 F.3d 289, 300 (2d Cir. 2015)*. Similarly, to state a claim for common-law fraud plaintiff must allege facts showing defendant made "(1) material representations of past or existing fact, (2) that were false, (3) made with knowledge of their falsity or in regardless disregard thereof, (4) and justifiably and detrimentally relied on by the Plaintiffs." *Clark v. Integrity Financial Group, Inc., 2002 U.S. Dist. LEXIS 14708 (S.D. Ind. June 25, 2002)*.

Plaintiffs allege that Capri Sun contains industrially manufactured citric acid, and industrial citric acid is artificial because it is usually produced through the industrial fermentation process. Kraft argues Plaintiffs' insufficiently allege that Kraft's statements that Capri Sun contains "no artificial preservatives" are false or misleading. Kraft contends these allegations are insufficient to link fermented citric acid to that [*12] used in Capri Sun. The Court agrees.

Plaintiffs' allegations detail the practices commonly used to manufacture citric acid throughout the industry before concluding: "Thus, Defendant's citric acid is artificial." That is too great of an inferential leap. To satisfy the pleading standards, Plaintiffs need to draw a connection between the common industry practice and the actual practice used by Kraft. Even drawing all reasonable inferences in the Plaintiffs' favor, the complaint fails to draw this nexus, and the Court cannot draw it for

Plaintiffs. Because Plaintiffs' allegations do not link the allegedly artificial citric acid to the actual citric acid used by Kraft, Plaintiffs have failed to allege sufficient facts showing that Kraft's "no artificial preservatives" statement was false. Therefore, the Court will dismiss Counts III and IV.

**CONCLUSION**

For the reasons mentioned above, the Court grants the Defendants' motion to dismiss. It is so ordered.

Dated: 10/10/2019

/s/ Charles P. Kocoras

Charles P. Kocoras

United States District Judge

**End of Document**

Ulrich v. Probalance, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 3581183, 75571UC1 Ree p. Srv. d26, CT

KeyCite Yellow Flag - Negative Treatment

Distinguished by Curran v. Bayer Healthcare LLC, N.D.Ill., January 31, 2019

2017 WL 3581183
United States District Court,
N.D. Illinois, Eastern Division.

John M. ULRICH, Plaintiff,

v.

PROBALANCE, INC., Defendant.

No. 16 C 10488
|
Signed 08/18/2017

**Attorneys and Law Firms**

Brian J. Wanca, Jeffrey Alan Berman, Patrick J. Solberg, Anderson & Wanca, Rolling Meadows, IL, Nick Suciu, III, Barbat, Mansour & Suciu PLLC, Detroit, MI, for Plaintiff.

Ryan Mathew Kaiser, Sanjay Satish Karnik, Amin Talati & Upadhye, LLC, Chicago, IL, for Defendant.


**MEMORANDUM OPINION AND ORDER**

HON. JORGE ALONSO, United States District Judge

**\*1** Plaintiff John M. Ulrich has filed a class action complaint, in which he alleges violations of state consumer fraud acts, breach of express warranty, and unjust enrichment. Defendant Probalance, Inc. ("Probalance") has moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6). For the reasons set forth below, Probalance's motion to dismiss is granted in part and denied in part.


**BACKGROUND**

Probalance, a Florida corporation, is a "health and fitness company that sells various liquid protein products." (Compl., ¶ 11, ECF No. 1.) Probalance's protein drinks, or "dietary supplements," include Probalance Protein Shot, Probalance Protein Shot Plus Energy, Probalance Protein Shot XL, and Probalance Protein Water ("the Products"). (Id. ¶¶ 1, 24.)

Plaintiff alleges in his complaint that on October 10, 2016, he "purchased four bottles of the Product from CVS/Pharmacy for $2.67 each, plus tax," without specifying which of the four Products he purchased. (Id. ¶ 10.)[1] The front labels of all of the Products prominently display the number of grams of protein contained in each bottle. The back labels show the same protein content figures, as well as, in some cases, the percent daily reference value ("DRV") of protein that each bottle contains.

The gravamen of the complaint rests on plaintiff's allegations that Probalance's products are misleadingly labeled with respect to their protein content. Plaintiff alleges that the protein in Probalance's products is a blend of "predominant[ly]" low-quality "collagen protein isolate" and a smaller amount of higher-quality proteins such as whey and casein. (Id. ¶ 15.) Because collagen protein is less digestible, plaintiff alleges, it is as if Probalance's products contain less protein than Probalance claims on its labels.

Under certain circumstances (which the Court will discuss more fully below), federal regulations require manufacturers such as Probalance to use a testing methodology known as the Protein Digestibility Corrected Amino Acid Score ("PDCAAS") to calculate a "corrected amount of protein" per serving for purposes of labeling their products. Under PDCAAS testing, the subject protein "is compared to a standard amino acid profile" and receives a score between 0 and 1.0, with a score of 1.0 indicating "maximum amino acid digestibility." (Id. ¶ 26.) According to plaintiff, common protein supplements such as whey and casein receive scores of 1.0, but "meat and soybeans (0.9), vegetables and other legumes (0.7), and whole wheat and peanuts (0.25-0.55) all provide diminished protein digestibility." (Id.) Collagen protein isolate, plaintiff alleges, has a PDCAAS of 0. (Id. ¶ 29.) Thus, according to plaintiff, the statements that Probalance makes on the Product labels concerning the amount of protein in the Products are misleading because at least some of the protein is virtually indigestible.

**\*2** Plaintiff's complaint contains four counts: Count I, violation of state consumer fraud acts (on behalf of a multi-state class); Count II, violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") (on behalf of an Illinois subclass, in the alternative to Count I); Count III, breach of express warranty (on behalf of a national class); and Count IV, unjust enrichment (in the alternative to Count III).

## DISCUSSION

### I. LEGAL STANDARDS

"A motion under Rule 12(b)(6) tests whether the complaint states a claim on which relief may be granted." *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012). Under Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The short and plain statement under Rule 8(a)(2) must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (ellipsis omitted).

Under federal notice-pleading standards, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* Stated differently, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955). "In reviewing the sufficiency of a complaint under the plausibility standard, [courts must] accept the well-pleaded facts in the complaint as true, but [they] 'need[ ] not accept as true legal conclusions, or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements.' " *Alam v. Miller Brewing Co.*, 709 F.3d 662, 665-66 (7th Cir. 2013) (quoting *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009)).

"Federal Rule of Civil Procedure 12(b)(1) authorizes the Court to dismiss any claim for which the Court lacks subject-matter jurisdiction, such as lack of standing." *Bohn v. Boiron, Inc.*, No. 11 C 8704, 2013 WL 3975126, at *2 (N.D. Ill. Aug. 1, 2013). Where a defendant seeks dismissal under Rule 12(b)(1) because the complaint lacks sufficient allegations to establish standing, courts should evaluate the sufficiency of the allegations by "us[ing] *Twombly–Iqbal's* 'plausibility' requirement, which is the same standard used to evaluate facial challenges to claims under Rule 12(b)(6)." *Silha v. ACT, Inc.*, 807 F.3d 169, 174 (7th Cir. 2015).

A plaintiff alleging fraud must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To do so, the plaintiff must "plead[ ] facts that make the allegation of fraud plausible." *United States ex rel. Grenadyor v. Ukrainian Vill. Pharmacy, Inc.*, 772 F.3d 1102, 1106 (7th Cir. 2014). The complaint must state "the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 668 (7th Cir. 2008). Stated differently, it must provide the "who, what, where, when and how" of the alleged misrepresentations. *Bank of Am., Nat. Ass'n, v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013). However, Rule 9(b) permits "[m]alice, intent, knowledge, and other conditions of a person's mind [to] be alleged generally"; that is, allegations of intent or other mental states need only meet the plausibility standard set by Rule 8 and described in *Twombly* and *Iqbal*, not Rule 9(b)'s higher particularity standard. *See Iqbal*, 556 U.S. at 686-87, 129 S.Ct. 1937.

### II. ANALYSIS

**\*3** Probalance moves to dismiss for failure to state a claim and lack of standing.

### A. FDCA PREEMPTION

Probalance argues that the Court should dismiss plaintiff's claims, all of which are based on state law, because the Food, Drug and Cosmetics Act ("FDCA") preempts them.

The FDCA "does not provide a private right of action." *Gubala v. HBS Int'l Corp.*, No. 14 C 9299, 2016 WL 2344583, at *2 (N.D. Ill. May 4, 2016). However, its labeling requirements may be privately enforced via state-law causes of action, so long as the effect of the governing state law is to impose labeling requirements that are identical to requirements of the FDCA; the FDCA expressly preempts any state-law requirement for product labeling that is "not identical" to a requirement of the FDCA. *See* 21 U.S.C. § 343-1(a)(4)-(5); *Porter v. NBTY, Inc.*, No. 15 CV 11459, 2016 WL 6948379 at *4, 2016 U.S. Dist. LEXIS 163352 at *12 (N.D. Ill. Nov. 28, 2016). Under the FDCA's implementing regulations, a state-law requirement is "not identical to" a requirement of the FDCA if "the State requirement directly or indirectly imposes obligations or contains provisions concerning the composition or labeling of food [that] ... [a]re not imposed by or contained in the applicable provision (including any implementing regulation) ... or [d]iffer from

Ulrich v. Probalance, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 9 1, 75571 UC1 Re e p . Srv. d3r26 , CT

those specifically imposed by or contained in the applicable provision of [the Act]." 21 C.F.R. § 100.1(c)(4). Thus, a state-law claim may be based on a violation of the labeling requirements of the FDCA, but only if the state-law claim is identical to a violation of the FDCA, meaning that it imposes no labeling requirements different from or in addition to the requirements of the FDCA or its implementing regulations.

Food labels violate the FDCA if they are "false or misleading" in any way. 21 U.S.C. § 343(a); see also 21 C.F.R. § 101.13(i)(3) (product label may contain statements about the amount of a nutrient if they are "not false or misleading in any respect"). The FDCA's implementing regulations require a food product manufacturer to display certain nutritional information, such as, for example, the level of protein and other enumerated nutrients, on the product label. 21 C.F.R. § 101.9(a), (c). In particular, the label must "state the number of grams of protein in a serving." 21 C.F.R. § 101.9(c)(7). The level of protein generally "may be calculated on the basis of the factor 6.25 times the nitrogen content of the food." Id.

However, "if a protein claim is made for the product," then the product label must not only state the amount of protein but also "the corrected amount of protein per serving, ... calculated as a percentage of the ... DRV for protein." 21 C.F.R. § 101.9(c)(7)(i). A "protein claim" is a "direct statement about the level" of protein in the product, see 21 C.F.R. § 101.13(b)(1); for example, the statements of protein content on the front labels of the Products are "protein claims" that trigger the corrected amount/percent DRV requirement of section 101.9(c)(7)(i). The "corrected amount" is the "actual amount of protein (gram) per serving multiplied by" the PDCAAS. 21 C.F.R. § 101.9(c)(7)(ii); see 21 C.F.R. § 101.9(c)(7)(i) (requiring calculation of "corrected amount of protein per serving" to be made "as determined in paragraph (c)(7)(ii) of this section").

**\*4** Plaintiff's complaint is sloppily drafted in some respects, and his precise theory of how the Products violate these labeling requirements (and are therefore allegedly misleading in violation of the law) is difficult to pin down. The complaint could be read to assert as many as three different such theories.

The first two theories plainly pass muster, for purposes of Probalance's preemption argument, because they are based on requirements identical to those imposed by federal law. First, plaintiff's complaint can be read to allege that the labels of the two Products that fail to state the percent DRV are misleading

in that respect. The implementing regulations clearly require a label to do exactly that whenever "a protein claim is made for the product," 21 C.F.R. § 101.9(c)(7)(i), as all four Product labels do. Thus, to the extent this is plaintiff's claim, it is not preempted.

Second, plaintiff's complaint could be read to assert that, to the extent that the Products state the percent DRV, the percent DRV is not correctly calculated according to the PDCAAS method. Section 101.9(c)(7)(ii) expressly requires the "corrected amount" of protein expressed as a percent DRV to be calculated according to the PDCAAS-adjusted method. Thus, to the extent this is plaintiff's claim, it is based on requirements identical to those of federal law, and therefore it is not preempted.[2]

Finally, the complaint could be read to allege that the protein content claims are misleading because they are not calculated according to the PDCAAS method. This theory is more difficult for plaintiff because, as the above discussion shows, the FDCA and its implementing regulations do not strictly require pure protein content claims (i.e., statements of grams of protein) to be calculated according to the PDCAAS method. By the plain language of section 101.9(c)(7), the nitrogen method "may" be used to calculate protein content; a label must (or, in the language of the regulation, "shall") state the amount of protein as calculated according to the PDCAAS method only in expressing the percent DRV (which is only required if, as in this case, the product makes a protein claim). See Porter, 2016 WL 6948379, at *5, 2016 U.S. Dist. LEXIS 163352, at *15 ("[P]rotein content may be calculated using the nitrogen method, but it also must be stated as a percentage of the Daily Reference Value using the corrected amount of protein. This alternative to the nitrogen method is only required in the statement of percentage; it is not required for statements of absolute protein content.")

**\*5** However, in his response brief, plaintiff argues that some recent cases in this district have permitted claims such as his to proceed because, even if the regulations do not require manufacturers to calculate protein content by the PDCAAS-adjusted method, it may nevertheless be misleading in a particular context to use the nitrogen method, and misleading labeling violates the FDCA and accompanying regulations. See id. at *5-6, 2016 U.S. Dist. LEXIS 163352, at *16, 2016 WL 6948379; Gubala v. CVS Pharmacy, Inc., No. 14 C 9039, 2016 WL 1019794, at *12 (N.D. Ill Mar. 15, 2016).

Ulrich v. Probalance, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 9 1, 75571UC1 Re e p . Srv. d326 , T

At first blush, it may seem that these cases are distinguishable because elements of the labels not present in this case made the protein claims in those cases misleading: in *Porter*, the manufacturer made a front-label protein claim stating that its product contained "60g *Premium* Protein," 2016 WL 6948379, at *5-6, 2016 U.S. Dist. LEXIS 163352, at *16 (emphasis added); in *Gubala*, the front label stated that the product contained "26 grams of *high-quality* protein," 2016 WL 1019794, at *12 (emphasis added).

But, although Probalance did not use adjectives such as "premium" and "high-quality" to describe the protein in its Products, plaintiff's claim that Probalance's labels are misleading is plausible nonetheless. According to plaintiff, Probalance mixed into its Products collagen protein isolate, which is a form of protein of such low quality that it is essentially indigestible. Assuming the truth of those allegations, it appears to be a fair inference that Probalance's use of collagen protein isolate in its blend of proteins must have reduced the digestibility of the protein in the Products, resulting in Products that effectively had less protein than they advertised—which, particularly considering that these Products were dietary supplements, was arguably misleading.

Thus, to the extent that plaintiff claims that Probalance violates state law by making protein claims that are deceptive or misleading because they do not calculate the protein content according to the PDCAAS-adjusted method, plaintiff is not asserting that Probalance violated any state-law requirements different from or additional to the requirements of the FDCA and its implementing regulations. His claims are not preempted.

## B. ARTICLE III STANDING

Probalance argues that even if plaintiff's claims are not preempted, he lacks standing to raise them to the extent his claims pertain to Products he did not purchase and to the extent he seeks injunctive relief. In order to establish Article III standing, a plaintiff must show the following: he has suffered an injury-in-fact that is both (a) concrete and particularized and (b) actual and imminent, not conjectural or hypothetical; the injury is fairly traceable to the challenged action of the defendant; and it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81, 120 S.Ct. 693, 145

L.Ed.2d 610 (2000) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

Even a violation of a federal statute does not confer standing unless the plaintiff has suffered a sufficiently concrete injury. *See Spokeo, Inc. v. Robins*, —— U.S. ——, 136 S.Ct. 1540, 1548-49, 194 L.Ed.2d 635 (2016) ("Particularization is necessary to establish injury in fact, but it is not sufficient."). A "concrete" injury must be "*de facto*"; that is, it must actually exist. *Id.*; *see O'Shea v. Littleton*, 414 U.S. 488, 494, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974) ("It must be alleged that the plaintiff 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged statute or official conduct.") (quoting *Mass. v. Mellon*, 262 U.S. 447, 488, 43 S.Ct. 597, 67 L.Ed. 1078 (1923)).

### 1. Product Not Purchased

 **\*6** The allegations of the complaint do not reveal whether plaintiff purchased one bottle of each of the four Products or four bottles of one Product, and if plaintiff did not purchase all four of them, Probalance argues, he lacks standing to assert claims based on violations related to products he did not purchase. Probalance relies heavily on *Porter*, which held in similar circumstances that, regardless of the fact that the case was a putative class action, the plaintiffs could not "establish an injury-in-fact caused by products plaintiffs did not purchase" because " 'a person cannot predicate standing on injury which he does not share.' " 2016 WL 6948379, at *3, 2016 U.S. Dist. LEXIS 163352 at *9-10 (quoting *Payton v. Cty. of Kane*, 308 F.3d 673, 682 (7th Cir. 2002)).

In response, plaintiff argues that he does "share" the injuries of anyone who purchased any of the four Products because these Products are substantially similar and their labels are misleading in substantially similar ways. District courts have frequently accepted this argument in cases like this one; in fact, it appears that "the majority of courts that have considered the issue 'hold that a plaintiff may have standing to assert claims for unnamed class members based on products he or she did not purchase so long as the products and alleged misrepresentations are substantially similar.' " *Wagner v. Gen. Nutrition Corp.*, No. 16 C 10961, 2017 WL 3070772, at *5 (N.D. Ill. July 19, 2017) (quoting *Mednick v. Precor, Inc.*, No. 14 C 3624, 2014 WL 6474915, at *3 (N.D. Ill. Nov. 13, 2014)); *see also* 1 *McLaughlin on Class Actions* § 4:28 (13th ed. 2016) ("A substantial number of courts have decided that a plaintiff may have standing to

Ulrich v. Probalance, Inc., Not Reported in Fed. Supp. (2017)

205 WL 9 1, 75571UC1 Re e p . Srv. d326 , CT

assert claims on behalf of class members based on products he or she did not purchase as long as the products and alleged misrepresentations about a purchased product are substantially similar. In those cases, the substantial similarity determination is a context-specific analysis, but frequently entails reference to whether the challenged products are of the same kind, whether they are composed of largely the same ingredients, and whether each of the challenged products bears the same alleged mislabeling."). These courts "consider not only physical similarities but also the misrepresentations' similarities." *Mednick*, 2014 WL 6474915, at *3.

At least for purposes of the present case, the Court is persuaded to follow *Wagner*, *Mednick* and like decisions that consider whether the products and alleged misrepresentations are substantially similar. In this case, all of the Products are protein supplements sold by Probalance, and all of them have labels that are misleading, plaintiff alleges, because they make protein content claims based at least partially on amounts of low-quality collagen protein isolate that is effectively indigestible. The alleged misrepresentations are the same, they all relate to the Products' quantity of protein, which "fill[s] the same function" in each Product and is "used in the same manner" in each Product, and the protein claims are "inaccurate" in "the same manner on every" Product. *See id.* at *4. Whatever differences there may be among the Products, they are irrelevant because the Products are all alike with respect to the "specific component" that is the subject of plaintiff's claims. *Id.* Ultimately, the Court fails to see any meaningful difference between the injury suffered by someone who purchased Probalance Protein Shot and the injury of another person who purchased Probalance Protein Shot XL or one of the other Products. The Products and the alleged misrepresentations are substantially similar, so plaintiff has standing regardless of whether he purchased all four of the Products or only some of them.

### 2. Injunctive Relief

 **\*7** "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects," *O'Shea*, 414 U.S. at 495-96, 94 S.Ct. 669, or by "a sufficient likelihood that [plaintiff] will again be wronged in a similar way," *City of Los Angeles v. Lyons*, 461 U.S. 95, 111, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). Probalance claims that plaintiff lacks standing to seek injunctive relief because he has alleged only that he purchased Probalance Products on one

discrete occasion in October 2016, not that he will purchase them again in the future.

Most courts to have considered the issue agree with Probalance that consumer plaintiffs cannot pursue injunctive relief if they are already aware of the alleged deceptive practice. *See in re Herbal Supplements Mktg. & Sales Practices Litig.*, No. 15 CV 5070, 2017 WL 2215025, at *7 (N.D. Ill. May 19, 2017)* (citing 1 *McLaughlin on Class Actions* § 4.28 (13th ed. 2016) ("[M]ost courts ... have ruled that a plaintiff who is a former customer who provides no concrete basis to conclude that he or she will purchase the product at issue in the future ... lacks standing to pursue injunctive relief on behalf of a consumer class because the plaintiff is unlikely to suffer future harm.")); *see also Mednick*, 2016 WL 5390955, at *9; *Bohn*, 2013 WL 3975126, at *4. This Court is persuaded by the reasoning of these decisions. If plaintiff is aware of Probalance's allegedly deceptive practice, then he faces no " 'real and immediate threat' " that Probalance's misleading labels will deceive him again in the future. *Bohn*, 2013 WL 3975126, at *3 (quoting *Lyons*, 461 U.S. at 102, 103 S.Ct. 1660). Plaintiff cites cases to the contrary in his response brief, but the Court agrees with defendant that these cases are unpersuasive to the extent they reason that a plaintiff's standing to pursue injunctive relief may be premised on "the prospect that *other* consumers may be deceived by" the defendant's products. *See Bohn*, 2013 WL 3975126, at *3 (" '[A]s important as consumer protection is, it is not within the Court's authority to carve out an exception to Article III's standing requirements to further the purpose of ... consumer protection laws.' ") (quoting *Mason v. Nature's Innovation, Inc.*, No. 12 CV 3019, 2013 WL 1969957, at *5 (S.D. Cal. May 13, 2013)).

The Seventh Circuit seems likely to agree, based on its reasoning in a similar context that a plaintiff who was already aware of the defendant's deceptive sales practices could not obtain injunctive relief because he "is not likely to be harmed in the future." *See Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 740 (7th Cir. 2014) (" '[P]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief.' ") (quoting *O'Shea*, 414 U.S. at 495, 94 S.Ct. 669). Although plaintiff cites a decision that has dismissed this portion of *Camasta* as *dicta*, *see Le v. Kohls Dep't Stores, Inc.*, 160 F.Supp.3d 1096, 1111 (E.D. Wis. 2016), the Court finds the Seventh Circuit's reasoning compelling, regardless of whether it is *dicta*. *See in re Herbal Supplements*, 2017 WL 2215025, at *8 ("Even if *Camasta* were *dicta*, as the court found in [*Le*], it is persuasive.").

Ulrich v. Probalance, Inc., Not Reported in Fed. Supp. (2017)

205 WL 9 1, 75571UC1 Re e p . Srv. d Br26 , ©T

Plaintiff lacks standing to pursue injunctive relief against Probalance.

## C. PLEADING STANDARDS

Probalance argues that, even if plaintiff's claims are not preempted and even if he has standing, his complaint fails to meet federal pleading standards.

### 1. Breach of Express Warranty

Probalance argues that plaintiff fails to meet his pleading burden on the breach of express warranty claim because he has failed to allege pre-suit notice of the breach. Probalance argues that under section 2-607 of the Uniform Commercial Code and Illinois law, a consumer is required to notify the seller of any breach within a reasonable time of discovering it to give the seller an opportunity to cure the breach without a lawsuit, or be barred from any judicial remedy. *See Connick v. Suzuki Motor Co.*, 174 Ill.2d 482, 221 Ill.Dec. 389, 675 N.E.2d 584, 589 (Ill. 1996).

**\*8** Plaintiff responds that he meets the exception to the notice requirement for cases in which the seller has "actual knowledge of the defect of the particular product." *Id.* According to plaintiff, Probalance was always fully aware that its protein content claims misled consumers, who would not receive the full benefit of the amount of protein they consumed because and to the extent that the protein was significantly composed of collagen protein isolate rather than a protein with a higher PDCAAS score.

Plaintiff cites some district court decisions that have accepted this argument, *see, e.g., Mednick*, 2014 WL 6474915, at \*6, but in reply, Probalance cites one that has cast doubt on it by explicitly criticizing the decisions plaintiff has cited, *see Muir v. NBTY, Inc.*, No. 15 C 9835, 2016 WL 5234596 at \*9-10, 2016 U.S. Dist. LEXIS 129494 at \*31-32 (N.D. Ill. Sep. 22, 2016). The Court is persuaded by *Muir*'s discussion of the issue. The purpose of the pre-suit notice requirement is to give sellers the opportunity to resolve breaches short of litigation, but if sellers are not apprised of "the trouble with a particular product purchased by a particular buyer," regardless of whether they are generally "aware of problems with a particular product line," then they have no opportunity to resolve that buyer's problem before litigation ensues. *Id.* (citing *Connick*, 221 Ill.Dec. 389, 675 N.E.2d at 591-92)

("As Judge Learned Hand stated regarding section 2-607's predecessor: 'The notice of the breach required is not of the facts, which the seller presumably knows quite as well as, if not better than, the buyer, but of *buyer's claim* that they constitute a breach.' ") (quoting *Am. Mfg. Co. v. United States Shipping Bd. Emergency Fleet Corp.*, 7 F.2d 565, 566 (2d Cir. 1925)). Plaintiff has not alleged that he provided pre-suit notice to Probalance, and he was required to do so in order to bring a breach of warranty claim, regardless of whether Probalance had knowledge generally of the fact that it used collagen protein isolate in its Products and did not adjust the labeling for digestibility. Plaintiff's breach of warranty claim is dismissed.

### 2. Consumer Fraud Claims

Plaintiff asserts claims under the ICFA and, if a multi-state class is certified, like statutes with identical elements in other jurisdictions. "The elements of a claim under the Illinois Consumer Fraud Act, 815 ILCS 505/2, are: (1) a deceptive act or practice by defendant; (2) defendant's intent that plaintiff rely on the deception; and (3) that the deception occurred in the course of conduct involving trade and commerce." *Connick*, 221 Ill.Dec. 389, 675 N.E.2d at 593 (internal citation altered). Probalance argues that plaintiff's consumer fraud claims fail because they do not sufficiently allege (a) Probalance's intent to deceive consumers; (b) proximate cause; or (c) damages.

#### a. Intent to Deceive

"When a plaintiff in federal court alleges fraud under the ICFA, the heightened pleading standard of Federal Rule of Civil Procedure 9(b) applies." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 441 (7th Cir. 2011). Probalance argues that plaintiff fails to plead with particularity that Probalance acted with intent to deceive. But, as explained above, the plain language of Federal Rule of Civil Procedure 9(b) requires plaintiff to allege only "the circumstances constituting fraud" with "particularity"; intent "may be alleged generally." Plaintiff alleges at least generally that Probalance acted with the intent to deceive, and it is reasonable to infer deceptive intent from Probalance's alleged misconduct (namely, failing to adjust its protein claims to account for the lesser digestibility of the protein it used in its Products, as revealed by the PDCAAS testing that federal regulations require under the circumstances). No

Ulrich v. Probalance, Inc., Not Reported in Fed. Supp. (2017)

205 WL 9 1, 75571UC1 Re e p . Srv. d3r26 , ©T

more particular allegations are required under Rule 9(b). *See Santangelo v. Comcast Corp.*, 162 F.Supp.3d 691, 704 (N.D. Ill. 2016); *Ciszewski v. Denny's Corp.*, No. 09 CV 5355, 2010 WL 1418582, at *2 (N.D. Ill. Apr. 7, 2010); *Gavin v. AT&T Corp.*, 543 F.Supp.2d 885, 911 (N.D. Ill. 2008).

**b.** **Proximate Cause**

 **\*9**  Probalance argues that plaintiff does not sufficiently plead that the allegedly deceptive labels proximately caused his injury; that is, according to Probalance, plaintiff never alleges that, "but for the challenged label claim(s), he would not have purchased the Product[s]." (Def.'s Mem. at 11, ECF No. 14.) In fact, as Probalance recognizes, plaintiff does allege (although in a portion of the complaint addressed to unjust enrichment) that he "would not have purchased the Product if the true facts would have been known." (Compl. ¶ 69.) But in any case, Probalance's argument relies on an actual reliance element that the ICFA does not actually contain. *See Anderson v. Klasek*, 393 Ill.App.3d 219, 332 Ill.Dec. 683, 913 N.E.2d 615, 618 (Ill. App. Ct. 2009) ("Unlike common law fraud, 'the Consumer Fraud Act does not require actual reliance, an untrue statement regarding a material fact, or knowledge or belief by the party making the statement that the statement was untrue.' ") (quoting *Martin v. Heinold Commodities, Inc.*, 163 Ill.2d 33, 205 Ill.Dec. 443, 643 N.E.2d 734, 754 (Ill. 1994)). Plaintiff is only required to allege a deceptive act occurring in commerce on which Probalance intended consumers to rely. *Martin*, 205 Ill.Dec. 443, 643 N.E.2d at 754. Of course, Probalance is correct that plaintiff can only recover under the ICFA for injuries proximately caused by the alleged deceptive business practice, *see Connick*, 675 N.E.2d at 502, but Probalance has not demonstrated that this principle requires plaintiff to prove that he would not have purchased the Products but for the misleading labeling. Plaintiff alleges that Probalance labeled its Products in such a way as to deceive consumers into purchasing them in the belief that they were getting the benefit of an advertised amount of protein but, due to the protein's limited digestibility, it was as if they were getting less; that is, plaintiff and other purchasers were allegedly harmed because they received less than they bargained for. Assuming the allegations are true, Probalance's deception caused harm to plaintiff and other purchasers, so Probalance's proximate cause argument fails.

**c.** **Damages**

Probalance argues that plaintiff has not stated in what way he was damaged by Probalance's deception. But plaintiff is not required to plead in his complaint the precise damages theory on which he will ultimately rely or the precise amount of damages he suffered. It is sufficient to allege that he "suffer[ed] a pecuniary loss by receiving goods that are worth less than was promised." *See Aliano v. Louisville Distilling Co., LLC*, 115 F.Supp.3d 921, 931 (N.D. Ill. 2015) (reasoning that plaintiffs stated ICFA claim because they alleged that they paid more for defendant's whiskey than it was worth). It is a reasonable inference from plaintiff's allegations that the Products were worth less than he paid for them because they were protein supplements that contained at least some effectively indigestible protein.

Probalance's arguments that plaintiff has failed to state a plausible consumer fraud claim are all without merit. Probalance's motion to dismiss is denied as to plaintiff's consumer fraud claims.

*3. Unjust Enrichment*

Probalance has also moved to dismiss plaintiff's unjust enrichment claim, arguing that it is duplicative of the consumer fraud claim and, "to the same extent the ICFA claim fails, the unjust enrichment claim fails as well." (Def.'s Mem. at 15, ECF No. 14) (citing *Cleary v. Philip Morris, Inc.*, 656 F.3d 511, 517-18 (7th Cir. 2011)). As the Court has explained above in Part III.C.2., plaintiff's consumer fraud claim survives Probalance's motion to dismiss, so the unjust enrichment claim also survives.

**CONCLUSION**

Probalance's motion to dismiss is denied in part and granted in part, without prejudice to filing an amended complaint by September 15, 2017, if plaintiff can do so in compliance with the Federal Rules of Civil Procedure. The motion is granted as to plaintiff's claims for injunctive relief and breach of express warranty, which are dismissed. It is otherwise denied.

**SO ORDERED.**

Ulrich v. Probalance, Inc., Not Reported in Fed. Supp. (2017)

205 WL 9 1, 75 571 UC1 Ree p . Srv . d 26 , ©T

**All Citations**

Not Reported in Fed. Supp., 2017 WL 3581183, 93 UCC Rep.Serv.2d 564

Footnotes

1    The complaint defines the term "Products" as the four aforementioned dietary supplements (*id.* ¶ 1), but it is impossible to tell from the allegations of the complaint whether the phrase "four bottles of the Product" in paragraph 10 means four bottles of one of the Products, one bottle of each of the Products, or some other configuration.

2    A harder question is whether plaintiff plausibly alleges that the percent DRV is incorrectly calculated; some courts have required plaintiffs in cases such as this to allege that they subjected the offending product to proper scientific testing. *See Durnford v. Musclepharm Corp.*, No. 15 CV 00413, 2015 WL 9258079, at *1, 4 (N.D. Cal. Dec. 18, 2015). But in this particular case, such allegations are not necessary. At least one of the Products is labeled to contain 15 grams of protein and 30 percent DRV of protein, and it lists "collagen peptides" as an ingredient. (Compl. ¶ 25.) Based on a total DRV of 50 grams, as the regulations prescribe, 15 grams is exactly 30 percent. Thus, unless Probalance adjusted both numbers for digestibility (which it has not claimed to have done), and assuming the truth of plaintiff's allegation that the Products contain significant amounts of relatively indigestible collagen protein isolate rather than higher-quality protein, it is a plausible inference that Probalance has not calculated the percent DRV by the PDCAAS-adjusted method, as federal regulations expressly require it to do. Thus, plaintiff's allegation that the percent DRV is improperly calculated is plausible.

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.